**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>   v.<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>                Defendant. | Civil Action No. 1:26-cv-11352-RGS |

**DEFENDANT'S SUBMISSION PURSUANT TO LOCAL RULES 40.1(G) AND 40.1(J)
CONCERNING RELATED CASE DESIGNATION**

This case is the latest chapter in the Government's unlawful campaign to strip Harvard of hundreds of millions of dollars in federal funding in retaliation for its refusal to capitulate to the Government's unconstitutional demands seeking to dictate Harvard's viewpoints and academic decision-making. Almost one year ago, the Government unlawfully terminated vital funding partnerships between the United States and Harvard based upon unfounded assertions that Harvard failed to respond to antisemitism on its campus. Harvard sued, and that case was litigated to judgment in this district. *Pres. & Fellows of Harv. Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 100, 132 (D. Mass. 2025) (Burroughs, J.) ("*Harvard v. HHS*").

In *Harvard v. HHS*, Harvard provided unrebutted evidence regarding the actions it had taken to address antisemitism—evidence the court credited in concluding the Government's case was pretextual. *Id.* at 121, 133. That evidence established, among other things, that Harvard created a Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias to examine antisemitism on its campus and provide recommendations to address it, many of which Harvard has implemented. *See Harvard v. HHS*, ECF No. 73, Newell Decl. The evidence also showed

- 1 -

that Harvard had updated and clarified policies on use of campus property and protests; incorporated the International Holocaust Remembrance Act ("IHRA") definition of antisemitism into the implementation of Harvard's Non-Discrimination and Anti-Bullying Policies; and provided expert training on combating antisemitism and the IHRA definition for staff involved in investigating complaints of discrimination. *Id.*; *see also Harvard v. HHS*, 798 F. Supp. 3d at 98 (Harvard "has taken steps to centralize and strengthen its disciplinary procedures," implemented recommendations to promote a "widespread sense of belonging" and "respectful dialogue," updated "policies, procedures, and training," and "reviewed recommendations concerning admissions, appointments, curriculum, and orientation and training programs.").[1]

The Government now seeks a do-over and brings this case resting on the same debunked assertions and seeking the same unconstitutional result: termination of Harvard's federal funding. But in its related case designation, Dkt. 1-3, the Government omits any mention of the *Harvard v. HHS* litigation that addresses the issues at the heart of this latest case, instead identifying only two cases filed in 2024 and resolved in January 2025.[2]  Local Rule 40.1(g)(1) states that civil actions are related when "some or all of the parties are the same" and they either "involve the same or substantially similar issues of fact" or "arise out of the same occurrence."  Yet the Government failed to mention that this case (1) has the same parties as *Harvard v. HHS*, (2) involves the same pretextual allegations that Harvard is deliberately indifferent to antisemitism, and (3) seeks the same relief of terminating federal funding that was permanently enjoined in *Harvard v. HHS*.

---

[1]     These efforts have been recognized by the Harvard community. *See, e.g.*, *Jewish Groups Say Harvard Was Not Indifferent to Antisemitism, Push Back on Justice Department Suit*, https://www.thecrimson.com/article/2026/3/25/jewish-groups-doj-lawsuit/ (Mar. 25, 2026).

[2]     In response to this Court's order requiring the Government to explain the basis for its related-case designation, Dkt. 5, the Government inexplicably doubled down on this approach, submitting a brief with one page of reasoning that provided no greater explanation than its original statement, and again neglected to mention *Harvard v. HHS*, *see* Dkt. 9.

The Court should reject the Government's certification that this case is related to *Kestenbaum v. President and Fellows of Harvard College*, No. 24-cv-10092 (D. Mass.), and *Louis D. Brandeis Center for Human Rights v. President and Fellows of Harvard College*, No. 24-cv-11354 (D. Mass.) ("*Brandeis Center*"), and should instead designate this case as related to *Harvard v. HHS* and transfer this case under Local Rule 40.1(j)(1).

**1. This case and *Harvard v. HHS* are based on the same core premise: Harvard's purported failure to address antisemitism on campus after October 7, 2023.** *Compare* Dkt. 1 at 2-3, *with Harvard v. HHS*, 798 F. Supp. 3d at 93-96. The Government's complaint in this case repeatedly relies upon the same sources as its filings in *Harvard v. HHS*—such as the Harvard Task Force Report, Statement of the President and Deans on University Rights and Responsibilities, and other sources documenting alleged incidents on campus. The Government's premise was already tested on heavily briefed cross-motions for summary judgment, where the Court considered unrebutted evidence regarding Harvard's actions to combat antisemitism. On that record, the Court observed that Harvard "concurrently began making policy and other changes" after October 7, 2023, that were "publicly announced and widely reported," *Harvard v. HHS*, 798 F. Supp. 3d at 93, and that Harvard "was, in fact, working to respond to and ameliorate antisemitism, that it continued to do so each time the government raised concerns, and that it remained (and seemingly remains) open to dialogue," *id.* at 130. It found that, as of one year ago, Harvard was "taking steps it needs to take to combat antisemitism and seems willing to do even more if need be." *Id.* at 137. The Court's comprehensive 84-page decision concluded that the Government was using antisemitism as a cover, explaining that "[t]he onslaught against Harvard was much more about promoting a governmental orthodoxy in violation of the First Amendment than about anything else, including fighting antisemitism," *id.* at 122, and "a review of the

administrative record makes it difficult to conclude anything other than that [the Government] used antisemitism as a smokescreen for a targeted, ideologically-motivated assault," *id.* at 136.

