**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>    v.<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>                Defendant. | Civil Action No. 1:26-cv-11352 |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DESIGNATE CASE AS RELATED AND TO TRANSFER

Pursuant to Local Rules 7.1, 40.1(g), and 40.1(j), Harvard respectfully moves this Court to designate this case as related to *President & Fellows of Harvard College v. U.S. Department of Health & Human Services*, No. 25-cv-11048-ADB (D. Mass.) ("*Harvard v. HHS*"), and transfer it to Judge Allison D. Burroughs in accordance with that designation. Harvard submits this motion to ensure that the Court has an opportunity to consider this closely related action that the Government failed to bring to the Court's attention despite multiple opportunities to do so, *see* Dkts. 1-3, 9, and despite the Government's "continuing duty to inform this Court of related actions before any court," Standing Order re: Notice of Related Actions In Cases Filed Before Stearns, D.J. (Apr. 16, 2014). Because Harvard's prior Notice Concerning Related Case Submission, Dkt. 13, was filed nearly simultaneously with the Court's Order noting its satisfaction with the Government's submission regarding relatedness under Local Rule 40.1(g), Dkt. 10, the Court's Order was issued without the benefit of the additional considerations in Harvard's submission. Accordingly, Harvard brings this motion to ensure that the Court has had the opportunity to consider the key similarities between this case and *Harvard v. HHS*.

## BACKGROUND

This case is most closely related to *Harvard v. HHS* because here the same parties come before the court with the same core premise—the Government's attempt to strip Harvard of hundreds of millions of dollars in federal funding in retaliation for Harvard's refusal to capitulate to the Government's unconstitutional demands. Indeed, this case is, in effect, the government's attempt to relitigate the court's findings in *Harvard v. HHS* and achieve its ultimate end-goal of dictating Harvard's academic decision making and rescinding its federal funding. Almost one year ago, the Government unlawfully terminated vital funding partnerships between the United States and Harvard based upon unfounded assertions that Harvard failed to respond to antisemitism on its campus. Harvard sued, and that case was litigated to a final judgment in this district. *Harvard v. HHS*, 798 F. Supp. 3d 77 (D. Mass. 2025).

In *Harvard v. HHS*, Harvard provided unrebutted evidence regarding the actions it had taken to address antisemitism. That evidence, which the Government did not counter, established, among other things:

- In January 2024, Harvard created a Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias (the "Harvard Task Force") to examine antisemitism on its campus and provide recommendations to address it, many of which Harvard has implemented.[1] *Harvard v. HHS*, ECF No. 73, Newell Decl. ¶ 26.

- In August 2024, Harvard issued updated Campus Use Rules prohibiting unauthorized "[c]amping . . . with or without a tent or other temporary structure" and unauthorized "exhibits or displays" on campus, and reaffirming rules against blocking building ingress and egress. *Id.*, Newell Decl. ¶ 5.

- That same month, President Garber publicly acknowledged the need to combat hate and bias toward Muslim, Arab, Palestinian, Jewish, and Israeli community members, and stated

---

[1] Recent updates regarding the substantive actions Harvard has taken to implement the Task Force's recommendations are available on the Task Force website. *See, e.g.*, *Academic Life*, Harvard University (April 2026), https://perma.cc/BF5C-C66N; *Religious, Community, and Campus Life*, Harvard University (April 2026), https://perma.cc/5M33-7ZWE; *Open Inquiry and Constructive Dialogue*, Harvard University (April 2026), https://perma.cc/V2AC-ZM7J; *Administrative Infrastructure, Policies, Procedures, and Training*, Harvard University (April 2026), https://perma.cc/KFS6-MVVZ.

that Harvard had "announced several initiatives and [is] taking significant steps to address these issues." *Id.*, Newell Decl. ¶ 7.

- In September 2024, Harvard issued guidance clarifying that online doxxing violates its "prohibitions on 'intense personal harassment' and constitutes bullying under its Non-Discrimination and Anti-Bullying Policies." *Id.*, Newell Decl. ¶ 8.

- In November 2024, Harvard issued FAQ guidance clarifying how protest rules apply specifically in libraries, explaining that even silent demonstrations that "express a shared message" violate University policy when they "interfere with the room's purpose as a place of study and research." *Id.*, Newell Decl. ¶ 10.

