**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>v.<br><br>PRESIDENT AND FELLOWS OF<br>HARVARD COLLEGE,<br><br>  Defendant. | Case No. 1:26-CV-11352-RGS |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANT'S MOTION TO DISMISS COMPLAINT</u>**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................3

      A.      Harvard Has Worked Continuously to Make Its Campus a Safer and More
Welcoming Place ................................................................................................ 3

      B.      The Government's Pretextual Efforts to Terminate Harvard's Funding ................ 6

      C.      The Government's Other Attempts to Punish Harvard........................................ 8

      D.      This Lawsuit........................................................................................................ 12

ARGUMENT ......................................................................................................................12

I.      The Government Fails to State a Claim Under Title VI .....................................12

      A.      The Government Fails to Allege Any Ongoing Noncompliance with Title
VI ...................................................................................................................... 12

      B.      The Government Fails to Plead Deliberate Indifference to a Hostile
Environment...................................................................................................... 15

            1.      The Government Fails to Plausibly Allege a Hostile Environment...........15

            2.      The Government Fails to Plausibly Allege Deliberate Indifference..........17

            3.      *Harvard v. HHS* Precludes the Government's Deliberate Indifference
Claim....................................................................................................22

      C.      The Government Fails to Plead Direct Discrimination....................................... 25

      D.      The Government Failed to Comply with Title VI's Mandatory Procedural
Requirements .................................................................................................... 27

II.      The Government's Breach of Contract Claim Fails as a Matter Of Law .........................29

      A.      Breach of Contract Principles Cannot Be Used to Circumvent Title VI's
Substantive and Procedural Limits ...................................................................... 30

      B.      The Government Fails to Plead Breach of Contract Under Common Law .......... 32

      C.      The Relief Sought Is Barred by Ordinary Contract Principles and the
Spending Clause................................................................................................ 35

III.      The Government's Claims Are a Pretext for Unlawful Retaliation..................................38

CONCLUSION....................................................................................................................40

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Alexander v. Sandoval*,
532 U.S. 275 (2001)..................................................................................................12, 27

*American Association of University Professors v. Trump*,
815 F. Supp. 3d 907 (N.D. Cal. 2025) ...............................................................................27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................................................29

*Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*,
490 F.3d 1 (1st Cir. 2007)..................................................................................................38

*Atlas Corp. v. United States*,
895 F.2d 745 (Fed. Cir. 1990)...........................................................................................33

*Barnes v. Gorman*,
536 U.S. 181 (2002)...........................................................................................................37

*Board of County Commissioners v. Brown*,
520 U.S. 397 (1997)...........................................................................................................17

*Board of Public Instruction v. Finch*,
414 F.2d 1068 (5th Cir. 1969) ...........................................................................................28

*Bedall v. State Street Bank & Trust Co.*,
137 F.3d 12 (1st Cir. 1998)..................................................................................................4

*Bell v. New Jersey*,
461 U.S. 773 (1983)...........................................................................................................37

*Bennett v. Kentucky Department of Education*,
470 U.S. 656 (1985)...........................................................................................30, 35, 37

*Brooks v. AIG SunAmerica Life Assurance Co.*,
480 F.3d 579 (1st Cir. 2007)........................................................................................32, 33

*Brown v. Hot, Sexy & Safer Productions, Inc.*,
68 F.3d 525 (1st Cir. 1995)...............................................................................................16

*Buck v. American Airlines, Inc.*,
476 F.3d 29 (1st Cir. 2007)................................................................................................33

*Canel v. Art Institute of Chicago*,
2026 WL 776580 (N.D. Ill. Mar. 19, 2026)......................................................................16

ii

*Cannon v. University of Chicago*,
441 U.S. 677 (1979).................................................................................................14

*Chicago Transit Authority v. U.S. Department of Transportation*,
2026 WL 810912 (N.D. Ill. Mar. 24, 2026)...........................................................27

*Cummings v. Premier Rehab, P.L.L.C.*,
2019 WL 227411 (N.D. Tex. Jan. 16, 2019), *aff'd*, 948 F.3d 673 (5th Cir.
2020), *aff'd*, 596 U.S. 212 (2022)...........................................................35, 36, 37

*Davis v. Monroe County Board of Education*,
526 U.S. 629 (1999).....................................................................15, 16, 18, 19, 20

*Doe v. Brown University*,
43 F.4th 195 (1st Cir. 2022)................................................................................26, 27

*Edlow v. RBW, LLC*,
2010 WL 2034772 (D. Mass. May 21, 2010)..........................................................34

*First Choice Women's Resource Centers, Inc. v. Davenport*,
608 U.S. ----, 2026 WL 1153029 (Apr. 29, 2026)..................................................38

*Gartenberg v. Cooper Union*,
765 F. Supp. 3d 245 (S.D.N.Y. 2025)....................................................................17

*Gilbert v. Department of Justice*,
334 F.3d 1065 (Fed. Cir. 2003)..............................................................................34

*Global NAPs, Inc. v. Verizon New England Inc.*,
603 F.3d 71 (1st Cir. 2010)..............................................................................22, 39

*Hankey v. Town of Concord-Carlisle*,
136 F. Supp. 3d 52 (D. Mass. 2015)......................................................................16

*Higgins v. Town of Concord*,
246 F. Supp. 3d 502 (D. Mass. 2017)....................................................................33

*HIM Portland, LLC v. Devito Builders, Inc.*,
317 F.3d 41 (1st Cir. 2003)....................................................................................32

*In re Kane*,
254 F.3d 325 (1st Cir. 2001)..................................................................................25

*John Hancock Life Insurance Co. v. Abbot Laboratories, Inc.*,
183 F. Supp. 3d 277 (D. Mass. 2016).....................................................................35

*Jones v. Bank of New York ex rel. Certificate Holders CWABS, Inc. Asset-Backed Certificates, Series 2004-7*,
542 F. Supp. 3d 44 (D. Mass. 2021) .........................................................................4, 10, 19

*Karasek v. Regents of University of California*,
956 F.3d 1093 (9th Cir. 2020) ...............................................................................................19

*Kestenbaum v. President & Fellows of Harvard College*,
743 F. Supp. 3d 297 (D. Mass. 2024) ..........................................................................14, 19, 26

*Kowalski v. Gagne*,
914 F.2d 299 (1st Cir. 1990)...................................................................................................21

*Landau v. Corporation of Haverford College*,
789 F. Supp. 3d 401 (E.D. Pa. 2025) ...............................................................................16, 20

*Louis D. Brandeis Center for Human Rights Under Law v. President & Fellows of Harvard College*,
2024 WL 4681802 (D. Mass. Nov. 5, 2024) .................................................14, 17, 19, 26

*M.L. ex rel. D.L. v. Concord School District*,
86 F.4th 501 (1st Cir. 2023)...........................................................................................17, 18

*M/S Bremen v. Zapata Off-Shore Co.*,
407 U.S. 1 (1972)...................................................................................................................32

*Manganella v. Evanston Insurance Co.*,
700 F.3d 585 (1st Cir. 2012)...................................................................................................22

*McIntosh v. Massachusetts Bay Transportation Authority*,
2024 WL 2704997 (D. Mass. May 27, 2024)..................................................................38

*Maryland-National Capital Park & Planning Commission v. Lynn*,
514 F.2d 829 (D.C. Cir. 1975)................................................................................................31

*Medina-Padilla v. U.S. Aviation Underwriters, Inc.*,
815 F.3d 83 (1st Cir. 2016)......................................................................................................3

*Mercado-Salinas v. Bart Enterprises International, Ltd.*,
671 F.3d 12 (1st Cir. 2011)......................................................................................................23

*Monarch Life Insurance Co. v. Ropes & Gray*,
65 F.3d 973 (1st Cir. 1995).....................................................................................................23

*National Association of Government Employees, Inc. v. Yellen*,
120 F.4th 904 (1st Cir. 2024)..................................................................................................14

*National Rifle Association of America v. Vullo*,
    602 U.S. 175 (2024).................................................................38, 40

*Nisselson v. Lernout*,
    469 F.3d 143 (1st Cir. 2006)...............................................................38

*O'Brien v. Deutsche Bank National Trust Co.*,
    948 F.3d 31 (1st Cir. 2020)..................................................................3

*Pennhurst State School & Hospital v. Halderman*,
    451 U.S. 1 (1981).........................................................................36, 37

*Porto v. Town of Tewksbury*,
    488 F.3d 67 (1st Cir. 2007)............................................................17, 18

*President & Fellows of Harvard College v. U.S. Department of Health & Human
    Services*,
    798 F. Supp. 3d 77 (D. Mass. 2025) ..........................................*passim*

*President & Fellows of Harvard College v. U.S. Department of Homeland
    Security*,
    788 F. Supp. 3d 182 (D. Mass. 2025) .....................................................9

*Regents of University of Michigan v. Ewing*,
    474 U.S. 214 (1985).........................................................................38

*Rodríguez-Garcia v. Miranda-Marin*,
    610 F.3d 756 (1st Cir. 2010)...............................................................22

*Rogers v. Town of Northborough*,
    188 F. Supp. 2d 10 (D. Mass. 2002) ...............................................23, 25, 39

*Rosenberger v. Rector & Visitors of University of Virginia*,
    515 U.S. 819 (1995).........................................................................16

*Securities & Exchange Commission v. Navellier & Assocs., Inc.*,
    108 F.4th 19 (1st Cir. 2024)................................................................40

*Segev v. President & Fellows of Harvard College*,
    No. 1:25-cv-12020 (D. Mass. Dec. 4, 2025)................................................16

*StandWithUs Center for Legal Justice v. MIT*,
    158 F.4th 1 (1st Cir. 2025)..............................15, 16, 17, 18, 19, 20

*Sussman v. MIT*,
    No. 25-cv-11826 (D. Mass. Jan. 5, 2026).................................................18

v

*Sweezey v. New Hampshire*,
354 U.S. 234 (1957) ........................................................................................38

*Thorpe v. Housing Authority*,
393 U.S. 268 (1969)..........................................................................................32

*United Launch Services, LLC v. United States*,
139 Fed. Cl. 664 (2018) ...................................................................................32

*United States v. City of Tampa*,
739 F. Supp. 3d 1055 (M.D. Fla. 2024) ...........................................................14

*United States v. Estate of Romani*,
523 U.S. 517 (1998)..........................................................................................36

*United States v. King County*,
122 F.4th 740 (9th Cir. 2024) ...........................................................................14

*United States v. Mejia*,
55 F.4th 1 (1st Cir. 2022)............................................................................34, 35

*Wood v. Lovett*,
313 U.S. 362 (1941)..........................................................................................31

*Yakoby v. Trustees of University of Pennsylvania*,
2025 WL 1558522 (E.D. Pa. June 2, 2025) .....................................................20

## STATUTES, RULES, AND REGULATIONS

42 U.S.C. § 2000d-1 .............................................................13, 27, 28, 31, 32, 36

2 C.F.R. Part 200..........................................................................30, 31, 36

7 C.F.R. § 15.8 ..................................................................................................27

28 C.F.R.
§ 42.401......................................................................................................28
§ 50.3 ........................................................................................................13

34 C.F.R. § 100.8 ..............................................................................................27

45 C.F.R.
§ 80.3(d)(1) ...............................................................................................10
§ 80.8(a), (c)(1) .........................................................................................27
§ 80.8(d).....................................................................................................29

*Enhancing National Security by Addressing Risks at Harvard University*, 90 Fed.
Reg. 24,493 (June 4, 2025) ................................................................................9

## OTHER AUTHORITIES

110 Cong. Rec. 6544 (1964) (statement of Sen. Humphrey)..........................................14

Restatement (Second) of Contracts
    § 241 (A.L.I. 1981) ...............................................................................35
    § 243(4)...............................................................................................37
    § 371   ...........................................................................................35, 37

Restatement (Third) of Restitution & Unjust Enrichment § 38(2)(b) (A.L.I Oct.
    2024 Update)........................................................................................36

26 Williston on Contracts § 68:2 (4th ed. May 2025 update)..........................................35

**<u>INTRODUCTION</u>**

Harvard condemns antisemitism and is committed to ensuring that Jewish and Israeli students, like all members of the Harvard community, are able to learn and participate fully in campus life free from harassment or exclusion.  In the wake of October 7, 2023, Harvard—like many universities across the country—confronted significant challenges on its campus.  But in the over two and a half years since, Harvard has engaged in sustained, institution-wide efforts to identify and address antisemitism on campus, as documented in a report the Government cites over forty times in its Complaint.  These extensive and ongoing efforts are the very opposite of deliberate indifference.

