# Attachment
# (Proposed Amicus Brief)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>President and Fellows of Harvard College,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:26-cv-11352-RGS |

**BRIEF OF PROFESSORS BENJAMIN EIDELSON
AND DEBORAH HELLMAN AS AMICI CURIAE
IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

Identity and Interests of Amici Curiae.................................................................................1

Summary of Argument ........................................................................................................1

Argument ............................................................................................................................3

I.    The Complaint Fails To Allege Discrimination Based on Race or Ancestry, as Opposed
      to Beliefs............................................................................................................................3

II.   The Complaint Fails To Allege Actionable Harassment Under the Narrow Definition
      that Governs in the University Context. ...........................................................................7

      A.  The Standard for Actionable Harassment ......................................................... 8

      B.  Application to the Government's Principal Allegations .................................. 10

III.  The Complaint Fails To Allege "Deliberate Indifference" Under the Exceptionally High
      Standard that Applies to Universities' Regulation of Students' Expressive Conduct. ..........13

Conclusion .......................................................................................................................17

## TABLE OF AUTHORITIES

**CASES**

*Alexander v. Sandoval*, 532 U.S. 275 (2001) .................................................................13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................6, 12

*Avis Rent A Car System, Inc. v. Aguilar,* 529 U.S. 1138 (2000) .......................................8

*Bachman v. St. Monica's Congregation*, 902 F.2d 1259 (7th Cir. 1990) ........................4

*Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999) ....................7, 13, 14, 15, 16

*Espinoza v. Farah Manufacturing Co.*, 414 U.S. 86 (1973) ............................................3

*Gartenberg v. Cooper Union for the Advancement of Science and Art*,
765 F. Supp. 3d 245 (S.D.N.Y. 2025) ..................................................................... *passim*

*Gartenberg v. Cooper Union for the Advancement of Science and Art*,
No. 1:24-cv-02669, 2025 WL 602945 (S.D.N.Y. Feb. 25, 2025) ..................................11

*Kestenbaum v. President & Fellows of Harvard College*,
743 F. Supp. 3d 297 (D. Mass. 2024) ..............................................................................7

*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998) ..................................8

*Regents of the University of California v. Bakke*, 438 U.S. 265 (1978) .........................16

*Rodriguez v. Maricopa County Community College District*,
605 F.3d 703 (9th Cir. 2010) .........................................................................................17

*Segev v. President & Fellows of Harvard College*,
No. 1:25-cv-12020-RGS (D. Mass. Dec. 4, 2025) ...........................................................5

*Stand With Us Center for Legal Justice v. MIT*, 158 F.4th 1 (1st Cir. 2025) ........................ *passim*

*Stand With Us Center for Legal Justice v. MIT*, 165 F.4th 97 (1st Cir. 2026) ..........................4, 14

*Sussman v. MIT*, No. 1:25-cv-11826-RGS (D. Mass. Jan. 5, 2026) .................................5

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) ...........................................................15

*Watterson v. Page*, 987 F.2d 1 (1st Cir. 1993) ...............................................................7

*Zeno v. Pine Plains Central School District*, 702 F.3d 655 (2d Cir. 2012) ...................................7

**STATUTES AND ADMINISTRATIVE MATERIALS**

42 U.S.C. § 2000d ...........................................................................................................3

Letter from Thomas E. Perez, Assistant Att'y Gen., U.S. Dep't of Just.,
to Russlynn H. Ali, Assistant Sec'y for the Off. of C.R., U.S. Dep't of Educ.
(Sept. 8, 2010), https://perma.cc/PU8R-P3K2 ............................................................4

Rescinding Portions of the Department of Justice Title VI Regulations,
90 Fed. Reg. 57141 (Dec. 10, 2025) (to be codified at 28 C.F.R. pt. 42) ......................12

**OTHER AUTHORITIES**

Lila Corwin Berman et al., Joint Statement of Jewish Studies Professors
to U.S. Commission on Civil Rights (Feb. 2026), https://perma.cc/477C-98UB ............................4

Benjamin Eidelson & Deborah Hellman, *Antisemitism, Anti-Zionism, and Title VI:
A Guide for the Perplexed*, 139 Harv. L. Rev. F. 1 (2025),
https://perma.cc/8VSP-EEZL ................................................................................ *passim*

Benjamin Eidelson, *Testimony for U.S. Commission on Civil Rights Hearing on
Antisemitism on America's College and University Campuses* (Feb. 6, 2026),
https://perma.cc/X4HS-PS23 ....................................................................1, 4, 5, 6, 11

Richard H. Fallon, Jr., *Sexual Harassment, Content Neutrality, and the First
Amendment Dog that Didn't Bark*, 1994 Sup. Ct. Rev. 1 ......................................8, 9, 10

Suzanne B. Goldberg & Olatunde C.A. Johnson, *Campus Crises and the
Limits of Title VI*, 126 Colum. L. Rev. F. 1 (2026) ........................................1, 7, 8, 9, 13

Harvard University, *Final Report: Presidential Task Force on Combating
Antisemitism and Anti-Israeli Bias* (2025) ..............................................................6, 13, 14

