**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 1:26-CV-11352-RGS |
| v. | |
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE, | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

    A.    Harvard Has Worked Consistently to Make Its Campus a Safer and More
Welcoming Place ................................................................................................. 3

    B.    The Government's Pretextual Efforts to Terminate Harvard's Funding ................ 6

    C.    The Government's Other Attempts to Punish Harvard .......................................... 8

    D.    This Lawsuit ...................................................................................................... 11

ARGUMENT .................................................................................................................... 11

I.    THE GOVERNMENT FAILS TO STATE A CLAIM UNDER TITLE VI ....................................... 11

    A.    The Government Fails to Allege Ongoing Noncompliance with Title VI ............ 12

    B.    The Government Fails to Plead Deliberate Indifference to a Hostile
Environment ...................................................................................................... 13

        1.    The Government Fails to Plausibly Allege a Hostile Environment .......... 13

        2.    The Government Fails to Plausibly Allege Deliberate Indifference .......... 16

        3.    *Harvard v. HHS* Precludes the Deliberate Indifference Claim ................ 21

    C.    The Government Fails to Plead Direct Discrimination ........................................ 23

    D.    The Government's Novel Title VI Negligence Theory Fails ............................... 25

    E.    The Government Failed to Comply with Title VI's Mandatory Procedural
Requirements .................................................................................................... 27

II.    THE GOVERNMENT'S BREACH OF CONTRACT CLAIM FAILS AS A MATTER OF LAW ........... 29

    A.    Breach of Contract Principles Cannot Be Used to Circumvent Title VI's
Substantive and Procedural Limits .................................................................... 30

    B.    The Government Fails to Plead Breach of Contract Under Common Law .......... 33

    C.    The Relief Sought Is Barred by Contract Principles and the Spending
Clause ............................................................................................................... 36

III.    THE GOVERNMENT'S CLAIMS ARE A PRETEXT FOR UNLAWFUL RETALIATION ................. 38

CONCLUSION ................................................................................................................. 40

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ActBlue, LLC v. Paxton*,
  2026 WL 1694290 (D. Mass. June 11, 2026) ..........................................................................40

*Alexander v. Sandoval*,
  532 U.S. 275 (2001).............................................................................................12, 25, 27

*American Association of University Professors v. Trump*,
  815 F. Supp. 3d 907 (N.D. Cal. 2025) ....................................................................28

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................................29

*Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*,
  490 F.3d 1 (1st Cir. 2007)......................................................................................39

*Atlas Corp. v. United States*,
  895 F.2d 745 (Fed. Cir. 1990)................................................................................33

*Barnes v. Gorman*,
  536 U.S. 181 (2002)................................................................................................38

*Bedall v. State Street Bank & Trust Co.*,
  137 F.3d 12 (1st Cir. 1998)......................................................................................4

*Bell v. New Jersey*,
  461 U.S. 773 (1983)................................................................................................38

*Bennett v. Kentucky Department of Education*,
  470 U.S. 656 (1985)....................................................................................31, 36, 38

*Board of Public Instruction v. Finch*,
  414 F.2d 1068 (5th Cir. 1969) ................................................................................28

*Brooks v. AIG SunAmerica Life Assurance Co.*,
  480 F.3d 579 (1st Cir. 2007)...........................................................................33, 34

*Brown v. Hot, Sexy & Safer Productions, Inc.*,
  68 F.3d 525 (1st Cir. 1995)....................................................................................15

*Buck v. American Airlines, Inc.*,
  476 F.3d 29 (1st Cir. 2007)....................................................................................34

*Canel v. Art Institute of Chicago*,
  2026 WL 776580 (N.D. Ill. Mar. 19, 2026)...........................................................................15

*Cannon v. University of Chicago*,
  441 U.S. 677 (1979).................................................................................................................12

*Chicago Transit Authority v. U.S. Department of Transportation*,
  2026 WL 810912 (N.D. Ill. Mar. 24, 2026)...........................................................................28

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
  596 U.S. 212 (2022)...................................................................................................36, 37, 38

*Davis v. Monroe County Board of Education*,
  526 U.S. 629 (1999)..............................................................................13, 14, 15, 16, 25, 26

*Doe v. Brown University*,
  43 F.4th 195 (1st Cir. 2022)..............................................................................................24, 25

*Edlow v. RBW, LLC*,
  2010 WL 2034772 (D. Mass. May 21, 2010).....................................................................35, 36

*First Choice Women's Resource Centers, Inc. v. Davenport*,
  146 S. Ct. 1114 (Apr. 29, 2026)..............................................................................................38

*Gartenberg v. Cooper Union*,
  765 F. Supp. 3d 245 (S.D.N.Y. 2025).....................................................................................15

*Gebser v. Lago Vista Independent School District*,
  524 U.S. 274 (1998)...................................................................................................................26

*Gilbert v. Department of Justice*,
  334 F.3d 1065 (Fed. Cir. 2003)................................................................................................35

*Global NAPs, Inc. v. Verizon New England Inc.*,
  603 F.3d 71 (1st Cir. 2010)................................................................................................21, 39

*Hankey v. Town of Concord-Carlisle*,
  136 F. Supp. 3d 52 (D. Mass. 2015) .......................................................................................14

*Higgins v. Town of Concord*,
  246 F. Supp. 3d 502 (D. Mass. 2017) .....................................................................................34

*John Hancock Life Insurance Co. v. Abbott Laboratories, Inc.*,
  183 F. Supp. 3d 277 (D. Mass. 2016) .....................................................................................36

*Jones v. Bank of New York ex rel. Certificate Holders CWABS, Inc. Asset-Backed
  Certificates, Series 2004-7*,
  542 F. Supp. 3d 44 (D. Mass. 2021) .................................................................................4, 18

*In re Kane*,
  254 F.3d 325 (1st Cir. 2001) ..................................................................................23

*Karasek v. Regents of University of California*,
  956 F.3d 1093 (9th Cir. 2020) ...............................................................................17

*Kestenbaum v. President & Fellows of Harvard College*,
  743 F. Supp. 3d 297 (D. Mass. 2024) .............................................................13, 17, 24

*Kowalski v. Gagne*,
  914 F.2d 299 (1st Cir. 1990) ..................................................................................20

*Landau v. Corporation of Haverford College*,
  789 F. Supp. 3d 401 (E.D. Pa. 2025) .................................................................15, 19

*Landor v. Lousiana Department of Corrections & Public Safety*,
  606 U.S. ___, slip op. (2026) ........................................................................30, 37, 38

*Louis D. Brandeis Center for Human Rights Under Law v. President & Fellows of
  Harvard College*,
  2024 WL 4681802 (D. Mass. Nov. 5, 2024) ....................................................13, 16, 17, 24

*M.L. ex rel. D.L. v. Concord School District*,
  86 F.4th 501 (1st Cir. 2023) ..................................................................................16

*M/S Bremen v. Zapata Off-Shore Co.*,
  407 U.S. 1 (1972) ..................................................................................................33

*Manganella v. Evanston Insurance Co.*,
  700 F.3d 585 (1st Cir. 2012) ..................................................................................21

*Medina-Padilla v. United States Aviation Underwriters, Inc.*,
  815 F.3d 83 (1st Cir. 2016) .....................................................................................4

*Monarch Life Insurance Co. v. Ropes & Gray*,
  65 F.3d 973 (1st Cir. 1995) ....................................................................................21

*National Association of Government Employees, Inc. v. Yellen*,
  120 F.4th 904 (1st Cir. 2024) ..................................................................................13

*National Rifle Association of America v. Vullo*,
  602 U.S. 175 (2024) ..........................................................................................38, 40

*Nisselson v. Lernout*,
  469 F.3d 143 (1st Cir. 2006) ..................................................................................38

*Northwest Airlines, Inc. v. Transport Workers Union of America*,
  451 U.S. 77 (1981) ................................................................................................31

iv

*O'Brien v. Deutsche Bank National Trust Co.*,
    948 F.3d 31 (1st Cir. 2020)........................................................................................4

*P. Gioioso & Sons, Inc. v. Occupational Safety & Health Review Commission*,
    115 F.3d 100 (1st Cir. 1997)...................................................................................30

*Porto v. Town of Tewksbury*,
    488 F.3d 67 (1st Cir. 2007)..........................................................................16, 17, 26

*President & Fellows of Harvard College v. U.S. Department of Health & Human
    Services ("Harvard v. HHS")*,
    798 F. Supp. 3d 77 (D. Mass. 2025) ................................................................ *passim*

*President & Fellows of Harvard College v. U.S. Department of Homeland Security*,
    2025 WL 1719206 (D. Mass. June 20, 2025)...........................................................8

*President & Fellows of Harvard College v. U.S. Department of Homeland Security*,
    788 F. Supp. 3d 182 (D. Mass. 2025) ......................................................................8

*Regents of University of Michigan v. Ewing*,
    474 U.S. 214 (1985).................................................................................................39

*Rodríguez-Garcia v. Miranda-Marin*,
    610 F.3d 756 (1st Cir. 2010)....................................................................................21

*Rogers v. Town of Northborough*,
    188 F. Supp. 2d 10 (D. Mass. 2002) ..........................................................21, 23, 39

*Rotinsulu v. Mukasey*,
    515 F.3d 68 (1st Cir. 2008)......................................................................................27

*Securities & Exchange Commission v. Navellier & Assocs., Inc.*,
    108 F.4th 19 (1st Cir. 2024).....................................................................................40

*Segev v. President & Fellows of Harvard College*,
    No. 1:25-cv-12020 (D. Mass. Dec. 4, 2025)......................................................15, 16

*Stand With Us Center for Legal Justice v. Massachusetts Institute of Technology*,
    158 F.4th 1 (1st Cir. 2025)..................................................14, 15, 16, 17, 18, 19

*Sussman v. Massachusetts Institute of Technology*,
    No. 25-cv-11826 (D. Mass. Jan. 5, 2026).............................................................16

*Sweezey v. New Hampshire*,
    354 U.S. 234 (1957).................................................................................................38

*United Launch Services, LLC v. United States*,
    139 Fed. Cl. 664 (Fed. Cl. 2018) ...........................................................................33

*United States v. City of Tampa*,
739 F. Supp. 3d 1055 (M.D. Fla. 2024) ......................................................................13

*United States v. Estate of Romani*,
523 U.S. 517 (1998).....................................................................................................37

*United States v. King County*,
122 F.4th 740 (9th Cir. 2024) .....................................................................................13

*United States v. Mejia*,
55 F.4th 1 (1st Cir. 2022)............................................................................................35

*United States v. President & Fellows of Harvard College*,
No. 1:26-cv-10844 (D. Mass. Feb. 13, 2026) ............................................................10

*Yakoby v. Trustees of University of Pennsylvania*,
2025 WL 1558522 (E.D. Pa. June 2, 2025) ...............................................................19

## STATUTES, RULES, AND REGULATIONS

42 U.S.C. § 2000d-1 ............................................................................12, 27, 28, 32, 37

2 C.F.R. Part 200.............................................................................................................32

2 C.F.R.
§ 200.208.............................................................................................................31, 32
§ 200.339.......................................................................................................31, 32, 37
§ 200.345...................................................................................................................32
§ 200.410...................................................................................................................32

28 C.F.R. § 50.3 ...........................................................................................12, 27, 30

45 C.F.R.
§ 80.3..........................................................................................................................9
§ 80.8........................................................................................................................27

*Rescinding Portions of Department of Justice Title VI Regulations To Conform
More Closely With the Statutory Text and To Implement Executive Order
14281*, 90 Fed. Reg. 57141 (Dec. 10, 2025) ............................................................26

*Rescinding Portions of DHS Title VI Regulations To Conform More Closely With
the Statutory Text and To Implement Executive Order 14281*, 91 Fed. Reg.
36963 (June 22, 2026).................................................................................................26

*Enhancing National Security by Addressing Risks at Harvard University*, 90 Fed.
Reg. 24493 (June 4, 2025) ............................................................................................8

*Regulation for Federal Financial Assistance*, 91 Fed. Reg. 32198 (May 29, 2026).....................32

## OTHER AUTHORITIES

Restatement (Second) of Contracts
    § 241............................................................................................................36
    § 243............................................................................................................38
    § 371.......................................................................................................36, 38

Restatement (Third) of Restitution & Unjust Enrichment § 38......................................36

26 Williston on Contracts § 68:2 (4th ed. May 2025 update)........................................36

## INTRODUCTION

The Government's Amended Complaint fails to cure the fatal deficiency in its original Complaint:  It contains no allegations of an ongoing or impending violation of Title VI as required to warrant the forward-looking relief the Government seeks.  This fundamental flaw and numerous others require dismissal of the Government's case.

