# Attachment
# (Proposed Amicus Brief)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| United States of America, | ) | |
| Plaintiff, | ) ) ) ) | |
| v. | ) ) | Civil Action No. 1:26-cv-11352-RGS |
| President and Fellows of Harvard College, | ) ) | |
| Defendant. | ) ) ) | |

**BRIEF OF PROFESSORS BENJAMIN EIDELSON
AND DEBORAH HELLMAN AS AMICI CURIAE
IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT**

## TABLE OF CONTENTS

IDENTITY AND INTERESTS OF AMICI CURIAE ....................................................... iii

SUMMARY OF ARGUMENT ................................................................................. 1

ARGUMENT ......................................................................................................... 3

I.    THE AMENDED COMPLAINT FAILS TO ALLEGE DISCRIMINATION BASED ON ANCESTRY, AS OPPOSED TO BELIEFS. ................................................................ 3

    A.   Title VI Prohibits Discrimination Based on Ancestry, Not Religion or Viewpoint............ 3

    B.   The Government's Allegations Fail To Distinguish Ancestry from Religion and Viewpoint. ...................................................................................... 4

    C.   The Government's Extreme Interpretations of Anti-Israel Protest Rhetoric Do Not Ground a Plausible Inference of Ancestry-Based Animus.......................... 5

II.   THE AMENDED COMPLAINT FAILS TO ALLEGE ACTIONABLE HARASSMENT UNDER THE NARROW DEFINITION THAT GOVERNS IN THE UNIVERSITY CONTEXT. ...................................... 9

    A.   At Most, Harassment Liability Extends to Targeted, Personal Abuse or Speech That Unambiguously and Purposely Demeans a Protected Class. ................................... 9

    B.   The Government's Allegations Do Not Meet the Applicable Standard.......................... 11

III.  THE AMENDED COMPLAINT FAILS TO ALLEGE THE REQUISITE SUBJECTIVE CULPABILITY ON HARVARD'S PART. ......................................................................... 14

    A.   Because Section 601 Prohibits Only Intentional Discrimination, the Government's Negligence Theory Is Legally Foreclosed................................. 14

    B.   Any Institutional Liability for a Hostile Environment Grounded in Expressive Activities Must Be Based on a Strict Form of Deliberate Indifference. .......................... 17

    C.   The Government Fails To Allege Deliberate Indifference.............................................. 18

CONCLUSION...................................................................................................... 20

# TABLE OF AUTHORITIES

**CASES**

*Alexander v. Sandoval*, 532 U.S. 275 (2001)....................................................................14, 15, 16

*Avis Rent A Car System, Inc. v. Aguilar,* 529 U.S. 1138 (2000).......................................................10

*Bachman v. St. Monica's Congregation*, 902 F.2d 1259 (7th Cir. 1990) ........................................4

*Bd. of Educ. of City Sch. Dist. of N.Y. v. Harris*, 444 U.S. 130 (1979) ........................................17

*Counterman v. Colorado*, 600 U.S. 66 (2023)...........................................................................17, 18

*Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999)..................................... *passim*

*Espinoza v. Farah Manufacturing Co.*, 414 U.S. 86 (1973)..............................................................3

*Gartenberg v. Cooper Union for the Advancement of Science and Art*,
765 F. Supp. 3d 245 (S.D.N.Y. 2025) ................................................................................ *passim*

*Gebser v. Lago Vista Independent School District*,
524 U.S. 274 (1998).......................................................................................................................16

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) ......................................................14, 15

*Kestenbaum v. President & Fellows of Harvard College*,
743 F. Supp. 3d 297 (D. Mass. 2024) .............................................................................................2, 5

*Maslenjak v. United States*, 582 U.S. 335 (2017).........................................................................15

*Moody v. NetChoice LLC*, 603 U.S. 707 (2024) ........................................................................18

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) .................................................................18

*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998)................................................10

*Rodriguez v. Maricopa County Community College District*,
605 F.3d 703 (9th Cir. 2010) ........................................................................................................17

*Segev v. President & Fellows of Harvard College*,
No. 1:25-cv-12020-RGS (D. Mass. Dec. 4, 2025).........................................................................6

*Stand With Us Center for Legal Justice v. MIT*, 158 F.4th 1 (1st Cir. 2025) ........................ *passim*

*Stand With Us Center for Legal Justice v. MIT*, 165 F.4th 97 (1st Cir. 2026) ..........................4, 17

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
600 U.S. 181 (2023)..................................................................................................................6

*Sussman v. MIT,* No. 1:25-cv-11826-RGS (D. Mass. Jan. 5, 2026) ...............................................6

STATUTES, REGULATIONS, AND ADMINISTRATIVE MATERIALS

42 U.S.C. § 2000d...................................................................................................................3, 14

42 U.S.C. § 2000d-1 ...................................................................................................................15

45 C.F.R. § 80.8(d) .....................................................................................................................15

Letter from Thomas E. Perez, Assistant Att'y Gen., U.S. Dep't of Just.,
to Russlynn H. Ali, Assistant Sec'y for the Off. of C.R., U.S. Dep't of Educ.
(Sept. 8, 2010), https://perma.cc/PU8R-P3K2 ..........................................................................5

*Rescinding Portions of Department of Justice Title VI Regulations*,
90 Fed. Reg. 57,141 (Dec. 10, 2025) ........................................................................................15

*Revised Sexual Harassment Guidance*,
65 Fed. Reg. 66,092 (Nov. 2, 2000)..........................................................................................16

OTHER AUTHORITIES

Lila Corwin Berman et al., *Statement of 20 Jewish Studies Professors
to U.S. Commission on Civil Rights* (Feb. 2026), https://perma.cc/477C-98UB............................4

Micha Danzig, *The Linguistics Behind 'From the River to the Sea'*,
Cleveland Jewish News (Nov. 6, 2025), https://perma.cc/HR4Z-V7MC.......................................7

Benjamin Eidelson & Deborah Hellman, *Antisemitism, Anti-Zionism, and Title VI:
A Guide for the Perplexed*, 139 Harv. L. Rev. F. 1 (2025),
https://perma.cc/8VSP-EEZL ..................................................................................... *passim*

Benjamin Eidelson, *Testimony for U.S. Commission on Civil Rights Hearing on
Campus Antisemitism* (Feb. 6, 2026), https://perma.cc/X4HS-PS23..................................... *passim*