    **2.  The relief the Government seeks is similar to the relief sought in *Harvard v. HHS*.** In *Harvard v. HHS*, the Government pursued its objectives by executive fiat.  It froze and terminated billions in federal grants, tying those decisions to Harvard's alleged failure to address antisemitism.  *Harvard v. HHS*, 798 F. Supp. 3d at 96-100.  It demanded sweeping changes to governance, hiring, and academic programs, including requirements to "audit the student body, faculty, staff, and leadership for viewpoint diversity" and to implement structural reforms dictated by the federal government.  *Id.* at 95.  Functionally, this amounted to using federal funding as leverage to force changes in Harvard's policies and operations.  The Court permanently enjoined the Government's actions.  *Id.* at 138-139 (enjoining the Government from "[i]mplementing, instituting, maintaining, or giving any force or effect to" the "unconstitutional conditions" and "[i]ssuing any other termination, fund freezes, stop work orders, or otherwise withholding payment on existing grants or other federal funding, or refusing to award future grants, contracts, or other federal funding to Harvard in retaliation for the exercise of its First Amendment rights, or on any purported grounds of discrimination without compliance with the terms of Title VI").

    In this "new" case, the Government seeks to cut off federal funding, recover past grant money, impose structural reforms (discipline policies, protest controls, cooperation with law enforcement), and install an independent monitor, subject to the approbation of the Assistant Attorney General for Civil Rights, to oversee Harvard's compliance.  Dkt. 1 at 42-43.  These remedies collectively aim to reshape Harvard's governance and tie its access to federal funds to compliance with federal demands under Title VI—just as the Government tried to do through the unconstitutional demands enjoined in *Harvard v. HHS*.

3. **The Government's certification obfuscates the relatedness to *Harvard v. HHS*.** Although there are overlapping allegations in the Government's complaint and the complaints in *Kestenbaum* and *Brandeis Center*, the similarities stop there: the operative complaints in those cases were filed in May 2024, and those cases settled well over a year ago. The current suit seeks a declaration that Harvard is out of compliance with Title VI "up to the present day," Dkt. 1 ¶ 154, and relies upon allegations that postdate the resolution of those cases relating to the Government's so-called "investigation" of Harvard's Title VI compliance, the Government's fundamentally deficient finding of a purported Title VI violation in June 2025, and the "negotiations" that have taken place since July 2025, *see id.* ¶¶ 8-10, 134-136. The Government cannot render its Complaint related to the now-settled cases arising from prior alleged conduct by pretending that time stopped in January 2025 when those cases were resolved. Furthermore, the Government is a categorically different plaintiff seeking a host of novel and disparate forms of relief that extend well beyond the remedies available to private plaintiffs in the closed, supposedly related prior cases. Indeed, in both *Kestenbaum* and *Brandeis Center*, private plaintiffs sought to remedy harms alleged by their members (and, in *Kestenbaum*, sought compensation for past harms allegedly experienced by the individual plaintiff). In neither case did plaintiffs seek the unprecedented and improper demand for restitution in this case, or rely upon a similar justification to the one the Government puts forth here. *See* Dkt. 1 ¶¶ 127, 129, 158, 159 (seeking termination of approximately $2.6 billion in grants from HHS along with unspecified amounts in grants from all other federal agencies, and restitution of payments from an untold number and amount of (unspecified) grants, including approximately $1 billion from HHS).

This case is related to *Harvard v. HHS*, should have been so designated under Local Rule 40.1(g)(1), and should therefore be transferred under Local Rule 40.1(j)(1)

DATED:  March 26, 2026

Respectfully Submitted,

*/s/ Felicia H. Ellsworth*

| | |
|---|---|
| Robert K. Hur* | Felicia H. Ellsworth, BBO # 665232 |
| KING & SPALDING LLP | WILMER CUTLER PICKERING |
| 1700 Pennsylvania Ave. NW, Suite 900 | HALE AND DORR LLP |
| Washington, DC 20006 | 60 State Street |
| T: (202) 383-8969 | Boston, MA 02109 |
| F: (202) 626 3737 | T: (617) 526-6000 |
| rhur@kslaw.com | F: (617) 526-5000 |
| | Felicia.Ellsworth@wilmerhale.com |
| | |
| Joshua S. Levy, BBO # 563017 | Steven P. Lehotsky, BBO # 655908 |
| ROPES & GRAY LLP | LEHOTSKY KELLER COHN LLP |
| The Prudential Tower | 200 Massachusetts Ave. NW, Suite 700 |
| 800 Boylston Street | Washington, DC 20001 |
| T: (617) 951-7000 | T: (512) 693-8350 |
| F: (617) 951-7050 | F: (512) 727-4755 |
| joshua.levy@ropesgray.com | steve@lkcfirm.com |

\* *pro hac vice* motion forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2026, I caused this document to be filed through the CM/ECF system, where it will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Felicia H. Ellsworth
Felicia H. Ellsworth