- Harvard suspended library access for "dozens of students and faculty members" following fall 2024 library protests. *Id.*, Newell Decl. ¶ 18(a). It terminated an employee who tore down a Chabad poster displaying Israeli hostage images "in violation of Harvard's policy against tampering with or removing approved displays." *Id.*, Newell Decl. ¶ 18(b). It placed the Palestine Solidarity Committee ("PSC") on probation in April 2025, banning it from hosting public events through June 30, 2025. *Id.*, Newell Decl. ¶ 18(c).

- In January 2025, Harvard adopted the International Holocaust Remembrance Alliance's ("IHRA") definition of antisemitism for use in anti-harassment and disciplinary proceedings, settling two Title VI lawsuits in the process. *Id.*, Newell Decl. ¶ 11.

- In March 2025, Harvard issued updated FAQs clarifying that Jewish and Israeli identities are covered by its Non-Discrimination and Anti-Bullying Policies, that the IHRA definition applies, and that "the Non-Discrimination Policy applies to conduct targeting Zionists." *Id.*, Newell Decl. ¶ 13. Harvard trained complaint reviewers on this guidance in spring 2025. *Id.*, Newell Decl. ¶ 14.

- Harvard committed to publish annual public reports on Title VI-related discipline outcomes for five years, host annual antisemitism symposia, and "provid[e] expert training on combating anti-Semitism and the IHRA definition for [Office for Community Conduct] staff involved in reviewing complaints of discrimination." *Id.*, Newell Decl. ¶ 15.

- Harvard dedicated additional academic resources to antisemitism and Hebrew and Judaic studies, including through Harvard Law School's Julis-Rabinowitz Program on Jewish and Israeli Law. *Id.*, Newell Decl. ¶ 24.

- Harvard's Governing Boards empowered the school's President to convene a faculty panel of the University Committee on Rights and Responsibilities to investigate and impose discipline on students across schools for policy violations. *Id.*, Newell Decl. ¶ 16.

- Harvard increased coordination between its police department and local and federal law enforcement. *Id.*, Newell Decl. ¶ 17.

- Harvard committed to host annual Brandeis Center events and funded student-led interfaith projects, including a joint Jewish-Muslim law forum titled "Linked Traditions: Islamic and Judaic Law." *Id.*, Newell Decl. ¶¶ 24–25.

The *Harvard v. HHS* court explicitly recognized Harvard's substantial efforts to confront and respond to antisemitism, explaining that "since the release of the [Harvard Task Force's]

report, Harvard has taken steps to centralize and strengthen its disciplinary procedures," implemented recommendations to promote a "widespread sense of belonging" and "respectful dialogue," updated "policies, procedures, and training," and "reviewed recommendations concerning admissions, appointments, curriculum, and orientation and training programs." *Harvard v. HHS*, 798 F. Supp. 3d at 98; *see also id*. at 93 (describing changes Harvard made while the Harvard Task Force conducted its work); *id.* at 131 (describing the reforms Harvard implemented). Based on these factual findings, it concluded that the Government's actions were retaliatory because it terminated funding "before [it] learned anything" about "what was being done in response" to antisemitism on campus. *Id*. at 121; *see also id.* at 132-133 (concluding the Government's actions were arbitrary and capricious in part because it "disregarded the substantial policy and other changes Harvard has taken and was continuing to take to address the issue"). The Court was unequivocal: "The record reflects that Harvard was, in fact, working to respond to and ameliorate antisemitism[.]" *Id*. at 130.[2]

The Government now seeks a do-over and brings this case resting on the same unfounded allegations and seeking the same unconstitutional result: termination of Harvard's federal funding. But in its related case designation, Dkt. 1-3, the Government omitted *any* mention of the *Harvard v. HHS* litigation that addresses the issues at the heart of this latest case, instead identifying only two cases filed in 2024 and resolved in January 2025: *Kestenbaum v. President & Fellows of*

---

[2]   These efforts have also been recognized by the Harvard Jewish community. *See, e.g.*, *Jewish Groups Say Harvard Was Not Indifferent to Antisemitism, Push Back on Justice Department Suit*, The Harvard Crimson (Mar. 25, 2026), https://perma.cc/ZFW7-9YAC ("'While there is much more to be done, the only plausible characterization of Harvard's current leadership is as principled and effective in confronting and removing the intolerance which had taken root on campus over more than a decade[.]'"); *At US Commission on Civil Rights hearing, Jewish students warn against politicizing campus antisemitism*, The Jewish Daily Forward (Feb. 23, 2026), https://perma.cc/92CP-XDZ2.