The Government ignores these efforts and, instead, continues the all-out campaign it began in April 2025 that seeks to punish Harvard for refusing to cede control over decisions regarding what Harvard can teach, the beliefs of the students it admits, and whom it can hire.  As another judge of this court recognized, this "government-initiated onslaught" is "much more about promoting a governmental orthodoxy in violation of the First Amendment than about anything else, including fighting antisemitism."  *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 122 (D. Mass. 2025) ("*Harvard v. HHS*").

Indeed, the *Harvard v. HHS* court already rejected the Government's attempt to terminate billions of dollars in grants to Harvard's scientists and researchers based on the same allegations of indifference to antisemitism on campus included in the Complaint here.  And those dated allegations are even weaker today.  Tellingly, the most recent allegation in the Government's Complaint in this case is from March 2025, well over a year ago.  As before, the Government has made no effort here to "learn[] anything about antisemitism on campus or what was being done [by Harvard] in response."  *Harvard v. HHS*, 798 F. Supp. 3d at 121.  This time, however, the Government claims an unprecedented entitlement to restitution of over a billion dollars in already

1

paid (and spent) grant money that has funded pathbreaking research across critical fields of study—including an advanced chip designed to measure NASA astronauts' radiation exposure during the Artemis II mission to the Moon, and medical research into cures or treatments for Lou Gehrig's disease, Alzheimer's disease, and heart disease, to name just a few. *Id.* at 131-132. The Court should dismiss this latest volley in the Government's unlawful campaign: it retreads allegations already tested and rejected in court, seeks relief Congress has not authorized, and attempts to convert disagreement with the university's management of difficult and highly charged campus activity into violations of federal law.

The Government's claims cannot proceed for three reasons.

*First*, the Government fails to state a claim under Title VI. The Government does not even attempt to allege an ongoing or threatened violation of Title VI, as required, and instead seeks retrospective relief untethered to any present noncompliance—relief Title VI does not permit. The Complaint also fails to plausibly allege deliberate indifference or direct discrimination. The Government's claims rest on isolated and diffuse incidents, which, even accepted as true, do not plausibly allege a hostile environment under the governing legal framework or demonstrate that Harvard was deliberately indifferent to such incidents. Moreover, the deliberate indifference claim is barred by issue preclusion because the court in *Harvard v. HHS* squarely rejected the Government's central factual premise—that Harvard failed to take meaningful steps to address antisemitism following October 7, 2023.

*Second*, the Government's breach of contract claim fails as a matter of law. The only breach alleged is of general obligations not to violate Title VI, and since there is no Title VI violation, there is no breach. In addition, the Complaint (a) seeks relief that lies beyond what Title VI and the federal grants regulatory framework allow, (b) does not plausibly allege the basic

elements of a breach of contract claim, and (c) seeks extraordinary rescission and restitution remedies that are barred by ordinary contract principles and the Spending Clause.

*Finally*, because this litigation is a continuation of the Government's unconstitutional retaliation campaign against Harvard, the Government's claims are barred in their entirety under the First Amendment.

## BACKGROUND

### A.    Harvard Has Worked Continuously to Make Its Campus a Safer and More Welcoming Place

Harvard has engaged in sustained and ongoing efforts to combat antisemitism, and its campus is thus a very different place today than it was several years ago.  Even taken at face value, the Government's allegations, which focused almost entirely on the 2023-24 academic year, *see* Complaint ¶¶ 13-48 ("Compl."), describe a snapshot in time that does not exist today.  Tellingly, the Government's discussion of events since May 2024 is limited to a handful of library protests, the latest of which took place in March 2025.  *See id.* ¶¶ 49-59.

On January 19, 2024, seventeen days into his tenure, then interim-President Garber established the Harvard Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias ("Harvard Task Force").  On June 6, 2024, the Harvard Task Force issued preliminary findings, Compl. ¶ 96, and on April 29, 2025, it issued a three-hundred plus page report of findings and recommendations ("Report"),[1] which is incorporated by reference into the Complaint.[2]  The

---

[1]    *Final Report*, Harvard University Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias (Apr. 29, 2025), https://perma.cc/M344-5WYX.

[2]    The Court may consider documents incorporated by reference in the Complaint, relevant public records susceptible to judicial notice, and the record from the original action that precludes the Government's claims.  *O'Brien v. Deutsche Bank Nat'l Tr. Co.*, 948 F.3d 31, 33 (1st Cir. 2020); *Medina-Padilla v. U.S. Aviation Underwriters, Inc.*, 815 F.3d 83, 85 (1st Cir. 2016).  The Government's pronouncement that the "numerous materials" it relies upon as the sole factual basis for many of its allegations are "not incorporate[d] … into the complaint" is contrary to this settled

Harvard Task Force was charged by President Garber to: "Examine the recent history of antisemitism and its current manifestations on the Harvard campus[;] identify causes of and contributing factors to anti-Jewish behaviors on campus; evaluate evidence regarding the characteristics and frequency of these behaviors; and recommend approaches to combat antisemitism and its impact on campus." Report at 5. Once the Harvard Task Force's Report was complete, President Garber published it with a note to the Harvard community.[3] In that note, he discussed the steps already taken, and those that would be taken, as an outgrowth of the Harvard Task Force's work, stating, "the conclusions that emerge from this work are clear. We need to recognize and act on them, and we are doing that."[4]

The very evidence on which the Government relies to identify past incidents—the unvarnished observations contained in the Report, and indeed the existence of the Harvard Task Force itself—demonstrates Harvard's seriousness of purpose in identifying, confronting, and ameliorating antisemitism. Consistent with Harvard's candid acknowledgement that it did not respond as rapidly or decisively as it should have immediately following October 7, *see Harvard v. HHS*, 798 F. Supp. 3d at 136, the Report calls for "comprehensive, integrated, and sustained

---

law. Compl. 1 n.1. When "a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Bedall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998). The Government references the Final Report of Harvard's Presidential Task Force forty-four times in the Complaint. *See* Compl. at 2, ¶¶ 35, 37, 39, 62, 78, 82, 95, 96, 117, 123 & nn. 3, 11-12, 16, 18, 20-21, 25, 27-32, 48-51, 54-58, 61-63, 65-66, 68, 71, 101, 107, 109, 113. It is thus "central" to the Government's claims and "sufficiently referred to in the complaint" that it is incorporated into the Complaint. *Jones v. Bank of N.Y. ex rel. Certificate Holders CWABS, Inc. Asset-Backed Certificates, Series 2004-7*, 542 F. Supp. 3d 44, 49 n.1 (D. Mass. 2021).

[3] Alan M. Garber, *Update on Presidential Task Forces*, Harvard Office of the President (Apr. 29, 2025), https://perma.cc/Z459-42NU.

[4] *Id.*

changes in how the University operates," Report at 28.  It also recounts the many actions Harvard has taken, particularly since the end of the 2023-24 academic year, to address antisemitism on campus, and contains recommendations for continued actions, which Harvard is implementing. Report at 193-200 (Appendix I: Recent Progress on Addressing Antisemitism and Anti-Israeli Bias Across Harvard); Report at 201-205 (Appendix II: Preliminary Recommendations).

Take disruptive protests and conduct as an example.  In January 2024, Harvard issued new time, place, and manner guidance for protests and demonstrations; reaffirmed that protests may not disrupt classes, libraries, or other core academic functions; and emphasized the need for consistent enforcement across schools.  Report at 112, 186, 199.  In August 2024, in light of challenges experienced during the spring semester of 2024, including a protest encampment in Harvard Yard, Harvard updated and clarified its rules governing the use of university grounds and facilities, including prohibitions on unauthorized camping and unauthorized exhibits or displays, and reaffirmed longstanding rules against blocking ingress to and egress from classrooms, libraries, residence halls, and administrative buildings.  *Id.* at 25, 186, 199.  In November 2024, Harvard explained how protest rules apply in libraries, clarifying that even silent demonstrations violate policy because they interfere with a library's function as a place of study and research.  *Id.* at 199.  Harvard also enforced rules governing approved displays and imposed disciplinary measures on student organizations for policy violations.  *Id.*  And it empowered the use of centralized, cross-school disciplinary mechanisms to address policy violations.  *Id.*  It also increased coordination between its police department and local and federal law-enforcement authorities in response to campus safety concerns.  *Id.* at 197.

As reflected in the Task Force Report that the Complaint makes central, Harvard has also vigorously advanced its efforts to address antisemitism head on through reforms to its

nondiscrimination and complaint-handling framework and expanded academic commitments. In January 2025, Harvard incorporated the International Holocaust Remembrance Alliance ("IHRA") definition of antisemitism into its non-discrimination and bullying policies, and it has since provided training on the IHRA definition and examples. Report at 20, 199. In March 2025, Harvard reaffirmed that Jewish and Israeli identities are protected under its policies, and it trained complaint reviewers on this guidance in the spring of 2025. *Id.* at 198-199. Harvard also provided specialized antisemitism training for staff involved in complaint review and significantly expanded academic and curricular investments relating to antisemitism and Jewish and Israeli studies. *Id.* at 82, 193-194, 199. These robust efforts to address antisemitism, along with related steps taken in response to the Harvard Task Force's recommendations, were part of the undisputed record in *Harvard v. HHS*, *see infra* pp.22-25, and it is remarkable that the Complaint omits any reference to these actions.