Max J. Krupnick, *Silent Study-Ins*, Harvard Magazine (Nov. 14, 2024),
https://perma.cc/H5DZ-U3WK ....................................................................................16

Todd E. Pettys, *Hostile Learning Environments, The First Amendment,
and Public Higher Education*, 54 Conn. L. Rev. 1 (2022) ................................................15

Stephen E. Sachs, *Zionism and Title VI*, 139 Harv. L. Rev. F. 50 (2025) ...................................4, 6

Eugene Volokh, *Freedom of Speech and Workplace Harassment*,
39 UCLA L. Rev. 1791 (1992) ......................................................................................................9

**IDENTITY AND INTERESTS OF AMICI CURIAE**

Amici are legal scholars who teach and write about anti-discrimination law and constitutional law. They are the co-authors of *Antisemitism, Anti-Zionism, and Title VI: A Guide for the Perplexed*, 139 Harv. L. Rev. F. 1 (2025), https://perma.cc/8VSP-EEZL [hereinafter "Eidelson & Hellman"], and have testified before federal agencies as experts on Title VI and campus antisemitism. *See* Benjamin Eidelson, Testimony for U.S. Commission on Civil Rights Hearing on Antisemitism on America's College and University Campuses (Feb. 6, 2026), https://perma.cc/X4HS-PS23 [hereinafter "Eidelson Testimony"]; Deborah Hellman, Remarks at Public Briefing of Colorado Advisory Committee to the U.S. Commission on Civil Rights (July 16, 2025), https://perma.cc/7LB6-QBR7.

Benjamin Eidelson is a Professor of Law and Affiliate Professor of Philosophy at Harvard University. Deborah Hellman is the Robert E. Scott Distinguished Professor of Law at University of Virginia School of Law.[1]

**SUMMARY OF ARGUMENT**

Until very recently, Title VI challenges to universities' handling of large-scale student protests were all but unheard of. *See* Suzanne B. Goldberg & Olatunde C.A. Johnson, *Campus Crises and the Limits of Title VI*, 126 COLUM. L. REV. F. 1, 4 (2026). As this Court well knows, however, such claims have proliferated in the wake of the anti-Israel protests that swept campuses after October 7, 2023. Amici submit this brief to highlight three important lessons of recent scholarship and judicial decisions in this area and to explain their implications here.

---

[1] No party or party's counsel authored this brief in whole or in part or contributed money intended to fund its preparation or submission, and no person other than amici and their counsel contributed money that was intended to fund preparing or submitting the brief. This brief reflects only amici's views and not those of amici's employers or any other institutions.

*First*, Title VI prohibits discrimination based on heritable, immutable characteristics, not beliefs or felt attachments to causes or institutions. It thus protects people from discrimination based on their Jewish (or Israeli or Palestinian) ancestry, not their support for any nation-state or geopolitical arrangement in the Middle East. Under *Stand With Us Center for Legal Justice v. MIT*, 158 F.4th 1 (1st Cir. 2025), this means that the Government must plausibly allege hostility to *people of Jewish or Israeli ancestry*. Hostility to the State of Israel—or even to everyone who supports the existence of a distinctly Jewish state in the historic Land of Israel—does not constitute discriminatory intent under Title VI.

*Second,* in judging the severity and objective offensiveness of alleged harassment, a court must account for the distinctive norms of a university setting and the need to "avoid a collision between the First Amendment and anti-discrimination law," *Gartenberg v. Cooper Union*, 765 F. Supp. 3d 245, 266 (S.D.N.Y. 2025). Subject to a possible exception for speech that can *only* plausibly be interpreted as intentionally demeaning people based on their race or ancestry, that means restricting harassment liability to *personal abuse targeted at individuals or small groups*—not the broadly addressed advocacy that makes up the bulk of the Government's allegations.

*Third*, harassment claims that implicate the enforcement of a university's speech rules are subject to "an even more limited application of the already strict deliberate indifference standard" (*id.*), one that accounts for the special academic-freedom concerns raised by state efforts to dictate how universities police dissent. The university must have actual knowledge that the relevant conduct constitutes ancestry-based harassment—a requirement that could not be met for the vast majority of the anti-Israel activities alleged here—and the institutional response must be so grievously deficient that it could not reflect a good-faith judgment about the complex balance that universities must strike in regulating protest consistent with their academic missions.

2

Here, as explained below, the Government's claim that Harvard has subjected its Jewish and Israeli students to unlawful discrimination fails at each of these three steps.

## ARGUMENT

### I. THE COMPLAINT FAILS TO ALLEGE DISCRIMINATION BASED ON RACE OR ANCESTRY, AS OPPOSED TO BELIEFS.

Title VI bars discrimination "on the ground of race, color, or national origin." 42 U.S.C. § 2000d. From the start, Congress's choice to omit "religion" from that list prompted questions about the statute's application to antisemitism. Since the mid-2000s, however, federal agencies and experts in this area have converged on the answer that Jews (like everyone else) are protected against discrimination *on the basis of their ancestry. See* Eidelson & Hellman, *supra*, at 2–6. Some division remains over whether "race" or "national origin" is more apt as a textual hook for this protection, but that distinction is not consequential because both refer to a heritable, immutable characteristic. As the Supreme Court has explained, "the terms 'national origin' and 'ancestry' were considered synonymous" by the enacting Congress. *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 89 (1973). It has thus become common to describe claims of anti-Jewish discrimination under Title VI as based on "shared ancestry," a category that could implicate either statutory term. *See* Eidelson & Hellman, *supra*, at 4–6 (tracing "judicial authority and executive-branch practice" on this issue). And discrimination against people of *Israeli* ancestry is similarly barred as a form of national origin discrimination—i.e., as discrimination on the basis of "the country where a person was born . . . [or] from which his or her ancestors came." *Espinoza*, 414 U.S. at 88.