Harvard condemns antisemitism and is committed to ensuring that Jewish and Israeli students, like all members of the Harvard community, can learn and participate fully in campus life free from harassment or exclusion.  In the wake of October 7, 2023, Harvard—like many universities across the country—confronted significant challenges.  But in the over two and a half years since, Harvard has engaged in sustained, institution-wide efforts to identify and address antisemitism on campus, including as documented in the three-hundred-plus-page report of findings and recommendations ("Report"), issued by Harvard's Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias ("Harvard Task Force"), which the Amended Complaint cites over sixty times.[1]

The Government ignores these extensive efforts and continues the all-out campaign it began in April 2025 that seeks to punish Harvard for refusing to cede control over decisions regarding what Harvard can teach, the beliefs of the students it admits, and whom it can hire.  As another judge of this court recognized, this "government-initiated onslaught" is "much more about promoting a governmental orthodoxy in violation of the First Amendment than about anything else, including fighting antisemitism."  *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 122 (D. Mass. 2025) ("*Harvard v. HHS*").[2]  Indeed,

---

[1]    *Final Report*, Harvard Task Force (Apr. 29, 2025), https://perma.cc/M344-5WYX.

[2]    Unless otherwise indicated, punctuation indicating non-substantive changes in underlying source quotations (e.g., brackets, ellipses, internal quotation marks) has been omitted.

the *Harvard v. HHS* court already rejected the Government's attempt to terminate grants to Harvard's scientists and researchers based on the same dated allegations of antisemitism found in the Amended Complaint. The most recent allegation in the Amended Complaint is from well over a year ago. As before, the Government has made no effort to "learn[] anything about antisemitism on campus or what was being done [by Harvard] in response." *Id.* at 121. Yet the Government claims an unprecedented entitlement to restitution of over a billion dollars in already paid (and spent) grant money for pathbreaking research—including the development of cures or treatments for Lou Gehrig's disease, Alzheimer's disease, and heart disease. *Id.* at 131-132.

In its initial motion, Harvard explained why the Government's Complaint failed: it rehashed allegations already tested and rejected in court, sought relief Congress has not authorized, and attempted to convert disagreement with Harvard's handling of highly charged campus activity into violations of federal law. The Amended Complaint does not fix those fatal deficiencies. Instead, it tacks on an unprecedented theory of Title VI liability lacking any statutory basis or legal precedent; doubles down on dated and conclusory allegations that fail to establish a Title VI violation; and confirms that its contract claim seeks to evade Title VI's procedural protections.

The Government's latest volley in its unlawful campaign cannot proceed for three reasons.

*First*, the Government fails to state a claim under Title VI. The Government does not even attempt to allege an ongoing or impending violation of Title VI, as required, and instead seeks retrospective relief untethered to any present noncompliance—relief Title VI does not permit. The Amended Complaint fails to plausibly allege that Harvard has violated Title VI under any established theory of liability, and its new theory, suggesting liability could exist under Title VI for "negligent conduct," is not supported by any statute or precedent. The Government's claims rest on isolated, dated, and diffuse incidents, which, even accepted as true, do not plausibly allege

a hostile environment under the only accepted governing legal framework or demonstrate that Harvard was deliberately indifferent to such incidents. Moreover, the deliberate indifference claim is barred by issue preclusion because *Harvard v. HHS* squarely rejected its central factual premise—that Harvard failed to take meaningful steps to address antisemitism after October 7.

*Second*, the Government's breach of contract claim fails as a matter of law. The only breach alleged is of general obligations not to violate Title VI, and since there is no Title VI violation, there is no breach. In addition, the Amended Complaint (a) seeks relief that lies beyond what Title VI and the federal grants regulatory framework allow, (b) does not plausibly allege the basic elements of a breach of contract claim, and (c) seeks extraordinary rescission and restitution remedies that are barred by ordinary contract principles and the Spending Clause.

*Finally*, because this litigation is a continuation of an unconstitutional retaliation campaign this administration has relentlessly pursued against Harvard, the Government's claims are barred in their entirety under the First Amendment.

## BACKGROUND

### A. Harvard Has Worked Consistently to Make Its Campus a Safer and More Welcoming Place

Harvard has engaged in sustained and ongoing efforts to combat antisemitism, and its campus is thus a very different place today than it was several years ago. Even taken at face value, the Government's allegations, which focus almost entirely on the 2023-24 academic year, *see* Amended Complaint ("AC") ¶¶ 19-66, describe a snapshot in time that does not exist today. The Government's discussion of events since May 2024 is limited to a handful of protests and isolated incidents of alleged harassment, the latest of which took place in March 2025. *See id.* ¶¶ 67-80.

On January 19, 2024, seventeen days into his tenure, President Garber established the Harvard Task Force. On June 6, 2024, the Harvard Task Force issued preliminary findings, AC

3

¶ 117, and on April 29, 2025, it issued a Report, which is incorporated by reference into the Amended Complaint.[3]  The Harvard Task Force was charged to: "Examine the recent history of antisemitism and its current manifestations on the Harvard campus[;] identify causes of and contributing factors to anti-Jewish behaviors on campus; evaluate evidence regarding the characteristics and frequency of these behaviors; and recommend approaches to combat antisemitism and its impact on campus." Report at 5.  President Garber published the Task Force Report with a note to the Harvard community discussing the steps already taken, and those that would be taken, as an outgrowth of the Harvard Task Force's work, stating, "the conclusions that emerge from this work are clear.  We need to recognize and act on them, and we are doing that."[4] The very evidence on which the Government relies—the unvarnished observations contained in the Report, and the existence of the Harvard Task Force itself—demonstrates Harvard's seriousness of purpose in identifying, confronting, and ameliorating antisemitism on campus. Consistent with Harvard's candid acknowledgement that it did not respond as rapidly or decisively as it should have immediately following October 7, *see Harvard v. HHS*, 798 F. Supp. 3d at 136,

---

[3]    The Court may consider documents incorporated by reference in the Amended Complaint, relevant public records susceptible to judicial notice, and the record from the original action that precludes the Government's claims. *O'Brien v. Deutsche Bank Nat'l Tr. Co.*, 948 F.3d 31, 33 (1st Cir. 2020); *Medina-Padilla v. U.S. Aviation Underwriters, Inc.*, 815 F.3d 83, 85 (1st Cir. 2016). The Government's pronouncement that the "numerous materials" it relies upon as the sole factual basis for many of its allegations are "not incorporate[d] … into the complaint," AC at 1 n.1, is contrary to this settled law.  When a complaint's factual allegations are both linked to and dependent upon a document, "that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Bedall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998).  The Government references the Final Report of Harvard's Presidential Task Force sixty-four times in the Amended Complaint.  It is thus "central" to the Government's claims and "sufficiently referred to" that it is incorporated into the Amended Complaint.  *Jones v. Bank of N.Y. ex rel. Certificate Holders CWABS, Inc. Asset-Backed Certificates, Series 2004-7*, 542 F. Supp. 3d 44, 49 n.1 (D. Mass. 2021).

[4]    Alan M. Garber, *Update on Presidential Task Forces*, Harvard Off. of the President (Apr. 29, 2025), https://perma.cc/Z459-42NU.

the Report calls for "comprehensive, integrated, and sustained changes," Report at 28.  It also recounts the many actions Harvard has taken, particularly since the end of the 2023-24 academic year, to address antisemitism on campus, and contains recommendations for continued actions, which Harvard is implementing.  *Id.* at 193-200 (Appendix I: Recent Progress on Addressing Antisemitism and Anti-Israeli Bias Across Harvard); *id.* at 201-205 (Appendix II: Preliminary Recommendations).

Take disruptive protests and conduct as an example.  In January 2024, Harvard issued new time, place, and manner guidance for protests and demonstrations; reaffirmed that protests may not disrupt classes, libraries, or other core academic functions; and emphasized the need for consistent enforcement across schools.  Report at 112, 186, 199.  In August 2024, in light of challenges experienced during the spring semester of 2024, including a protest encampment in Harvard Yard, Harvard updated and clarified its rules governing the use of university grounds and facilities, including prohibitions on unauthorized camping, exhibits or displays, and reaffirmed longstanding rules against blocking ingress to and egress from classrooms, libraries, residence halls, and administrative buildings.  *Id.* at 25, 186, 199.  In November 2024, Harvard explained how protest rules apply in libraries, clarifying that even silent demonstrations violate policy because they interfere with a library's function as a place of study and research.  *Id.* at 199. Harvard also enforced rules governing approved displays and imposed disciplinary measures on student organizations for policy violations.  *Id.*  And it empowered the use of centralized, cross-school disciplinary mechanisms to address policy violations.  *Id.*  It also increased coordination between its police department and local and federal law enforcement authorities to assess and respond to campus safety concerns.  *Id.* at 197.

As reflected in the Task Force Report, Harvard has also vigorously advanced its efforts to address antisemitism head-on through reforms to its nondiscrimination and complaint-handling framework and expansion of relevant academic offerings. In January 2025, Harvard incorporated the International Holocaust Remembrance Alliance ("IHRA") definition of antisemitism into its non-discrimination and anti-bullying policies, and it has since provided training on the IHRA definition and examples. Report at 20, 199. In March 2025, Harvard reaffirmed that Jewish and Israeli identities are protected under its policies, and it trained complaint reviewers on this guidance in spring 2025. *Id.* at 198-199. Harvard also provided specialized antisemitism training for staff involved in complaint review and significantly expanded academic and curricular investments relating to antisemitism and Jewish and Israeli studies. *Id.* at 82, 193-195, 199. These robust efforts, along with related steps taken in response to the Task Force's recommendations, were part of the undisputed record in *Harvard v. HHS*. *See infra* pp.21-23.

**B.      The Government's Pretextual Efforts to Terminate Harvard's Funding**

In *Harvard v. HHS*, Harvard challenged the Government's attempts to terminate its federal funding by using allegations of indifference to antisemitism as pretext to coerce Harvard's adherence to the Government's preferred viewpoint. *See* 798 F. Supp. 3d at 121. In September 2025, a judge of this court ruled that the Government's actions contravened not only Title VI, but also the First Amendment, and found that Harvard had, in fact, acted to address antisemitism, which the Government ignored when it terminated Harvard's funding. *Id.* at 121-128, 132-133.