Richard H. Fallon, Jr., *Sexual Harassment, Content Neutrality, and the First
Amendment Dog that Didn't Bark*, 1994 Sup. Ct. Rev. 1 ....................................................9, 10, 11

Suzanne B. Goldberg & Olatunde C.A. Johnson, *Campus Crises and the Limits of Title VI*, 126 Colum. L. Rev. F. 1 (2026)......................................................1, 9, 10, 11, 14

Harvard University, *Combating Antisemitism* (Nov. 9, 2023),
https://perma.cc/46MG-AXWJ....................................................................................8

Harvard University, *Final Report: Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias* (2025).......................................................................14

Deborah Hellman, *Remarks at Briefing of Colorado Advisory Committee to the U.S. Commission on Civil Rights* (July 16, 2025), https://perma.cc/7LB6-QBR7 ..........................1

Max J. Krupnick, *Silent Study-Ins*, Harvard Magazine (Nov. 14, 2024),
https://perma.cc/H5DZ-U3WK...................................................................................18

Maha Nassar, *Why 'From the River to the Sea' Still Echoes Across Campuses One Year Into Protests*, Jewish Daily Forward (Oct. 24, 2024),
https://perma.cc/49CM-5AZR ....................................................................................8

Stephen E. Sachs, *Zionism and Title VI*, 139 Harv. L. Rev. F. 50 (2025) ......................................4

Eugene Volokh, *Freedom of Speech and Workplace Harassment*,
39 UCLA L. Rev. 1791 (1992) ...................................................................................11

**IDENTITY AND INTERESTS OF AMICI CURIAE**

Amici are legal scholars who teach and write about anti-discrimination law and constitutional law. They are the co-authors of *Antisemitism, Anti-Zionism, and Title VI: A Guide for the Perplexed*, 139 Harv. L. Rev. F. 1 (2025), https://perma.cc/8VSP-EEZL, and have testified before federal agencies as experts on Title VI and campus antisemitism. *See* Benjamin Eidelson, Testimony for U.S. Commission on Civil Rights Hearing on Campus Antisemitism (Feb. 6, 2026), https://perma.cc/X4HS-PS23; Deborah Hellman, Remarks at Briefing of Colorado Advisory Committee to the U.S. Commission on Civil Rights (July 16, 2025), https://perma.cc/7LB6-QBR7.

Benjamin Eidelson is the Felix Frankfurter Professor of Law and an Affiliate Professor of Philosophy at Harvard University. Deborah Hellman is the Robert E. Scott Distinguished Professor of Law at University of Virginia School of Law.[1]

**SUMMARY OF ARGUMENT**

Until very recently, Title VI challenges to universities' handling of large-scale student protests were all but unheard of. *See* Suzanne B. Goldberg & Olatunde C.A. Johnson, *Campus Crises and the Limits of Title VI*, 126 Colum. L. Rev. F. 1, 4 (2026). As this Court well knows, however, such claims have proliferated in the wake of the anti-Israel protests that swept campuses after October 7, 2023. Amici submit this brief to highlight three important lessons of recent scholarship and judicial decisions in this area and to explain their implications here.

*First*, Title VI prohibits discrimination based on heritable, immutable characteristics, not beliefs or felt attachments to causes or institutions. It thus protects people from discrimination based on their Jewish (or Israeli or Palestinian) ancestry, not their support for any nation-state or

---

[1] No party or party's counsel authored any part of this brief, and no person other than amici and their counsel contributed money that was intended to fund preparing or submitting the brief. This brief reflects only amici's views and not those of amici's employers or any other institutions.

geopolitical arrangement in the Middle East. Under *Stand With Us Center for Legal Justice v. MIT*, 158 F.4th 1 (1st Cir. 2025), this means that the Government must plausibly allege hostility to *people of Jewish or Israeli ancestry*. Hostility to the State of Israel—or even to everyone who supports the existence of a distinctly Jewish state in the historic Land of Israel—does not suffice.

*Second,* in judging the severity and objective offensiveness of alleged harassment, a court must account for the distinctive norms of a university setting and the need to "avoid a collision between the First Amendment and anti-discrimination law," *Gartenberg v. Cooper Union*, 765 F. Supp. 3d 245, 265 (S.D.N.Y. 2025). Subject to a possible exception for speech that can *only* plausibly be interpreted as intentionally demeaning people based on their race or ancestry, that means restricting harassment liability to *personal abuse targeted at individuals or small groups*—not the broadly addressed advocacy that makes up the bulk of the Government's allegations.

*Third*, harassment claims that implicate the enforcement of a university's speech rules are subject to "an even more limited application of the already strict deliberate indifference standard" (*id.*), one that accounts for the special academic-freedom concerns raised by state efforts to dictate how universities police dissent. The university must have actual knowledge that the relevant conduct constitutes ancestry-based harassment—a requirement that could not be met for the vast ma--ority of the anti-Israel activities alleged here—and the institutional response must be so grievously deficient that it could not reflect a good-faith judgment about the complex balance that universities must strike in regulating protest consistent with their academic missions.

Here, as explained below, the Government's claim that Harvard has subjected its Jewish and Israeli students to unlawful discrimination fails at each of these three steps.[2]

---

[2] Although the Government's disparate treatment theory raises distinct questions that amici do not address here, it appears to suffer from the same absence of plausibly analogous comparators that doomed the parallel allegation in the *Kestenbaum* case. *See* Eidelson & Hellman, *supra*, at 23–24.

**ARGUMENT**

**I.**    **THE AMENDED COMPLAINT FAILS TO ALLEGE DISCRIMINATION BASED ON ANCESTRY, AS OPPOSED TO BELIEFS.**

**A.    Title VI Prohibits Discrimination Based on Ancestry, Not Religion or Viewpoint.**

Title VI bars discrimination "on the ground of race, color, or national origin." 42 U.S.C. § 2000d. From the start, Congress's choice to omit "religion" from that list prompted questions about the statute's application to antisemitism. Since the mid-2000s, however, federal agencies and experts in this area have converged on the answer that Jews (like everyone else) are protected against discrimination *on the basis of their ancestry*. *See* Eidelson & Hellman, *supra*, at 2–6. Some division remains over whether "race" or "national origin" is more apt as a textual hook for this protection, but that distinction is not consequential because both refer to a heritable, immutable characteristic. As the Supreme Court has explained, "the terms 'national origin' and 'ancestry' were considered synonymous" by the enacting Congress. *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 89 (1973). It has thus become common to describe claims of anti-Jewish discrimination under Title VI as based on "shared ancestry," a category that could implicate either statutory term. *See* Eidelson & Hellman, *supra*, at 4–6 (tracing "judicial authority and executive-branch practice" on this issue). And discrimination against people of *Israeli* ancestry is similarly barred as a form of national origin discrimination—i.e., as discrimination on the basis of "the country where a person was born . . . [or] from which his or her ancestors came." *Espinoza*, 414 U.S. at 88.