*Harvard College*, No. 24-cv-10092-RGS (D. Mass.), and *Louis D. Brandeis Center for Human Rights v. President and Fellows of Harvard College*, No. 24-cv-11354-RGS (D. Mass.). This Court then ordered the Government to explain the basis for certifying that this case is related to *Kestenbaum*. Dkt. 5. In response, the Government submitted a brief that again omitted any mention of *Harvard v. HHS*, *see* Dkt. 9.

Local Rule 40.1(g)(1) states that civil actions are related when "some or all of the parties are the same," and they either "involve the same or substantially similar issues of fact" or "arise out of the same occurrence." This case and *Harvard v. HHS* are most closely related under those standards because this case (1) has the same parties as *Harvard v. HHS*, (2) is premised on the same pretextual—and rejected—allegations that Harvard is deliberately indifferent to antisemitism, and (3) seeks the same relief of terminating federal funding that was permanently enjoined in *Harvard v. HHS*.

For the reasons stated below, the Court should designate this case as related to *Harvard v. HHS* and transfer it under Local Rule 40.1(j)(1).

## ARGUMENT

Under Local Rule 40.1(g)(7)(B), "[i]f the defendant … believes that a case that has not been designated as related should have been so designated, that party shall file a motion in the later filed case for the judge's consideration of transfer[.]" Because this case is most closely related to *Harvard v. HHS*, the Court should designate the case as so related and transfer it to Judge Burroughs.

### I.    This Case Is Related To *Harvard v. HHS*

This case and *Harvard v. HHS* are based on the same core premise: Harvard's alleged failure to address antisemitism on campus after October 7, 2023. *Compare* Dkt. 1 at 2-3, *with Harvard v. HHS*, 798 F. Supp. 3d at 93-96. The Government's complaint in this case relies upon

the same sources as its filings in *Harvard v. HHS*—including the Harvard Task Force Report[3] and the Statement of the President and Deans on University Rights and Responsibilities.[4] The Government's premise was already tested on cross-motions for summary judgment in *Harvard v. HHS*, where the Court considered copious, unrebutted, evidence regarding Harvard's actions to combat antisemitism. On that record, the Court noted that Harvard "concurrently began making policy and other changes" after October 7, 2023, *Harvard v. HHS*, 798 F. Supp. 3d at 93, and that Harvard "was, in fact, working to respond to and ameliorate antisemitism," *id.* at 130. The Court found that, as of one year ago, Harvard was "taking steps it needs to take to combat antisemitism and seems willing to do even more if need be." *Id.* at 137. The Court's comprehensive 84-page decision concluded that the Government was using antisemitism as a cover, explaining that "[t]he onslaught against Harvard was much more about promoting a governmental orthodoxy in violation of the First Amendment than about anything else, including fighting antisemitism," *id.* at 122, and "a review of the administrative record makes it difficult to conclude anything other than that [the Government] used antisemitism as a smokescreen for a targeted, ideologically-motivated assault," *id.* at 136.

In this case, the Government now seeks the same relief under the pretense of a different authority. In *Harvard v. HHS*, the Government had pursued its objectives by executive fiat. It froze and terminated billions in federal grants, tying those decisions to Harvard's alleged failure to address antisemitism. *Id*. at 96-100. It demanded sweeping changes to governance, hiring, and academic programs, including requirements to "audit the student body, faculty, staff, and

---

[3] *Final Report*, Harvard University Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias (Apr. 29, 2025), https://perma.cc/M344-5WYX.

[4] *Statement of Interim President and Deans on University Rights and Responsibilities*, Harvard University: Office of the President (Jan. 19, 2024), https://perma.cc/2ND4-HHDV.

leadership for viewpoint diversity" and to implement structural reforms dictated by the federal government. *Id.* at 95. Functionally, this amounted to using federal funding as leverage to force changes in Harvard's policies and operations. The Court permanently enjoined the Government from "[i]mplementing, instituting, maintaining, or giving any force or effect to" the "unconstitutional conditions" and "[i]ssuing any other termination, fund freezes, stop work orders, or otherwise withholding payment on existing grants or other federal funding, or refusing to award future grants, contracts, or other federal funding to Harvard in retaliation for the exercise of its First Amendment rights, or on any purported grounds of discrimination without compliance with the terms of Title VI." *Id.* at 138-139.