### B.    The Government's Pretextual Efforts to Terminate Harvard's Funding

In *Harvard v. HHS*, Harvard challenged the Government's prior attempts to terminate its federal funding by using allegations of indifference to antisemitism as pretext to coerce Harvard's adherence to the Government's preferred viewpoint. *See* 798 F. Supp. 3d at 121. In September 2025, another judge of this court ruled that the Government's actions contravened not only Title VI, but also the First Amendment, and found that Harvard had, in fact, acted to address antisemitism, which the Government ignored when it terminated Harvard's funding. *Id.* at 121-128, 132-133.

As the *Harvard v. HHS* decision recounts, in October 2024, Leo Terrell, Senior Counsel to the Assistant Attorney General for the Civil Rights Division, foreshadowed the Government's actions against Harvard when he announced, "'Harvard will lose much more effective January 2025.'" 798 F. Supp. 3d at 93. In February 2025, the Department of Justice publicly announced

6

the creation of its own Task Force to Combat Antisemitism ("Federal Task Force") with Terrell at the helm. *Id.* On March 31, 2025, within two months of its creation, the Federal Task Force notified Harvard that it was reviewing more than $8.7 billion in federal grant commitments purportedly involving the University. *Id.* at 93-94. Days later, the Federal Task Force asserted that Harvard had "'failed to protect American students and faculty from antisemitic violence'" and conditioned Harvard's continued eligibility for federal funding on compliance with a broad swath of "preconditions." *Id.* at 94, 126. These "preconditions" included "'commission[ing] an external party… to audit the student body, faculty, staff, and leadership for viewpoint diversity'" as well as "'hiring a critical mass of new faculty' and 'admitting a critical mass of students' to provide the government's preferred balance of viewpoint diversity."[5] *Id.* at 94-95 (alteration in original).

On April 14, 2025, Harvard rejected the Government's demands, explaining its commitment to "'fighting antisemitism and other forms of bigotry in its community'" and detailing "'substantial policy and programmatic changes' undertaken in the 'past 15 months' to make Harvard 'a very different place today from where it was a year ago.'" *Harvard v. HHS*, 798 F. Supp. 3d at 95. Harvard further expressed its concerns that the Government had ignored those efforts in order to "'present demands that, in contravention of the First Amendment, invade university freedoms long recognized by the Supreme Court.'" *Id.* "Within hours of Harvard's refusal" to capitulate to those demands, the Government froze grants worth $2.2 billion and approximately $60 million in contracts awarded to Harvard. *Id.* at 96. One week later, on April 21, 2025, Harvard sued to defend its constitutional and statutory rights. *Id.* at 91 & n.1, 102.

---

[5] None of the above requirements are directed at antisemitism per se—nor are they remedial requirements available to the Government to impose in response to Title VI violations.

On May 5, 2025, the Department of Education issued an order purportedly freezing any new federal grants to Harvard. *Harvard v. HHS*, 798 F. Supp. 3d. at 98. Throughout the month that followed, multiple agencies terminated "grants related to all manner of medical, scientific, technological, and other projects." *Id.* at 99. The Government has repeatedly and publicly made clear that its actions were a direct response to Harvard's refusal to accede to its demands and its decision to litigate. The Secretary of Education explained that because "'Harvard's answer was a lawsuit,'" the Government was focused on "'how can we really make our point.'" *Id.* at 102. And the President explained that "'every time [Harvard] fight[s], they lose another $250 million.'" *Id.*

The *Harvard v. HHS* court accordingly found that the Government had invoked antisemitism as a pretext to justify its unlawful efforts to terminate Harvard's funding, noting that the funding decisions were "made before [the Government] learned anything about antisemitism on campus or what was being done in response." 798 F. Supp. 3d at 121, 132. Indeed, the court found that, as of mid-2025, "Harvard was, in fact, working to respond to and ameliorate antisemitism" through "publicly announced and widely reported" reforms. *Id.* at 130-131. These reforms included "creating the Harvard Task Force; disciplining students and faculty who violate applicable policies; enhancing programs and policies designed to address bias and promote ideological diversity and civil discourse; adopting new accountability procedures and clarified policies…; supplementing existing safety and security measures; refining procedures and protections for reporting misconduct; and making several leadership and personnel changes." *Id.* at 131.

### C.    The Government's Other Attempts to Punish Harvard

The Government's coordinated, multi-agency "onslaught," *Harvard v. HHS*, 798 F. Supp. 3d at 122, extends beyond its efforts to strip Harvard of federal funding and includes deployment

of additional coordinated measures to systematically attack key foundations of Harvard's educational mission and institutional stability.

*First*, the Government summarily revoked Harvard's longstanding certification to host thousands of international students under the F-1 visa program, immediately threatening to disrupt Harvard's educational programs.  In addition, the President issued a Proclamation prohibiting foreign nationals from entering the United States to study or research at Harvard—and only Harvard.[6]

*Second*, senior government officials openly threatened Harvard's tax-exempt status under Section 501(c)(3) of the Internal Revenue Code, jeopardizing Harvard's financial stability and capacity to support students and research.[7]

*Third*, multiple federal agencies—including the Departments of Education and Justice—initiated far-ranging investigations into Harvard's finances, admissions practices, academic standards, regulatory compliance, and programs of visa sponsorship for international student.[8]

---

[6]     Proclamation No. 10948, *Enhancing National Security by Addressing Risks at Harvard University*, 90 Fed. Reg. 24493 (June 4, 2025).  *See President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec.*, 788 F. Supp. 3d 182 (D. Mass. 2025), *and* 2025 WL 1719206, at *1 (D. Mass. June 20, 2025) (preliminarily enjoining these actions).

[7]     *See, e.g.*, Donald J. Trump (@realDonaldTrump), *Truth Social* (Apr. 15, 2025), https://perma.cc/K9KJ-NUV4 ("Perhaps Harvard should lose its Tax Exempt Status and be Taxed as a Political Entity if it keeps pushing political, ideological, and terrorist inspired/supporting 'Sickness'.").

[8]     *See, e.g.*, Press Release, U.S. Dep't of Educ., *U.S. Department of Education Issues Denial of Access Letter to Harvard University for Its Continued Failure to Provide Admissions Data* (Sept. 19, 2025), https://perma.cc/H3GB-7UV4; Press Release, U.S. Dep't of Just., *Justice Department Establishes Civil Rights Fraud Initiative* (May 19, 2025), https://perma.cc/J4B7-UVQ4; *see also* Michael C. Bender & Michael S. Schmidt, *Trump Administration Escalates Harvard Feud with New Justice Department Investigation*, N.Y. Times (May 15, 2025), https://perma.cc/W68X-VWLC.

*Fourth*, on June 30, 2025, the HHS Office for Civil Rights issued an abrupt Notice of Violation to Harvard ("HHS Notice") stating that Harvard had violated Title VI through "deliberate indifference" to "discrimination directed towards Jewish and Israeli students." *See* Compl. ¶ 9 & n.4.[9] The HHS Notice said it would "make additional efforts to persuade Harvard to take appropriate corrective action, including through submission of a voluntary resolution agreement," HHS Notice at 33, while also preemptively concluding that "given Harvard's failure to comply with Title VI, we have ample grounds, under 45 C.F.R. § 80.3(d)(1), to determine that compliance cannot be secured by voluntary means," *id.* at 33-34.

*Finally*, shortly after the court's decision in *Harvard v. HHS*, the Department of Education placed Harvard on Heightened Cash Monitoring, requiring Harvard to submit a $36 million letter of credit and to front student-aid disbursements from its own funds before drawing down federal aid, citing in part HHS's Title VI violation finding.[10] On February 6, 2026, the Department of Defense announced it was ending all professional military education fellowships and certificate programs with Harvard, stating that participation "no longer meets the needs" of the Department.[11] The Government also initiated new Title VI compliance reviews targeting Harvard's academic and administrative operations and sued Harvard for objecting to specific document demands.[12]

---

[9]     Office for C.R., U.S. Dep't of Health & Hum. Servs., *Notice of Violation: Harvard University* (OCR Trans. No. DO-25-607541-RV-CRR-Rac) (June 30, 2025), https://perma.cc/9M7U-Z9CJ. The Government references the HHS Notice eighteen times in the Complaint, thereby incorporating it by reference. *See Jones*, 542 F. Supp. 3d at 49 n.1.

[10]     Press Release, U.S. Dep't of Educ., *U.S. Department of Education Places Harvard University on Heightened Cash Monitoring for Financial Responsibility Concerns* (Sept. 19, 2025), https://perma.cc/YF55-2KAW.

[11]     C. Todd Lopez, *War Department Cuts Ties With Harvard University*, U.S. Dep't of War (Feb. 6, 2026), https://perma.cc/N8D8-5Y3L.

[12]     *See United States v. President & Fellows of Harv. Coll.*, No. 1:26-cv-10844 (D. Mass. Feb. 13, 2026); Press Release, U.S. Dep't of Educ., *U.S. Department of Education's Office for Civil*

10

All the while, the Government has made its motives plain.  It has publicly acknowledged these actions are in response to Harvard's rejections of its various demands to impose government control over curriculum, hiring, and governance; Harvard's decision to defend itself in court; and Harvard's refusal to settle on the Government's terms.  President Trump has repeatedly expressed this: "Everyone knows that Harvard has 'lost its way.' … Harvard has been hiring almost all woke, Radical Left, idiots and 'birdbrains' … Harvard is a JOKE … and should no longer receive Federal Funds."[13]  According to public reporting, the White House convened top government officials from nearly a dozen agencies to discuss additional punitive measures to target Harvard.[14]  A White House spokesperson said: "The latest moves against Harvard are truly just scratching the surface," and Harvard would suffer a "self-inflicted demise" because it "decided to litigate."[15]  The Secretary of Commerce confirmed the same in August 2025 shortly after initiating a far-reaching audit of Harvard's patents, remarking, "[W]e just have a blast, you know?  Because [the Secretary of Education is] hitting Harvard, and she says, 'What can we do?'  Now we send them a patent letter and hit them again.  So, we're having fun together."[16]

---

*Rights Opens Two New Probes into Harvard University for Continued Discrimination on Campus* (Mar. 23, 2026), https://perma.cc/5WPM-9PNU.

[13]    Donald J. Trump (@realDonaldTrump), *Truth Social* (Apr. 16, 2025, 7:05 AM), https://perma.cc/7RCD-GH6L.

[14]    Sophia Cai & Megan Messerly, *White House Convenes Meeting to Brainstorm New Harvard Measures*, Politico (May 30, 2025), https://perma.cc/SC5L-VMAH.

[15]    *Id.*

[16]    The White House, *President Trump Participates in a Cabinet Meeting*, YouTube at (2:12:50–2:13:01) (Aug. 26, 2025), https://perma.cc/BCT3-33AV, https://www.youtube.com/live/inRXd4OWt2M?si=SE9kqV2fCxK1sjjt&t=7972; *see* Remarks During a Cabinet Meeting and an Exchange with Reporters, Daily Comp. Pres. Docs., 202500873 (Aug. 26, 2025), https://perma.cc/2ETA-3AC9 (omitting these particular remarks); *see also* Donald J. Trump (@realDonaldTrump), *Truth Social* (Feb. 2, 2026, 11:20 PM), https://perma.cc/VUE4-JF3V.