Recognizing that the protected characteristic at issue is a person's *ancestry* (whether Jewish or Israeli) is vital because it sets the terms of the rest of the Title VI analysis. According to the First Circuit, a person's conduct must be motivated by "discriminatory intent" or "animus" with respect to a given characteristic in order to constitute harassment on that basis. *Stand With Us*

*Center for Legal Justice v. MIT*, 158 F.4th 1, 18 (1st Cir. 2025); *see also Stand With Us Center for Legal Justice v. MIT*, 165 F.4th 97, 102 (1st Cir. 2026) (Dunlap, J., concurring in denial of rehearing en banc) (rejecting suggestion "that a plaintiff need not demonstrate that a harasser is motivated by hostility to a protected class."); *Gartenberg v. Cooper Union*, 765 F. Supp. 3d 245, 259 (S.D.N.Y. 2025) (same).[2] Filling in a correct understanding of the characteristics at issue here, that means the Government must plausibly plead an intent to treat the alleged victims differently because of their *Jewish or Israeli ancestry*, not their religious or political beliefs about the State of Israel or Zionism. *See, e.g.*, Lila Corwin Berman et al., Joint Statement of Jewish Studies Professors to U.S. Commission on Civil Rights (Feb. 2026), https://perma.cc/477C-98UB (explaining that "Zionism is not an ethnic or ancestral trait"); Eidelson & Hellman, *supra*, at 9–11; Eidelson Testimony, *supra*, at 7; *see also Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1260 (7th Cir. 1990) (distinguishing "religious anti-Semitism, typified by the attitude of the medieval Roman Catholic Church, and racial anti-Semitism, typified by Hitler").

While amici do not condone any form of stereotyping or harassment, the First Circuit's intent requirement, together with Congress's choice not to extend Title VI to religion, means that several incidents in the Complaint simply do not implicate the statute as pleaded—because they do not involve any claim of intentional discrimination based on ancestry. *E.g.*, Compl. ¶ 72 (quoting a student's speculation that peers at the encampment refused to speak to him because he "wear[s] a kippah" and they took that as signaling his views); *see* Eidelson & Hellman, *supra*, at 11. In fact, the Justice Department itself has long drawn the same distinction: Title VI does not

---

[2] Although *Stand With Us* settles the question here, some contend that intent to treat someone adversely on the basis of a protected characteristic should *not* be required for a hostile environment claim, at least in some circumstances. *See, e.g.*, Stephen E. Sachs, *Zionism and Title VI*, 139 Harv. L. Rev. F. 50, 62–63 (2025); *see also* Eidelson & Hellman, *supra*, at 7–8 (noting this possibility). If that alternate premise were accepted, the fact that the relevant characteristic is a form of ancestry would significantly limit the conduct that could qualify as severely offensive in a relevant respect. *See* Eidelson Testimony, *supra*, at 9–11.

4

reach "discrimination [that] is based on . . . religious practice," as opposed to race or ancestry. Letter from Thomas Perez, Assistant Att'y Gen., to Russlynn Ali, Assistant Sec'y, Dep't of Educ. 1 (2010), https://perma.cc/PU8R-P3K2; *see* Eidelson Testimony, *supra*, at 4–5. But because the Government here relies so heavily on the report of Harvard's antisemitism task force—which had no reason to distinguish attitudes toward people of Jewish faith and Jewish ancestry—it repeatedly fails even to allege that an incident involved targeting based on ancestry, as opposed to a student's apparent religious faith and the views imputed to them on that basis. *E.g.*, Compl. ¶¶ 30, 66, 69.

Nor does vitriolic anti-Israel or anti-Zionist rhetoric suffice to ground a plausible inference of the requisite ancestry-based motivation—a point that this Court has recognized repeatedly in applying *Stand With Us* to similar allegations. *See* 158 F.4th at 17–19; Order, *Segev v. Pres. & Fellows of Harvard College*, No. 1:25-cv-12020-RGS (D. Mass. Dec. 4, 2025), ECF No. 35 ("[N]othing in the Amended Complaint plausibly supports the notion that [the] assailants' conduct was motivated by race-based antisemitism . . . rather than disagreement with the underlying political message."); Order, *Sussman v. MIT*, No. 1:25-cv-11826-RGS (D. Mass. Jan. 5, 2026), ECF No. 75 ("[T]he court sees no basis on which to distinguish the First Circuit's conclusion that anti-Israeli sentiment is not, without more, antisemitic messaging."). The Complaint's assertions about how certain slogans sound "[t]o a Jewish or Israeli ear" (Compl. ¶ 22) are thus not only wildly overbroad, but largely beside the point: *Stand With Us* requires that alleged harassment be motivated by hostility to people of Jewish (or Israeli) ancestry, and for purposes of drawing an inference about motivation, it is how the speaker understands their own message that counts. *See Stand With Us*, 158 F.4th at 19; Eidelson & Hellman*, supra*, at 15–17.[3]