As the *Harvard v. HHS* decision recounts, in October 2024, Leo Terrell, Senior Counsel to the Assistant Attorney General for the Civil Rights Division, foreshadowed the Government's actions against Harvard when he announced, "Harvard will lose much more effective January 2025." 798 F. Supp. 3d at 93. In February 2025, the Department of Justice publicly announced the creation of its own Task Force to Combat Antisemitism ("Federal Task Force") with Terrell at

6

the helm. *Id.* On March 31, 2025, the Federal Task Force notified Harvard that it was reviewing more than $8.7 billion in federal grant commitments involving the University. *Id.* at 93-94. Days later, the Federal Task Force asserted that Harvard had "'failed to protect American students and faculty from antisemitic violence.'" *Id.* at 94. It conditioned Harvard's continued eligibility for federal funding on compliance with certain "pre-conditions," including "commissioning an external party to audit the student body, faculty, staff, and leadership for viewpoint diversity," "hiring a critical mass of new faculty and admitting a critical mass of students to provide the government's preferred balance of viewpoint diversity." *Id.* at 94-95.

On April 14, 2025, Harvard rejected the Government's demands, explaining its commitment to "fighting antisemitism and other forms of bigotry in its community" and detailing "substantial policy and programmatic measures undertaken in the past 15 months to make Harvard a very different place today from where it was a year ago." *Harvard v. HHS*, 798 F. Supp. 3d at 95. "Within hours of Harvard's refusal" to capitulate to those demands, the Government froze grants worth $2.2 billion and approximately $60 million in contracts awarded to Harvard. *Id.* at 96. Harvard then sued to defend its rights. *Id.* at 91 & n.1, 102.

On May 5, 2025, the Department of Education froze all new federal grants to Harvard. *Harvard v. HHS*, 798 F. Supp. 3d. at 98. Multiple agencies followed, "terminat[ing] grants related to all manner of medical, scientific, technological, and other projects." *Id.* at 99. These actions were a direct response to Harvard's decision to litigate rather than accede to the Government's demands. The Secretary of Education explained that because "Harvard's answer was a lawsuit," the Government was cutting funds to "really make our point." *Id.* at 102. The President explained: "every time [Harvard] fight[s], they lose another $250 million." *Id.*

The *Harvard v. HHS* court found the Government had invoked antisemitism as a pretext to justify its unlawful efforts to terminate Harvard's funding, noting that the funding decisions were "made before [the Government] learned anything about antisemitism on campus or what was being done in response." 798 F. Supp. 3d at 121, 132. Indeed, the court found that, as of mid-2025, "Harvard was, in fact, working to respond to and ameliorate antisemitism" through "publicly announced and widely reported" reforms. *Id.* at 130-131. These reforms included "creating the Harvard Task Force; disciplining students and faculty who violate applicable policies; enhancing programs and policies designed to address bias and promote ideological diversity and civil discourse; adopting new accountability procedures and clarified policies…; supplementing existing safety and security measures; refining procedures and protections for reporting misconduct; and making several leadership and personnel changes." *Id.* at 131.

### C.      The Government's Other Attempts to Punish Harvard

The Government's coordinated, multi-agency "onslaught," *Harvard v. HHS*, 798 F. Supp. 3d at 122, extends beyond its efforts to target Harvard's funding to additional coordinated attacks on key foundations of Harvard's educational mission and institutional stability.

*First*, the Government revoked Harvard's longstanding certification to host international students and scholars on F and J visas, immediately threatening to disrupt Harvard's educational programs. In addition, the President issued a Proclamation barring foreign nationals from entering the United States to study or conduct research at Harvard—and specifically only Harvard.[5]

---

[5]      Proclamation No. 10948, *Enhancing National Security by Addressing Risks at Harvard University*, 90 Fed. Reg. 24493 (June 4, 2025); Press Release, U.S. Dep't of Homeland Sec., *Harvard University Loses Student and Exchange Visitor Program Certification for Pro-Terrorist Conduct* (May 22, 2025), https://perma.cc/787S-P4WH; *see also President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec.*, 2025 WL 1719206, at *1 (D. Mass. June 20, 2025), and 788 F. Supp. 3d 182 (D. Mass. 2025) (preliminarily enjoining these actions).

*Second*, senior government officials openly threatened Harvard's tax-exempt status under Section 501(c)(3) of the Internal Revenue Code, jeopardizing Harvard's financial stability and capacity to support students and research.[6]

*Third*, multiple federal agencies—including the Departments of Education and Justice— initiated far-ranging investigations into Harvard's finances, admissions practices, academic standards, regulatory compliance, and programs of visa sponsorship for international students.[7]

*Fourth*, on June 30, 2025, the HHS Office for Civil Rights issued an abrupt Notice of Violation to Harvard ("HHS Notice") stating that Harvard had violated Title VI through "deliberate indifference" to "discrimination directed towards Jewish and Israeli students." *See* AC ¶ 9 & n.6.[8]    The HHS Notice disclaimed any obligation to seek voluntary compliance, preemptively concluding that it had "ample grounds, under 45 C.F.R. § 80.3(d)(1), to determine that compliance cannot be secured by voluntary means." HHS Notice at 33-34.

*Finally*, shortly after the court's decision in *Harvard v. HHS*, the Department of Education placed Harvard on Heightened Cash Monitoring, requiring Harvard to submit a $36 million letter of credit and to front student-aid disbursements from its own funds before drawing down federal

---

[6]    *See, e.g.*, Donald J. Trump, *Truth Social* (Apr. 15, 2025, 10:09 AM), https://perma.cc/ K9KJ-NUV4 ("Perhaps Harvard should lose its Tax Exempt Status and be Taxed as a Political Entity if it keeps pushing political, ideological, and terrorist inspired/supporting 'Sickness?'").

[7]    *See, e.g.*, Press Release, U.S. Dep't of Educ., *U.S. Department of Education Issues Denial of Access Letter to Harvard University for Its Continued Failure to Provide Admissions Data* (Sept. 19, 2025), https://perma.cc/H3GB-7UV4; Press Release, U.S. Dep't of Just., *Justice Department Establishes Civil Rights Fraud Initiative* (May 19, 2025), https://perma.cc/J4B7-UVQ4; *see also Trump Administration Escalates Harvard Feud with New Justice Dept. Investigation*, N.Y. Times (May 15, 2025), https://perma.cc/W68X-VWLC.

[8]    Off. for C.R., U.S. Dep't of Health & Hum. Servs., *Notice of Violation: Harvard University* (June 30, 2025), https://perma.cc/9M7U-Z9CJ.

aid.[9]  On February 6, 2026, the Department of Defense announced it was ending all professional military education fellowships and certificate programs with Harvard.[10]  The Government also initiated new Title VI compliance reviews targeting Harvard's academic and administrative operations and sued Harvard for negotiating over document demands.[11]

All the while, the Government made its motives plain.  It publicly acknowledged that its actions are in response to Harvard's rejections of its various demands to impose government control over curriculum, hiring, and governance; Harvard's decision to defend itself in court; and Harvard's refusal to settle on the Government's terms.  President Trump has repeatedly expressed this: "Everyone knows that Harvard has 'lost its way.' … Harvard has been hiring almost all woke, Radical Left, idiots and 'birdbrains' … Harvard is a JOKE … and should no longer receive Federal Funds."[12]  The White House convened top government officials from nearly a dozen agencies to discuss additional punitive measures.  A White House spokesperson said: "The latest moves against Harvard are truly just scratching the surface," and Harvard would suffer a "self-inflicted demise" because it "decided to litigate."[13]  The Commerce Secretary confirmed the same shortly after initiating a far-reaching audit of Harvard's patents, remarking, "[W]e just have a blast, you

---

[9]    Press Release, U.S. Dep't of Educ., *U.S. Department of Education Places Harvard University on Heightened Cash Monitoring for Financial Responsibility Concerns* (Sept. 19, 2025), https://perma.cc/YF55-2KAW.

[10]    *War Department Cuts Ties With Harvard University*, U.S. Dep't of War (Feb. 6, 2026), https://perma.cc/N8D8-5Y3L.

[11]    *See United States v. President & Fellows of Harvard Coll.*, No. 1:26-cv-10844 (D. Mass. Feb. 13, 2026); Press Release, U.S. Dep't of Educ., *U.S. Department of Education's Office for Civil Rights Opens Two New Probes into Harvard University for Continued Discrimination on Campus* (Mar. 23, 2026), https://perma.cc/5WPM-9PNU.

[12]    Donald J. Trump, *Truth Social* (Apr. 16, 2025, 7:05 AM), https://perma.cc/7RCD-GH6L.

[13]    *White House Convenes Meeting to Brainstorm New Harvard Measures*, Politico (May 30, 2025), https://perma.cc/SC5L-VMAH.

know?  Because [the Secretary of Education is] hitting Harvard, and she says, 'What can we do?'

Now we send them a patent letter and hit them again.  So, we're having fun together."[14]

###### D.    This Lawsuit

The Amended Complaint alleges discrimination against Jewish and Israeli students in

violation of Title VI and asserts breaches of (unspecified) contracts based on the same alleged

violations.  It seeks far-ranging relief, including declaratory judgments of Title VI violations and

breach of contract, permanent injunctive relief regulating Harvard's operations, rescission and

restitution of past grant payments, a bar on future federal funding, and the appointment of a

government-approved independent monitor, AC ¶¶ 202-210—relief that mirrors the preconditions

the Government sought to impose on Harvard in April 2025, *see Harvard v. HHS*, 798 F. Supp.

3d at 94-95.  The Assistant Attorney General for Civil Rights has publicly declared that this lawsuit

was filed because "Harvard sued us" and "is defiant."[15]

## ARGUMENT

## I.    THE GOVERNMENT FAILS TO STATE A CLAIM UNDER TITLE VI

The Amended Complaint cures none of the defects in its Title VI claim.  Instead, it adds a

handful of dated allegations and asserts for the first time that Harvard can be held liable under Title

VI without a showing of deliberate indifference or direct discrimination.  The Amended Complaint

fails to state a viable Title VI claim because it fails to (1) allege ongoing Title VI noncompliance;

---

[14]    The White House, *President Trump Participates in a Cabinet Meeting*, at 2:12:50-2:13:01 (YouTube Aug. 26, 2025), https://perma.cc/BCT3-33AV, https://www.youtube.com/live/inRXd4OWt2M?si=SE9kqV2fCxK1sjjt&t=7972; *see* Remarks During a Cabinet Meeting and an Exchange with Reporters, Daily Comp. Pres. Doc., 202500873 (Aug. 26, 2025), https://perma.cc/2ETA-3AC9 (omitting these particular remarks); *see also* Donald J. Trump, *Truth Social* (Feb. 2, 2026, 11:20 PM), https://perma.cc/VUE4-JF3V.

[15]    *Harmeet Dhillon, Trump's Civil-Rights Enforcer in Action*, Wall St. J. (Mar. 27, 2026), https://perma.cc/523M-NZMN.

(2) state a claim for deliberate indifference; (3) allege a viable negligence theory; (4) plead direct discrimination; or (5) establish that DOJ has complied with Title VI's procedural requirements.