Recognizing that the protected characteristic at issue is a person's *ancestry* (whether Jewish or Israeli) is vital because it sets the terms of the rest of the Title VI analysis. According to the First Circuit, a person's conduct must be motivated by "discriminatory intent" or "animus" with respect to a given characteristic in order to constitute harassment on that basis. *Stand With Us Center for Legal Justice v. MIT*, 158 F.4th 1, 18 (1st Cir. 2025); *see also Stand With Us Center for*

3

*Legal Justice v. MIT*, 165 F.4th 97, 102 (1st Cir. 2026) (Dunlap, J., concurring in denial of rehearing en banc) (rejecting suggestion "that a plaintiff need not demonstrate that a harasser is motivated by hostility to a protected class").[3] And as a matter of both fact and law, "Zionism is not an ethnic or ancestral trait." Lila Corwin Berman et al., *Statement of 20 Jewish Studies Professors to U.S. Commission on Civil Rights* (Feb. 2026), https://perma.cc/477C-98UB; *see* Eidelson & Hellman, *supra*, at 9–11; Eidelson Testimony, *supra*, at 7. Accordingly, the Government must plausibly plead an intent to treat people differently because of their *Jewish or Israeli ancestry*, not their religious or political beliefs about Zionism or the State of Israel. *Cf. Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1260 (7th Cir. 1990) (distinguishing "religious anti-Semitism, typified by the attitude of the medieval Roman Catholic Church, and racial anti-Semitism, typified by Hitler," for purposes of a civil rights statute).

**B.  The Government's Allegations Fail To Distinguish Ancestry from Religion and Viewpoint.**

While amici do not condone any form of stereotyping or harassment, Congress's choice not to extend Title VI to religion, together with the First Circuit's intent requirement, means that many incidents in the Amended Complaint, as pleaded, simply do not implicate the statute—because they do not involve any claim of intentional discrimination based on ancestry. *E.g.*, AC ¶ 93 (quoting a student's speculation that peers at the encampment refused to speak to him because he "wear[s] a kippah" and they took that as signaling his views); *see* Eidelson & Hellman, *supra*, at 11. The Justice Department itself has long drawn the same distinction: Title VI does not reach "discrimination [that] is based on . . . religious practice," as opposed to race or ancestry. Letter

---

[3] Although *Stand With Us* settles the question here, some contend that conventional discriminatory intent is not always required for a hostile environment claim. *See, e.g.*, Stephen E. Sachs, *Zionism and Title VI*, 139 Harv. L. Rev. F. 50, 62–63 (2025); *see also* Eidelson & Hellman, *supra*, at 7–8 (noting this possibility). If that premise were accepted, the fact that the relevant characteristic is ancestry would still limit the conduct that qualifies as severely offensive in a relevant respect. *See* Eidelson Testimony, *supra*, at 9–11.

from Thomas Perez, Assistant Att'y Gen., to Russlynn Ali, Assistant Sec'y, Dep't of Educ. 1 (2010), https://perma.cc/PU8R-P3K2; *see* Eidelson Testimony, *supra*, at 4–5. But because the Government here relies so heavily on the report of Harvard's antisemitism task force—which had no reason to distinguish attitudes toward people of Jewish faith and Jewish ancestry—it repeatedly fails even to allege that an incident involved targeting based on ancestry, as opposed to a student's apparent religion and the views imputed to them on that basis. *E.g.*, AC ¶¶ 38, 89, 90.

Title VI's restriction to ancestry-based harassment also means that the Government's allegations about the intensity of anti-Israel or "anti-Zionist" sentiment on campus are mostly beside the point. *E.g.*, AC ¶¶ 9, 19–21, 51, 54, 56, 68, 79, 97. Drawing on the same Harvard report, for example, the Government stresses that many Jewish survey respondents "indicated they had experienced some form of discrimination, stereotyping, or negative bias on campus *due to their views on current events*." *Id.* ¶ 85 (emphasis added). Those experiences certainly matter for a university that aims to foster respectful engagement amid profound disagreements. But under *Stand With Us*, the Government must allege facts suggesting that the hostility felt by these students was *not* simply "due to their views on current events"—even if those views were despised by many of their peers—but rather owed to their Jewish or Israeli birth. Assuming *arguendo* that many Harvard students reject the legitimacy of a specifically Jewish state in the historic Land of Israel—and that many of those anti-Zionist students exhibited intolerance toward everyone who disagreed with them—those hostile students still would not have engaged in discrimination covered by Title VI. *See, e.g.*, *Kestenbaum v. President & Fellows of Harvard College*, 743 F. Supp. 3d 297, 311 (D. Mass. 2024) ("[V]iewpoint discrimination . . . is not actionable under Title VI.").

### C. The Government's Extreme Interpretations of Anti-Israel Protest Rhetoric Do Not Ground a Plausible Inference of Ancestry-Based Animus.