In this "new" case, the Government seeks to cut off federal funding, recover past grant money, impose structural reforms (discipline policies, protest controls, cooperation with law enforcement), and install an independent monitor, subject to the approbation of the Assistant Attorney General for Civil Rights, to oversee Harvard's compliance. Dkt. 1 at 42-43. These remedies again collectively aim to reshape Harvard's governance and tie its access to federal funds to compliance with federal demands made under the guise of Title VI—just as the Government tried to do through the unconstitutional demands enjoined in *Harvard v. HHS*.

## II.    The Government's Filings Obfuscated The Relatedness To *Harvard v. HHS*

The Government's initial related case certification, Dkt. 1-3, and its response to the Court's order regarding relatedness, Dkt. 9, both insist that this case is related to *Kestenbaum*, while omitting *any* reference to *Harvard v. HHS*.

Although there are overlapping allegations in the Government's complaint and the complaint in *Kestenbaum*, the similarities stop there: the operative complaint in *Kestenbaum* was filed in May 2024, and that case settled over a year ago. The current suit seeks a declaration that Harvard is not in compliance with Title VI "up to the present day," Dkt. 1 ¶ 154, thus covering

two additional years of campus activity and Harvard's efforts to address antisemitism as well as many aspects of campus culture and life. The current suit also relies upon allegations that postdate the resolution of *Kestenbaum* relating to the Government's so-called "investigation" of Harvard's Title VI compliance, the Government's fundamentally deficient finding of a purported Title VI violation in June 2025, and the "negotiations" that have taken place since July 2025, *see id.* ¶¶ 8-10, 134-136. The Government cannot render its Complaint related to the now-settled *Kestenbaum* case arising from prior alleged conduct by pretending that time stopped when that case was resolved.

Furthermore, the Government is a categorically different plaintiff seeking a host of novel and disparate forms of relief that extend well beyond the remedies available to private plaintiffs in the closed *Kestenbaum* case. In *Kestenbaum*, private plaintiffs sought to remedy harms alleged by their members and sought compensation for past harms allegedly experienced by the individual plaintiff. The *Kestenbaum* plaintiffs did not seek the unprecedented and improper demand for restitution in this case or rely upon a similar justification to the one the Government puts forth here. *See* Dkt. 1 ¶¶ 127, 129, 158, 159 (seeking termination of approximately $2.6 billion in grants from HHS along with unspecified amounts in grants from all other federal agencies, and restitution of payments from an untold number and amount of (unspecified) grants, including approximately $1 billion from HHS).

## **CONCLUSION**

The Court should designate the case as related to *Harvard v. HHS* under Local Rule 40.1(g)(1) and transfer the case to Judge Burroughs under Local Rule 40.1(j)(1).

DATED:  April 13, 2026                              Respectfully Submitted,


                                                    /s/ Felicia H. Ellsworth
Robert K. Hur*                                      Felicia H. Ellsworth, BBO # 665232
KING & SPALDING LLP                                 WILMER CUTLER PICKERING
1700 Pennsylvania Ave. NW, Suite 900                  HALE AND DORR LLP
Washington, DC 20006                                60 State Street
T: (202) 383-8969                                   Boston, MA 02109
F: (202) 626 3737                                   T: (617) 526-6000
rhur@kslaw.com                                      F: (617) 526-5000
                                                    Felicia.Ellsworth@wilmerhale.com


Joshua S. Levy, BBO # 563017                        Steven P. Lehotsky, BBO # 655908
ROPES & GRAY LLP                                    LEHOTSKY KELLER COHN LLP
The Prudential Tower                                200 Massachusetts Ave. NW, Suite 700
800 Boylston Street                                 Washington, DC 20001
T: (617) 951-7000                                   T: (512) 693-8350
F: (617) 951-7050                                   F: (512) 727-4755
joshua.levy@ropesgray.com                           steve@lkcfirm.com


\* *pro hac vice* motion forthcoming

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 13, 2026, I caused this document to be filed through the CM/ECF system, where it will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Felicia H. Ellsworth
Felicia H. Ellsworth