### D.    This Lawsuit

On March 20, 2026, the Government filed this lawsuit, alleging discrimination against Jewish and Israeli students in violation of Title VI and asserting breaches of (unspecified) contracts based on the same alleged violations.  The Complaint seeks far-ranging relief, including declaratory judgments of Title VI violations and breach of contract, permanent injunctive relief regulating Harvard's operations, rescission and restitution of past grant payments, a bar on future federal funding, and the appointment of a government-approved independent monitor, Compl. ¶¶ 154-162—relief that mirrors the preconditions the Government sought to impose on Harvard in April 2025, *see Harvard v. HHS*, 798 F. Supp. 3d at 94-95.  The Assistant Attorney General for Civil Rights has publicly declared that this lawsuit was filed because "Harvard sued us" and "is defiant."[17]

## ARGUMENT

### I.    THE GOVERNMENT FAILS TO STATE A CLAIM UNDER TITLE VI

The Government's Title VI claims should be dismissed for multiple independent reasons. The Complaint fails to (1) allege any ongoing Title VI noncompliance; (2) state a claim for deliberate indifference; (3) plead direct discrimination; or (4) establish that DOJ has complied with Title VI's procedural requirements.

### A.    The Government Fails to Allege Any Ongoing Noncompliance with Title VI

The Government's claims under Title VI are flatly inconsistent with the remedial scheme designed by Congress in enacting Title VI, which imposes "elaborate restrictions on agency enforcement."  *See Alexander v. Sandoval*, 532 U.S. 275, 290 (2001).  Section 602 of the Civil

---

[17]    Tunku Varadarajan, *Harmeet Dhillon, Trump's Civil-Rights Enforcer in Action*, Wall St. J. (Mar. 27, 2026), https://perma.cc/523M-NZMN.

Rights Act of 1964 provides that the Government may "effect[]" compliance with Title VI either "by the termination of or refusal to grant or to continue assistance," or "by any other means authorized by law," including judicial enforcement. 42 U.S.C. § 2000d-1. Regardless of which avenue the Government pursues, "no such action shall be taken" until the relevant agency has first determined that compliance "cannot be secured by voluntary means." *Id.* These requirements exist to "avoid[] a punitive … application of the termination power." *Harvard v. HHS*, 798 F. Supp. 3d at 127 (cleaned up).

Yet here the Government seeks to impose draconian punishments without even alleging ongoing or threatened noncompliance with Title VI. Rather than identifying present conditions requiring correction, the Complaint recounts a closed set of alleged incidents ending a year before the filing of the Complaint. *See* Compl. ¶¶ 12-60. Even assuming that the historical allegations in the Complaint might support a retrospective claim under Title VI for damages, *but see infra* at pp.15-22, a full calendar year and nearly a full academic year have passed since *any* alleged harassment identified by the Government. That defect requires dismissal because Title VI's government enforcement provision is forward-looking, aimed at bringing recipients of federal financial assistance into prospective compliance, not imposing punitive measures for purported historical violations. The text of Title VI limits the Government's role to ensuring that "[c]ompliance with" Title VI is "effected." 42 U.S.C. § 2000d-1. That is why the Government cannot file a suit unless and until the relevant agency "has determined that compliance cannot be secured by voluntary means." *Id.* DOJ regulations likewise cabin "judicial enforcement" of Title VI to relief "designed to secure compliance," not punish past shortcomings. 28 C.F.R. § 50.3. When a recipient is already in compliance, an enforcement action seeking relief based on past violations is inconsistent with this statutory and regulatory text. Limiting the Government to

13

forward-looking relief is, by contrast, consistent with Congress's intent that loss of funding be "a last resort," *see Cannon v. Univ. of Chi.*, 441 U.S. 677, 705 & n.38 (1979), and that the Government's ability to proceed "by any other means authorized by law" operates to "encourage[] agencies to find ways to end racial discrimination *without refusing or terminating assistance*," 110 Cong. Rec. 6544 (1964) (statement of Sen. Humphrey) (emphasis added).

The Government's failure to plead an ongoing Title VI violation also means that it lacks standing. To establish standing for prospective relief, there must be an "'ongoing injury or a sufficient threat that the injury will recur.'" *Nat'l Ass'n of Gov't Emps., Inc. v. Yellen*, 120 F.4th 904, 910 (1st Cir. 2024). "Past harm is insufficient to 'confer standing to seek forward-looking declaratory or injunctive relief.'" *Id.* This requirement applies with equal force when the plaintiff is the United States. *See United States v. City of Tampa*, 739 F. Supp. 3d 1055, 1064-1066 & n.2 (M.D. Fla. 2024); *United States v. King County*, 122 F.4th 740, 750-751 (9th Cir. 2024). Because the Complaint alleges only historical conduct and does not even allege, let alone plausibly allege, any continuing violation or imminent risk of future injury, the Government cannot establish standing to pursue a Title VI claim. That distinguishes this case from this Court's prior decisions involving private plaintiffs seeking relief against Harvard under Title VI based on allegations of then-ongoing harassment during the 2023-24 academic year—nearly two years before this suit, and well before Harvard issued its Task Force Report in April 2025 or undertook many of the actions described in that Report. *See Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 303-305 (D. Mass. 2024); *Louis D. Brandeis Ctr. for Hum. Rts. Under L. v. President & Fellows of Harvard Coll.*, 2024 WL 4681802, at *4 (D. Mass. Nov. 5, 2024).

14

**B.    The Government Fails to Plead Deliberate Indifference to a Hostile Environment**

The Government has failed to allege facts demonstrating either of the two required elements of a Title VI deliberate indifference claim: (1) the existence of a hostile educational environment and (2) deliberate indifference to that hostile environment. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999).

**1.    The Government Fails to Plausibly Allege a Hostile Environment**

Harvard condemns antisemitism and is committed to ensuring that all members of its community are able to learn and participate fully in campus life free from harassment or exclusion. The Harvard Task Force Report forthrightly acknowledged the events on campus following October 7 and recognized the importance of taking additional action to combat antisemitism.[18] But the allegations of the Complaint do not meet the heightened standard necessary to state a claim. To prevail on a Title VI hostile environment claim, the Government must plead harassment "so severe, pervasive, and objectively offensive" that it deprived students of access to educational opportunities. *Davis*, 526 U.S. at 650.  The Complaint's allegations instead describe discrete instances of peer-on-peer offensive conduct, as well as protests that did not plausibly target students based on a protected characteristic, that do not meet that standard.

The Complaint alleges several isolated instances of conduct targeting Jewish students. Compl. ¶ 30 (allegation that demonstrators occupying a school lounge "stopped, targeted, and accosted Jewish students"); *id.* ¶ 41 (allegation that some demonstrators "occupying Harvard Yard 'followed and verbally harassed' Jewish students").  Although the alleged conduct is disturbing and all such allegations must be taken seriously, it is also the case that allegations of "isolated

---

[18]    *See also* Alan M. Garber, *Update on Presidential Task Forces*, Harvard Office of the President (Apr. 29, 2025), https://perma.cc/Z459-42NU.

incidents of antisemitism," do not amount to the "systemic" "deprivation of educational access" required to establish a Title VI violation. *StandWithUs Ctr. for Legal Just. v. MIT*, 158 F.4th 1, 20-21 (1st Cir. 2025); *see also Hankey v. Town of Concord-Carlisle*, 136 F. Supp. 3d 52, 66 (D. Mass. 2015) ("'[I]solated incidents' may not constitute pervasive … harassment."); *see also Davis*, 526 U.S. at 652. Moreover, as the Government concedes, "[m]uch of the problem was student-on-student harassment." Compl. ¶ 65. That "further undermines any inference of severe or pervasive harassment," *StandWithUs*, 158 F.4th at 21, because "[p]eer harassment, in particular, is less likely to satisfy the[] requirements" for hostile environment liability, *Davis*, 526 U.S. at 653.

The bulk of the allegations in the Complaint, however, do not reflect harassing conduct directly targeting Jewish students, but instead student speech and protest activity. Title VI does not require a university to "put an end to the protestors' speech," even where offensive. *StandWithUs*, 158 F.4th at 13 (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 836 (1995)); *see also id.* at 15 ("[T]he First Amendment erects safeguards that limit the ability of the government or private plaintiffs to punish [universities] for not restricting more severely … protected speech."); *see also Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 541 (1st Cir. 1995) (no hostile environment where offensive behavior was based on viewpoint, not protected characteristic), *abrogated on other grounds by DePoutot v. Raffaelly*, 424 F.3d 112, 118 n.4 (1st Cir. 2005); Order, *Segev v. President & Fellows of Harvard Coll.*, No. 1:25-cv-12020, Dkt. 35 (D. Mass. Dec. 4, 2025) (dismissing claim where conduct was not plausibly "based on antisemitism rather than disagreement with the underlying political message"); *Canel v. Art Inst. of Chi.*, 2026 WL 776580, at *11-12 (N.D. Ill. Mar. 19, 2026); *Landau v. Corp. of Haverford Coll.*, 789 F. Supp. 3d 401, 414-15 & n.6 (E.D. Pa. 2025). No less important, the Government fails to allege that

campus disruptions resulting from aggressive protest tactics targeted Jewish or Israeli students in particular, as opposed to targeting "prominent location[s]" for all students on campus. *StandWithUs*, 158 F.4th at 19-20; *see also Gartenberg v. Cooper Union*, 765 F. Supp. 3d 245, 271 (S.D.N.Y. 2025) ("no factual support" for assertion that messages were "intended to target particular Jewish students, as opposed to … the Cooper Union community at large"); *Brandeis Ctr.*, 2024 WL 4681802, at *4-5 (actions must be "*because of* some anti-Jewish or anti-Israel discriminatory animus").

Many of the Government's allegations simply claim that demonstrations violated Harvard's rules, yet the Complaint does not allege whether or how those rule violations relate to antisemitism, much less resulted in discriminatory harassment.  *See, e.g.*, Compl. ¶¶ 49, 52, 54. The Government cannot sidestep this problem by asserting "on information and belief" the motivation for the speech alleged, *id.* ¶ 22, because "conclusory allegations of antisemitic animus" do not "permit the inference that in these specific circumstances the protestors' strident criticisms of Israel were driven by antisemitism." *StandWithUs*, 158 F.4th at 18-19; *see also Segev*, Dkt. 35 (plaintiff "cannot transform … anti-Israel sentiment into antisemitism based on [the] use of certain rhetoric").

### 2.    The Government Fails to Plausibly Allege Deliberate Indifference

Even if the Government had plausibly alleged a hostile environment, it does not and cannot meet the high bar of pleading deliberate indifference.  Under settled law, deliberate indifference is "'a stringent standard of fault, requiring proof that [the] actor disregarded a *known or obvious* consequence of his action' or inaction." *Porto v. Town of Tewksbury*, 488 F.3d 67, 73 (1st Cir. 2007) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)).  "A university is deliberately indifferent under Title VI only if its response to known harassment is 'so lax, so misdirected, or so poorly executed as to be *clearly unreasonable* under the known circumstances.'"