---

[3] Unsurprisingly, terms like "intifada" "ha[ve] multiple resonances imparted by [their] usage for different purposes within different communities." Eidelson & Hellman, *supra*, at 15–16. "As one Jewish undergraduate observed, '[g]rowing up in a Zionist family . . . the word intifada was only associated with death and terrorism and destruction.'" *Id.* at 16. "But the word is also commonly used in other communities to refer

Of course, "[t]his is not to say that anti-Zionism is never wielded as a tool of the antisemite" or that there are no "specific circumstances" that could warrant an inference of prohibited motive. *Stand With Us*, 158 F.4th at 17; *see also* Eidelson & Hellman, *supra*, at 11; Eidelson Testimony, *supra*, at 7. For example, the same anti-Israel slogans that were discounted in *Stand With Us* carry a very different meaning when rendered in "the stylized font commonly associated with Hitler's *Mein Kampf.*" 158 F.4th at 17 (quoting *Gartenberg*, 765 F. Supp. 3d at 269). But *Stand With Us* makes clear that the Court's plausibility analysis under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), must account for the genuine diversity of stances toward Zionism among Jews and non-Jews alike, the various reasons why "anti-Zionist" student protesters might call for "the rejection of any spe-cifically Jewish state in any part of Israel,"[4] and the different resonances that the same chants have come to bear within different communities. *See* 158 F.4th at 16–19; *accord* Eidelson & Hellman, *supra*, at 15–18. The Government thus cannot rely on unsupported and profoundly implausible assertions about the motives of large numbers of Harvard students, such as the postulate ("[o]n information and belief") that when students joined chants rhyming "intifada revolution" with "so-lution," they must have "intend[ed] . . . to be understood" as alluding to "gas chambers" (Compl.

---

to the phenomenon of Palestinian resistance more broadly—or, indeed, to refer to resistance movements in the Arab world more broadly still." *Id.*; *see id.* (citing examples). To be sure, "the fact that some will hear a call for 'intifada' as urging the murder of Israeli Jews furnishes a powerful reason to avoid that word." *Id.* It does not follow, however, "that protesters who hew to the 'intifada' chant are making that choice in order to provoke, insult, or threaten their Jewish (or even Israeli) peers." *Id.* at 17. "Quite apart from any such motive, it is unsurprising that some Palestinians (and those aiming to express solidarity with them) might strongly favor 'our indigenous language as Palestinians'"; indeed, "even somebody who sincerely regrets the distress inflicted on Jewish peers might be reluctant to help cement a norm that amounts to a taboo on the prevailing Arabic word for Palestinian resistance." *Id.* These complex communicative dynam-ics underscore the wisdom of the First Circuit's refusal to embrace the "theory that [plaintiffs] can dictate the interpretation of the protestors' speech in order to suppress it, without any facts suggesting that the protestors were using these slogans in the way plaintiffs claim." *Stand With Us*, 158 F.4th at 19.

[4] Stephen E. Sachs, *Zionism and Title VI*, 139 Harv. L. Rev. F. 50, 57–58 (2025) (defining "antizionism").

¶¶ 21–22).[5]

## II. THE COMPLAINT FAILS TO ALLEGE ACTIONABLE HARASSMENT UNDER THE NARROW DEFINITION THAT GOVERNS IN THE UNIVERSITY CONTEXT.

In addition to discriminatory intent, a viable Title VI claim based on peer harassment requires that the alleged conduct be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999). Until recently, claims of such a "hostile environment" have overwhelmingly rested on allegations of "extremely abusive or exclusionary behavior" that is "directed at specific individuals" (usually children) and lacks any meaningful relationship to political debate. Goldberg & Johnson, *supra*, at 19; *see, e.g.*, *Zeno v. Pine Plains Cent. School Dist.*, 702 F.3d 655, 667 (2d Cir. 2012). This case requires the Court to adapt the same underlying standard to expressive activities on college campuses in a manner that "avoid[s] a collision between the First Amendment and anti-discrimination law." *Gartenberg*, 765 F. Supp. 3d at 266.[6] As explained below, that means refusing to treat broadly addressed acts of protest as "offensive" on the basis of

---

[5] Harvard's antisemitism task force report (on which the Complaint heavily relies) confirms that the campus protesters had "diverse motives," with "many students, including Jewish ones," participating out of "sympathy with the Palestinians" rather than ancestry-based hostility toward anyone. Harvard Univ., *Final Report: Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias* 8 (2025). Indeed, the task force found that "a small but vocal segment of Jewish students" joined these protests because they embraced an anti-Zionist political ideology (which, again, does not constitute animus toward Jewish or Israeli peers on account of their ancestry). *Id.*; *see also id.* at 104 ("Understanding the past year at Harvard involves considering . . . divisions within Harvard's Jewish community itself."). These facts underscore the implausibility and unfairness of the Government's sweeping allegations about what student protesters must have intended to express. (Because the report is "sufficiently referred to in the complaint," *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993), it can be considered in connection with a motion to dismiss.)