### A.    The Government Fails to Allege Ongoing Noncompliance with Title VI

The Government's claims are inconsistent with the Title VI remedial scheme Congress designed, which imposes "elaborate restrictions on agency enforcement." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001). Title VI provides that the Government may "effect[]" compliance either "by the termination of or refusal to grant or to continue assistance," or "by any other means authorized by law." 42 U.S.C. § 2000d-1. Whichever path the Government pursues, "no such action shall be taken" until the relevant agency has first determined that compliance "cannot be secured by voluntary means." *Id.* These requirements exist to "avoid[] a punitive … application of the termination power." *Harvard v. HHS*, 798 F. Supp. 3d at 127.

Yet here the Government seeks to impose draconian punishments despite its repeated failure to allege ongoing or threatened noncompliance with Title VI. Rather than identifying present conditions requiring correction, both the original and Amended Complaints recount a closed set of alleged incidents that ended a year before filing. *See* AC ¶¶ 14-80. In fact, a full calendar year and academic year have now passed since *any* alleged harassment identified by the Government. But Title VI's government enforcement provision is aimed only at bringing funding recipients into prospective compliance, not imposing punitive measures for purported historical violations. The text of Title VI limits the Government's role to ensuring that "[c]ompliance with" Title VI is "effected." 42 U.S.C. § 2000d-1. That is why the Government cannot sue unless it "has determined that compliance cannot be secured by voluntary means." *Id.* DOJ regulations likewise cabin "judicial enforcement" of Title VI to relief "designed to secure compliance." 28 C.F.R. § 50.3. Limiting the Government to forward-looking relief accords with Congress's intent that loss of funding be "a last resort." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 705 & n.38 (1979).

12

The Government's failure to plead an ongoing Title VI violation also means that it lacks standing. To establish standing for prospective relief, there must be an "'ongoing injury or a sufficient threat that the injury will recur.'" *Nat'l Ass'n of Gov't Emps., Inc. v. Yellen*, 120 F.4th 904, 910 (1st Cir. 2024). "Past harm is insufficient to 'confer standing to seek forward-looking declaratory or injunctive relief.'" *Id.* This requirement applies with equal force to the United States. *See United States v. City of Tampa*, 739 F. Supp. 3d 1055, 1064-1066 & n.2 (M.D. Fla. 2024); *United States v. King County*, 122 F.4th 740, 750-751 (9th Cir. 2024). Because the Amended Complaint does not allege any continuing violation, the Government cannot establish standing for a Title VI claim. That distinguishes this case from this Court's prior decisions allowing private Title VI suits against Harvard to proceed past the pleading stage based on allegations of then-ongoing harassment during the 2023-24 academic year—more than two years before this pleading, and well before Harvard issued its Task Force Report or undertook many of the actions described in that Report. *See Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 303-305 (D. Mass. 2024); *Louis D. Brandeis Ctr. for Hum. Rts. Under L. v. President & Fellows of Harvard Coll.*, 2024 WL 4681802, at *4 (D. Mass. Nov. 5, 2024).

### B.    The Government Fails to Plead Deliberate Indifference to a Hostile Environment

The Government has failed to allege facts demonstrating either of the two required elements of a Title VI deliberate indifference claim: (1) the existence of a hostile educational environment and (2) deliberate indifference to that hostile environment. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999).

#### 1.    The Government Fails to Plausibly Allege a Hostile Environment

The Harvard Task Force Report forthrightly acknowledged the events on campus following October 7 and recognized the importance of additional action to combat antisemitism. Even so,

the Government's allegations fall short of plausibly alleging a hostile environment. To allege a hostile environment, the Government must plead harassment "so severe, pervasive, and objectively offensive" that it deprived students of access to educational opportunities. *Davis*, 526 U.S. at 650. Neither the original nor the Amended Complaint does so, describing instead discrete instances of peer-on-peer offensive conduct and protests that did not target students based on a protected trait.

To begin, the Amended Complaint does not plausibly allege that conduct targeting Jewish students in the 2023-24 timeframe went beyond a small number of discrete instances of harassment. The Government previously claimed that protestors occupying a school lounge "stopped, targeted, and accosted Jewish students," AC ¶ 38, and that some demonstrators "occupying Harvard Yard followed and verbally harassed Jewish students," *id.* ¶ 57. It now adds that (a) Jewish students "were singled-out, surrounded and intimidated" during a November 2023 protest, *id.* ¶ 44; (b) "a Jewish teaching fellow was assaulted" during the April 2024 encampment, *id.* ¶ 58; (c) unknown individuals sent vile social media messages during the 2023-24 school year, *id.* ¶ 29; and (d) offensive stickers appeared on and off campus in October 2024, *id.* ¶ 69. These allegations are disturbing, but they reflect "isolated incidents of antisemitism" that do not amount to the "systemic" "deprivation of educational access" required to establish a Title VI violation. *StandWithUs Ctr. for Legal Just. v. MIT*, 158 F.4th 1, 20-21 (1st Cir. 2025) ("The requirement that the deprivation of educational access be systemic is key."); *see also Hankey v. Town of Concord-Carlisle*, 136 F. Supp. 3d 52, 66 (D. Mass. 2015) ("[I]solated incidents may not constitute pervasive … harassment."); *Davis*, 526 U.S. at 652. In *StandWithUs*, the court held that scattered instances of alleged antisemitic conduct were "isolated" rather than "systemic," including because they "occurr[ed] over the course of seven months" and were "few in number and, even then, not all trained on any" individual student. 158 F.4th at 20-21. Moreover, as the Government concedes,

14

"[m]uch … of the problem was student-on-student harassment."  AC ¶ 86.  That "undermines any inference of severe or pervasive harassment," *StandWithUs*, 158 F.4th at 21, because "[p]eer harassment, in particular, is less likely to" create a hostile environment, *Davis*, 526 U.S. at 653.[16]

The bulk of the allegations in the Amended Complaint reflect student speech and protest activity.  Title VI does not require a university to "put an end to the protestors' speech," even where offensive.  *StandWithUs*, 158 F.4th at 13; *see also id.* at 15 ("[T]he First Amendment erects safeguards that limit the ability of the government or private plaintiffs to punish [universities] for not restricting more severely … protected speech."); *Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 541 (1st Cir. 1995) (no hostile environment where offensive behavior was based on viewpoint, not protected characteristic); *Segev v. President & Fellows of Harvard Coll.*, No. 1:25-cv-12020, Dkt. 35 (D. Mass. Dec. 4, 2025) (dismissing claim where conduct was not plausibly "based on antisemitism rather than disagreement with the underlying political message"); *Canel v. Art Inst. of Chi.*, 2026 WL 776580, at *11-12 (N.D. Ill. Mar. 19, 2026); *Landau v. Corp. of Haverford Coll.*, 789 F. Supp. 3d 401, 414-415 & n.6 (E.D. Pa. 2025).  No less important, the Government fails to allege that campus disruptions or aggressive protest tactics targeted Jewish or Israeli students in particular, as is required, as opposed to targeting "prominent location[s]" for all students on campus.  *StandWithUs*, 158 F.4th at 19-20; *see also Gartenberg v. Cooper Union*, 765 F. Supp. 3d 245, 271 (S.D.N.Y. 2025) ("no factual support" for assertion that messages were "intended to target particular Jewish students, as opposed to … the Cooper Union community at

---

[16]    The allegation that a faculty member violated the rights of three Israeli students during a two-week workshop in spring 2023 do not change this result.  Harvard responded to that incident by retaining outside counsel to conduct an investigation and imposing remedial measures. *Brandeis Center*, Dkts. 1-8, 1-10 (May 22, 2024).

15

large"); *Brandeis Ctr.*, 2024 WL 4681802, at *4-5 (actions must be "*because of* some anti-Jewish or anti-Israel discriminatory animus").

Many of the Government's allegations claim that demonstrations violated Harvard's rules, yet the Amended Complaint does not allege how those purported rule violations relate to antisemitism, much less resulted in discriminatory harassment. *See, e.g.*, AC ¶¶ 67, 68, 72, 74. The Government tries to sidestep this problem by claiming that certain protest chants are inherently antisemitic and thus automatically convert demonstrations into actionable harassment. *See, e.g.*, *id.* ¶¶ 24-28, 34, 43. But such "conclusory allegations of antisemitic animus" do not "permit the inference that in these specific circumstances the protestors' strident criticisms of Israel were driven by antisemitism." *StandWithUs*, 158 F.4th at 18-19; *see Segev*, Dkt. 35 (plaintiff "cannot transform … anti-Israel sentiment into antisemitism based on [the] use of certain rhetoric").

### 2. The Government Fails to Plausibly Allege Deliberate Indifference

Even if the Government had pleaded a hostile environment, it does not and cannot meet the high bar of pleading deliberate indifference. Deliberate indifference is "a stringent standard of fault, requiring proof that the actor disregarded a *known or obvious* consequence of his action or inaction." *Porto v. Town of Tewksbury*, 488 F.3d 67, 73 (1st Cir. 2007). "A university is deliberately indifferent under Title VI only if its response to known harassment is 'so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances.'" *StandWithUs*, 158 F.4th at 22 (quoting *M.L. ex rel. D.L. v. Concord Sch. Dist.*, 86 F.4th 501, 511 (1st Cir. 2023)); *see also Sussman v. MIT*, No. 25-cv-11826, Dkt. 75 (D. Mass. Jan. 5, 2026) (no liability where university is not "*affirmatively choosing* to do the wrong thing"). Universities do not have to "purg[e] their schools of actionable peer harassment" to avoid liability. *Davis*, 526 U.S. at 648. They need not be "perfect." *D.L.*, 86 F.4th at 511. Nor are they required to "engage in particular disciplinary action" to satisfy their Title VI obligations. *Davis*, 526 U.S. at 648.

16

The Government cannot plead deliberate indifference by asserting in a conclusory fashion (and in direct conflict with the Task Force Report upon which it repeatedly relies) that Harvard's response to concerns of antisemitism since the end of the 2023-24 academic year has been to "do nothing." AC at 1; *id.* ¶¶ 37, 50, 76. The basis for this claim appears to be that Harvard has not taken the Government's favored approach on its preferred timeline. The Government claims, for example, that Harvard has not "enforce[d] its rules or meaningfully discipline[d]" students to the Government's satisfaction. *Id.* at 1-2. The Government also faults Harvard for declining to turn the police on student protesters. *Id.* ¶¶ 42, 45, 204(c). And the Government claims that—as of a year ago—Harvard had made less progress than the Government would have liked to improve its reporting process for harassment. *Id.* ¶¶ 140-141. But disagreement with Harvard's approach does not establish deliberate indifference. *See Porto*, 488 F.3d at 73 ("[A] claim that the school system could or should have done more is insufficient to establish deliberate indifference"). "Title VI does not require schools to craft perfect solutions" and does not entitle complainants to their preferred "remedial demands." *StandWithUs*, 158 F.4th at 23. Courts must "refrain from second guessing" a university's chosen response "unless those decisions were clearly unreasonable." *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1109 (9th Cir. 2020).