The Government attempts to close the gap between anti-Israel sentiment and ancestry-

based animus mainly by treating certain protest slogans—such as "from the river to the sea, Palestine will be free" or "intifada revolution"—as manifesting hostility toward people of Jewish or Israeli ancestry. Because the Government seeks to use this expression as a basis for inferring animus on the part of the speakers, however, what it needs are "facts suggesting that either chant was commonly so construed *by the protestors*." *Stand With Us*, 158 F.4th at 19 (emphasis added). In fact, the very same slogans were at issue in *Stand With Us*, and the plaintiffs there made substantially the same claims about the slogans' histories and associations. *See* First Am. Compl., *StandwithUs Ctr. for Legal Justice v. MIT*, No. 1:24-cv-10577-RGS (filed May 17, 2024), ¶¶ 137, 156, 185. Yet the First Circuit insisted that these slogans do not express ancestry-based hostility "on [their] face" and could not ground an inference of animus absent "specific circumstances" suggesting "that the protestors were using these slogans in the way plaintiffs claim." 158 F.4th at 19.[4]

Rather than identifying any such circumstances, the Amended Complaint relies on sweeping assertions about how the same slogans sound "to a Jewish or Israeli ear" (¶ 28). If these are claims about ancestry-defined groups, they appear to "engage[] in the offensive and demeaning assumption that [students] of a particular race, because of their race, think alike." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 220–21 (2023) (citation omitted). Moreover, the Government's own allegations suggest that a number of the "student agitators" whom it accuses of harassment—including at least two of the students who allegedly led chants of "intifada"—were members of "Harvard Jews for Palestine." AC ¶¶ 42 n.27, 127. But in any event, the Government cannot deny that terms like "intifada" "ha[ve] multiple resonances

---

[4] *See also* Order, *Segev v. President & Fellows of Harvard College*, No. 1:25-cv-12020-RGS (D. Mass. Dec. 4, 2025), ECF No. 35 ("[N]othing in the Amended Complaint plausibly supports the notion that [the] assailants' conduct was motivated by race-based antisemitism . . . rather than disagreement with the underlying political message."); Order, *Sussman v. MIT*, No. 1:25-cv-11826-RGS (D. Mass. Jan. 5, 2026), ECF No. 75 ("[T]he court sees no basis on which to distinguish the First Circuit's conclusion that anti-Israeli sentiment is not, without more, antisemitic messaging.").

imparted by [their] usage for different purposes within different communities." Eidelson & Hellman, *supra*, at 15–16. As one Jewish undergraduate observed, "[g]rowing up in a Zionist family . . . 'the word intifada was only associated with death and terrorism and destruction.'" *Id.* at 16 (citation omitted). But the word is also commonly used in other communities to refer to Palestinian resistance more broadly. *See id.* (citing examples). Given this diversity, nothing in the Government's allegations suggests that protesters who used the word "intifada" intended to express an-estry-based hostility rather than to invoke "the prevailing Arabic word for Palestinian resistance." *Id.* at 17; *see id.* at 15–18. The allegation that some protesters rhymed "intifada revolution" with "solution," for example, cannot justify the Government's speculation that they must have "intend[ed] . . . to be understood" as alluding to "gas chambers" (¶¶ 27–28).

The Government fares no better with its assertion that Harvard students who chanted "from the river to the sea, Palestine will be free" were intentionally "calling for [the] deaths" of Jews and Israelis (¶¶ 24–25, 34, 44). Tellingly, even the Government's chosen source on this topic acknowledges that this widely used slogan "sounds noble" in its English formulation—and that the antise-itic meaning that the Government sees in it is thus "invisible to many campus activists." Micha Danzig, *The Linguistics Behind 'From the River to the Sea'*, Cleveland Jewish News (Nov. 6, 2025), https://perma.cc/HR4Z-V7MC (cited in AC ¶ 26). That hardly suggests that the phrase was "commonly . . . construed by the protestors" as expressing hatred for people of Jewish or Israeli birth. *Stand With Us*, 158 F.4th at 19. In the Amended Complaint, the Government has added a vague allegation (¶ 26) that some "demonstrators at Harvard" also chanted an Arabic phrase that proclaims Palestine to be "Arab" (rather than calling for it to be "free"). But the only incidents that the Government alleges with actual dates and locations involve the English slogan (¶¶ 34, 44), and the Government identifies no source that might pin down what it means to allege regarding the

Arabic one—such as where any purported "demonstrat[ion]" occurred, whether any significant number of "demonstrators" were involved, and whether those "demonstrators" were even Harvard students.[5] In any case, even as to the Arabic slogan, the Government's simplistic, acontextual reading is at odds with the "academic literature" that *Stand With Us* made a touchstone. 158 F.4th at 16; *see, e.g.*, Maha Nassar, *Why 'From the River to the Sea' Still Echoes Across Campuses One Year Into Protests*, Jewish Daily Forward (Oct. 24, 2024), https://perma.cc/49CM-5AZR (summary by scholar of Palestinian history).[6]

Of course, "[t]his is not to say that anti-Zionism is never wielded as a tool of the antisemite" or that there are no "specific circumstances" that could indicate a prohibited motive. *Stand With Us*, 158 F.4th at 17; *see also* Eidelson & Hellman, *supra*, at 11; Eidelson Testimony, *supra*, at 7. For example, the same slogans that were discounted in *Stand With Us* carry a very different meaning when rendered in "the stylized font commonly associated with Hitler's *Mein Kampf*." 158 F.4th at 17 (quoting *Gartenberg*, 765 F. Supp. 3d at 269). But the Government alleges nothing like that here. Indeed, because the Government has opted to rely overwhelmingly on student newspaper articles and allegations cataloged by Harvard's antisemitism task force, it can speak only in sweeping generalities about amorphous groups of "student agitators" (¶ 43), further obstructing any inference about the intent of anyone who might be accused of any concrete act of harassment.

---

[5] Here, unlike elsewhere in the Amended Complaint, the Government cannot even cite its own prior findings of fact concerning the same period, because those findings make no mention of any such Arabic chanting.

[6] The Government also attempts to shore up its "inference of antisemitic intent" (¶ 28) by invoking then-President Claudine Gay's condemnation of "from the river to the sea" in November 2023. But it is simply untrue that Gay called the slogan "'eliminationist'"—despite the Government's false quotation marks—or ascribed any "antisemitic" motive to the protesters' use of it. *Combating Antisemitism*, Harvard Univ. (Nov. 9, 2023), https://perma.cc/46MG-AXWJ. It *is* true that Gay urged greater sensitivity to the way that many Jewish community members interpreted the slogan. *See* AC ¶ 44. But regardless of whether a pro-Palestine protester should acquiesce to that account of the slogan's meaning out of sensitivity, refusing to do so does not suggest that they agree with it. *Cf.* Nassar, *supra* (describing the effort to cast "from the river to the sea" as a "'Hamas slogan,'" "without acknowledging its wider use and deeper history," as "a dangerous and racist guilt-by-association tactic used to demonize supporters of Palestinian rights").