17

*StandWithUs*, 158 F.4th at 22 (quoting *M.L. ex rel. D.L. v. Concord Sch. Dist.*, 86 F.4th 501, 511 (1st Cir. 2023) (emphasis added)); *see also Sussman v. MIT*, No. 25-cv-11826, Dkt. 75 (D. Mass. Jan. 5, 2026) (no liability where university is not "*affirmatively choosing* to do the wrong thing"). Universities do not have to "purg[e] their schools of actionable peer harassment" to avoid liability. *Davis*, 526 U.S. at 648; *StandWithUs*, 158 F.4th at 22-23. They are not required to be "perfect." *D.L.*, 86 F.4th at 511. Nor are they required to "engage in particular disciplinary action," as "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648.

The Government cannot plausibly establish deliberate indifference by asserting in conclusory fashion (and in direct conflict with the Task Force Report upon which it repeatedly relies) that Harvard's response to concerns of antisemitism since the end of the 2023-24 academic year has been to "do nothing." Compl. at 1; *id.* ¶¶ 29, 38; *see also id.* ¶ 56 (Harvard "took no meaningful action"). The basis for this claim appears to be that Harvard has not taken the Government's favored approach on its preferred timeline. The Government claims, for example, that Harvard has not "enforce[d] its rules or meaningfully discipline[d]" students to the Government's satisfaction. *Id.* at 1-2. The Government also faults Harvard for declining to turn the police on student protesters. *Id.* ¶¶ 31, 34, 156(c). And the Government claims that—as of a year ago—Harvard had made less progress than the Government would have liked to improve its reporting process for harassment. *Id.* ¶¶ 118-119. But the law is clear that the Government's disagreement with Harvard's approach is insufficient to plead deliberate indifference. *See Porto*, 488 F.3d at 73 ("[A] claim that the school system could or should have done more is insufficient to establish deliberate indifference"). "Title VI does not require schools to 'craft perfect solutions'" and does not entitle complainants to their preferred "'remedial demands.'"

18

*StandWithUs*, 158 F.4th at 23 (citations omitted).  Even if the Government would "have handled the situation differently," courts must "'refrain from second guessing'" Harvard's chosen response "unless those decisions were 'clearly unreasonable.'"  *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1109 (9th Cir. 2020) (quoting *Davis*, 526 U.S. at 648).

Unlike the private plaintiffs in the prior litigations before this Court in *Kestenbaum* and *Brandeis Center*, the Government here cannot rest on Harvard's conduct in responding to "ongoing" campus incidents as of May 2024.  *See Kestenbaum*, 743 F. Supp. 3d at 304-305; *Brandeis Ctr.*, 2024 WL 4681802, at \*5.  The Government's allegations from after that date—the sum total of which consists of six protests in three different Harvard libraries that took place during the course of Fall 2024 semester, Compl. ¶¶ 49-55,[19] and two outdoor protests in March 2025, *id.* ¶¶ 58-59—end over a year ago.  Instead, the Government must plausibly allege Harvard's response *continues* to be deliberately indifferent *today.  See supra* pp.12-14.  It has not because it cannot.

Quite the opposite, the Government's own allegations highlight Harvard's evolving and sustained response to reports of antisemitism, describing "an escalating series of actions aimed at calming the turmoil without violence" that is incompatible with deliberate indifference. *StandWithUs*, 158 F.4th at 22.  As the Government recounts, Harvard's response to reports of antisemitism in the aftermath of October 7 was to tighten security on campus and urge students to engage in civil debate.  *See* Compl. ¶¶ 33, 87.  As demonstrations continued into the next semester, Harvard released new time, place, and manner guidelines on protest in an effort to ensure its

---

[19]    Although the Complaint describes an October 2024 protest by "Harvard *professors*" as "anti-Israeli," Compl. ¶ 50, the source that it cites for that allegation, the HHS Notice, describes that protest (accurately) as a protest of "the library's decision to temporarily ban students" on the basis of a prior demonstration.  HHS Notice at 15.  In other words, this was a protest against Harvard's enforcement of its policy, not a protest related to Israel.  *See Jones*, 542 F. Supp. 3d at 55 ("[W]hen a document contradicts an allegation in the complaint, the document trumps the allegation." (cleaned up)).

campus remained a welcoming place for all while upholding its commitment to free expression. *See* Compl. ¶ 102.  With respect to the encampment in Harvard Yard, the Government concedes that Harvard issued admonishments, threatened discipline, and ultimately placed students on involuntary leave to secure an end to the encampment.  *See id.* ¶¶ 43-48.  Harvard's successful efforts to end the encampment demonstrate that Harvard "manag[ed] the situation so as to avoid escalation and violence." *StandWithUs*, 158 F.4th at 23.  Like other schools, Harvard reached the "defensible conclusion" that, "amidst a period of extreme unrest on college campuses across the country," precipitous and ill-considered intervention "could have triggered an even larger and more disruptive backlash." *Landau*, 789 F. Supp. 3d at 421.  The Government might have preferred a swifter or harsher outcome, but that is insufficient to plausibly allege a Title VI claim. *See Davis*, 526 at 648.

What is more, the Harvard Task Force Report, which the Government repeatedly invokes in its Complaint, directly rebuts the Government's conclusory claim that Harvard has "do[ne] nothing" to address antisemitism.  Compl. at 1.  The creation and extensive work of the Harvard Task Force *itself* demonstrates the reasonableness of Harvard's ongoing response.  *See StandWithUs*, 158 F.4th at 22 (citing MIT's Standing Together Against Hate initiative in dismissing deliberate indifference claim); *Yakoby v. Trs. of Univ. of Pa.*, 2025 WL 1558522, at *7 n.3 (E.D. Pa. June 2, 2025) (citing University of Pennsylvania's Presidential Commission on Countering Hate and Building Community in dismissing deliberate indifference claim).  The Report, read in its entirety, underscores the work Harvard has done to respond to concerns of antisemitism on campus.[20]  The Government cannot selectively ignore the substantial portions of

---

[20]    Indeed, Harvard's efforts have been recognized by the Harvard Jewish community.  *See, e.g.*, Sebastian B. Connolly & Summer E. Rose, *Jewish Groups Say Harvard Was Not Indifferent to Antisemitism, Push Back on Justice Department Suit*, The Harvard Crimson (Mar. 25, 2026),

the document (upon which its Complaint heavily relies) that establish the many actions Harvard has taken to combat antisemitism and improve its campus environment—actions that render the Government's claims implausible.  For example, Harvard has taken steps to educate its community members so that they can recognize and respond to antisemitism and engage in civil debate over contentious issues; updated its policies to "establish clearer expectations for community behavior," better defined the limitations on campus protest and dissent, and clarified how schools must evaluate claims of antisemitic harassment; and worked directly with its Jewish community to ensure Jewish students feel welcome and safe on campus.  *See* Report at 193-199; *supra* pp.3-6.[21]

Harvard's actions in connection with the resolution of the *Kestenbaum* and *Brandeis Center* lawsuits further refute the Government's claim that Harvard is deliberately indifferent.[22] As a part of those settlements, Harvard made substantial forward-looking commitments to ensure that its campus remains a welcoming environment for Jewish and Israeli students.  Harvard committed to incorporating the IHRA definition of antisemitism into its nondiscrimination policies; to reaffirming in annual community messages that antisemitism will not be tolerated at Harvard; to new public reporting on complaints of discrimination, including antisemitism; to hiring

---

https://perma.cc/ZFW7-9YAC ("While there is much more to be done, the only plausible characterization of Harvard's current leadership is as principled and effective in confronting and removing the intolerance which had taken root on campus over more than a decade[.]"); Jackie Hajdenberg, *At US Commission on Civil Rights hearing, Jewish students warn against politicizing campus antisemitism*, The Jewish Daily Forward (Feb. 23, 2026), https://perma.cc/92CP-XDZ2; *see* Business Meeting, U.S. Comm'n on C.R. 163-171, 179-187 (Feb. 19, 2026) (testimony of Harvard students), https://perma.cc/BGT3-7HZL.

[21]    Although the Report itself outlines a number of actions Harvard has taken to address antisemitism, the Harvard Task Force's website further documents the "University-wide and School-specific initiatives" Harvard continues to implement in line with the Report's recommendations.  *See University Actions and Commitments*, Harvard University Presidential Task Force on Combating Antisemitism and Anti-Israel Bias, https://perma.cc/HB4M-HMX3.

[22]    The material terms of those January 2025 settlements are public court records subject to judicial notice.  *See Kowalski v. Gagne*, 914 F.2d 299, 305-306 (1st Cir. 1990).

a designated individual responsible for consulting on all complaints of antisemitism; and to investing in academic resources to study antisemitism. *See* Dkt. 104-1, *Kestenbaum*, No. 1:24-cv-10092 (Jan. 21, 2025); Dkt. 81-1, *Brandeis Ctr.*, No. 1:24-cv-11354 (Jan. 21, 2025). Here too, Harvard's actions demonstrate the opposite of deliberate indifference; they evince Harvard's ongoing commitment to respond to allegations of antisemitism.

### 3. *Harvard v. HHS* Precludes the Government's Deliberate Indifference Claim

The Government also cannot state a deliberate indifference claim because the central factual premise on which its allegations rest—that Harvard has failed to respond to concerns about antisemitism on campus—was fully litigated and resolved in *Harvard v. HHS*. Issue preclusion bars a party from "relitigating an issue already decided in a federal court," when "(1) both proceedings involved the same issue of law or fact, (2) the parties actually litigated that issue, (3) the prior court decided that issue in a final judgment, and (4) resolution of that issue was essential to judgment on the merits." *Global NAPs, Inc. v. Verizon New England Inc.*, 603 F.3d 71, 95 (1st Cir. 2010). The doctrine "applies to issues of fact as well as those of law," *Manganella v. Evanston Ins. Co.*, 700 F.3d 585, 591 (1st Cir. 2012), and extends to "necessary *intermediate* findings," not merely "ultimate issues," *Rodríguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 771 (1st Cir. 2010).

The decision in *Harvard v. HHS* precludes relitigating the factual premise underlying the Government's current deliberate indifference claim and means that the Government will not be able to establish deliberate indifference, as a matter of law, in the face of these binding factual findings. *First*, both this proceeding and *Harvard v. HHS* revolve around a core factual issue: whether Harvard failed to take substantial action to address antisemitism on its campus. In *Harvard v. HHS*, a central question was whether the Government's stated reason for terminating

22

Harvard's federal funding—its claim that Harvard purportedly had not sufficiently responded to antisemitism—was factually accurate or instead pretextual. 798 F. Supp. 3d at 129, 132-133. The Complaint here relies upon the same purported facts the Government previously invoked when terminating Harvard's funding. Indeed, the Complaint does not allege a single incident that post-dates Harvard's complaint in *Harvard v. HHS*, 798 F. Supp. 3d at 102, or the Federal Task Force's March 31, 2025, letter alleging violations of Title VI based on claims of antisemitism (which begat the *Harvard v. HHS* litigation).