[6] Since this Court's decision in *Kestenbaum v. President & Fellows of Harvard College*, 743 F. Supp. 3d 297 (D. Mass. 2024), the First Circuit has clarified that the question is not whether a university can "hide behind the First Amendment to justify avoidance of its Title VI obligations," *id.* at 309, but rather whether a "proposed application of a harassment claim under Title VI comports with First Amendment principles." *Stand With Us*, 158 F.4th at 12.

the message expressed, subject only to a possible exception for speech that could *only* be inter-

preted as purposely demeaning members of a protected class. And measured by that standard, the

Government's allegations here fail to state a claim.

### A.  The Standard for Actionable Harassment

The leading approach to reconciling the First Amendment and Title VI is developed in a

body of scholarship that substantially aligns with both Judge Cronan's opinion in *Gartenberg v.

Cooper Union* and the First Circuit's reasoning in *Stand With Us*. *See* Goldberg & Johnson, *supra*,

at 37 ("[T]he approach taken by these two courts resonates with the [academic] commentary . . .

and may be able to guide universities in crafting policies that attend to both free expression and

inclusion."). This approach begins from the Supreme Court's insistence on an "objective" standard

for assessing harassment claims—a standard that, as Richard Fallon explained in an influential

analysis of sexual harassment law, "should be viewed . . . as a constitutionally mandated limitation

on the statutory prohibition." Richard H. Fallon, Jr., *Sexual Harassment, Content Neutrality, and

the First Amendment Dog that Didn't Bark*, 1994 Sup. Ct. Rev. 1, 44–46, 54–55.[7] This objective

standard requires "careful consideration of the social context," *Oncale v. Sundowner Offshore

Servs.*, 523 U.S. 75, 81 (1998), and the social context of a university triggers a distinctive and

heightened set of expectations for claims of offense at the viewpoints expressed by others.

As Judge Cronan put the point: "[I]n the context of higher education, . . . the reasonable

student expects (if not hopes) to encounter . . . the unfettered exchange of ideas concerning a wide

---

[7] *See also Avis Rent A Car System, Inc. v. Aguilar*, 529 U.S. 1138, 1141 (2000) (Thomas, J., dissenting from denial of certiorari) (noting that "even those commentators who conclude the First Amendment generally permits application of harassment laws to workplace speech recognize exceptions where First Amendment interests are especially strong" (citing Fallon, *supra*)).

range of controversial topics." *Gartenberg*, 765 F. Supp. 3d at 265 (internal quotation marks omitted). Reasonable students also appreciate that this expectation would be thwarted by broad efforts to stamp out speech that "communicates a[n] [identity]-based message of hostility or inferiority," because such efforts pose a severe risk of "chill[ing] debate at the heart of the university's critical, discursive, truth-seeking, and pedagogical missions." Fallon, *supra*, at 54. Within a university environment, therefore, there is, at a minimum, no actionable harassment "when the offensive activity can plausibly be understood as merely reckless with regard to the identity-related offense that others will justifiably take (rather than as aimed at provoking that response)." Eidelson & Hellman, *supra*, at 14; *see* Goldberg & Johnson, *supra*, at 35–36. This reasoning accords with the First Circuit's refusal to read Title VI as requiring suppression of "stridently pro-Palestinian and anti-Zionist" speech in the "absence of consensus" about its meaning (or other grounds to safely infer that it must have been "driven by antisemitism"). *Stand With Us*, 158 F.4th at 16–19.[8]

Although "the 'reasonable person' [thus] assumes the risk of being offended by others' political expression at a university," Eidelson & Hellman, *supra*, at 14–15, courts and scholars have also recognized a critical distinction between speech or conduct that is *targeted at* particular students and that which is *addressed to the community at large*. *See* Goldberg & Johnson, *supra*, at 34, 37–38. As Professor Fallon explained, "narrowly targeted, face-to-face expression has often received less constitutional protection" because such speech "is less likely to have public or political value" and "especially likely to have the purpose of being, and to be experienced as, invasive, threatening, or coercive." Fallon, *supra*, at 42; *see also* Eugene Volokh, *Freedom of Speech and*

---

[8] *Stand With Us* left open the "nettlesome issue[]" of whether even speech that *was* unambiguously racist could be made a basis of Title VI liability in the university context. 158 F.4th at 15; *cf.* Eidelson & Hellman, *supra*, at 15 & n.90 (reserving judgment on the same issue).

*Workplace Harassment*, 39 UCLA L. Rev. 1791, 1863–67 (1992) (similar). Likewise, the contextual norm of special solicitude for open expression in the university context "does not extend to literal 'harassment' in the sense of conduct that genuinely singles a fellow student out for insistent, personal abuse." Eidelson & Hellman, *supra*, at 14; *cf. Gartenberg*, 765 F. Supp. 3d at 265–66 (distinguishing between "targeted, personal harassment aimed at a particular person" and "efforts to communicate a political message to the . . . community at large"); Fallon, *supra*, at 54–55 (positing that liability should be limited to "hate-charged epithets, targeted at individuals or small groups of individuals with the purpose or predictable effect of interfering with their work or education").