Unlike the private plaintiffs in *Kestenbaum* and *Brandeis Center*, the Government here cannot rest on Harvard's response to "ongoing" campus incidents as of May 2024. *Kestenbaum*, 743 F. Supp. 3d at 304-305; *Brandeis Ctr.*, 2024 WL 4681802, at *5. Over the entire course of the Fall 2024 semester, the Government identifies six protests in three different Harvard libraries, for nearly all of which the Government alleges no explicit connection to antisemitism, and ignores that Harvard enforced its policies against students and faculty who violated them. AC ¶¶ 67, 70-

17

75.[17]  The Amended Complaint adds two incidents from October 2024: vandalization of a statue and placing of antisemitic stickers on and off campus.  *Id.* ¶¶ 68-69.  The only other alleged incidents took place in March 2025: two outdoor protests and the removal of hostage posters.  *Id.* ¶¶ 78-80.[18]  In its original Motion to Dismiss, Harvard explained that the Government must plausibly allege that Harvard *continues* to be deliberately indifferent.  Dkt. 28 at 19; *see also supra* pp.12-13.  But even after amending, the Government still has failed to put forward *any* allegations that support an inference of deliberate indifference in the past 15 months.

In fact, the Government's own allegations highlight Harvard's evolving and sustained response to reports of antisemitism, describing "an escalating series of actions aimed at calming the turmoil without violence" that is incompatible with deliberate indifference.  *StandWithUs*, 158 F.4th at 22.  As the Government recounts, Harvard's response to reports of antisemitism in the aftermath of October 7 was to tighten security on campus and urge students to engage in civil debate.  *See* AC ¶¶ 40, 44, 109, 118, 130.  Early the next semester, Harvard released new time, place, and manner guidelines on protest in an effort to ensure its campus remained a welcoming place for all while upholding its commitment to free expression.  *See* AC ¶ 123.  With respect to the encampment in Harvard Yard, the Government concedes that Harvard issued admonishments, threatened discipline, and ultimately placed students on involuntary leave to secure an end to the

---

[17]    Although the Amended Complaint describes an October 2024 protest by "Harvard *professors*" as "anti-Israeli," AC ¶ 70, the source that it cites for that allegation describes that protest (accurately) as a protest of "the library's decision to temporarily ban students" on the basis of a prior demonstration.  HHS Notice at 15.  First, this was a protest against Harvard's enforcement of a policy banning library protests, not a protest related to Israel.  *See Jones*, 542 F. Supp. 3d at 55 (document trumps inconsistent allegation).  Second, the protest related to the library's *enforcement* of its no protest policy, showing that that policy was, in fact, enforced.  HHS Notice at 15.

[18]    The Amended Complaint neglects to mention that the employee who removed the hostage posters was immediately terminated.  *Librarian Who Removed Chabad Poster Is No Longer Employed at Harvard*, Harvard Crimson (Mar. 10, 2025), https://perma.cc/AR76-YRZH.

encampment.  *See id.*  ¶¶ 60-64, 66.  Harvard's successful efforts to end the encampment demonstrate that it "manag[ed] the situation so as to avoid escalation and violence." *StandWithUs*, 158 F.4th at 23.  Like other schools, Harvard reached the "defensible conclusion" that, "amidst a period of extreme unrest on college campuses across the country," precipitous and ill-considered intervention "could have triggered an even larger and more disruptive backlash." *Landau*, 789 F. Supp. 3d at 421.  The Government might have preferred a swifter or harsher outcome, but that is insufficient to plausibly allege a Title VI claim.  *See Davis*, 526 at 648.

The Harvard Task Force Report directly rebuts the Government's conclusory refrain that Harvard has "do[ne] nothing" to address antisemitism.  AC at 1.  The creation and extensive work of the Harvard Task Force *itself* demonstrate the reasonableness of Harvard's ongoing response. *See StandWithUs*, 158 F.4th at 22 (citing MIT's initiative "to combat antisemitism on campus"); *Yakoby v. Trs. of Univ. of Pa.*, 2025 WL 1558522, at *7 n.3 (E.D. Pa. June 2, 2025) (citing similar Penn task force).  The Government's response is that the Harvard Task Force was "a façade," AC ¶ 53—a puzzling assertion given its several dozen invocations of the Report as the basis for the Amended Complaint.  Moreover, this characterization is belied by the Report itself, which underscores the real work Harvard has done to respond to concerns of antisemitism on campus.[19] The Government cannot selectively ignore the substantial portions of the Report that establish the many actions Harvard has taken to combat antisemitism and improve its campus environment— actions that render the Government's claims implausible.  For example, Harvard has educated its

---

[19]    Indeed, Harvard's efforts have been recognized by the Harvard Jewish community.  *See, e.g., Jewish Groups Say Harvard Was Not Indifferent to Antisemitism, Push Back on Justice Department Suit*, Harvard Crimson (Mar. 25, 2026), https://perma.cc/ZFW7-9YAC; *At US Commission on Civil Rights hearing, Jewish students warn against politicizing campus antisemitism*, Jewish Daily Forward (Feb. 23, 2026), https://perma.cc/92CP-XDZ2; *Harvard's Jewish Life Thrives as Trump Investigates*, N.Y. Times (May 29, 2026), https://perma.cc/LBY7-HMLH.

community members on recognizing and responding to antisemitism and engaging in civil debate over contentious issues; updated its policies to "establish clearer expectations for community behavior"; better defined the limitations on campus protest and dissent; clarified how schools must evaluate claims of antisemitic harassment; and worked directly with its Jewish community so that Jewish students feel welcome and safe on campus. *See* Report at 193-199; *supra* pp.3-6.[20]

Harvard's resolution of the *Kestenbaum* and *Brandeis Center* lawsuits further refutes the claim that Harvard has "do[ne] nothing."[21] AC at 1. As a part of those settlements, Harvard made substantial forward-looking commitments designed to ensure that its campus remains a welcoming environment for Jewish and Israeli students. Harvard committed to incorporating the IHRA definition of antisemitism into its nondiscrimination policies; to reaffirming in annual community messages that antisemitism will not be tolerated at Harvard; to new public reporting on complaints of discrimination, including antisemitism; to hiring a designated individual responsible for consulting on all complaints of antisemitism; and to investing in academic resources to study antisemitism. *See Kestenbaum*, Dkt. 104-1 (Jan. 21, 2025); *Brandeis Ctr.*, Dkt. 81-1 (Jan. 21, 2025). Here, too, Harvard's actions demonstrate the opposite of deliberate indifference; they evince Harvard's ongoing commitment to respond to allegations of antisemitism.[22]

---

[20]    The Harvard Task Force's website further documents the "University-wide and School-specific initiatives" Harvard continues to implement in line with the Report's recommendations. *See University Actions and Commitments*, Harvard University Presidential Task Force on Combating Antisemitism and Anti-Israel Bias, https://perma.cc/HB4M-HMX3.

[21]    The material terms of those January 2025 settlements are public court records subject to judicial notice. *See Kowalski v. Gagne*, 914 F.2d 299, 305-306 (1st Cir. 1990).

[22]    The Government asserts that Harvard has not satisfied one settlement term because it has not yet published a forthcoming report addressing complaints of Title VI harassment since October 2023, *id.* ¶¶ 142-143, but provides no basis to infer that Harvard's report is untimely (it is not).

### 3.     *Harvard v. HHS* **Precludes the Deliberate Indifference Claim**

The Government also cannot state a claim because the central factual premise on which its allegations rest—that Harvard has failed to respond to concerns about antisemitism on campus—was fully litigated and resolved in *Harvard v. HHS*.  Issue preclusion bars a party from "relitigating an issue already decided," when "(1) both proceedings involved the same issue of law or fact, (2) the parties actually litigated that issue, (3) the prior court decided that issue in a final judgment, and (4) resolution of that issue was essential to judgment on the merits."  *Global NAPs, Inc. v. Verizon New England Inc.*, 603 F.3d 71, 95 (1st Cir. 2010).  The doctrine "applies to issues of fact as well as those of law," *Manganella v. Evanston Ins. Co.*, 700 F.3d 585, 591 (1st Cir. 2012), and extends to "'necessary *intermediate* findings,'" not merely "'ultimate issues,'" *Rodríguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 771 (1st Cir. 2010).

The decision in *Harvard v. HHS* precludes relitigating the factual premise underlying the Government's deliberate indifference claim.  *First*, both this proceeding and *Harvard v. HHS* revolve around a core factual issue: whether Harvard failed to take action to address antisemitism on its campus.  In *Harvard v. HHS*, a central question was whether the Government's stated reason for terminating funding—that Harvard had not sufficiently responded to antisemitism—was factually accurate or instead pretextual.  798 F. Supp. 3d at 129, 132-133.  The Amended Complaint relies upon the same allegations the Government invoked in that case.  Indeed, the Government does not allege *a single incident* that post-dates Harvard's complaint in *Harvard v. HHS*, *id*. at 102, or the Federal Task Force's March 31, 2025, letter alleging violations of Title VI based on claims of antisemitism (which begat the *Harvard v. HHS* litigation).

*Second*, this issue was actually litigated: it was raised, contested by the parties, submitted for determination by the court, and determined.  *See Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 981 (1st Cir. 1995); *Rogers v. Town of Northborough*, 188 F. Supp. 2d 10, 14

21

(D. Mass. 2002).  In *Harvard v. HHS*, the summary judgment briefing put Harvard's alleged failure to address antisemitism squarely at issue.  The Government asserted that "[b]ecause of Harvard's acknowledged failures to address antisemitism … the agencies exercised their authority, as set out in the text of Harvard's contracts, to cancel those agreements."  Defs.' S.J. Mem., *Harvard v. HHS*, No. 25-cv-11048 (D. Mass. June 16, 2025), Dkt. 186 at 1.[23]  The Government justified its termination of Harvard's federal research grants because Harvard was "'being investigated for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment.'" *Harvard v. HHS*, 798 F. Supp. 3d at 128 (quoting Government brief).  The *Harvard v. HHS* court thus addressed "the steps Harvard had taken to research or address antisemitism on campus" and whether the Government had adequately considered those steps.  *Id.* at 130; *see id.* at 121.

The *Harvard v. HHS* court concluded that, as of mid-2025, Harvard had already taken (and was continuing to take) substantial steps to address antisemitism on campus.  798 F. Supp. 3d at 137.  The court found that these efforts began during the 2023-24 academic year with "policy and other changes aimed at ensuring that its campus is safe and welcoming for Jewish and Israeli students."  *Id.* at 93.  As noted above, these reforms included convening the Harvard Task Force, "disciplining students and faculty who violate applicable policies," "enhancing programs and policies designed to address bias and promote ideological diversity and civil discourse," "adopting new accountability procedures and clarified policies," and "making several leadership and personnel changes."  *Id.* at 131.  The court also acknowledged that these efforts continued after

---

[23]     *See also, e.g.*, Defs.' S.J. Mem., *Harvard v. HHS*, at 3 (Government's purported policy purpose for canceling grants was "to not fund institutions that fail to address antisemitism"); *id*. at 4 ("Harvard's grants were terminated due to, in the agencies' estimation, the inadequacy of the measures Harvard had implemented up to that point to address antisemitism."); *id*. at 34-35 ("Rather, it is the fact that Harvard refused to take adequate actions to respond to antisemitism on its own campus that justified the agency action."); *see also id.* at 5-10.

issuance of the Report in April 2025, as Harvard worked "to centralize and strengthen its disciplinary procedures," worked to promote a "widespread sense of belonging" and "respectful dialogue," updated "policies, procedures, and training," and "reviewed recommendations concerning admissions, appointments, curriculum, and orientation and training programs." *Id*. at 98. The court thus concluded, "[t]he record reflects that Harvard was, in fact, working to respond to and ameliorate antisemitism." *Id.* at 130. In doing so, it resolved and rejected the claim here that Harvard has "do[ne] nothing" or has "failed to take material steps to address the severe and pervasive harassment of and discrimination against Jewish and Israeli students." AC at 1, ¶ 84.