**II.     THE AMENDED COMPLAINT FAILS TO ALLEGE ACTIONABLE HARASSMENT UNDER THE NARROW DEFINITION THAT GOVERNS IN THE UNIVERSITY CONTEXT.**

Even if the Government plausibly alleged that one or more students acted out of anti-Jewish or anti-Israeli animus, it would also need to allege that they engaged in harassing conduct "so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999). Until recently, claims of such a "hostile environment" have nearly always rested on allegations of "extremely abusive or exclusionary behavior" that was "directed at specific individuals" (usually children) and lacked any meaningful connection to political debate. Goldberg & Johnson, *supra*, at 19. This case requires the Court to adapt the same underlying standard to expressive activities on college campuses while "avoid[ing] a collision between Title VI and the First Amendment." *Gartenberg*, 765 F. Supp. 3d at 266. As explained below, that means refusing to treat broadly addressed protest as "offensive" on the basis of the message expressed, subject only to a possible exception for speech that could *only* be interpreted as purposely demeaning members of a protected class. And measured by that standard, the Government's allegations here fail to state a claim.

### A.     At Most, Harassment Liability Extends to Targeted, Personal Abuse or Speech that Unambiguously and Purposely Demeans a Protected Class.

The leading approach to reconciling the First Amendment and Title VI is developed in a body of scholarship that substantially aligns with both Judge Cronan's opinion in *Gartenberg v. Cooper Union* and the First Circuit's reasoning in *Stand With Us*. *See* Goldberg & Johnson, *supra*, at 37 ("[T]he approach taken by these two courts resonates with the [academic] commentary . . . and may be able to guide universities in crafting policies that attend to both free expression and inclusion."). This approach begins from the Supreme Court's insistence on an "objective" standard for assessing harassment claims—a standard that, as Professor Richard Fallon explained in an influential analysis of harassment law, "should be viewed . . . as a constitutionally mandated limita-

tion on the statutory prohibition." Richard H. Fallon, Jr., *Sexual Harassment, Content Neutrality, and the First Amendment Dog that Didn't Bark*, 1994 Sup. Ct. Rev. 1, 44–46, 54–55; *see also Avis Rent A Car System, Inc. v. Aguilar*, 529 U.S. 1138, 1141 (2000) (Thomas, J., dissenting from denial of certiorari). This objective standard requires "careful consideration of the social context," *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998), and the university context triggers a distinctive and heightened set of expectations for claims of offense at the views expressed by others.

Most importantly, "the reasonable student expects" an "unfettered exchange of ideas concerning a wide range of controversial topics." *Gartenberg*, 765 F. Supp. 3d at 265 (citation omit-ed). Reasonable students also appreciate that this expectation would be thwarted by broad efforts to stamp out speech that "communicates a[n] [identity]-based message of hostility or inferiority," because such efforts risk "chill[ing] debate at the heart of the university's critical, discursive, truth-seeking, and pedagogical missions." Fallon, *supra*, at 54. Within a university environment, therefore, there is, at a minimum, no actionable harassment "when the offensive activity can plausibly be understood as merely reckless with regard to the identity-related offense that others will justifiably take (rather than as aimed at provoking that response)." Eidelson & Hellman, *supra*, at 14; *see* Goldberg & Johnson, *supra*, at 35–36. This reasoning accords with the First Circuit's refusal to read Title VI as requiring suppression of "stridently pro-Palestinian and anti-Zionist" speech in the "absence of consensus" about its meaning (or other grounds to safely infer that it must have been "driven by antisemitism"). *Stand With Us*, 158 F.4th at 16–19.[7]

Although "the 'reasonable person' [thus] assumes the risk of being offended by others' political expression at a university," Eidelson & Hellman, *supra*, at 14–15, courts and scholars

---

[7] *Stand With Us* left open the "nettlesome issue[]" of whether even speech that *was* unambiguously racist could be made a basis of Title VI liability in the university context. 158 F.4th at 15; *cf.* Eidelson & Hellman, *supra*, at 15 & n.90 (reserving judgment on the same issue).

have also recognized a critical distinction between speech or conduct that is *targeted at particular students* and that which is *addressed to the community at large*. *See* Goldberg & Johnson, *supra*, at 34, 37–38. As Professor Fallon explained, "narrowly targeted, face-to-face expression has often received less constitutional protection" because it is "less likely to have public or political value" and "especially likely to have the purpose of being, and to be experienced as, invasive, threatening, or coercive." Fallon, *supra*, at 42; *see also* Eugene Volokh, *Freedom of Speech and Workplace Harassment*, 39 UCLA L. Rev. 1791, 1863–67 (1992) (similar). Likewise, the norm of unfettered expression in the university context "does not extend to literal 'harassment' in the sense of conduct that genuinely singles a fellow student out for insistent, personal abuse." Eidelson & Hellman, *supra*, at 14; *cf. Gartenberg*, 765 F. Supp. 3d at 265–271 (distinguishing "targeted, personal harassment" from "efforts to communicate a political message to the . . . community"); Fallon, *supra*, at 54 (positing liability limited to "hate-charged epithets, targeted at individuals or small groups of individuals with the purpose or predictable effect of interfering with their work or education").

**B.    The Government's Allegations Do Not Meet the Applicable Standard.**

Measured against these principles, the Amended Complaint fails to state a claim.

*1. Anti-Israel Protests.* The bulk of the factual allegations concern public acts of protest that were addressed to the community at large: a public statement by student groups that blamed "the Israeli regime . . . for all unfolding violence" (¶ 20); "study-ins" at campus libraries, at which students studied silently with political slogans—such as "No normalcy during genocide"—taped to their laptops (¶¶ 45, 67, 70–76); marches and rallies "accus[ing] Israel of 'genocide'" and featuring the chants discussed above (¶¶ 34, 46); and the Harvard Yard encampment demanding divestment from Israel (¶¶ 56–66). Each of these is a paradigm of expressive activity, on matters of intense public concern, directed at the university administration, the Harvard community, and the wider world—not personally targeted abuse of the sort that might constitute harassment.

To be sure, most of the protest activity alleged in the Amended Complaint *could* be made a basis of discipline by Harvard under content-neutral rules (as much of it was). But, at a university, nobody has a reasonable expectation that the institution will treat offensive protest activities more harshly than it would treat other violations of the same rules—such as parallel "study-ins" with stickers about global warming—that would not cause similar offense. And regardless of whether the conduct at issue violates university rules, failing to protect students from the viewpoint-based offense they might reasonably take at others' expression cannot ordinarily be a basis of liability consistent with the First Amendment. *See supra* Section II.A.