*Second*, this issue was actually litigated. An issue is "actually litigated" when it is raised, contested by the parties, submitted for determination by the court, and determined. *See Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 981 (1st Cir. 1995). The court in *Harvard v. HHS* adjudicated this issue at summary judgment, so that standard is easily met. *Rogers v. Town of Northborough*, 188 F. Supp. 2d 10, 14 (D. Mass. 2002); *see also Mercado-Salinas v. Bart Enters. Int'l, Ltd.*, 671 F.3d 12, 22 (1st Cir. 2011). In *Harvard v. HHS*, the summary judgment briefing put Harvard's alleged failure to address antisemitism squarely at issue. The Government's brief asserted that "[b]ecause of Harvard's acknowledged failures to address antisemitism … the agencies exercised their authority, as set out in the text of Harvard's contracts, to cancel those agreements." Defs.' Mem. Supp. Cross-Mot. S.J., *Harvard v. HHS*, No. 25-cv-11048 (D. Mass. June 16, 2025), Dkt. 186 at 1.[23] One of the Government's chief arguments was that its actions

---

[23]    *See also, e.g.*, Defs.' Mem. Supp. Cross-Mot. S.J., *Harvard v. HHS*, at 3 (Government's purported policy purpose for canceling grants was "to not fund institutions that fail to address antisemitism"); *id*. at 4 ("Harvard's grants were terminated due to, in the agencies' estimation, the inadequacy of the measures Harvard had implemented up to that point to address antisemitism."); *id*. at 5-9 (section purporting to recount "Harvard's failure to meaningfully address antisemitism on its campus" based entirely on citations to the Harvard Task Force Report); *id*. at 10 (header titled "The agencies terminate Harvard's grants for no longer aligning with the Government's policy against antisemitism."); *id*. at 34-35 ("Rather, it is the fact that Harvard refused to take adequate actions to respond to antisemitism on its own campus that justified the agency action.").

canceling and terminating Harvard's federal research grants were justified because Harvard was "'being investigated for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment.'" *Harvard v. HHS*, 798 F. Supp. 3d at 128 (quoting Government brief). The *Harvard v. HHS* court thus addressed "the steps Harvard had taken to research or address antisemitism on campus" and whether the Government had adequately considered those steps. *Id.* at 130; *see id.* at 121.

The *Harvard v. HHS* court concluded that, as of mid-2025, Harvard had already taken (and was continuing to take) substantial steps to address antisemitism on campus. 798 F. Supp. 3d at 137. The court found that these efforts began during the 2023-24 academic year with "policy and other changes aimed at ensuring that its campus is safe and welcoming for Jewish and Israeli students." *Id.* at 93. As noted above, these reforms included convening the Harvard Task Force, "disciplining students and faculty who violate applicable policies," "enhancing programs and policies designed to address bias and promote ideological diversity and civil discourse," "adopting new accountability procedures and clarified policies," and "making several leadership and personnel changes." *Id.* at 131. The court also acknowledged that these efforts continued after issuance of the Report in April 2025, as Harvard worked "to centralize and strengthen its disciplinary procedures," implemented recommendations to promote a "widespread sense of belonging" and "respectful dialogue," updated "policies, procedures, and training," and "reviewed recommendations concerning admissions, appointments, curriculum, and orientation and training programs." *Id*. at 98. The court thus concluded that "[t]he record reflects that Harvard was, in fact, working to respond to and ameliorate antisemitism." *Id.* at 130. The court's factual determination in *Harvard v. HHS* therefore resolved the central factual premise of the Government's claims here: that Harvard "failed to take material steps to address the severe and

24

pervasive harassment of and discrimination against Jewish and Israeli students." Compl. ¶ 63; *see also id.* ¶ 147.

*Third*, the *Harvard v. HHS* order is a valid and binding final judgment. "A granted motion for summary judgment constitutes a decision on the merits that is binding … for purposes of preclusion." *Rogers*, 188 F. Supp. 2d at 14; *see also In re Kane*, 254 F.3d 325, 328 (1st Cir. 2001) (preclusion applies "even where the first, or issue preclusive judgment is still on appeal when the second action occurs").

*Fourth*, the findings regarding Harvard's responses to antisemitism were essential to that judgment. As the court explained, the Government's funding terminations were based upon the Government's "determination that Harvard had not taken sufficient steps to address antisemitism." *Harvard v. HHS*, 798 F. Supp. 3d at 129. The court reached the opposite conclusion, finding that the record showed Harvard was actively working to respond to antisemitism and that there was "no evidence" the Government considered the many reforms Harvard had implemented. *Id.* at 130. Those findings were integral to the court's holding that the Government's actions were pretextual and unlawful. *See, e.g.*, *id.* at 121-122, 130-133.

Because a court has already determined that Harvard took substantial and continuing steps to address antisemitism, the Government is barred from relitigating that issue and the Government's Title VI deliberate indifference claim should therefore be dismissed.

### C.    The Government Fails to Plead Direct Discrimination

The Government's alternative theory of Title VI liability likewise fails because the Government has not plausibly alleged that Harvard violated Title VI through "intentional refusal to treat actions taken against Jews and Israelis on the same basis as other violations of its rules." Compl. ¶ 147. The allegations it relies upon—many of them recycled from the direct

discrimination claim this Court dismissed in *Kestenbaum* and *Brandeis Center*—fall well short of satisfying this requirement.

To state a direct discrimination claim under Title VI, the Government must "plausibly establish[]" that Harvard itself acted "*because of* some anti-Jewish or anti-Israel discriminatory animus." *Brandeis Ctr.*, 2024 WL 4681802, at *4. A discriminatory animus claim can be pleaded through comparator allegations. *Doe v. Brown Univ.*, 43 F.4th 195, 207 (1st Cir. 2022). To plead "a comparator claim based on Harvard's failure to punish the conduct of others," the Government was therefore required to "identify reasonably comparable analogs." *Kestenbaum*, 743 F. Supp. 3d at 311. This includes plausibly alleging that "'the nature of the infraction and knowledge of the evidence by college officials [was] sufficiently similar.'" *Id.* at 310 (quoting *Brown Univ.*, 43 F.4th at 207).

The Government comes nowhere close. The Complaint lists a handful of past campus controversies involving other forms of bias and describes how Harvard reacted to them. Compl. ¶¶ 122-124. None of those past controversies is "reasonably comparable" to any incident of alleged antisemitism identified in the Complaint. In fact, nearly all of the exact same comparators were raised, litigated, and rejected in *Kestenbaum*. *Compare* Compl. ¶¶ 122-123, 124(a)-(c), 124(e), *with Kestenbaum*, 743 F. Supp. 3d at 311 & n.14, *and* Second Am. Compl., *Kestenbaum*, Dkt. 63, ¶¶ 278, 284, 287, 290 (May 28, 2024). The Court correctly concluded in *Kestenbaum* that none of these purported comparators identifies "comparably situated speakers or students" who "engaged in conduct analogous" to the harassment the Government alleges. *Kestenbaum*, 743 F. Supp. 3d at 311.[24]

---

[24] The only purported comparator allegation the Government does not borrow from *Kestenbaum* is its claim that Harvard declined to condemn disruptive protests featuring allegedly antisemitic chants even as it condemned "a billboard truck that drove around Harvard Square,

### D.    The Government Failed to Comply with Title VI's Mandatory Procedural Requirements

Title VI does not authorize agencies to proceed directly to litigation based on alleged noncompliance.  Instead, Congress imposed strict procedural limitations designed to ensure notice, an opportunity for voluntary resolution, and deliberation before the extraordinary step of cutting off federal funding or bringing suit.  *See* 42 U.S.C. § 2000d-1; *see also Alexander*, 532 U.S. at 290.

Federal agencies have implemented these statutory requirements through regulations. Under HHS's Title VI regulations, for example, enforcement "by any other means authorized by law" (such as referral to DOJ to bring suit) is permissible only if alleged noncompliance "cannot be corrected by informal means," and may not proceed unless the agency has (1) advised the recipient of both the alleged failure to comply and the action that will be taken to effect compliance, and (2) determined that voluntary compliance cannot be secured.  45 C.F.R. § 80.8(a), (c)(1) (2024).[25]  The Government thus cannot attempt to enforce compliance without adhering to the safeguards built into the Title VI remedial scheme, and courts routinely deem efforts to enforce Title VI without following these procedural requirements unlawful.  *See, e.g.*, *Chi. Transit Auth. v. U.S. Dep't of Transp.*, 2026 WL 810912, at *5 (N.D. Ill. Mar. 24, 2026) (government did not "initially seek voluntary compliance as required"); *Am. Ass'n of Univ. Professors v. Trump*, 815 F. Supp. 3d 907, 964 (N.D. Cal. 2025) (recipient "was not given the opportunity to voluntarily remedy the alleged violations"); *Harvard v. HHS*, 798 F. Supp. 3d at 126-127 (government action

---

displaying names and photos of students."  Compl. ¶ 124(d).  On its face, this allegation describes how Harvard reacted differently to two non-analogous factual circumstances.  This allegation therefore cannot "'support a finding of facial inconsistency,'" let alone an inference of discriminatory animus, in Harvard's response.  *Brown University*, 43 F.4th at 207.

[25]    Other agencies' Title VI regulations are materially identical.  *See, e.g.*, 7 C.F.R. § 15.8 (Agriculture); 34 C.F.R. § 100.8 (Education).

inconsistent with Title VI because administrative record had "no evidence of a notice of noncompliance [or] an assessment that compliance could not be achieved by voluntary means").

The Complaint does not plausibly allege that the Government complied with Title VI's procedural requirements. *First*, the Government alleges—at most—that one agency, HHS, provided notice of a Title VI violation and attempted to secure voluntary compliance. Compl. ¶¶ 8-10, 134-136. But this action seeks sweeping relief well beyond HHS, including a declaration that the Government "need not make any additional payments to Harvard" under existing grants from any agency, as well as rescission and restitution of all grant payments made by any agency. *Id.* ¶¶ 158-159. Title VI does not permit one agency's alleged efforts to stand in for the independent statutory obligations of every other federal agency whose funding the Government now seeks to withhold or recover. *See* 42 U.S.C. § 2000d-1 (specifying that termination of grants to effect ongoing compliance with Title VI "shall be limited in its effect to the particular program, or part thereof, in which such noncompliance is found."); 28 C.F.R. § 42.401 ("Responsibility for enforcing title VI rests with the federal agencies which extend financial assistance."); *Bd. of Pub. Instruction v. Finch*, 414 F.2d 1068, 1078 (5th Cir. 1969) ("[T]he purpose of the Title VI cutoff is best effectuated by separate consideration of the use or intended use of federal funds under each grant statute.").