### B.    Application to the Government's Principal Allegations

Applying these principles to the Complaint's factual core makes clear that it does not state a cognizable hostile environment claim under Title VI.

*1. Anti-Israel Protests.* The bulk of the Complaint's factual allegations concern public acts of protest that were addressed to the community at large: a public statement by student groups that blamed "the Israeli regime . . . for all unfolding violence" (¶¶ 14–15); "study-ins" at campus libraries, at which students studied silently with political slogans—such as "No normalcy during genocide"—taped to the backs of their laptops (¶¶ 34, 49–56); marches and rallies "accus[ing] Israel of 'genocide'" and featuring the protest chants discussed above (¶¶ 26, 35); and the Harvard Yard encampment demanding divestment from Israel (¶¶ 40–48). Each of these is a paradigmatic example of expressive activity, on matters of intense public concern, directed at the university administration, the broader university community, and the wider world—not personally targeted abuse of the sort that might constitute harassment.

To be sure, most of the protest activity alleged in the Complaint *could* be made a basis of discipline by Harvard under content-neutral rules (as much of it was). But, at a university, nobody

10

has a reasonable expectation that the institution will treat offensive protest activities more harshly than it would treat other violations of the same rules—such as parallel "study-ins" with stickers about global warming—that would not cause similar offense. And regardless of whether the conduct at issue violates university rules, failing to protect students from the viewpoint-based offense they might reasonably take at others' expression cannot ordinarily be a basis of institutional liability consistent with the First Amendment. *Supra*, pp. 8–9.

Even if a more restrictive rule applies to speech whose offensiveness to a racial group is clearly purposeful rather than a result of insensitivity (*supra*, p. 9), the protest activity alleged here does not meet that description. Although the Complaint asserts categorically that the protesters' expression "can only be reasonably understood as . . . calls to kill Jews" (Compl. ¶¶ 21–22), that extreme claim is not defensible, and *Stand With Us* makes clear that the Court may consider the "academic literature" and other resources demonstrating as much. *See* 158 F.4th at 16–19; *see also* Eidelson Testimony, *supra*, at 10–12 (discussing the Government's tendentious characterizations of the silent study-ins and "the practical reality . . . that much of the unsettling rhetoric in this area is genuinely ambiguous").[9] Regardless of whether any of this conduct violated campus rules or caused understandable hurt and estrangement, therefore, it fails to state a claim under Title VI.

**2. Scattered allegations of harassment.** The Complaint contains some allegations that could, in principle, support a claim that certain students faced at least some degree of peer harassment. *Cf. Gartenberg v. Cooper Union*, No. 1:24-cv-02669, 2025 WL 602945, at *4 (S.D.N.Y.

---

[9] One concrete example illustrates how far the Government's conclusory descriptions of the protests diverge from events. According to the Government, "Harvard *professors* participated in a similar anti-Israeli 'study-in'" (Compl. ¶ 50). In support of that allegation, the Government points the Court to its own administrative finding against Harvard. But that finding correctly described the gathering as a "protest [of] the library's decision to temporarily ban students"—not as a protest that was anti-Israel (let alone "anti-Israeli"). The characterization of this faculty protest *of Harvard's speech restrictions* as "anti-Israeli" exemplifies how promiscuously the Government applies that and similar labels throughout the Complaint.

11

Feb. 25, 2025) (recognizing "a plausible claim for a hostile educational environment based on physically threatening or humiliating harassment and repeated acts of antisemitic vandalism and graffiti"). These include an alleged incident of physical contact with a student who "attempted to film" student protesters (¶ 24) and an incident in which some unnamed students allegedly "targeted[] and accosted Jewish students" in a student lounge (¶ 30). Under *Stand With Us*, however, a bare assertion that a student was "target[ed]" for being Jewish does not suffice to withstand a motion to dismiss, and the simple fact that the alleged wrongdoers were participating in a pro-Palestinian protest cannot ground such an inference either. *See* 158 F.4th at 18 ("[P]laintiffs proffer only conclusory allegations of antisemitic animus that are 'not entitled to be assumed true'" (citing *Iqbal*, 556 U.S. at 680–81)).[10] In any event, the Government has not plausibly alleged that scattered incidents experienced by different students across a vast campus over several months subjected any student to a "systemic deprivation of educational opportunities and benefits." *Stand With Us*, 158 F.4th at 20–21 (making the same point as to MIT).

 **3. *Overall campus climate.*** Finally, the Complaint repeatedly points to diffuse perceptions of a "hostile campus atmosphere" (¶ 71) and feelings of "discomfort and alienation" (¶ 64) on the part of some Jewish and Israeli students. Insofar as those experiences reflect that Zionism or support for a distinctly Jewish state in Israel "holds deep meaning for [many] Jews and Israelis" (¶ 68), it is essentially a disparate-impact claim of the sort that the Government has repudiated.[11] Even

---

[10] With respect to the student who attempted to film protesters, the Complaint describes the student as "Israeli Jewish" (¶ 24) but does not even allege that he was targeted on either of those grounds, rather than because (as the Complaint says) he attempted to record the protest. More broadly, the Government's tendentious characterizations of events throughout the Complaint (*see supra* at 11 n.9) underscore the special importance here of not filling in key facts that even the Government was not prepared to allege.