*Third*, the *Harvard v. HHS* order is a valid and binding final judgment. "A granted motion for summary judgment constitutes a decision on the merits that is binding … for purposes of preclusion." *Rogers*, 188 F. Supp. 2d at 14; *see also In re Kane*, 254 F.3d 325, 328 (1st Cir. 2001).

*Fourth*, the findings regarding Harvard's responses to antisemitism were essential to that judgment. The Government's funding terminations were based on the Government's "determination that Harvard had not taken sufficient steps to address antisemitism." *Harvard v. HHS*, 798 F. Supp. 3d at 129. But the court found that Harvard was actively working to respond to antisemitism and that there was "no evidence" the Government considered the many reforms Harvard had implemented. *Id*. at 130. Those findings were integral to the court's holding that the Government's actions were pretextual and unlawful. *See, e.g.*, *id.* at 121-122, 130-133.

Because a court has already determined that Harvard took substantial and continuing steps to address antisemitism, the Government is barred from relitigating that issue and the Government's Title VI deliberate indifference claim should therefore be dismissed.

## C.    The Government Fails to Plead Direct Discrimination

The Government also has not plausibly alleged that Harvard violated Title VI through "intentional refusal to enforce its rules against discriminatory conduct directed towards Jews and

23

Israelis" while enforcing its rules when other groups are targeted. AC ¶ 194. The allegations it relies upon—many of them recycled from the direct discrimination claims this Court dismissed in *Kestenbaum* and *Brandeis Center*—fall well short of satisfying this requirement.

To state a direct discrimination claim under Title VI, the Government must "plausibly establish[]" that Harvard itself acted "*because of* some anti-Jewish or anti-Israel discriminatory animus." *Brandeis Ctr.*, 2024 WL 4681802, at *4. Discriminatory animus can be pleaded through comparator allegations. *Doe v. Brown Univ.*, 43 F.4th 195, 207 (1st Cir. 2022). To plead "a comparator claim based on Harvard's failure to punish the conduct of others," the Government must "identify reasonably comparable analogs," *Kestenbaum*, 743 F. Supp. 3d at 311, which requires alleging that "'the nature of the infraction and knowledge of the evidence by college officials [was] sufficiently similar,'" *id.* at 310.

The Government comes nowhere close. The original Complaint listed a handful of past campus controversies involving other forms of bias and describes how Harvard reacted to them. *See* AC ¶¶ 147-149. None of those past controversies is "reasonably comparable" to any incident of alleged antisemitism identified in the Amended Complaint. In fact, nearly all were raised and rejected in *Kestenbaum*. *Compare* AC ¶¶ 147-148, 149(a)-(c), 149(e), *with Kestenbaum*, 743 F. Supp. 3d at 311 & n.14, *and* Second Am. Compl., *Kestenbaum*, Dkt. 63, ¶¶ 278, 284, 287, 290 (May 28, 2024). The Court there correctly concluded that none of these purported comparators identifies "comparably situated speakers or students" who "engaged in conduct analogous" to the harassment the Government alleges. *Kestenbaum*, 743 F. Supp. 3d at 311. The original Complaint here included only one purported comparator that was not borrowed from *Kestenbaum*, and the

24

Amended Complaint adds one more, neither of which "support[s] a finding of facial inconsistency," let alone an inference of discriminatory animus. *Brown Univ.*, 43 F.4th at 207.[24]

### D.   The Government's Novel Title VI Negligence Theory Fails

The Government's alternative theory that Harvard can be liable for alleged "negligent conduct," AC ¶ 202, fails for the reason already given: Harvard's sustained response to antisemitism leaves no violation of Title VI for the United States to abate. *See supra* pp.12-13. But Count I is defective for the further reason that it asks the Court to declare that Harvard violated Title VI on the premise that it "should have known" of harassment and failed to prevent it. AC ¶ 184. Because Title VI does not reach negligence, this claim fails.

It is "beyond dispute" that Title VI "prohibits only intentional discrimination"—*i.e.*, mistreatment because of race, color, or national origin. *Sandoval*, 532 U.S. at 280. Intentional discrimination can be proved in only two ways: direct discrimination, *see supra* pp.23-25, or deliberate indifference to a hostile environment, *see supra* pp.13-20. The latter is understood as a form of intentional discrimination in its own right—a recipient's "*own* decision to remain idle in the face of known" harassment is how it "intentionally violates" the statute and becomes liable "for its own misconduct." *Davis*, 526 U.S. at 641-643. Count I travels neither path.

The Government has likewise acknowledged that a funding recipient's intentional discrimination, not its negligence, violates Title VI. Notably, in its recent rulemaking amending Department of Justice Title VI regulations, the Government reaffirmed that the statute "prohibits

---

[24]   The original Complaint alleged that Harvard did not condemn disruptive protests but did condemn a doxing billboard truck. *See* AC ¶ 149(d). The Amended Complaint adds that Harvard disciplined a protestor who "spoke out against" China's policies at an event featuring the Chinese Ambassador but "explicitly permitted" protestors to disrupt an event featuring a former Hamas member turned outspoken opponent. *Id.* ¶ 149(f). Both allegations describe nothing more than different reactions to non-analogous circumstances.

25

only intentional discrimination." 90 Fed. Reg. 57141, 57144 (Dec. 10, 2025). Other agencies have followed suit. *See* 91 Fed. Reg. 36963 (June 22, 2026). The Government's new claim that it can sue Harvard over merely negligent (*i.e.*, unintentional) conduct is flatly inconsistent with its public pronouncement in that same rulemaking that "any version of imposing liability for unintentional discrimination is inconsistent with Title VI's original public meaning." 90 Fed. Reg. at 57145. And just months ago, the Government's HHS Notice explained that "a hostile environment alone does not create Title VI liability for Harvard—it is the school's deliberate indifference to such harassment that imposes such liability." HHS Notice at 11 n.63.

Yet Count I does not attempt to plead any form of intentional discrimination. Instead, the Government accuses Harvard of "enabling" and "fostering and incubati[ng]" a hostile environment" through "actions clearly insufficient in light of the known circumstances." *See* AC ¶¶ 177, 181, 184. It seeks to hold Harvard responsible for statements and actions of independent actors on no firmer ground than that Harvard "should have known" that their conduct violated Title VI. *Id*. ¶ 184. This is not a cognizable Title VI theory. The Supreme Court has expressly "declined the invitation to impose liability under what amounted to a negligence standard." *Davis*, 526 U.S. at 642. The mere failure to "do[] more" is not a Title VI violation. *Porto*, 488 F.3d at 73. The Court has also confined hostile environment liability to "known" harassment. *Davis*, 526 U.S. at 642; *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 288 (1998) ("vicarious liability or constructive notice" is insufficient).

Attempting to circumvent existing law, the Government wrongly asserts that it need not prove "deliberate indifference" because it (1) requests a "non-monetary judicial remedy" and (2) relies on Title VI's "implementing regulations." AC ¶¶ 175, 177. But, as to the first claim, the requirement of intentional discrimination is not linked to a particular remedy; it limits what

26

conduct violates the statute in the first place. *See Sandoval*, 532 U.S. at 280. In any event, the Government claims the "non-monetary" remedy is a predicate for the steep monetary relief it also seeks. AC ¶¶ 201, 207. As to the second, even if a Title VI violation could rest on something short of intentional discrimination when grounded in an applicable regulation, Count I would still fail; it does not cite any regulation, funding condition, or requirement under Section 602 that imposes a negligence standard. Nor could it, because no such requirement exists.[25]

### E.    The Government Failed to Comply with Title VI's Mandatory Procedural Requirements

Title VI does not authorize agencies to proceed directly to litigation based on alleged noncompliance. Instead, Congress imposed strict procedural limitations designed to ensure notice, an opportunity for voluntary resolution, and deliberation before the extraordinary step of cutting off federal funding or bringing suit. *See* 42 U.S.C. § 2000d-1; *Sandoval*, 532 U.S. at 289-290.

Federal agencies have implemented these statutory requirements through regulations. Under HHS's Title VI regulations, for example, enforcement "by any other means authorized by law" (such as referral to DOJ to bring suit) is permissible only if alleged noncompliance "cannot be corrected by informal means," and may not proceed unless the agency has (1) advised the recipient of both the alleged failure to comply and the action that will be taken to effect compliance, and (2) determined that voluntary compliance cannot be secured. 45 C.F.R. § 80.8(a), (c)(1). The Government was obligated to abide by these regulations. *See Rotinsulu v. Mukasey*, 515 F.3d 68 (1st Cir. 2008). The Government thus cannot attempt to enforce compliance without adhering to the safeguards built into the Title VI remedial scheme, and courts routinely deem efforts to enforce

---

[25]    Count I invokes only the Department's coordination regulations, which authorize judicial enforcement but identify no substantive standard, and certainly not one that imposes liability for negligence. 28 C.F.R. § 50.3.

27

Title VI without following these procedural requirements unlawful. *See, e.g.*, *Chi. Transit Auth. v. U.S. Dep't of Transp.*, 2026 WL 810912, at *5 (N.D. Ill. Mar. 24, 2026) (government did not "initially seek voluntary compliance as required"); *Am. Ass'n of Univ. Professors v. Trump*, 815 F. Supp. 3d 907, 964 (N.D. Cal. 2025) (recipient "was not given the opportunity to voluntarily remedy the alleged violations"); *Harvard v. HHS*, 798 F. Supp. 3d at 126-127 (administrative record had "no evidence of a notice of noncompliance [or] an assessment that compliance could not be achieved by voluntary means").

The Amended Complaint does not plausibly allege the Government complied with Title VI's procedural requirements. *First*, the Government alleges—at most—that one agency, HHS, provided notice of a Title VI violation and attempted to secure voluntary compliance. AC ¶¶ 8-10, 163-165. But this action seeks sweeping relief well beyond HHS, including a declaration that the Government "need not make any additional payments to Harvard" under any existing grant, as well as rescission and restitution of all grant payments made by any agency. *Id.* ¶¶ 206-207. Title VI does not permit one agency's alleged efforts to stand in for the independent statutory obligations of every other federal agency whose funding the Government seeks to withhold or recover. *See* 42 U.S.C. § 2000d-1 (grant termination "shall be limited in its effect to the particular program, or part thereof, in which such noncompliance is found"); *see also Bd. of Pub. Instruction v. Finch*, 414 F.2d 1068, 1078 (5th Cir. 1969) ("[T]he purpose of the Title VI cutoff is best effectuated by separate consideration of the use or intended use of federal funds under each grant statute.").

*Second*, even as to HHS, the Amended Complaint contains only conclusory assertions that the agency "negotiated with Harvard in good faith" and attempted voluntary resolution.

AC ¶ 165.[26]  The Amended Complaint offers no factual allegations describing what proposals were made, what steps were required of Harvard, or how those efforts reflected a genuine attempt to secure voluntary compliance with Title VI.  Nor could it, since no such efforts were made.[27]  Such "'formulaic recitation[s]'" are insufficient to plausibly allege compliance with Title VI's demanding procedural standards.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Title VI requires not only notice of alleged noncompliance but also notice of the remedial step the Government proposes to take if voluntary efforts fail.  Even accepting the Government's barebones allegations as true, the Amended Complaint falls far short of plausibly satisfying these requirements.