Even if a more restrictive rule applies to speech whose racial offensiveness is clearly purposeful rather than a result of insensitivity (*supra*, p. 10), the protest activity alleged here does not meet that description. Although the complaint asserts categorically that the protesters' expression "can only be reasonably understood as . . . calls to kill Jews" (¶¶ 27–28), that extreme claim is not defensible, *see supra* Section I.C, and *Stand With Us* makes clear that the Court may consider the "academic literature" and other resources demonstrating as much. 158 F.4th at 16; *see also* Eidelson Testimony, *supra*, at 10–12 (discussing the Government's tendentious characterizations of the silent study-ins and "the practical reality . . . that much of the unsettling rhetoric in this area is genuinely ambiguous"). Regardless of whether any of the alleged conduct violated campus rules or caused understandable hurt, therefore, these allegations fail to state a claim under Title VI.[8]

***2. Scattered allegations of harassment.*** The Amended Complaint contains some allegations that could, in principle, support a claim that certain students faced at least some degree of

---

[8] One example illustrates the perils of crediting the Government's conclusory labels here. The Government alleges that "Harvard *professors*" also staged an "anti-Israeli 'study-in'" (¶ 70). But the HHS finding on which it relies correctly described that gathering as a "protest [of] the library's decision to temporarily ban students." The portrayal of this faculty protest *of Harvard's speech restrictions* as "anti-Israeli" exemplifies how promiscuously the Government uses such terms throughout the Amended Complaint. And the fact that the Government stands by its seeming error here suggests that it is not a slip but a considered choice.

peer harassment. These include an alleged incident of physical contact with a student who "attempted to film" student protesters (¶ 32); an incident in which some unnamed students allegedly "targeted[] and accosted Jewish students" in a lounge (¶ 38); and an alleged assault at the Harvard Yard encampment (¶ 58). Under *Stand With Us*, however, a bare assertion that a student was "target[ed]" for being Jewish does not suffice, and the simple fact that the alleged wrongdoers were participating in an anti-Israel protest cannot ground such an inference either. *See* 158 F.4th at 18.[9] In any event, these scattered incidents experienced by different students across a vast campus at different times over a period of years did not plausibly subject anyone to a "systemic deprivation of educational opportunities and benefits." *Id.* at 20–21 (same as to MIT).

    *3. Overall campus climate.* Finally, the Amended Complaint repeatedly points to diffuse perceptions of a "hostile campus atmosphere" (¶ 92) and feelings of "discomfort and alienation" (¶ 85) on the part of some Jewish and Israeli students. Insofar as those experiences reflect that Zionism or support for a distinctly Jewish state in Israel "holds deep meaning for [many] Jews and Israelis" (¶ 89), the suggestion that these experiences amount to a hostile environment is essentially a disparate-impact claim that the Government has repudiated. *See* Eidelson & Hellman, *supra*, at 8–9; Eidelson Testimony, *supra*, at 8–11. Even assuming that Jewish and Israeli students experienced intentionally targeted hostility *on the basis of their ancestry*, however, "[the] high standard for finding harassment means that harassment law does not address the full range of hostile acts, statements, attitudes, microaggressions, and 'low-grade' discrimination that often makes

---

[9] With respect to the student who attempted to film protesters, the complaint describes him as "Israeli Jewish" (¶ 32) but does not allege that he was targeted on those grounds, rather than because (as the complaint says) he attempted to record the protest. Likewise, the Government does not claim that a Jewish teaching fellow who was allegedly "assaulted by one of the encampment dwellers" was targeted on any protected ground (¶ 58). And the Government's demonstrably false or tendentious characterizations of events elsewhere in the complaint (*see, e.g.*, *supra* at 8 n.6, 12 n.8) underscore the importance of not filling in key facts that even the Government was not prepared to allege here.

13

students deeply uncomfortable or upset in college settings." Goldberg & Johnson, *supra*, at 18.

This high bar does not excuse universities from the ethical and institutional imperatives to foster inclusive communities. To the contrary, it creates space for universities to act candidly and reflectively in undertaking that delicate work, *see id.* at 38–54, in ways that are nearly impossible when the university is under existential threat from federal officials who stoke resentment, pressure the university to take sides on divisive questions, and exploit their leverage for their own ends. At Harvard, for example, an effective effort to address the "campus atmosphere" (¶ 92) would need to reckon with the experiences of Jewish, Israeli, Arab, and Muslim students in tandem—recognizing that *all* of these groups report "greater levels of discomfort and alienation"[10]—rather than pitting them against each other and wantonly accusing students of prejudice (¶¶ 22–28).

### III.    THE AMENDED COMPLAINT FAILS TO ALLEGE THE REQUISITE SUBJECTIVE CULPABILITY ON HARVARD'S PART.

#### A.    Because Section 601 Prohibits Only Intentional Discrimination, the Government's Negligence Theory Is Legally Foreclosed.

In *Alexander v. Sandoval*, 532 U.S. 275 (2001), the Supreme Court made explicit that the main operative provision of Title VI, known as § 601, "reach[es] only instances of intentional discrimination." *Id.* at 281; *see* 42 U.S.C. § 2000d. Yet *Sandoval* did not disturb the Court's holding in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), that student-on-student harassment can sometimes ground a § 601 claim against the school itself. What squares these seemingly dissonant propositions is *Davis*'s more specific holding: "[D]eliberate indifference to known acts of harassment" can "amount[] to an intentional violation" in its own right. *Id.* at 643. As the Court put it after *Sandoval*, "the deliberate indifference [in *Davis*] constituted intentional

---

[10] According to Harvard's antisemitism task force, "Jewish students reported greater levels of discomfort and alienation than their Christian or atheist/agnostic peers, but lower levels than Muslim students." Harvard Univ., *Final Report: Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias* 121 (2025).

discrimination on the basis of sex." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182 (2005).