*Second*, even as to HHS, the Complaint contains only conclusory assertions that the agency "negotiated with Harvard in good faith" and attempted voluntary resolution. Compl. ¶ 136.[26] The

---

[26] However, in August 2025, President Trump publicly directed Secretary McMahon not to negotiate with Harvard, stating, "I—we want nothing less than $500 million from Harvard…Don't negotiate, Linda….They've been very bad. Don't negotiate." Remarks During a Cabinet Meeting and an Exchange with Reporters, *supra* note 16. President Trump confirmed this approach in February 2026, claiming that Harvard was trying to "get[] out of a large cash settlement of more than 500 Million Dollars" and that "[w]e are now seeking One Billion Dollars in damages, and

28

Complaint offers no factual allegations describing what proposals were made, what steps were required of Harvard, or how those efforts reflected a genuine attempt to secure voluntary compliance with Title VI. Nor could it, since no such efforts were made. Such "'formulaic recitation[s]'" are insufficient to plausibly allege compliance with Title VI's demanding procedural standards. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Notably, the Government does not allege that any agency ever notified Harvard of the specific enforcement action it intended to take in order to effect compliance. *See* Compl. ¶ 10; 45 C.F.R. § 80.8(d).[27] Title VI requires not only notice of alleged noncompliance but also notice of the remedial step the Government proposes to take if voluntary efforts fail. Even accepting the Government's barebones allegations as true, the Complaint falls far short of plausibly satisfying these requirements.

## II.    THE GOVERNMENT'S BREACH OF CONTRACT CLAIM FAILS AS A MATTER OF LAW

Seeking to circumvent the limitations of Title VI, the Government has asserted an unprecedented breach of contract claim seeking restitution of billions of dollars of previously provided federal grants. That claim must be dismissed on multiple grounds. The Government's only asserted basis for a breach of contract is Harvard's alleged noncompliance with Title VI. *See* Compl. ¶ 150. Absent a plausible Title VI violation, the breach of contract claim fails. *See supra* Part I. But even on its own terms, the breach of contract claim fails for three independent reasons. First, the Government cannot use common-law contract principles to obtain relief that Title VI's remedial scheme does not allow. Second, the Complaint does not plausibly allege the basic elements of breach of contract. Third, the relief the Government seeks—unprecedented

---

want nothing further to do, into the future, with Harvard University." Trump, *Truth Social* (Feb. 2, 2026, 11:20 PM), *supra* note 16.

[27]    Tellingly, although its Notice of Violation stated that HHS would provide Harvard with a voluntary resolution agreement, the Complaint does not allege that HHS ever followed through.

institution-wide rescission and restitution, untethered from any specific alleged contractual breach—is unavailable under ordinary contract principles and the Spending Clause.

### A.      Breach of Contract Principles Cannot Be Used to Circumvent Title VI's Substantive and Procedural Limits

The Government's contract theory seeks to convert Title VI's compliance-oriented statutory scheme into a draconian remedy Congress did not authorize.  Title VI was designed to end discrimination through prospective compliance, not to impose retroactive penalties or institution-wide forfeitures.  *See supra* pp.12-14.  The Government may not evade those limits by recasting its purported Title VI claim as a common-law contract claim.

The same prospective compliance architecture that undergirds Title VI is reflected in the federal grant-making rules.  The government-wide "Uniform Guidance," codified at 2 C.F.R. Part 200, implements Title VI's compliance-first approach across federal grant programs by authorizing prospective responses to noncompliance aimed at correcting deficiencies going forward—such as withholding or suspending future payments, imposing specific conditions on future awards, or shifting from advance payments to reimbursement.  *See* 2 C.F.R. §§ 200.339(a)-(f), 200.208(c)(1).  It does not authorize retributive measures untethered from prospective compliance, such as an across-the-board clawback of funds already paid and expended.

Federal grant awards incorporate—and are thus limited by—this statutory and regulatory scheme.  The Supreme Court has emphasized that federal grants do not resemble ordinary contracts, but instead "originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy."  *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985).  Any grant "contract," therefore, cannot be understood in isolation from the statutes and regulations that define the scope of permissible enforcement and remedies.

30

The Complaint nowhere identifies the specific grants the Government seeks to rescind or recover. Even if the Court were to infer that HHS grants are among those at issue, the Government would fare no better. The HHS Grants Policy Statement—"incorporated by reference in the official Notice of Award as a standard term and condition" of every HHS grant—provides that the Uniform Guidance, 2 C.F.R Part 200, "appl[ies] to all HHS awards." U.S. Dep't of Health & Hum. Servs., HHS Grants Policy Statement 5, app. D § 1.2 (Oct. 2025) ("HHS GPS").[28] And as described above, the Uniform Guidance limits the Government's institution-wide enforcement options to specified, prospective responses such as imposing "specific conditions" (including enhanced reporting, prior approvals, or reimbursement-based payment plans), "temporarily withhold[ing] payments" pending corrective action, "suspend[ing] or terminat[ing] the Federal award," or "[w]ithhold[ing] further Federal funds" for the relevant "project or program." See 2 C.F.R. §§ 200.339(a)-(f), 200.208(c)(1). Even if the Government purported to proceed under Part 200 (it does not), any recovery of funds would have to be confined to award-specific determinations after audit or review and be consistent with the regulatory limits governing disallowance and closeout. See id. § 200.339(b); § 200.345(a)(1); § 200.410.

In all events, any action must be "consistent with [the] achievement of the objectives of the statute authorizing the financial assistance," 42 U.S.C. § 2000d-1—not the institution-wide, retrospective relief sought here. Harvard's awards were thus expressly subject to the remedial framework that forecloses the institution-wide rescission and restitution the Government seeks in this litigation.[29] Applied here, the Government's contract claim flies in the face of the enforcement

---

[28]    Available at https://perma.cc/VM4D-5PPY.

[29]    Even if the text of the grant awards were silent as to these limitations, laws in force at the time of contracting "enter into and form a part of [the contract] as if they were expressly referred to or incorporated in its terms." Md.-Nat'l Cap. Park & Plan. Comm'n v. Lynn, 514 F.2d 829, 833 (D.C. Cir. 1975) (citing Wood v. Lovett, 313 U.S. 362 (1941)). Those laws may also "supplement[]

31

structure Congress put in place. Title VI assigns enforcement authority to the "department or agency concerned" and permits enforcement only to achieve prospective compliance. 42 U.S.C. § 2000d-1.

The Complaint makes no effort to comply with these provisions. It seeks sweeping government-wide relief—including a declaration that the United States "need not make any additional payments" under "existing grants" and restitution of "all grant payments made" during the alleged period of noncompliance. Compl. ¶¶ 158-159. Basic principles of contract law do not permit a party to sidestep agreed-upon and statutory limits on remedies and enforcement mechanisms. *See M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10-12 (1972); *cf. HIM Portland, LLC v. Devito Builders, Inc.*, 317 F.3d 41, 44 (1st Cir. 2003). Having awarded grants governed by a specific statutory and regulatory framework, the Government may not now seek relief that conflicts with the remedial scheme it agreed to follow.

### B.    The Government Fails to Plead Breach of Contract Under Common Law

Even if a breach of contract claim were permissible notwithstanding Title VI's statutory and regulatory limits, the Government has not plausibly stated such a claim here. To state a claim for breach of contract under federal common law, the Government must plead "(1) the existence of a valid contract between the parties; (2) an obligation or duty arising from that contract; (3) a breach of that duty; and (4) damages caused by that breach." *United Launch Servs., LLC v. United States*, 139 Fed. Cl. 664, 681 (2018); *see also Brooks v. AIG SunAmerica Life Assurance Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (same under Massachusetts law).

---

the contract" by imposing obligations and limits not spelled out in the text. *Thorpe v. Hous. Auth.*, 393 U.S. 268, 279 (1969). Thus, even absent an express incorporation, the statutory and regulatory constraints described above would still govern the Government's enforcement authority.

The Government's claim fails at the outset because the Complaint does not specify which alleged contractual obligations Harvard breached. *See Brooks*, 480 F.3d at 586 (finding a plaintiff "must do more than allege, in conclusory fashion, that the defendant breached the contract, by describing, with 'substantial certainty,' the specific contractual promise the defendant failed to keep"); *see also Atlas Corp. v. United States*, 895 F.2d 745, 754 (Fed. Cir. 1990) (dismissing breach of contract claim when plaintiffs "pointed to no specific [contract] provision that was breached").  Courts routinely dismiss contract claims for failure to meet this basic pleading requirement.  *E.g.*, *Brooks*, 480 F.3d at 586; *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 38 (1st Cir. 2007); *Higgins v. Town of Concord*, 246 F. Supp. 3d 502, 518 (D. Mass. 2017).

Here, the Government alleges only that Harvard "signed" unspecified "contractual assurances" that it would comply with Title VI, Compl. ¶ 128; that Harvard generally certified "compliance with all applicable laws" in making payment requests (only some of which the Government identifies by date), *id.* ¶¶ 130-131; that "each award includes standard language incorporating Title VI" (with no example provided), *id.* ¶ 132; and that Harvard "periodically signed certificates of its purported compliance with Title VI" (identifying one such certificate by date), *id.* ¶¶ 130-133.  None of these allegations identifies a specific contractual promise, let alone an enforceable duty of the kind the Government now seeks to impose.  The Government's failure to identify *any* contractual term that supplies the duty allegedly breached or that anticipates the extraordinary remedies demanded is fatal to its claim.  No less important, the Government fails to connect any asserted Title VI noncompliance to any award term governing the expenditure or retention of funds.  The Complaint does not allege what the term "applicable laws" encompasses for any specific award, what portion of any award is implicated by the alleged noncompliance, or

33

how any alleged noncompliance relates to "the obligation, expenditure, and drawdown of award funds" that the certification itself references.  Compl. ¶ 131.

Even if the Complaint were read to identify a contractual duty across an undefined universe of awards, it does not allege that any such duty was a material, award-specific term of those grants, the breach of which could support the relief sought here.  Under federal contract law, "[a] party breaches a contract when it is in material non-compliance with the terms of the contract."  *See Gilbert v. Dep't of Just.*, 334 F.3d 1065, 1071 (Fed. Cir. 2003).  Conclusory allegations of "material" breach, absent factual content showing how the Defendant's conduct violated "'an essential and inducing feature' of the contract," cannot give rise to liability as a matter of law. *Edlow v. RBW, LLC*, 2010 WL 2034772, at *3 (D. Mass. May 21, 2010); *see also United States v. Mejia*, 55 F.4th 1, 8 (1st Cir. 2022).  Likewise, an assertion of breach of collateral or generalized assurances cannot establish materiality.

The Government's own grant framework treats Title VI compliance as a generalized assurance, not a material, award-specific term.  The HHS Grants Policy Statement classifies "Discrimination Based on Race, Color, and National Origin"—including Title VI—under "General Certifications and Representations," a category distinct from program-specific award terms and performance conditions.  HHS GPS app. D §§ 1.2 & 4.2, app. E (Oct. 2025).  Generalized compliance assurances cannot be used to convert ordinary regulatory violations into contract breaches that carry remedies the governing statutory scheme does not authorize.  Notably, the October 2025 revision of the Policy Statement adds language indicating that these civil rights assurances are "material," while expressly acknowledging that this "reflects a change in the government's position regarding the materiality of the foregoing requirements" and that "prior payment of similar claims does not reflect the materiality of the foregoing requirements to this

34

Agreement." *Id*. at 21-22. Thus, even if the Government were permitted to claim that all "General Certifications and Representations" were "material" *prospectively* regardless of the grant in question, its admission that this was not the case previously is fatal to the Government's ability to allege materiality here. A recipient cannot be held liable for material breach of a term that the Government itself did not view as material until October 2025, well after many of the relevant grants were awarded and performed. *See Bennett*, 470 U.S. at 669 (grant obligations determined by framework in effect at time of contracting).