[11] *See* Eidelson & Hellman, *supra*, at 8–9; Eidelson Testimony, *supra*, at 8–11. According to the Justice Department, "Title VI . . . does not prohibit unintentional disparate impact" on a protected class. *Rescinding Portions of the Department of Justice Title VI Regulations*, 90 Fed. Reg. 57141, 57148 (Dec. 10, 2025) (to be codified at 28 C.F.R. pt. 42).

assuming that Jewish and Israeli students experienced hostility *on the basis of their race or ancestry*, however, "[the] high standard for finding harassment means that harassment law does not address the full range of hostile acts, statements, attitudes, microaggressions, and 'low-grade' discrimination that often makes students deeply uncomfortable or upset in college settings." Goldberg & Johnson, *supra*, at 18.

This high bar does not excuse universities from the ethical and institutional imperatives to foster genuinely inclusive communities. To the contrary, it creates space for universities to act candidly and reflectively in undertaking that delicate work, *see id.* at 38–54, in ways that are practically impossible when the university is under existential threat from federal officials who stoke resentment, pressure the university to take sides on profoundly divisive questions, and generally exploit their leverage for their own ends. At Harvard, for example, an effective effort to address the "campus atmosphere" (¶ 71) would need to reckon with the experiences of Jewish, Israeli, Arab, and Muslim students in tandem—recognizing that *all* of these groups report "greater levels of discomfort and alienation"[12]—rather than pitting them against each other and wantonly accusing large numbers of students of prejudice (Compl. ¶¶ 17–22).

## III.    THE COMPLAINT FAILS TO ALLEGE "DELIBERATE INDIFFERENCE" UNDER THE EXCEPTIONALLY HIGH STANDARD THAT APPLIES TO UNIVERSITIES' REGULATION OF STUDENTS' EXPRESSIVE CONDUCT.

Because the Supreme Court has held that Title VI "reach[es] only . . . intentional discrimination," *Alexander v. Sandoval*, 532 U.S. 275, 281 (2001), a university may be liable only when its "deliberate indifference to known acts of harassment . . . amounts to an intentional violation of

---

[12] According to Harvard's antisemitism task force, "Jewish students reported greater levels of discomfort and alienation than their Christian or atheist/agnostic peers, but lower levels than Muslim students." Task Force Report, *supra* note 5, at 121.

13

[the statute]." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642–43 (1999).[13] Like the notion of severely and objectively offensive conduct, this standard operates very differently here—where the Government takes issue with a university's approach to regulating adults' political speech—than in more familiar cases like *Davis*, where a grade school stood by while one child sexually harassed another for months. In other words, cases like this one are subject to "an even more limited application of the already strict deliberate indifference standard," including on First Amendment grounds. *Stand With Us*, 165 F.4th at 102 (Dunlap, J., concurring in the denial of rehearing en banc) (quoting *Gartenberg*, 765 F. Supp. 3d at 266). As courts flesh out the contours of this variant on the *Davis* standard, three considerations are especially important.

First, because *Davis* requires deliberate indifference to "*known* acts of sexual [here, racial] harassment," the relevant set of acts is restricted to those in which the university has "actual knowledge" that the harassment was *based on a protected characteristic*. *Davis*, 526 U.S. at 642, 644 (emphasis added). That is not much of a hurdle in traditional cases of racial slurs or sexual misconduct, where the conduct ordinarily speaks for itself. But the actual knowledge requirement poses a severe obstacle for the Government here, because Harvard was not required to join the Government in presuming that avowedly pro-Palestinian, anti-Israel, and pro-free-speech activities were actually motivated by racial animus.[14] Without plausibly alleging that Harvard had as reductive an understanding of its students' motives as the Government does, the Government cannot plausibly allege that Harvard was deliberately indifferent to what it actually knew to be intentional, ancestry-based harassment. *Cf.* Task Force Report, *supra* note 5, at 5 (observing that

---

[13] The Government rests its hostile environment theory (Count II) entirely on a claim of deliberate indifference and does not distinguish between damages and other relief.

[14] For an example of the Government's apparent presumption that pro-free-speech advocacy is "anti-Israeli," see *supra* at 11 n.9.

"many Jewish and Israeli students found themselves . . . on the wrong side of a political binary that provided no room for the complexity of history or current politics" and noting the "wide gap" between what some students intended to say and what others heard).