## II.    THE GOVERNMENT'S BREACH OF CONTRACT CLAIM FAILS AS A MATTER OF LAW

In an attempt to circumvent the limitations of Title VI, the Government seeks restitution of billions of dollars of federal grants under the guise of a breach of contract claim.  That claim must be dismissed on multiple grounds.  The Amended Complaint asserts that Harvard's alleged breach occurred "through direct discrimination against its Jewish and Israeli students" and by "foster[ing], or else remain[ing] deliberately indifferent to, the hostile campus environment," AC ¶ 198—*i.e.*, alleged noncompliance with Title VI.  Because there is no Title VI violation, the breach of contract claim fails.  *See supra* Part I.  However, the contract claim fails for three additional reasons.  First, the Government cannot use common-law contract principles to obtain relief that Title VI's remedial scheme does not allow.  Second, even after amendment, the Amended Complaint still fails to plead the basic elements of breach of contract.  Third, the relief the Government seeks—

---

[26]     In August 2025, President Trump publicly directed Secretary McMahon not to negotiate with Harvard, stating, "I—we want nothing less than $500 million from Harvard … Don't negotiate, Linda…. They've been very bad. Don't negotiate."  Cabinet Meeting, *supra* note 14.

[27]     The Government's claim that the May 15 L.R. 7.1(a)(2) conference during which counsel for Harvard explained the grounds for its initial motion to dismiss and the Government stated that it did not assent to Harvard's motion, was an effort to secure voluntary compliance, AC ¶ 12, is laughable.

unprecedented institution-wide rescission and restitution, untethered from any specific alleged contractual breach—is unavailable under ordinary contract principles and the Spending Clause, which, as the Supreme Court recently reaffirmed, permits sanctions "only with the 'voluntary and knowing' consent of those who must bear them." *Landor v. La. Dep't of Corr. & Pub. Safety*, 606 U.S. ___, slip op. at 6 (2026).

### A.  Breach of Contract Principles Cannot Be Used to Circumvent Title VI's Substantive and Procedural Limits

The Government's contract theory seeks to convert Title VI's compliance-oriented scheme into a draconian remedy Congress did not authorize.  Title VI was designed to end discrimination through prospective compliance, not to impose retroactive penalties or institution-wide forfeitures. *See supra* pp.12-13.  The Government may not evade those congressionally imposed limits by recasting its purported Title VI claim as a common-law contract claim.

The Amended Complaint only confirms this point.  The Government now invokes the "Guidelines for the enforcement of Title VI" to argue that its breach of contract claim is the kind of "court action" that is "envisioned by the Guidelines," and that it may therefore circumvent the procedural requirements of Title VI.  AC ¶ 167 (quoting 28 C.F.R. § 50.3(c)(I)(B)(1)).  But the "Guidelines" themselves provide only "procedural guidance … in selecting … a course of action that fully conforms to the letter and spirit of section 602 of [Title VI]." 28 C.F.R. § 50.3(c).  That limited scope makes sense because the Guidelines cannot "alter the statutory scheme" Congress enacted. *P. Gioioso & Sons, Inc. v. Occupational Safety & Health Rev. Comm'n*, 115 F.3d 100, 105 (1st Cir. 1997).  In addition, the authorized "court action" set forth by the "Guidelines" is one to compel "*[c]ompliance* with the nondiscrimination mandate of title VI," 28 C.F.R. § 50.3(c)(I)(B)(1) (emphasis added)—not a common-law contract suit seeking billions of dollars in supposed "restitution."  The Government's contention that this "action is not precluded by the

30

optional extrajudicial remedies available to the United States outlined in Section 602" also misses the point. AC ¶ 168. The very regulation the Government invokes implements Section 602 and describes a lawsuit to effect forward-looking compliance as one of the "other means authorized by law"—confirming that any such action must operate within Title VI's remedial framework. In short, the Government's reliance on the Guidelines only reinforces that Title VI's remedial scheme is designed to achieve prospective compliance, not retroactive forfeiture.

The same prospective compliance architecture that undergirds Title VI is reflected in the federal grant-making rules. The government-wide "Uniform Guidance" implements Title VI's compliance-first approach across federal grant programs by authorizing prospective responses to noncompliance aimed at correcting deficiencies going forward—such as withholding or suspending future payments, imposing specific conditions on future awards, or shifting from advance payments to reimbursement. *See* 2 C.F.R. §§ 200.339(a)-(f), 200.208(c)(1). It does not authorize retributive measures untethered from prospective compliance, such as an across-the-board clawback of funds already paid and expended.

Federal grant awards incorporate—and are thus limited by—this scheme. They do not resemble ordinary contracts, but instead "originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985). Any grant, therefore, cannot be understood in isolation from the statutes and regulations that define the scope of permissible enforcement and remedies. *Cf. Northwest Airlines, Inc. v. Transport Workers Union of America*, 451 U.S. 77, 95-97 (1981) ("[T]he judiciary may not, in the face of such comprehensive legislative schemes, fashion new remedies that might upset carefully considered legislative programs.").

31

The Amended Complaint still fails to identify the specific grants the Government seeks to rescind or recover.  Even if the Court were to infer that HHS grants are among those at issue, the HHS Grants Policy Statement—"incorporated by reference in the official Notice of Award as a standard term and condition" of every HHS grant—provides that the Uniform Guidance, 2 C.F.R. Part 200, "appl[ies] to all HHS awards."  HHS Grants Policy Statement 5, app. D § 1.2 (Oct. 2025) ("HHS GPS").   And as described above, the Uniform Guidance limits the Government's institution-wide enforcement options to specified, prospective responses such as imposing "specific conditions" (including enhanced reporting, prior approvals, or reimbursement-based payment plans), "[t]emporarily withhold[ing] payments" pending corrective action, "suspend[ing] or terminat[ing] the Federal award," or "[w]ithhold[ing] further Federal funds" for the relevant "project or program."  *See* 2 C.F.R. §§ 200.339(a)-(f), 200.208(c)(1).  Even if the Government purported to proceed under Part 200 (it does not), any recovery of funds would have to be confined to award-specific determinations after audit or review and be consistent with the regulatory limits governing disallowance and closeout.  *See id.* §§ 200.339(b), 200.345(a)(1), 200.410.[28]

In all events, any action must be "consistent with [the] achievement of the objectives of the statute authorizing the financial assistance," 42 U.S.C. § 2000d-1—not the institution-wide, retrospective rescission, restitution, and damages sought here.  Harvard's awards were thus

---

[28]     The Government knows that its current regulations do not support its attempt to terminate an award based solely on its belief that a Title VI violation has occurred.  A recent notice of proposed rulemaking seeks to incorporate into every federal award authority to terminate the award if a federal agency "determines that a termination is in the interest of the Federal agency… including if a Federal award does not effectuate program goals, Federal agency priorities, or the national interest as they exist at the time of the termination."  Regulation for Federal Financial Assistance, 91 Fed. Reg. 32198, 32204 (May 29, 2026) (proposed 2 C.F.R. §§ 200.211, 200.340(a)(2)).  In other words, the Government seeks to condition *future* grants on its ability to terminate an award at the sole discretion of the agency, confirming that such discretionary termination authority does not currently exist.

expressly subject to the remedial framework that forecloses the relief the Government seeks. Applied here, the Government's contract claim flies in the face of the enforcement structure Congress put in place, which assigns enforcement authority to the "department or agency concerned" and permits enforcement only to achieve prospective compliance. *Id.*

The Amended Complaint makes no effort to comply with these provisions. It seeks sweeping government-wide relief—including a declaration that the United States "need not make any additional payments" under "existing grants" and restitution of "all grant payments made" during the alleged period of noncompliance. AC ¶¶ 206-207. Basic principles of contract law do not permit a party to sidestep agreed-upon and statutory limits on remedies and enforcement mechanisms. *See M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10-12 (1972). Having awarded grants governed by a specific statutory and regulatory framework, the Government may not now seek relief that conflicts with the remedial scheme it agreed to follow.

## B.    The Government Fails to Plead Breach of Contract Under Common Law

Even if a breach of contract claim were permissible notwithstanding Title VI's statutory and regulatory limits, the Government has not plausibly stated such a claim here. To state a claim for breach of contract under federal common law the Government must allege "(1) the existence of a valid contract between the parties; (2) an obligation or duty arising from that contract; (3) a breach of that duty; and (4) damages caused by that breach." *United Launch Servs., LLC v. United States*, 139 Fed. Cl. 664, 681 (Fed. Cl. 2018).

The Government's claim fails at the outset because it does not identify a breach of an enforceable obligation that could support the relief sought. *See Brooks v. AIG SunAmerica Life Assurance Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (plaintiff must describe "with 'substantial certainty,' the specific contractual promise the defendant failed to keep"); *see also Atlas Corp. v. United States*, 895 F.2d 745, 754 (Fed. Cir. 1990) (plaintiffs "pointed to no specific [contract]

33

provision that was breached"). Courts routinely dismiss contract claims for failure to meet this pleading requirement. *See, e.g.*, *Brooks*, 480 F.3d at 586; *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 38 (1st Cir. 2007); *Higgins v. Town of Concord*, 246 F. Supp. 3d 502, 518 (D. Mass. 2017).

The Amended Complaint points to only two categories of contractual obligations: the text of a standard form assurance in which Harvard agreed to comply with Title VI and its implementing regulations, AC ¶ 155, and the text of the certification that Harvard submits when requesting payment on an existing grant, *id.* ¶ 159. But identifying these boilerplate provisions (while still failing to identify any specific contract) does not establish, with "substantial certainty," "the specific contractual promise the defendant failed to keep." *Brooks*, 480 F.3d at 586. These provisions are standard-form, government-wide assurances required of every federal grantee. Neither identifies a negotiated, award-specific obligation—let alone one whose breach could support the institution-wide forfeiture the Government demands. Nor does the Amended Complaint identify any other contractual language that imposes the duty allegedly breached or anticipates the extraordinary remedies demanded. No less important, the Government fails to connect any asserted Title VI noncompliance to any award term governing the expenditure or retention of funds. The Amended Complaint does not allege what the term "applicable laws" encompasses for any specific award, what portion of any award is implicated by the alleged noncompliance, or how any alleged noncompliance relates to "the obligation, expenditure, and drawdown of award funds" that the certification itself references. AC ¶ 159.

Even if the Amended Complaint were read to identify a contractual duty across an undefined universe of awards, it does not allege that any such duty was a material, award-specific term of those grants, the breach of which could support the relief sought here. Under federal contract law, "[a] party breaches a contract when it is in material non-compliance with the terms

34

of the contract." *See Gilbert v. Dep't of Just.*, 334 F.3d 1065, 1071 (Fed. Cir. 2003). Conclusory allegations of "material" breach, absent facts showing how the Defendant's conduct violated "'an essential and inducing feature' of the contract," cannot give rise to liability as a matter of law. *Edlow v. RBW, LLC*, 2010 WL 2034772, at *3 (D. Mass. May 21, 2010); *see also United States v. Mejia*, 55 F.4th 1, 8 (1st Cir. 2022). The Government invokes 45 C.F.R. § 80.4(d)(1) to argue that, because Harvard is an institution of higher education, its compliance obligations extend to "the treatment of all students on its campus," not merely to specific funded programs. AC ¶ 162. But that regulation defines the scope of the nondiscrimination obligation under Title VI's administrative enforcement framework; it does not transform a generalized compliance assurance into a material, award-specific contract term.