These holdings foreclose the Government's new theory that it need not allege intentional discrimination to obtain "non-monetary" relief under § 601 (AC ¶¶ 177, 184, 202). Again, "Title VI itself prohibits only intentional discrimination." *Jackson*, 544 U.S. at 178.[11] So regardless of the relief sought, any claim that Harvard has *unintentionally* violated its Title VI obligations would have to rest instead on regulations, enacted under § 602, that go beyond the core prohibition. 42 U.S.C. § 2000d-1. Yet the Government's new Count I—for which it says it need not "satisfy a 'deliberate indifference' standard"—alleges only a violation of § 601 itself (¶¶ 174–77). And that is no accident: The Justice Department recently repudiated the use of § 602 to "forbid conduct . . . that [§ 601] permits." *Rescinding Portions of Department of Justice Title VI Regulations*, 90 Fed. Reg. 57,141, 57,142 (Dec. 10, 2025) (quoting *Sandoval*, 532 U.S. at 284–85). The Government has thus foreclosed itself from relying on the enforcement standards that were traditionally cast as construing § 602 regulations and that embodied "a strikingly expansive conception of regulated parties' affirmative responsibility to curb discrimination." Eidelson & Hellman, *supra*, at 20.[12]

Even if the Government had tried to allege a violation of such a regulation, moreover, it likely could not obtain the unprecedented equitable relief it seeks here without proving intentional discrimination anyway. According to the Supreme Court, it is because "[a] violation of Title VI

---

[11] Even if the Government were understood as alleging that Harvard unintentionally "subject[ed]" students to intentional discrimination by others, it is very implausible that this act of "subject[ion]," alone among the conduct covered by § 601, is proscribed even when done unintentionally. The premise of the intentional reading of § 601, after all, is that the statute mirrors equal protection law, which imposes no such prohibition. And if § 601 were *not* read as imposing the familiar intent requirement across the board, it would seemingly impose strict liability, not the Government's atextual "negligence" standard. *Cf. Maslenjak v. United States*, 582 U.S. 335, 344 (2017) (rejecting a "proposed limitation" that "has no basis in [the statute's] text" as "a *deus ex machina* . . . serving only to get the Government out of a tight interpretive spot").

[12] The Notice of Violation issued by HHS in June 2025 also failed to identify any regulatory violation. In fact, the agency's failure to anticipate the Government's new theory alone appears to doom Count I—and to preclude any belated effort to identify a relevant regulatory violation—because no enforcement action could be taken without prior notice of the noncompliance alleged. *See* HHS Notice 33; 45 C.F.R. § 80.8(d).

may result in a cutoff of all federal funds"—not an award of damages—that "it is likely that Congress would wish this drastic result only when the discrimination is intentional." *Bd. of Educ. of City Sch. Dist. of N.Y. v. Harris*, 444 U.S. 130, 150 (1979).

Finally, insofar as the Government seeks to ground its new theory in the language of *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998) (AC ¶ 177), it misunderstands the legal backdrop to that decision. It is true that the *Gebser* described the deliberate indifference requirement as a precondition for "recovery in damages." *Id.* at 288. But that is because *Sandoval* had not yet sharply separated the enforcement of § 601 from the enforcement of regulations, promulgated under § 602, that also define schools' obligations. In fact, at the time of *Gebser* and *Davis*, "every Court of Appeals to address the question ha[d] concluded that a private right of action exists to enforce the rights guaranteed both by the text of Title VI and by any regulations"—and the Supreme Court itself had indicated "that private parties could bring lawsuits under Title VI and its implementing regulations" as well. *Sandoval*, 532 U.S. at 294, 296–302 (Stevens, J., dissenting). Faced with claims based on this undifferentiated mass of statutory and regulatory prohibitions, it made perfect sense for *Gebser* and *Davis* to cast the intent requirement as sorting Title IX (or Title VI) claims into those that could "support[] a private damages action," *Davis*, 526 U.S. at 643, and those that could not. The Court did not thereby imply that any claim *based on a violation of § 601 alone*—i.e., a claim not relying on what *Sandoval* would later partition off as "the independent force of § 602," 532 U.S. at 286—could somehow prevail without intentional discrimination.[13]

---

[13] Even before *Sandoval*, in fact, the Government recognized—contrary to its apparent position today—that what *Gebser* and *Davis* had preserved was the possibility of relief, without a showing of deliberate indifference, for claims based on the agency regulations. *See Revised Sexual Harassment Guidance*, 65 Fed. Reg. 66,092, 66,094 (Nov. 2, 2000) (proposing revisions to sexual harassment guidance, after *Gebser* and *Davis*, to reflect that "[the] basis for [a] school's responsibility is the Title IX regulations" and to detail those "regulatory requirements" (capitalization omitted)); *id*. at 66,093 (contrasting the Court's damages holding with its recognition of the authority to promulgate regulations under the Title IX analogue of § 602).

16

**B.  Any Institutional Liability for a Hostile Environment Grounded in Expressive Activities Must Be Based on a Strict Form of Deliberate Indifference.**

Even if the Government's new theory of Title VI were sound as a general matter, the First Amendment would independently require a rigorous deliberate indifference standard here. As noted earlier, the typical hostile environment case (like *Davis* itself) involves severe bullying of a particular student by their school-age peers. But here the Government seeks to subject a university to adverse consequences for its choices about how to regulate or punish its students' protests and advocacy on matters of public concern. As courts have recognized, that context calls for "an even more limited application of the already strict deliberate indifference standard." *Stand With Us*, 165 F.4th at 102 (Dunlap, J., concurring in the denial of rehearing en banc) (quoting *Gartenberg*, 765 F. Supp. 3d at 266). In other words, the First Amendment "requires courts to 'defer to colleges' decisions to err on the side of academic freedom.'" *Gartenberg*, 765 F. Supp. 3d at 267 (quoting *Rodriguez v. Maricopa Cnty. Community College Dist.*, 605 F.3d 703, 708–09 (9th Cir. 2010)).

This is also the clear lesson of *Counterman v. Colorado*, 600 U.S. 66 (2023), where the Court exhaustively reviewed the mental-state requirements that it has imposed for regulations of even *unprotected* speech. Across the domains of defamation, obscenity, incitement, and true threats, the Court explained, it has "insist[ed] on a subjective element" to mitigate the risk that speakers will "swallow [their] words" for fear of running afoul of an objective standard (or even of "incurring legal costs" in vindicating themselves). *Id.* at 73–78. Still more, the mental-state bar has been set singularly high—at "specific intent, presumably equivalent to purpose or knowledge"—in contexts where enforcement could "bleed over, either directly or through a chilling effect, to dissenting political speech at the First Amendment's core." *Id.* at 81. Absent that protection, the Court explained, regulated parties would be too likely to exhibit "cautio[n]" and engage in "'self-censorship' of speech that could not be proscribed." *Id.* at 75.