### C.     The Relief Sought Is Barred by Ordinary Contract Principles and the Spending Clause

The Government also fails to state a viable contract claim because the relief it demands—rescission, restitution, and a bar on future federal funding—is unavailable as a matter of both ordinary contract law and principles applicable to spending legislation. Courts routinely strike or dismiss demands for relief that are unavailable as a matter of law. *See John Hancock Life Ins. Co. v. Abbot Labys., Inc.*, 183 F. Supp. 3d 277, 303 (D. Mass. 2016), *rev'd in part on other grounds*, 863 F.3d 23 (1st Cir. 2017). In these circumstances, the absence of any legally available remedy is fatal to the claim. *See, e.g.*, *Cummings v. Premier Rehab, P.L.L.C.*, 2019 WL 227411, at 4 (N.D. Tex. Jan. 16, 2019) (dismissing claims where damages unavailable as matter of law), *aff'd*, 948 F.3d 673 (5th Cir. 2020), *aff'd*, 596 U.S. 212 (2022).

Rescission is an extraordinary remedy available only for breaches that defeat a contract's essential purpose. *See* 26 Williston on Contracts § 68:2 (4th ed. May 2025 update); Restatement (Second) of Contracts § 241 (A.L.I. 1981). Restitution, like rescission, depends on a failure of the fundamental exchange, not merely an alleged violation of a collateral regulatory obligation, and it must be confined to the benefit conferred or unjust enrichment attributable to the breach—not to every dollar paid under every agreement during a period of alleged noncompliance. Restatement

35

(Second) of Contracts § 371; Restatement (Third) of Restitution & Unjust Enrichment § 38(2)(b) (A.L.I Oct. 2024 Update).  The Complaint does not allege a failure of the fundamental bargain between Harvard and the various relevant funding agencies.  It does not, for example, allege that Harvard retained funds for work it did not perform, that an agency paid for research that was not conducted, or that any particular disbursement exceeded Harvard's entitlement under any specific award.  Instead, it alleges generalized Title VI noncompliance and seeks rescission and restitution across an undefined universe of awards, agencies, and dates of issuance.  The Government's effort to transform alleged regulatory noncompliance into a wholesale forfeiture of fully performed grants cannot provide a basis for rescission or restitution.

The Government's request for a prospective bar on future payments fares no better.  The Complaint seeks a declaration that the United States "need not make any additional payments" under "existing grants."  Compl. ¶ 158.  That is not a contract remedy.  It is an administrative sanction governed by Title VI—an entirely separate body of law.  Title VI and the Uniform Guidance prescribe the procedures for imposing such sanctions, including agency-specific determinations, notice, opportunities for voluntary compliance, and program-specific action.  *See* 42 U.S.C. § 2000d-1; 2 C.F.R. § 200.339.  The Government cannot bypass those statutory and regulatory limits by repackaging a funding cutoff as contract relief.  *Cf. United States v. Estate of Romani*, 523 U.S. 517, 530 (1998) (specific, comprehensive statute reflecting specific policy choice controls).

Finally, principles governing spending legislation independently foreclose the Government's requested relief as a matter of law.  Title VI was enacted pursuant to Congress' Spending Clause authority and accordingly conditions an offer of federal funding on the recipient's agreement to comply with specified obligations.  *Cummings*, 596 U.S. at 216 (quoting *Pennhurst*

36

*State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)); *see also Barnes v. Gorman*, 536 U.S. 181, 186–188 (2002).  As a result, a remedy for a violation of Title VI is available "only if the funding recipient is on notice that, by accepting federal funding, it exposes itself to liability of that nature." *Cummings*, 596 U.S. at 220.  This is because "when considering whether to accept federal funds, a prospective recipient would surely wonder not only what rules it must follow, but also what sort of penalties might be on the table." *Id.*

Consistent with these principles, the Supreme Court has tightly constrained the remedies available under Spending Clause statutes, reasoning that, although a funding recipient is generally on notice that "it will be subject to the *usual* contract remedies," it lacks notice of its exposure to "*unusual*, even 'rare' remedies." *Cummings*, 596 U.S. at 221-223.  Atypical contractual remedies such as punitive damages, *see Barnes*, 536 U.S. at 188, are thus unavailable.

The same is true of the remedies the Government seeks here.  Again, rescission is an exceptional remedy that courts reserve for circumstances involving a breach that "so substantially impairs the value of the contract" that it is just to allow the injured party to recover on the basis of all remaining rights to performance.  Restatement (Second) of Contracts § 243(4).  Similarly, restitution is available only to the extent of the benefit conferred or unjust enrichment attributable to a particular breach.  *Id.* § 371.  Rescission and restitution of this kind are "special" remedies that a funding recipient would not have been on notice of in accepting federal funds.  *See Cummings*, 596 U.S. at 216.  The blanket forfeiture of all disbursements, as the Government seeks here, is categorically unavailable as a matter of law.  *Cf., e.g.*, *Bennett*, 470 U.S. at 662-65; *Bell v. New Jersey*, 461 U.S. 773, 780-787 (1983).

In short, the Government's breach of contract claim would convert generalized assurances of regulatory compliance into a basis for extraordinary remedies that contract law does not permit, federal grant law rejects, and principles governing spending legislation do not allow.

### III.   THE GOVERNMENT'S CLAIMS ARE A PRETEXT FOR UNLAWFUL RETALIATION

The Court should also dismiss the Complaint because it is a continuation of the Government's ongoing unlawful campaign of retaliation against Harvard for refusing to "capitulate to government demands that it audit, censor, or dictate viewpoints of staff and students." *Harvard v. HHS*, 798 F. Supp. 3d at 121; *see also Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006) (court may grant motion to dismiss on basis of an affirmative defense); *McIntosh v. Mass. Bay Transp. Auth.*, 2024 WL 2704997, at *6 (D. Mass. May 27, 2024).  The First Amendment forbids officials from using state power "to punish or suppress disfavored expression," and government officials may not "wield[] their power selectively to punish or suppress speech," including through coercive threats and coordinated pressure rather than neutral adjudication.  *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188, 198 (2024); *see also First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. ----, 2026 WL 1153029 (Apr. 29, 2026). That prohibition extends to government efforts to bend educational institutions to its will.  *Sweezey v. New Hampshire*, 354 U.S. 234, 250 (1957) (plurality opinion); *id.* at 261-263 (Frankfurter, J., concurring in the result).  Academic freedom depends on both "the independent and uninhibited exchange of ideas among teachers and students" as well as an institution's "autonomous decisionmaking." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985).  This creates "'a zone of First Amendment protection for the educational process itself.'" *Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007).

In *Harvard v. HHS*, the court surveyed the many actions the Government had taken as of mid-2025 and concluded that the Government sought to "require Harvard to overhaul its

governance, hiring, and academic programs to comport with the government's ideology and prescribed viewpoint." 798 F. Supp. 3d at 119. This "government-initiated onslaught against Harvard" was intended to "promot[e] a governmental orthodoxy in violation of the First Amendment." *Id.* at 122. Indeed, the Government "specifically and repeatedly linked the coordinated funding cuts to Harvard's decision to 'fight,'" an action that is "indisputably protected by the First Amendment." *Id.* at 123.

The Government may not attempt to achieve through this litigation the result the *Harvard v. HHS* court already concluded was a violation of Harvard's constitutional rights. *See Glob. NAPs, Inc.*, 603 F.3d at 95; *Rogers*, 188 F. Supp. 2d at 14. All that has changed since *Harvard v. HHS* is that the Government has further confirmed its retaliatory motives while Harvard has continued to make progress in implementing reforms related to antisemitism, non-discrimination, and campus protests—progress the Government has entirely ignored despite ample knowledge of these facts, as reflected in material the cited in the Government's Complaint.

As detailed above, senior government officials have continued to issue public statements underscoring that Harvard's refusal to capitulate, and its decision to litigate, remain central to the Government's actions, including the filing of this litigation. For example, the Assistant Attorney General for Civil Rights has stated that this lawsuit was intended to single Harvard out because "Harvard sued us" and "is defiant." *See supra* p.12. And the Complaint certainly does not demonstrate any effort by the Government to "engage[] in … a [funding] review, weigh[] the value of any grant, gather[] any data regarding antisemitism at Harvard, or consider[] if and how terminating certain grants would improve the situation for Jewish students at Harvard." *Harvard v. HHS*, 798 F. Supp. 3d at 121. Because the Complaint reflects not a neutral application of Title VI, but the continued singling out of Harvard for differential treatment based on impermissible

considerations, it should be dismissed in its entirety as a product of unconstitutional retaliation. *See Nat'l Rifle Ass'n of Am.*, 602 U.S. at 180 ("[T]he First Amendment prohibits government officials from relying on the threat of invoking legal sanctions and other means of coercion to achieve the suppression of disfavored speech." (cleaned up)); *Sec. & Exch. Comm'n v. Navellier & Assocs., Inc.*, 108 F.4th 19, 39 (1st Cir. 2024) (government may not engage in selective enforcement "based on impermissible considerations such as … intent to inhibit or punish the exercise of constitutional rights").

## **CONCLUSION**

The Government has publicly declared its improper motives in pursuing this litigation. After a year-long campaign to burden Harvard's First Amendment rights, this litigation is another transparent—but equally unlawful—effort to accomplish the ends the Government has long sought through a different means.  Harvard, meanwhile, remains steadfast in its efforts to address and eliminate antisemitism on its campus, despite the Government's ostrich-like attempt to ignore those efforts.

Harvard has not been deliberately indifferent to antisemitism on its campus; it has not discriminated against its Jewish and Israeli students; and it has not breached its agreements with the federal government related to the funding of vital research projects across a multitude of disciplines.

The Complaint should be dismissed with prejudice.

DATED:  May 18, 2026

Respectfully Submitted,


*/s/ Felicia H. Ellsworth*

Robert K. Hur*                                    Felicia H. Ellsworth, BBO # 665232
KING & SPALDING LLP                   WILMER CUTLER PICKERING
1700 Pennsylvania Ave. NW, Suite 900      HALE AND DORR LLP
Washington, DC 20006                     60 State Street
T: (202) 383-8969                        Boston, MA 02109
 F: (202) 626 3737                       T: (617) 526-6000
rhur@kslaw.com                           F: (617) 526-5000
                                         Felicia.Ellsworth@wilmerhale.com


Joshua S. Levy, BBO # 563017             Steven P. Lehotsky, BBO # 655908
ROPES & GRAY LLP                         LEHOTSKY KELLER COHN LLP
The Prudential Tower                     200 Massachusetts Ave. NW, Suite 700
800 Boylston Street                      Washington, DC 20001
T: (617) 951-7000                        T: (512) 693-8350
F: (617) 951-7050                        F: (512) 727-4755
joshua.levy@ropesgray.com                steve@lkcfirm.com


* *pro hac vice* motion pending