Second, universities exercise vastly less control over their students than do K-12 schools. The *Davis* Court reasoned that schools could appropriately be held liable for peer harassment in light of "school officials' 'comprehensive authority . . . to prescribe and control conduct in the schools.'" 526 U.S. at 646. But this sweeping authority, the Court recognized, "could not be exercised over free adults," and the *Davis* standard was supposed to be "sufficiently flexible" to account for that fact. *Id.* at 649; *see id.* ("A university might not, for example, be expected to exercise the same degree of control over its students that a grade school would enjoy . . ."). Like many universities, Harvard is a sprawling residential institution with many thousands of students, all of them adults, assembled from around the world; it resembles a small city more than it does a grade school. In that context, it would be unreasonable to suppose that the university's "own deliberate indifference effectively 'caused'" the diffuse social pressures to which unnamed students allegedly subjected one another in their social lives. *Davis*, 526 U.S. at 642–43; *see* Eidelson & Hellman, *supra*, at 21; Todd E. Pettys, *Hostile Learning Environments, The First Amendment, and Public Higher Education*, 54 Conn. L. Rev. 1, 21–22 (2022).

Finally, the Court's admonition that plaintiffs have no "right to make particular remedial demands," *Davis*, 526 U.S. at 648, has special force when the choices at issue involve contested trade-offs among values central to the academic enterprise. Even in the K-12 context, schools are not required to "ensure that . . . students conform their conduct to certain rules" on pain of being held deliberately indifferent. *Id.* But if "courts should refrain from second-guessing the disciplinary decisions made by school administrators" in addressing sexual harassment by a fifth-grader,

15

*id.*, they should be all the more reluctant to displace the difficult choices that universities must make, based on a balance of institutional priorities, when formulating and enforcing campus rules about expressive activities. *Cf. Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) (plurality opinion) (describing "the areas of academic freedom and political expression" as ones "in which government should be extremely reticent to tread," because "impos[ing] any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation").

Indeed, a university confronted with campus protest must attempt to integrate a number of often-competing goals central to its academic mission. These include preserving and affirming the university's historic solicitude for the open exchange of controversial ideas, ensuring both the reality and the appearance of evenhandedness in addressing rule violations by different groups, respecting the profoundly different frames of reference that students assembled from around the world bring to global affairs, and maintaining the conditions under which teaching and scholarship can proceed. *Cf. Stand With Us*, 158 F.4th at 22–24 (observing that "fair-minded persons might be sympathetic to a university's concern that it not counterproductively aggravate the situation" and crediting MIT for "managing the situation so as to avoid escalation and violence"). At the university level, all of these are among "the practical realities of responding to student behavior, realities that Congress could not have meant to be ignored." *Davis*, 526 U.S. at 653.

How to balance these considerations in particular cases is a topic of perennial and legitimate debate within universities, where it has traditionally been seen as a central issue of academic governance.[15] And as courts have recognized, it thus squarely implicates "[a] university's academic freedom," which "long has been viewed as a special concern of the First Amendment."

---

[15] At Harvard, for example, these debates have centered on the University-Wide Statement on Rights and Responsibilities (Compl. ¶ 115)—a "faculty-written statement" that was "[a]dopted in 1970 following the

*Stand With Us*, 158 F.4th at 13 (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978) (opinion of Powell, J.)); *see Gartenberg*, 765 F. Supp. 3d at 267 ("The First Amendment therefore 'demands substantial deference to [a] college's decision not to take action against' students who engage in expressive activity on matters of public concern and instead requires courts to 'defer to colleges' decisions to err on the side of academic freedom'" (quoting *Rodriguez v. Maricopa Cty. Community College Dist.*, 605 F.3d 703, 708–09 (9th Cir. 2010))).

For all of these reasons, the Court should be very reluctant to attribute the results of Harvard's deliberations, even as depicted in the Complaint, to "deliberate indifference." And the Court should be mindful of the very real danger that, if cases like this one proceed past the motion-to-dismiss stage, Title VI will increasingly be exploited to manipulate administrators into cracking down on dissent for fear of bet-the-university litigation. *See Rodriguez*, 605 F.3d at 708 (warning against creating incentives for universities to "steer far from any controvers[y] . . . in order to reduce the possibility of civil liability").[16]

## CONCLUSION

The motion to dismiss should be granted.

---

violent Vietnam War-era protests that severely disrupted academic life on campus" and "protected expression during a moment when the University could have completely shut protests down." Max J. Krupnick, *Silent Study-Ins*, Harvard Magazine (Nov. 14, 2024), https://perma.cc/H5DZ-U3WK.

[16] This brief addresses the Government's primary theory of liability—that Harvard was deliberately indifferent to a "hostile environment" for Jewish and Israeli students. The Complaint also advances a disparate-treatment theory premised on alleged selective enforcement of campus rules. Although that theory raises distinct questions that amici do not address here, it appears to suffer from the same absence of plausibly analogous comparators that doomed the parallel allegation in the *Kestenbaum* case. *See* Eidelson & Hellman, *supra*, at 23–24.

Dated: May 20, 2026

David Zimmer (BBO 692715)
ZIMMER, CITRON & CLARKE LLP
711 Atlantic Ave., 6th Floor
Boston, MA 02111
(617) 676-9421
dzimmer@zimmercitronclarke.com

Respectfully submitted,

/s/ Benjamin Eidelson
Benjamin Eidelson (*pro hac vice*)
1575 Massachusetts Ave.
Cambridge, MA 02138
(617) 495-4846
ben@beneidelson.org


*Counsel for Amici Curiae*

18