The Government's own grant framework treats Title VI compliance as a generalized assurance, not a material, award-specific term. The HHS Grants Policy Statement classifies "Discrimination Based on Race, Color, and National Origin"—including Title VI—under "General Certifications and Representations," a category distinct from program-specific award terms and performance conditions. HHS GPS app. D §§ 1.2 & 4.2, app. E (Oct. 2025). Generalized compliance assurances cannot be used to convert ordinary regulatory violations into contract breaches that carry remedies the governing statutory scheme does not authorize. Notably, the October 2025 revision of the Policy Statement adds language claiming that these civil rights assurances are "material," expressly acknowledging that this "reflects a change in the government's position regarding the materiality of the foregoing requirements" and that "prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement." *Id*. at 21-22. Thus, even if the Government could claim that all "General Certifications and Representations" were "material" *prospectively* (a questionable proposition), its

35

admission regarding the prior landscape is fatal to a claim of materiality here.  Harvard cannot be liable for breach of a term that the Government itself did not view as material until October 2025, well after many of the relevant grants were awarded and performed.  *See Bennett*, 470 U.S. at 669 (grant obligations determined by framework in effect at time of contracting).  That the Amended Complaint now recites the assurance's own description of compliance as a "material condition," AC ¶ 155, does not change this analysis.  Whether a term is "material" for purposes of a breach of contract claim is not one resolved by the label a standard-form document assigns to itself— particularly where the Government's own prior practice confirms that it does not treat these assurances as material.  *See Edlow*, 2010 WL 2034772, at *3.

      **C.**      **The Relief Sought Is Barred by Contract Principles and the Spending Clause**

The Government also fails to state a viable contract claim because the forms of relief it demands—rescission, restitution, and a bar on future federal funding—are unavailable as a matter of both ordinary contract law and principles applicable to spending legislation.  Courts routinely strike or dismiss demands for relief that are unavailable as a matter of law.  *See John Hancock Life Ins. Co. v. Abbott Labys., Inc.*, 183 F. Supp. 3d 277, 303 (D. Mass. 2016), *rev'd in part on other grounds*, 863 F.3d 23 (1st Cir. 2017).  In these circumstances, the absence of any legally available remedy is fatal to the claim.  *See, e.g.*, *Cummings v. Premier Rehab, P.L.L.C.*, 596 U.S. 212 (2022).

Rescission is an extraordinary remedy available only for breaches that defeat a contract's essential purpose.  *See* 26 Williston on Contracts § 68:2 (4th ed. May 2025 update); Restatement (Second) of Contracts § 241.  Restitution, like rescission, depends on a failure of the fundamental exchange, and it must be confined to the benefit conferred or unjust enrichment attributable to the breach.  Restatement (Second) of Contracts § 371; Restatement (Third) of Restitution & Unjust Enrichment § 38(2)(b).  The Amended Complaint does not allege a failure of the fundamental bargain between Harvard and the relevant funding agencies.  It does not, for example, allege that

36

Harvard retained funds for work it did not perform, that an agency paid for research that was not conducted, or that any particular disbursement exceeded Harvard's entitlement under any specific award. Instead, it alleges generalized Title VI noncompliance and seeks institution-wide rescission and restitution across an undefined universe of awards, agencies, and dates of issuance. The Government's effort to transform alleged regulatory noncompliance into a wholesale forfeiture of fully performed grants cannot provide a basis for rescission or restitution.

The Government's request for a prospective bar on future payments fares no better. The Amended Complaint seeks a declaration that the United States "need not make any additional payments" under "existing grants." AC ¶ 206. That is not a contract remedy. It is an administrative sanction governed by Title VI. Title VI and the Uniform Guidance prescribe the procedures for imposing such sanctions, including agency-specific determinations, notice, opportunities for voluntary compliance, and program-specific action. *See* 42 U.S.C. § 2000d-1; 2 C.F.R. § 200.339. The Government cannot bypass those statutory and regulatory limits by repackaging a funding cutoff as contract relief. *Cf. United States v. Estate of Romani*, 523 U.S. 517, 530 (1998) (specific, comprehensive statute reflecting specific policy choice controls).

Finally, constitutional principles independently foreclose the Government's requested relief as a matter of law. Title VI was enacted pursuant to Congress' Spending Clause authority and accordingly conditions an offer of federal funding on the recipient's agreement to comply with specified obligations. *See Cummings*, 596 U.S. at 216. Therefore, a remedy for a violation of Title VI is available "only if the funding recipient is on notice that, by accepting federal funding, it exposes itself to liability of that nature." *Id.* at 220; *see also Landor*, slip op. at 7 (the Government "must clearly and unambiguously alert a grant recipient to any condition on federal funds"). This is because "when considering whether to accept federal funds, a prospective recipient would surely

wonder not only what rules it must follow, but also what sort of penalties might be on the table." *Cummings*, 596 U.S at 220. Any other rule would give the Government "an effectively unbridled police power" to "regulate directly" wherever federal money has flowed. *Landor*, slip op. at 13. Consistent with these principles, the Supreme Court has tightly constrained the remedies available under Spending Clause statutes: because a funding recipient lacks notice that it will be exposed to "*unusual*, even rare remedies," those remedies are unavailable. *Cummings*, 596 U.S. at 221-223. Atypical contractual remedies such as punitive damages are thus unavailable. *Barnes v. Gorman*, 536 U.S. 181, 186-188 (2002). So too are the rescission and restitution remedies that the Government seeks. *See Cummings*, 596 U.S. at 216; *see also* Restatement (Second) of Contracts §§ 243(4), 371. And the blanket forfeiture of all disbursements is categorically unavailable as a matter of law. *Cf., e.g.*, *Bennett*, 470 U.S. at 662-65; *Bell v. New Jersey*, 461 U.S. 773, 780-787 (1983).

### III.   THE GOVERNMENT'S CLAIMS ARE A PRETEXT FOR UNLAWFUL RETALIATION

The Court should also dismiss the Amended Complaint because it is a continuation of the Government's ongoing unlawful campaign of retaliation against Harvard for refusing to "capitulate to government demands that it audit, censor, or dictate viewpoints of staff and students." *Harvard v. HHS*, 798 F. Supp. 3d at 121; *see also Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006). The First Amendment forbids officials from using state power "to punish or suppress disfavored expression," and government officials may not "wield[] their power selectively to punish or suppress speech," including through coercive threats and coordinated pressure rather than neutral adjudication. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188, 198 (2024); *see also First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114 (Apr. 29, 2026). That prohibition extends to government efforts to bend educational institutions to its will. *Sweezey v. New Hampshire*, 354 U.S. 234, 250 (1957) (plurality opinion). Academic freedom

depends on both "the independent and uninhibited exchange of ideas among teachers and students" as well as an institution's "autonomous decisionmaking." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985). This creates "'a zone of First Amendment protection for the educational process itself.'" *Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007).

In *Harvard v. HHS*, the court concluded that the Government sought to "require Harvard to overhaul its governance, hiring, and academic programs to comport with the government's ideology and prescribed viewpoint." 798 F. Supp. 3d at 119. This "government-initiated onslaught against Harvard" was intended to "promot[e] a governmental orthodoxy in violation of the First Amendment." *Id.* at 122. Indeed, the Government "specifically and repeatedly linked the coordinated funding cuts to Harvard's decision to 'fight,'" an action that is "indisputably protected by the First Amendment." *Id.* at 123.

The Government may not attempt to achieve through this litigation the result the *Harvard v. HHS* court already concluded was a violation of Harvard's constitutional rights. *See Global NAPs, Inc.*, 603 F.3d at 95; *Rogers*, 188 F. Supp. 2d at 14. All that has changed since *Harvard v. HHS* is that the Government has further confirmed its retaliatory motives while Harvard has continued to implement reforms and take actions to address antisemitism, non-discrimination, and campus protests—progress the Government has entirely ignored.

As detailed above, senior government officials have continued to issue public statements underscoring that Harvard's refusal to capitulate remains central to the Government's actions, including the filing of this litigation. For example, the Assistant Attorney General for Civil Rights has stated that this lawsuit was intended to single out Harvard because "Harvard sued us" and "is defiant." *Supra* pp.10-11; *see also id.* (Commerce Secretary discussing "having fun together" by

39

"hitting Harvard"). "[P]ublic statements in the wake of filing the case … reveal [the] true motivation." *ActBlue, LLC v. Paxton*, 2026 WL 1694290, at \*4 (D. Mass. June 11, 2026). And the Amended Complaint certainly does not demonstrate any effort by the Government to "engage[] in … a [funding] review, weigh[] the value of any grant, gather[] any data regarding antisemitism at Harvard, or consider[] if and how terminating certain grants would improve the situation for Jewish students at Harvard." *Harvard v. HHS*, 798 F. Supp. 3d at 121. Because the Amended Complaint reflects not a neutral application of Title VI, but the continued singling out of Harvard for differential treatment based on impermissible considerations, it should be dismissed in its entirety as a product of unconstitutional retaliation. *See Vullo*, 602 U.S. at 180 ("[T]he First Amendment prohibits government officials from relying on the threat of invoking legal sanctions and other means of coercion to achieve the suppression of disfavored speech."); *Sec. & Exch. Comm'n v. Navellier & Assocs., Inc.*, 108 F.4th 19, 39 (1st Cir. 2024) (government may not engage in selective enforcement "based on impermissible considerations such as … intent to inhibit or punish the exercise of constitutional rights"); *ActBlue*, 2026 WL 1694290, at \*4-5.

## CONCLUSION

The Government has publicly declared its improper motives in pursuing this litigation. After a year-long campaign to burden Harvard's First Amendment rights, this litigation is another transparent—but equally unlawful—effort to accomplish the ends the Government has long sought through a different means. Harvard, meanwhile, remains steadfast in its efforts to address and eliminate antisemitism on its campus, despite the Government's ostrich-like attempt to ignore those efforts. Harvard has not been deliberately indifferent to antisemitism on its campus; it has not discriminated against its Jewish and Israeli students; and it has not breached its agreements with the federal government related to the funding of vital research projects across a multitude of disciplines. The Amended Complaint should be dismissed with prejudice.

40

DATED: June 30, 2026                              Respectfully Submitted,


                                                 /s/ Felicia H. Ellsworth

Robert K. Hur (*pro hac vice*)                   Felicia H. Ellsworth, BBO # 665232
KING & SPALDING LLP                              WILMER CUTLER PICKERING
1700 Pennsylvania Ave. NW, Suite 900                HALE AND DORR LLP
Washington, DC 20006                             60 State Street
T: (202) 383-8969                                Boston, MA 02109
 F: (202) 626 3737                               T: (617) 526-6000
rhur@kslaw.com                                   F: (617) 526-5000
                                                 Felicia.Ellsworth@wilmerhale.com


Joshua S. Levy, BBO # 563017                     Steven P. Lehotsky, BBO # 655908
ROPES & GRAY LLP                                 LEHOTSKY KELLER COHN LLP
The Prudential Tower                             200 Massachusetts Ave. NW, Suite 700
800 Boylston Street                              Washington, DC 20001
T: (617) 951-7000                                T: (512) 693-8350
F: (617) 951-7050                                F: (512) 727-4755
joshua.levy@ropesgray.com                        steve@lkcfirm.com