17

That concern applies with special force in this case. If the Government is not required to prove "a culpable mental state" (*id.*) here, Harvard and other universities will have powerful incentives to err on the side of caution in the speech they permit (and zeal in the discipline they impose). But if the First Amendment demands prophylactic protection for speech that is borderline-obscene or borderline-defamatory—lest some barely protected speech of those kinds be chilled—it surely affords at least as much protection to the exercise of "[a] university's academic freedom," which "long has been viewed as a special concern of the First Amendment." *Stand With Us*, 158 F.4th at 12–13 (citation omitted); *see also Moody v. NetChoice LLC*, 603 U.S. 707, 743 (2024) (holding that the First Amendment protects a platform's choice of "content-moderation policies"). Choices about which offensive or disruptive speech to tolerate, in what campus venues, and subject to what penalties, pose central issues of academic governance and institutional self-definition.[14] Allowing the Government to distort these core academic judgments through the threat of Title VI enforcement would intrude on the First Amendment rights of both the university and its students, *see Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024); *Gartenberg*, 765 F. Supp. 3d at 260, at least absent a showing that the university actually knew of actionable harassment and exhibited genuine indifference to it.

## C. The Government Fails To Allege Deliberate Indifference.

Regardless of whether the deliberate indifference requirement is rooted in Title VI or the First Amendment (or both), the Government's allegations fail to satisfy that requirement here.

First, because *Davis* requires deliberate indifference to "*known* acts of sexual [here, racial]

---

[14] At Harvard, debates over these questions have centered on the University-Wide Statement on Rights and Responsibilities (AC ¶ 135)—a "faculty-written statement" that was "[a]dopted in 1970 following the violent Vietnam War-era protests that severely disrupted academic life on campus" and "protected expression during a moment when the University could have completely shut protests down." Max J. Krupnick, *Silent Study-Ins*, Harvard Magazine (Nov. 14, 2024), https://perma.cc/H5DZ-U3WK.

18

harassment," the relevant set of acts is restricted to those in which the university has "actual knowledge" that the harassment was *based on a protected characteristic*. 526 U.S. at 642, 644 (emphasis added). That is not much of a hurdle in traditional cases of racial slurs or sexual misconduct, where the conduct ordinarily speaks for itself. But the actual knowledge requirement poses a severe obstacle for the Government here, because Harvard was not required to join the Government in presuming that avowedly pro-Palestinian, anti-Israel, and pro-free-speech activities were actually motivated by racial animus. Without plausibly alleging that Harvard had as re-uctive an understanding of its students' motives as the Government does, the Government cannot allege that Harvard was indifferent to what it knew to be intentional, ancestry-based harassment.

Second, throughout the Amended Complaint, the Government fails to account for the limited control that universities exercise over their students. The *Davis* Court reasoned that schools could appropriately be held liable for peer harassment in light of "school officials' 'comprehensive authority . . . to prescribe and control conduct in the schools.'" *Id.* at 646. But this sweeping authority, the Court recognized, "could not be exercised over free adults," and the *Davis* standard was supposed to be "sufficiently flexible" to account for that fact. *Id.* at 646, 649; *see id.* at 649 ("A university might not, for example, be expected to exercise the same degree of control . . ."). Like many universities, Harvard is a sprawling residential institution with many thousands of students, all of them adults, assembled from around the world; it resembles a small city more than it does a grade school. In that context, it would be unreasonable to suppose that the university's "own deliberate indifference effectively 'caused'" the diffuse social pressures to which unnamed students allegedly subjected one another in their social lives. *Id.* at 642–43; *see* Eidelson & Hellman, *supra*, at 21. Likewise, short of remaking itself as a police state, a university cannot realistically prevent anonymous students (let alone "Harvard outsiders," AC ¶ 139) from removing posters

19

from public bulletin boards or the like (¶¶ 29 39, 48, 51).

Finally, the Court's admonition that plaintiffs have no "right to make particular remedial demands," *Davis*, 526 U.S. at 648, has special force when the choices at issue involve contested trade-offs among values central to the academic enterprise. Even in the K-12 context, schools are not required to "ensure that . . . students conform their conduct to certain rules" on pain of being held deliberately indifferent. *Id*. But if "courts should refrain from second-guessing the disciplinary decisions made by school administrators" in addressing sexual harassment by a fifth-grader, *id.*, they should be all the more reluctant to displace the difficult choices that universities must make, based on a balance of institutional priorities, when policing college students' expression on matters of public concern. Those priorities include affirming the university's historic solicitude for the open exchange of controversial ideas, ensuring both the reality and the appearance of even-handedness, respecting the divergent frames of reference that students from around the world bring to global affairs, and much more. *Cf. Stand With Us*, 158 F.4th at 22–24 (observing that "fair-minded persons might be sympathetic to a university's concern that it not counterproductively aggravate the situation" and crediting MIT for "managing the situation so as to avoid escalation"). At the university level, all of these are among "the practical realities of responding to student behavior, realities that Congress could not have meant to be ignored." *Davis*, 526 U.S. at 653.

Given the delicate and constitutionally protected balancing that Harvard had to undertake here, the Court should be very reluctant to attribute the results of its deliberations, even as depicted by the Government, to "deliberate indifference." And the Court should be mindful that, if a case like this one withstands a motion to dismiss, Title VI will increasingly be used to coerce administrators into cracking down on disfavored views for fear of bet-the-university litigation.

## CONCLUSION

The motion to dismiss should be granted.

20

Dated: July 10, 2026

David Zimmer (BBO 692715)
ZIMMER, CITRON & CLARKE LLP
711 Atlantic Ave., 6th Floor
Boston, MA 02111
(617) 676-9421
dzimmer@zimmercitronclarke.com

Respectfully submitted,

/s/ Benjamin Eidelson
Benjamin Eidelson (*pro hac vice*)
1575 Massachusetts Ave.
Cambridge, MA 02138
(617) 495-4846
ben@beneidelson.org

*Counsel for Amici Curiae*