**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br>    Defendant. | Case No. 1:26-CV-11352-RGS |

<u>**MEMORANDUM OF LAW OPPOSING DEFENDANT'S MOTION TO DISMISS
AMENDED COMPLAINT**</u>

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

    I.    Jewish and Israeli Students Were Subjected to Severe, Pervasive, and Objectively Offensive Harassment Because of Their Race or National Origin ................................... 3

    II.    Jewish and Israeli Students Were Excluded from Harvard's Educational Benefits .......... 7

    III.    Harvard Chose Not to Enforce Its Own Rules .................................................................... 8

    IV.    The United States Investigates Harvard ........................................................................... 10

LEGAL STANDARD ........................................................................................................... 10

ARGUMENT ....................................................................................................................... 11

    I.    The United States has stated a Title VI claim. ................................................................. 11

        a.    The United States has satisfied administrative prerequisites to file suit. ................. 11

        b.    The United States has alleged that Jewish and Israel students faced a hostile educational environment. ...................................................................................... 13

        c.    The United States need not satisfy the deliberate indifference standard. ................. 21

        d.    Alternatively, the United States has alleged that Harvard was deliberately indifferent to discrimination against and harassment of Jewish and Israeli students ................ 23

        e.    The United States has alleged intentional discrimination. ....................................... 29

        f.    The United States has alleged ongoing noncompliance with Title VI ..................... 30

    II.    The United States has stated a claim for breach of contract. ........................................... 33

        a.    The Complaint pleads each element of breach of contract. .................................... 33

        b.    A breach-of-contract claim can proceed even if Harvard has cured the breach ........ 35

        c.    Title VI and the Spending Clause do not preclude a breach-of-contract claim. ....... 36

        d.    Harvard's remedy-based arguments do not warrant dismissal ............................... 37

    III.    This lawsuit is neither retaliatory nor pretextual. ........................................................... 38

CONCLUSION ..................................................................................................................... 40

# TABLE OF AUTHORITIES

**CASES**

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ............................................................................................. 23

*Arellano v. McDonough*,
1 F.4th 1059 (Fed. Cir. 2021) ...................................................................... 35-36

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................. 10

*Barnes v. Gorman*,
536 U.S. 181 (2002) ....................................................................................... 36, 37

*Bell v. New Jersey*,
461 U.S. 773 (1983) ............................................................................................. 32

*Blackstone Realty LLC v. FDIC*,
244 F.3d 193 (1st Cir. 2001) .............................................................................. 38

*Bryant v. Independent School District No. I-38*,
334 F.3d 928 (10th Cir. 2003) ...................................................................... 16, 27

*Custis v. United States*,
511 U.S. 485 (1994) ............................................................................................. 12

*Czerwienski v. Harvard Univ.*,
666 F. Supp. 3d 48 (D. Mass. 2023) ............................................................ 25, 27

*Davis v. Monroe Cty. Bd. of Educ.*,
526 U.S. 629 (1999) ....................................................................................... 14, 21

*D.B. v. Esposito*,
675 F.3d 26 (1st Cir. 2012) ................................................................................ 39

*De Prins v. Michaeles*,
942 F.3d 521 (1st Cir. 2019) .............................................................................. 29

*Doe v. U.S. Dep't of Just.*,
753 F.2d 1092 (D.C. Cir. 1985) ......................................................................... 37

*EEOC v. Mitsubishi Motor Mfg. of Am.*,
990 F. Supp. 1059 (C.D. Ill. 1998) .................................................................... 23

i

*Enica v. Principi*,
544 F.3d 328 (1st Cir. 2008) ............................................................................... 29

*Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012) ........................................................................................... 38

*Faigin v. Kelly*,
184 F.3d 67 (1st Cir. 1999) ................................................................................. 28

*Foley v. Wells Fargo Bank, N.A.*,
772 F. 3d 63 (1st Cir. 2014) ................................................................................ 37

*Frankel v. Regents of Univ. of Cal.*,
744 F. Supp. 3d 1015 (C.D. Cal. 2024) ............................................................... 18

*Frederick v. Simpson Coll.*,
160 F. Supp. 2d 1033 (S.D. Iowa 2001) .............................................................. 21

*Gartenberg v. Cooper Union for the Advancement of Sci. & Art*,
765 F. Supp. 3d 245 (S.D.N.Y. 2025) ..................................... 15, 18, 19, 24, 25, 26

*Gebser v. Lago Vista Independent School District*,
524 U.S. 274 (1998) ..................................................................................... 21, 22

*Global NAPs, Inc. v. Verizon New Eng, Inc.*,
603 F.3d 71 (1st Cir. 2010) ............................................................................ 25, 28

*Granger v. Klein*,
197 F. Supp. 2d 851 (E.D. Mich. 2002) .............................................................. 33

*Hildebrand v. Allegheny Cty.*,
757 F.3d 99 (3d Cir. 2014) ................................................................................. 13

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012) ........................................................................................... 38

*I.G. v. Jefferson County School District Through Board Of Education*,
452 F. Supp. 3d 989, (D. Colo. 2020) ................................................................. 16

*Israel. Rumsfeld v. Forum for Acad. and Inst. Rts., Inc.*,
547 U.S. 47 (2006) ............................................................................................. 19

*Jonathan R. v. Morrisey*,
178 F.4th 139 (4th Cir. 2026) ............................................................................. 13

*Kestenbaum v. President and Fellows of Harvard Coll.*,
743 F. Supp. 3d 297 (D. Mass. 2024) ................................................................... *passim*

*Kocsis v. Fla. State Univ. Bd. of Trs.*,
788 F. App'x 680 (11th Cir. 2019) ................................................................... 21

*Louis D. Brandeis Center For Hum. Rts. Under L. v. President and Fellows of Harvard Coll.*,
2024 WL 4681802 (D. Mass. Nov. 5, 2024) ................................................... *passim*

*Mach Mining, LLC v. EEOC*,
575 U.S. 480 (2015) ....................................................................................... 35

*Miller v. Mills Constr.*,
352 F.3d 1166 (8th Cir. 2003) ....................................................................... 35

*MJ's Mkt., Inc. v. Jushi Holdings, Inc.*,
766 F. Supp. 3d 197 (D. Mass. 2025) ............................................................ 38

*Ocasio-Fernandez v. Fortuno-Burset*,
640 F.3d 1 (1st Cir. 2011) ............................................................................. 10

*Orantes-Hernandez v. Thornburgh*,
919 F.2d 549 (9th Cir. 1990) ......................................................................... 33

*O'Brien v. Deutsche Bank Nat. Tr. Co.*,
948 F.3d 31 (1st Cir. 2020) ........................................................................... 11

*Porto v. Town of Tewksbury*,
488 F.3d 67 (1st Cir. 2007) ........................................................................... 26

*President and Fellows of Harvard Coll. v. Department of Health and Human Services*,
798 F. Supp. 3d 77 (D. Mass. 2025) ................................................... 28, 29, 38, 39

*Reynolds Industries, Inc. v. Mobil Oil Corp.*,
618 F. Supp. 419 ........................................................................................... 34

*Ricketts v. Wake Cty. Pub. Sch. Sys.*
125 F.4th 507 (4th Cir. 2025) ........................................................................ 31

*Rodriquez-Reyes v. Molina-Rodriguez*,
711 F. 3d 46 (1st Cir. 2013) .......................................................................... 30

*SEC v. Koracorp Indus., Inc.*,
575 F.2d 692 (9th Cir. 1978) ..................................................................... 31, 33

iii

*StandWithUs Ctr. for Legal Just. v. MIT*,
No. 1:24-cv-10577 (D. Mass. 2024) ................................................................... 17

*StandWithUs Center for Legal Justice v. MIT*,
158 F.4th 1 (1st Cir. 2025) ................................................ 16, 19, 20, 24, 27

*StandWithUs Ctr. for Legal Justice v. MIT*,
165 F.4th 97 (1st Cir. 2026) .................................................... 19, 20, 21

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) .......................................................................... 30

*T.E. v. Pine Bush Center School District*,
58 F. Supp. 3d 332 (S.D.N.Y. 2014) ................................................... 16

*United Launch Servs., LLC v. United States*,
139 Fed. Cl. 664 (Fed. Cl. 2018) ......................................................... 33

*United States v. Borden Co.*,
347 U.S. 514 (1954) ............................................................................ 25

*United States v. Facteau*,
89 F.4th 1 (1st Cir. 2023) ................................................................... 19

*United States v. Florida*,
938 F.3d 1221 (11th Cir. 2019) ........................................................... 37

*United States v. Marion Cty. Sch. Dist.*,
625 F.2d 607 (5th Cir. 1980) ............................................................... 37

*United States v. Regents of the Univ. of Cal.*,
No. 2:26-cv-05589 (C.D. Cal. 2026) .............................................. 27, 40

*United States v. Shelton*,
465 F.2d 361 (4th Cir. 1972) ............................................................... 32

*United States v. Winstar Corp.*,
518 U.S. 839 (1996) ............................................................................ 36

*Vance v. Spencer Cnty. Pub. Sch. Dist.*,
231 F. 3d 253 (6th Cir. 2000) ............................................................. 24

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ............................................................................ 30

*Walton v. Nalco Chem. Co.*,
  272 F.3d 13 (1st Cir. 2001) ............................................................................... 13

*Zeno v. Pine Plains Cent. Sch. Dist.*,
  702 F.3d 655 (2d Cir. 2012) ........................................................................ 18-19

## STATUTES & REGULATIONS

42 U.S.C. § 2000d ............................................................................................. 13, 23
42 U.S.C. § 2000d-1 ......................................................................................... *passim*
42 U.S.C. § 2000e-5 ................................................................................................ 12
42 U.S.C. § 2000h-3 ......................................................................................... 22, 36

28 C.F.R. § 50.3 ............................................................................................... 22-23
45 C.F.R. § 80.8 ..................................................................................................... 11

## RULES

Fed. R. Civ. P. 8 .................................................................................................... 35
Fed. R. Civ. P. 9 ........................................................................................... 2, 12, 13
Fed. R. Civ. P. 12 ............................................................................................ *passim*

## OTHER AUTHORITIES

*Additional Measures to Combat Anti-Semitism*
  Executive Order 14188 (Jan. 29, 2025) ............................................................ 40

Michael S. Schmidt and Michael C. Bender, *Trump Officials Blame Mistake for Setting Off
  Confrontation With Harvard*, The New York Times (Apr. 18, 2025) ..................... 39

Restatement (Second) of Contracts
  § 242 ................................................................................................................. 36

1 Calvin W. Corman, Limitation of Actions (1991)
  § 6.1 .................................................................................................................. 36

**INTRODUCTION**

This Court already has held—twice—that Jewish and Israeli students have adequately pleaded that Harvard's botched response to rampant antisemitism on campus violates Title VI.[1] *Kestenbaum v. President and Fellows of Harvard Coll.*, 743 F. Supp. 3d 297 (D. Mass. 2024); *Louis D. Brandeis Center For Hum. Rts. Under L. v. President and Fellows of Harvard Coll.*, 2024 WL 4681802 (D. Mass. Nov. 5, 2024). In those cases, the plaintiffs alleged that antisemitic demonstrators occupied buildings, disrupted classes, physically assaulted and stalked Jews, excluded Jews and Israelis from common spaces, and erected a large encampment in Harvard Yard. They alleged that Jewish students had to conceal their religious attire to protect their own safety. And they alleged that Harvard routinely ignored complaints, failed to enforce its own rules, and was biased against Jews and Israelis. The United States has made materially identical allegations in the Amended Complaint ("Complaint"), which exhaustively details the incidents of harassment and deliberate indifference that this Court twice has held suffice to state a Title VI claim.

Harvard nevertheless argues that the Complaint does not plausibly allege a Title VI violation. Unable to seriously contest that the United States plausibly alleged that Harvard was in violation of Title VI in the past, Harvard seeks dismissal of the Title VI claim because it supposedly is complying with Title VI in the present. But Harvard's extensive past discrimination raises a plausible inference of present discrimination; institutionalized antisemitism does not vanish overnight. Further, as Harvard seems to acknowledge, any present compliance with Title VI speaks only to the availability of "forward-looking relief," Mot. 1, not the merits of the

---

[1] For ease of reference, this brief refers to anti-Jewish and anti-Israeli harassment, discrimination, and animus as "antisemitism." The United States reserves the right to present evidence of harassment of and discrimination against non-Jewish Israelis at Harvard.

United States' claims or the availability of monetary relief to the United States.

Harvard's remaining Title VI arguments fall short. First, Harvard accuses the United States of failing to negotiate in good faith and of making only conclusory allegations that it complied with statutory conditions precedent to filing suit. However, Title VI does not require the United States to negotiate endlessly, *see* 42 U.S.C. § 2000d-1, and the pleading of conditions precedent is governed by Rule 9, which allows conclusory allegations, not by Rule 12. Second, although the United States has alleged deliberate indifference, it need not do so because the deliberate-indifference standard applies only to actions seeking monetary damages by private plaintiffs. Third, the United States has stated a claim for intentional discrimination. Citing Harvard's own findings, the Complaint alleges that Harvard ignored complaints of antisemitism while preferencing complaints involving other forms of hate.

The United States also has stated a claim for breach of contract. The terms of the United States' grants to Harvard, which Harvard does not dispute are legally binding contracts, plainly require Harvard to comply with Title VI and provide that compliance is a material condition. Because Harvard violated Title VI, it follows that Harvard breached its contracts with the United States. Any subsequent compliance with Title VI and curing of the breach speaks only to the available remedy and does not defeat a breach-of-contract claim on the merits. Nor does Title VI itself preclude a breach of contract claim; the statute does not abrogate the United States' common law right to sue to enforce its own contracts.

Finally, Harvard raises the affirmative defense that this lawsuit is retaliation against Harvard for exercising its First Amendment rights. Harvard cannot meet its heavy burden of prevailing on an affirmative defense at this stage. The Complaint establishes that even absent a retaliatory motive, the United States would have investigated the rampant antisemitism at Harvard

2

anyway. The United States aggressively has combatted antisemitism on campus, and this action is just one of many similar investigations and lawsuits across the country.

In short, Harvard fails to distinguish *Kestenbaum* and *Brandeis Center* or otherwise refute that the United States has stated a plausible Title VI claim. It hides behind doomed procedural arguments, targets the availability of remedies rather than the merits of the United States' claims, and rehashes the tired argument that any enforcement action, no matter how justified, is retaliatory. As in *Kestenbaum* and *Brandeis*, Harvard's motion to dismiss should be denied.

## BACKGROUND

On October 7, 2023, the designated foreign terrorist organization Hamas invaded Israel and committed unspeakable atrocities against Jewish men, women, and children. Hamas slaughtered nearly 1,200 people and took 254 hostages. Hamas terrorists raped an unknown number of people and slaughtered babies. This massacre was the largest taking of Jewish life on a single day since the Holocaust. AC ¶ 18.

### I.   Jewish and Israeli Students Were Subjected to Severe, Pervasive, and Objectively Offensive Harassment Because of Their Race or National Origin

Immediately after the October 7 terrorist attacks, Harvard erupted into a hotbed of antisemitism. AC ¶ 19. On October 7, the Harvard Undergraduate Palestine Solidarity Committee released a statement "hold[ing] the Israeli regime entirely responsible" for the violence against its own people. AC ¶ 20. Thirty-three other student grounds signed the Committee's letter, agreeing that Israel "was the only one to blame." AC ¶ 20 and n. 15.

Harvard's students began organizing en masse to target their Jewish and Israeli peers and to disrupt student life at Harvard. On October 14, students organized an anti-Israeli demonstration on the steps of Widener Library. AC ¶ 21. On October 18, students organized a "die-in," and two students physically assaulted an Israeli Jewish student who attempted to film the incident.

3

AC ¶ 32. Rather than punish the assaulters, Harvard later awarded one with a fellowship and selected the other for the prestigious position of Class Marshal. AC ¶ 33.

On October 19, hundreds of students marched through the campus and called for the elimination of Jewish and Israeli people. AC ¶ 34. Many individuals from outside the Harvard community joined the demonstration and trespassed in Harvard buildings after bypassing ID-scanners. The Harvard University Police stood idly by as terrified Jewish students "hid or ran away, sometimes covering or removing Jewish symbols." AC ¶ 35-36.

On October 30, anti-Israel agitators began a lengthy occupation of Harvard Law School's Caspersen Student Center, "where they stopped, targeted, and accosted Jewish students, forcing Jewish students to stop using the law school's primary student lounge." AC ¶ 38. Harvard's administration took no action for two weeks, until the dean of Harvard Law School sent an email reminding all students about the policies governing common spaces. AC ¶ 40. Graduate Students For Palestine nonetheless organized a "vigil for martyrs," *i.e.*, slain Hamas terrorists, in Caspersen Student Center only a few weeks later. AC ¶ 41. After Jewish students reported this "vigil," the Law School's dean of students attended the "vigil" rather than dismantle it. *Id.* Demonstrators again invaded the student center on March 5, 2024—this time, professors participated in the illicit demonstration. AC ¶ 54.

Illegal occupations of Harvard's buildings worsened. Throughout the month of November, student agitators repeatedly disrupted classes, chanting "globalize the intifada." AC ¶ 43. On November 16, 2023, anti-Israel demonstrators occupied University Hall. One student admitted that the protestors "came here to get fucking arrested." AC ¶ 42. Instead of ordering police to arrest the students, Harvard fed them. "Faculty Dean of Adams House Salmaan Keshavjee brought them burritos for dinner, and Harvard College Dean Rakesh Khurana gave

4

them candy." *Id.* (quotation marks omitted). On November 29, the African and African American Resistance Organization disrupted classes by chanting into megaphones, "from the river to the sea, Palestine will be free." AC ¶ 44. And on December 10, anti-Israel students blocked the entrance to Widener Library, demanding "[j]ustice for Palestine." AC ¶ 45. Similar demonstrations continued at Widener Library throughout early 2024, in violation of Harvard's policies. AC ¶¶ 46, 50.

Jewish and Israeli students also had to confront repeated acts of racism, vandalism, and graffiti after October 7. Anonymous students on the social-media platform SideChat called for Jews and Israelis to "COOK." AC ¶ 29. And demonstrators defaced posters of the Jewish and Israelis taken hostage by Hamas. *Id.*; *see also* AC ¶ 51.

Harvard's Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias ("Task Force") later found that "[t]his period marked a time of heightened anxiety for many Jewish students." AC ¶ 55. One Jewish student complained about the "nonstop and unrelenting" "barrage of antisemitic hate speech and protests outside of Harvard regulations." *Id.* According to another Jewish student, "[I] [l]iterally have been stalked across Harvard Yard by protestors while walking my dog [and] had 'Heil Hitler' yelled at me twice .… I've never felt less safe on a campus than I did this past year at Harvard." *Id.*

The campus climate continued to worsen. On April 24, 2024, anti-Israel students "erected an encampment … in the heart of Harvard Yard." AC ¶ 56. These demonstrators "followed and verbally harassed" Jewish students and displayed signs calling for the eradication of Israel. AC ¶ 57. One demonstrator attacked a Jewish teaching fellow while police stood by. AC ¶ 58. Jewish community members expressed fears about "being surveilled and targeted as a 'Zionist' by protestors using the label to be denigrating and derogatory" and about the "hostile and

5

intimidating environment for … Jewish first-year students who live in Harvard Yard." AC ¶ 59.

Harvard nevertheless did not "break up the encampment or meaningfully punish the individuals that acted in violation of university policy." AC ¶ 57. Harvard's Dean of Students threatened to discipline students if the encampment did not end, but his empty threats had no effect. AC ¶ 60-62. Harvard's President Alan Garber threatened to place demonstrators in the encampment on involuntary leave. He acknowledged that the encampment "present[ed] a significant risk to the educational environment of the University," "disrupted [Harvard's] educational activities and operations," and impeded students' "ability to sleep, study, and move freely about the campus." AC ¶ 64. Notwithstanding what President Garber referred to as "safety concerns," and despite the demonstrators' flagrant violations of Harvard's time, place, and manner rules, the chief of the Harvard University Policy Department declared that the demonstrators occupying Harvard Yard had a "right" to "protest peacefully." AC ¶ 63-64.

On May 14, President Garber reneged on his threats to place demonstrators on involuntary leave. He negotiated a deal with the demonstrators, in which Harvard would reinstate at least 22 students from involuntary leave in exchange for an end to the encampment. He also rewarded the demonstrators by offering meetings with Harvard's leadership about divestment from Israel. AC ¶ 66.

The harassment of Jewish and Israeli students continued into the 2024-2025 academic year. On September 21, 2024, anti-Israeli agitators (again) occupied Widener Library. Harvard's administrators had prior knowledge of the planned occupation and warned the agitators that their conduct violated Harvard's policies. Harvard nevertheless chose not to prevent the occupation or to punish the occupiers. AC ¶ 67. On October 16, Harvard professors occupied Widener Library in (another) anti-Israel "study-in." Again, Harvard took no preventative or punitive action. AC ¶

70. Similar library occupations occurred throughout the semester and into the following year. AC ¶¶ 71, 73-75, 80. On one occasion, masked students blocked the steps of Widener Library, declaring that they "will honor all our martyrs," namely, the Hamas terrorists killed by the Israeli Defense Forces. AC ¶ 80.

## II. Jewish and Israeli Students Were Excluded from Harvard's Educational Benefits

According to Harvard's own Task Force, "[t]he situation of Israeli students at Harvard has been dire. They have frequently been subject to derision and social exclusion … Jewish students felt doubly traumatized—first by the massacre of Israelis on October 7th and subsequently by the rapid transformation of the Harvard campus, especially after Israel's military response to the massacre, into what appeared to be a space for the unfettered expression of pro-Palestinian solidarity and rage at Israel—a rage that many Jewish and especially Israeli students felt was directed against them as well." AC ¶ 83-84.

Jewish students widely indicated that they were victims of severe harassment. The Task Force found that "substantial numbers of Jewish students indicated experiencing discomfort and alienation at Harvard … 26% felt physically unsafe and 44% felt mentally unsafe. Nearly half (49%) felt their well-being was not supported at Harvard … Almost 60% of Jewish students indicated they had experienced some form of discrimination, stereotyping, or negative bias on campus due to their views on current events." AC ¶ 85; *see also id.* ¶ 95. Some Jewish students concluded "that their personal safety was jeopardized by visible signifiers of their identity like a kippa" and resorted to "conceal[ing] their Jewish identity from classmates." AC ¶ 93.

These students' sentiments and fears largely resulted from student-on-student harassment that Harvard failed to prevent. Jewish and Israeli students were "spit on in the face for wearing a yarmulke, stalked on campus, and jeered by peers with calls of 'Heil Hitler' … result[ing] in

Jewish and Israeli students constantly fearing for their physical safety." AC ¶ 87. Although these and similar assaults were "timely reported to Harvard administrators, Harvard took no meaningful action to quell this antisemitic violence and vitriol." *Id.*

Harvard's instructors contributed to the creation of a hostile environment for Jews and Israelis. One professor threw an Israeli student out of class because the student was from Israel. The student filed a complaint with Dean Khurana, who did not follow up. AC ¶ 98. The Task Force received "disturbing reports that faculty members and teaching fellows discriminate against or harass students because they are Israeli." AC ¶ 99. One teaching fellow reportedly canceled class so students could join the Palestinian Solidarity Committee's demonstrations. AC ¶ 101. Other professors ended class early on the day of the protest or endorsed the protest during class. AC ¶ 103.

Harvard was well-aware of the suffering of its Jewish and Israeli students. On January 10, 2024—months before students created the encampment in Harvard Yard—a Jewish student filed a Title VI lawsuit against Harvard. AC ¶ 114; *see Kestenbaum v. President and Fellows of Harv. Coll.*, No. 24-10092 (D. Mass. 2024). On January 19, Harvard convened its Task Force. AC ¶ 116. And, of course, Harvard knew about the repeated library occupations, demonstrations, encampment, assaults, and harassment on its campus. These incidents attracted considerable attention and were the subject of complaints by students to Harvard's leadership, as well as the Task Force's June 6, 2024, preliminary report. AC ¶¶ 117, 118, 120.

## III.    Harvard Chose Not to Enforce Its Own Rules

"At all relevant times, Harvard had time, place, and manner rules governing university conduct (including student protests), as well as policies prohibiting discrimination and harassment, including discrimination against Jews and Israelis." AC ¶ 122. As early as 2002, Harvard maintained "explicit time, place, and manner limitations relevant to protest and dissent."

8

AC ¶ 123. Harvard (theoretically) prohibited demonstrations that disrupted "the normal activities of the University," such as those that "interfere[d] with freedom of movement" or "block[ed] ingress or egress to campus buildings, classrooms, administrative offices, or other spaces" or "pedestrian traffic." *Id.*

Harvard also had anti-harassment policies such as the Harvard University Non-Discrimination Policy, the Harvard University Anti-Bullying Policy, the University-Wide Statement on Rights and Responsibilities, and various handbooks governing student conduct. AC ¶ 132. Like Title VI, these policies prohibit "severe or pervasive" discrimination on the basis of race and national origin through "words or actions." AC ¶ 133-135.

Harvard made minimal, if any, efforts to enforce these policies as applied to anti-Israeli protests. It could have, but did not, use its police force to disperse the encampment and building occupations. And it could have, but did not, impose meaningful consequences on students who broke the rules. AC ¶ 124. For example, the students who interrupted classes with bullhorns and shouted "globalize the intifada" received only "admonishments." AC ¶ 127. When the Harvard Graduate School of Education found that five students violated Harvard policies by participating in the encampment, it "affirm[ed] the importance of [their] participation in civic activities and encourage[d] [them] to continue engaging in meaningful discourse." AC ¶ 130. Two Harvard Law School students who participated in the encampment similarly received only "informal warnings." AC ¶ 131.

Harvard's failure to enforce its own rules was itself a violation of Harvard's policies. The University-Wide Statement on Rights and Responsibilities commits Harvard "to give full and fair hearing to reasoned expressions of grievances; and to respond promptly and in good faith to such expressions and to widely expressed needs for change." AC ¶ 137. But Harvard's Task Force later

9

found that "students suffer from a lack of transparency, clarity, and clear process for the submission of complaints of antisemitic or otherwise hostile behavior" and that there was a "lack of follow-up after complaints regarding antisemitic expression or behavior." *Id.* Indeed, the Task Force concluded that Harvard failed to "establish effective reporting and remediation mechanisms for antisemitism." AC ¶ 140.

## IV.    The United States Investigates Harvard

Harvard receives billions of dollars of federal funding from the Department of Health and Human Services ("HHS") alone. AC ¶ 153. As a condition of receiving these grants, Harvard signed contractual assurances pledging that it would comply with Title VI and all regulatory requirements imposed by HHS. AC ¶ 145-155. Harvard repeatedly certified that it was "in com[pliance] with all applicable laws, regulations, certifications, and assurances." AC ¶ 159 (emphasis omitted).

On April 7, 2025, HHS began reviewing Harvard's compliance with Title VI. AC ¶ 163. On June 30, HHS issued findings that "Harvard University is in violent violation of Title VI." AC ¶ 164. Although HHS negotiated in good faith to attempt to bring Harvard into voluntary compliance with Title VI, the parties were unable to reach an agreement. HHS accordingly referred this case to the Department of Justice. *Id.*

## LEGAL STANDARD

"The sole inquiry under Rule 12(b)(6) is whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted." *Ocasio-Fernandez v. Fortuno-Burset*, 640 F.3d 1, 7 (1st Cir. 2011). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quotation marks omitted). A court must "draw the operative facts primarily from the complaint"

10

but "may also incorporate facts from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." *O'Brien v. Deutsche Bank Nat. Tr. Co.*, 948 F.3d 31, 33 (1st Cir. 2020) (quotation marks omitted).

## ARGUMENT

### I. The United States has stated a Title VI claim.

#### a. The United States has satisfied administrative prerequisites to file suit.

Title VI imposes minimal procedural obligations on the United States. Prior to bringing a lawsuit, the United States need only "advise[] the appropriate person or persons of the failure to comply with the requirement" and "determine[] that compliance cannot be secured by voluntary means." 42 U.S.C. § 2000d-1. After taking these steps, a federal agency may submit "a reference to the Department of Justice with a recommendation that appropriate proceedings be brought." 45 C.F.R. § 80.8(a) (HHS regulations).

The Complaint alleges that HHS took these steps. AC ¶¶ 8, 10. Specifically, HHS issued a notice of findings letter to Harvard on June 30, 2025, informing Harvard of HHS's determination that Harvard's failure to respond to widespread antisemitic harassment and abuse on its campus violated Title VI. AC ¶ 9. After meeting and conferring with Harvard on July 8, 2025, to attempt to secure Harvard's voluntary compliance, HHS issued written notice to Harvard on July 30, 2025, explaining that voluntary compliance could not be secured, and the matter would be referred to the United States Department of Justice ("Department") for appropriate proceedings. AC ¶ 10.

Nonetheless, Harvard faults the United States for making "only conclusory assertions that [HHS] 'negotiated with Harvard in good faith' and attempted voluntary resolution." Mot. 28 (quoting AC ¶ 165). This argument fails for two independent reasons.

First, Title VI does not require the United States to negotiate in good faith. In fact, Title VI does not require the United States to negotiate at all. Title VI requires the United States to "advise"

11

a defendant of "failure to comply" and to "determine[] that compliance cannot be secured by voluntary means," 42 U.S.C. § 2000d-1, but it does not require the United States to negotiate, settle, or compromise. The absence of an explicit negotiation requirement is glaring. "[W]hen Congress intended" to require agencies to negotiate with civil-rights defendants before filing a lawsuit, "it knew how to do so." *Custis v. United States*, 511 U.S. 485, 492 (1994). Title VII, requires the Equal Employment Opportunity Commission ("EEOC") to "endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion" before filing a lawsuit. 42 U.S.C. § 2000e-5(b). The "omission of similar language" from the neighboring Title VI "indicate[s] that [Congress] did not intend" to create a corresponding negotiation requirement. *Custis*, 511 U.S. at 492.[2]

Second, Harvard is incorrect that the United States must allege in a non-conclusory manner that it has satisfied the procedural requirements to filing this lawsuit. Mot. 28-29. "In pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred." Fed. R. Civ. P. 9(c). Thus, "a general averment in the complaint that all conditions precedent had been satisfied [is] sufficient for pleading purposes." *EEOC v. Standard Forge & Axle Co., Inc.*, 496 F.2d 1392, 1393 (5th Cir. 1974).

Title VI's procedural requirements are conditions precedent, the pleading of which is governed by Rule 9, not Rule 12. In *Standard Forge*, the district court dismissed the EEOC's discrimination claim because it did not "allege in detail that the Commission had fulfilled each of the administrative steps established by… Title VII." *Id.* The Fifth Circuit reversed. It explained

---

[2] Even Title VII does not impose a "duty of good-faith bargaining" on the EEOC. *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 490-491 (2015). The EEOC enjoys "leeway" to make "strategic decisions as whether to make a bare-minimum offer, to lay all its cards on the table, or to respond to a [defendant's] counter-offers, however far afield." *Id*. at 492.

12

that under Rule 9(c), the Commission need not "factually allege[] compliance with each provision" of Title VII. *Id.* at 1395. The Third Circuit arrived at the same conclusion in *Hildebrand v. Allegheny Cty.*, 757 F.3d 99, 112 (3d Cir. 2014). The complaint in that case alleged that "[a]ll conditions precedent to jurisdiction under section 706 of Title VII, have occurred or been complied with." *Id.* at 111. The Third Circuit held that this allegation was sufficient because the "pleading of conditions precedent is governed by Rule 9(c)" and "falls outside the strictures of *Iqbal* and *Twombly*." *Id.* at 112. The applicable pleading standard here is that of Rule 9(c), and the United States has satisfied this test by alleging that it "attempt[ed] to secure Harvard's compliance with Title VI by voluntary means." AC ¶ 10. Thus, Harvard's "Rule 12(b)(6) objection [is] insufficient to place a condition precedent … in issue." *Walton v. Nalco Chem. Co.*, 272 F.3d 13, 22 n.15 (1st Cir. 2001) (citing *Standard Forge*, 496 F.2d at 1395).

Separately, Harvard argues that the Complaint alleges that while only HHS "provided notice of a Title VI violation and attempted to secure voluntary compliance … this action seeks sweeping relief well beyond HHS." Mot. 28. This argument is premature. "Any necessary tailoring of [Harvard's] requested relief is better left for after a determination of the merits of [its] claims." *Jonathan R. v. Morrisey*, 178 F.4th 139, 159 (4th Cir. 2026) (quotation marks omitted); *Infra* 37-38.

### b. The United States has alleged that Jewish and Israel students faced a hostile educational environment.

Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. To prevail on a Title VI claim, the United States must show harassment "that is so severe, pervasive, and objectively offensive, and that so undermines

and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651 (1999). A hostile educational environment (1) features "severe, pervasive, and objectively offensive harassment" and (2) has "caused [students] to be deprived of educational opportunities or benefits." *Kestenbaum*, 743 F. Supp. 3d 297 at 308 (ellipses omitted).

**1.** The United States has pleaded the existence of a hostile educational environment at Harvard. According to the Complaint, Jewish and Israeli students have been physically assaulted (AC ¶ 32), excluded from common spaces (AC ¶ 38), subjected to calls for genocide (AC ¶ 29), stalked and surveilled (AC ¶¶ 59, 87), spat on (AC ¶ 87), and ejected from class (AC ¶ 97). They have fled from hostile trespassers (AC ¶ 35) and have resorted to concealing their religious attire (AC ¶¶ 35, 93). Posters of the Jews and Israelis abducted by Hamas were destroyed or defaced. AC ¶ 29. Jews have been called "Zionist[s]" by anti-Israel demonstrators in a "denigrating and derogatory" manner. AC ¶¶ 59, 93; *see* Dep't of Educ., *Dear Colleague Letter* (May 7, 2024) at 7 (explaining that calling a Muslim student a "terrorist" due to her "perceived race and national origin" can amount to harassment). Unsurprisingly, more than half of Jewish students at Harvard indicated that they were victims of "discrimination, stereotyping, or negative bias," and nearly a quarter indicated that they "felt physically unsafe." AC ¶ 85.

In two cases, this Court has held that Jewish students faced a hostile educational environment at Harvard. In *Kestenbaum*, 743 F. Supp. at 309, this Court observed that the "protests were, at times, confrontational and physically violent, and plaintiffs legitimately fear their repetition" and that Jewish students "dreaded walking through the campus, missed classes, and stopped participating in extracurricular events." The United States makes materially identical allegations here. *E.g.*, AC ¶ 87 ("Jewish and Israeli students constantly fear[] for their physical

safety"). Likewise, in *Brandeis Center*, 2024 WL 4681802, at *4, this Court declined to dismiss a Title VI claim where plaintiffs alleged that Harvard's campus is "filled with antisemitic and anti-Israeli rhetoric that Harvard refuses to sanction or even address." Again, the United States has made similar allegations. *E.g.*, AC ¶ 29 ("[S]tudent demonstrators called for Jews and Israelis to 'COOK' and mocked students' physical appearance.").

*Kestenbaum* and *Brandeis Center* are not outliers. Courts consistently have held that antisemitic conduct similar to that at Harvard was severe, pervasive, and objectively offensive. For example, in *Gartenberg v. Cooper Union for the Advancement of Sci. & Art,* 765 F. Supp. 3d 245 (S.D.N.Y. 2025), plaintiff alleged that "Jewish students were harassed … through repeated instances of antisemitic vandalism and graffiti that violated Cooper Union's disciplinary policies," such as the destructions of "posters with the names and photographs of people who had been abducted by Hamas." *Id.* at 273; *see* AC ¶ 29 ("[D]emonstrators defaced posters of Jewish and Israeli hostages."). A bathroom stall was vandalized with the phrase "from the river to the sea." *Id.*; *see* AC ¶ 26 (alleging that students chanted the same phrase). In an incident that was plausibly "physically threatening or humiliating" to Jewish students, a mob of protestors "disrupted classes" and blocked exits from a library while chanting anti-Israel slogans. *Id.* at 252, 269; *see* AC ¶¶ 43-45, 127 (alleging that students "disrupted classes" while chanting the same phrase). These slogans were allegedly "thinly veiled code words" that "when uttered just two weeks after the deadliest massacre of Jews since the Holocaust in a manner that reasonably appears to celebrate and glorify that same violence … support[ed] at least a plausible inference of animus towards Jews." *Id.* at 269 (quotation marks omitted); *see* AC ¶ 25-27 (explaining the antisemitic connotations of these phrases). The court held that the student pleaded a hostile educational environment. *Id.* at 270.

15

Similarly, in *I.G. v. Jefferson County School District Through Board Of Education*, 452 F. Supp. 3d 989, (D. Colo. 2020), the court held that a Jewish student stated a Title VI claim by alleging "that students were giving Nazi salutes, saying 'Heil Hitler,' wearing swastikas, and referencing gas chambers used to kill Jews during the Holocaust." *Id.* at 1002. And in *T.E. v. Pine Bush Center School District*, 58 F. Supp. 3d 332, 357 (S.D.N.Y. 2014), the court similarly held that allegations regarding "anti-Semitic slurs," "swastika graffiti," "physical harassment," and statements that Jewish students "should have been burned in the Holocaust" sufficed to state a Title VI claim. *See* AC¶ ¶ 27, 88 (referencing "gas chambers"), ¶ 69 ("swastika stickers"), *and* AC ¶¶ 55, 87 ("calls of 'Heil Hitler'"); *see also Bryant v. Independent School District No. I-38*, 334 F.3d 928, 931 (10th Cir. 2003) (holding that black students stated a Title VI claim arising out of racial epithets, swastikas, "KKK" inscriptions, and nooses).

Harvard makes no effort to distinguish *Kestenbaum* and *Brandeis Center's* findings of a hostile educational environment. Nor could it; the cases are materially identical in this regard. Instead, while admitting that the Complaint's allegations are "disturbing," Harvard relies on *StandWithUs Center for Legal Justice v. MIT*, 158 F.4th 1, 20-21 (1st Cir. 2025), and downplays them as only "'isolated incidents of antisemitism' that do not amount to the 'systemic' 'deprivation of educational access' required to establish a Title VI violation. Mot. 14 (quoting *StandWithUs*, 158 F.4th at 21). The Complaint establishes that these incidents were anything but "isolated." It provides data (complied by Harvard's own Task Force) that antisemitism at Harvard went far "beyond a small number of discrete instances of harassment." *Id*. "Almost 60% of Jewish students indicated they had experienced some form of discrimination, stereotyping, or negative bias on campus due to their views on current events," and "26% felt physically unsafe." AC ¶ 85. When more than half of Jewish students claim they are victims of discrimination and over a

16

quarter feel that their physical safety is threatened, there is at least a *plausible* inference that antisemitism is far more "systemic" than Harvard cares to admit.

Additionally, *StandWithUs*—a case arising out of antisemitism at MIT—does not mean that there was no actionable harassment at Harvard. This Court previously distinguished Harvard's response, which was "poorly executed," from MIT's response, which for all its flaws, at least displayed a "consistent sense of purpose in returning civil order and discourse to its campus." *Kestenbaum*, 743 F. 3d. at 310. The Complaint plausibly alleges what this Court previously found, that antisemitic harassment at Harvard was significantly worse than that at MIT. The allegations in *StandWithUs* largely concerned pre-October 7 political speech divorced from any antisemitic conduct (¶ 135-143), comments by various external actors (¶ 205-206), generalized national statistics, surveys, and statements (¶¶ 106-116, 272, 275-277), secondhand descriptions of the campus environment (¶¶ 191-192, 207-209), and additional minimally probative evidence of a hostile educational environment.[3] To be sure, MIT also hosted an anti-Israel encampment (¶ 220-245), and the *StandWithUs* plaintiffs did allege abhorrent examples of antisemitic conduct, such as physical assaults (¶ 155). But absent from *StandWithUs* is anything resembling the most powerful evidence of antisemitism at Harvard: (1) survey data indicating that the Jewish community as a whole—as opposed to the individual plaintiffs—faced a hostile educational environment, and (2) a university-created task force detailing extensive evidence that antisemitism was widespread. *E.g.*, AC ¶ 83 ("[T]he situation of Israeli students at Harvard has been dire.").

Harvard also argues that the United States "fails to allege that campus disruptions or aggressive protest tactics targeted Jewish or Israeli students in particular, as is required, as

---

[3] *StandWithUs Ctr. for Legal Just. v. MIT*, No. 1:24-cv-10577 (D. Mass.), Doc. 36.

opposed to targeting prominent locations for all students on campus." Mot. 15 (cleaned up). That is simply untrue. Many of the Complaint's allegations feature conduct directed at Jews for being Jews. *E.g.* AC ¶ 38 (alleging Jewish students were "targeted" in a student lounge); ¶ 59 (alleging "violent language" was directed at Jews); ¶ 87 (alleging that Jews were "spit on in the face for wearing a yarmulke … and jeered by peers with calls of 'Heil Hitler'"); ¶ 55 (similar); ¶ 98 (alleging an Israeli was kicked out of a class after verbally identifying as Israeli). Regarding the Complaint's allegations of repeated takeovers and barricades of libraries, the United States plausibly has alleged that, as in *Gartenburg*, 765 F. Supp. at 276, the combination of "menacing" tactics and anti-Israel speech is motivated by antisemitism. *Supra* 14-16.

**2.** The Complaint also plausibly alleges that at least some Jewish and Israeli students were deprived of educational opportunities or benefits. Jewish and Israeli students were excluded from common spaces and classes and faced "safety concerns" when attempting to traverse Harvard Yard, leading many to conceal their Jewish identity. AC ¶¶ 38, 45 59, 64, 93, 97. Access to common spaces and classes is plainly an educational benefit, and Jewish students are deprived of that benefit when they are functionally "excluded from portions of … campus." *Frankel v. Regents of Univ. of Cal.*, 744 F. Supp. 3d 1015, 1020 (C.D. Cal. 2024). Harvard does not dispute this point.

In addition to physical exclusion from common spaces, the United States has alleged that Jewish and Israeli students suffered from considerable emotional distress. Specifically, "39% [of Jewish students] did not feel at home at the University … and 44% felt mentally unsafe. Nearly half (49%) felt their well-being was not supported at Harvard." AC ¶ 85. This "depriv[ation] of a supportive, scholastic environment free of racism and harassment" amounts to the denial of an educational benefit or opportunity. *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 667 (2d

Cir. 2012); *see also Gartenburg*, 765 F. Supp. at 278 (allegations about "emotional distress …

are sufficient to plead a deprivation of educational benefits or opportunities for purposes of

Title VI"). Again, Harvard does not dispute this point.

**3.** Harvard also argues that the United States' Title VI claim should be dismissed because

the "bulk of the allegations in the Amended Complaint reflect student speech and protest activity."

Mot. 15. The United States recognizes that antisemitic *speech* is protected by the First

Amendment and that Title VI accordingly should not and cannot require universities to "put an

end" to such hateful speech. *See StandWithUs*, 158 F.4th at 13. But the *conduct* detailed in the

Complaint goes far beyond constitutionally protected speech. Again, the Complaint alleges that

Jews and Israelis were assaulted, spat on, excluded from class, denied entrance to buildings,

stalked, and coerced into removing religious attire. *Supra* 14-18. It should go without saying that

this "conduct" cannot "be labeled 'speech'" simply because the demonstrators "engaging in the

conduct intend[ed] thereby to express an idea" of Jew hatred or opposition to Israel. *Rumsfeld v.

Forum for Acad. and Institutional Rts., Inc.*, 547 U.S. 47, 65 (2006).

"[T]he First Amendment does not apply to the evidentiary use of speech to establish the

elements of a crime or to prove motive or intent." *United States v. Facteau*, 89 F.4th 1, 23 (1st

Cir. 2023) (quotation marks omitted). Accordingly, *StandWithUs* does not foreclose the

possibility that "racist speech" can be "punished pursuant to Title VI." *StandWithUs*, 158 F.4th

at 15. Indeed, the First Circuit noted that it did not "address[] the … issue." *Id.*; *see also

StandWithUs Ctr. for Legal Justice v. MIT*, 165 F.4th 97, 99 (1st Cir. 2026) (Dunlap, J.,

concurring in denial of rehearing en banc) (observing that the panel did not "determin[e] whether

racist speech can be punished under Title VI without violating the First Amendment"). Rather,

the First Circuit explained that MIT students who brought a Title VI claim failed to raise a

19

plausible inference "that *in these specific circumstances*[,] the protestors' strident criticisms of Israel were driven by antisemitism" and that "[w]ithout such an inference, the protestors' speech cannot constitute racial harassment for Title VI purposes." *StandWithUs*, 158 F.4th at 18 (emphasis added). The First Circuit also noted that under different circumstances, "anti-Zionism [can be] wielded as a tool of the antisemite." *Id.* at 17.

The United States plausibly has alleged that this case presents those different circumstances under which it is "at least plausible" that anti-Israel speech "support[s] an inference of animus towards Jews." *StandWithUs*, 165 F.4th at 101 (Dunlap, J., concurring) (quotation marks omitted). The Complaint details antisemitic phrases such as "globalize the intifada" and "gas all the Jews" (AC ¶¶ 43, 88) not because this speech itself violates Title VI but because it evinces antisemitic animus at Harvard. By President Gay's own admission, the chants of "from the river to the sea," as used at Harvard, implied "the eradication of Jews from Israel." AC ¶ 28. This phrase and similar phrases were "widely perceived as antisemitic" under the specific circumstances at Harvard, suggesting that it is at least *plausible* that the anti-Israel demonstrators were motivated by antisemitic animus. Harvard University Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias, *Final Report,* 32 (2025).[4] As President Gay reluctantly admitted, phrases such as "from the river to the sea" "engender both pain and existential fears within our Jewish community." Miles J. Herszenhorn and Claire Yuan, *Harvard President Gay Announces Antisemitism Training, Condemns Pro-Palestine Phrase 'From the River to the Sea,'* Harvard Crimson (Nov. 10, 2023) (cited at AC ¶ 28 n.22). While it is possible—"depending on the context" as President Gay would say (AC ¶ 110)—that these phrases are protected "political opinions," given "other incidents of antisemitism on campus," the United States should "be[]

---

[4] Available at https://tinyurl.com/2rnsacda.

afford[ed] the opportunity to prove whether such an inference of animus could be sustained." *StandWithUs* 165 F.4th at 101 (Dunlap, J., concurring).

### c.  The United States need not satisfy the deliberate indifference standard.

The deliberate indifference standard is a judicially created doctrine that originated in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998); *see also Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). This standard applies in cases brought by private plaintiffs who seek monetary damages. But it is "not clear" whether the standard "appl[ies] to claims for non-monetary relief." *Kocsis v. Fla. State Univ. Bd. of Trs.*, 788 F. App'x 680, 684 n.2 (11th Cir. 2019); *see also Frederick v. Simpson Coll.*, 160 F. Supp. 2d 1033, 1035 (S.D. Iowa 2001) (*Gebser* "is silent regarding whether this heightened standard applies to cases when plaintiffs seek equitable relief.").

The proper standard for a federal enforcement action seeking equitable relief is not the judicially created doctrine of deliberate indifference. *Gebser* illustrates why. In that case, a private Title IX plaintiff alleged that she was sexually harassed by and had an inappropriate sexual relationship with a teacher. *Gebser*, 524 U.S. at 277-278. The plaintiff sought damages, and the Supreme Court held that "a damages remedy will not lie under Title IX unless" there is "an official decision by the [defendant] not to remedy the violation," *i.e.*, that the defendant's "response … amount[s] to deliberate indifference to discrimination." *Id.* at 290-291. The Court explained that this deliberate-indifference standard is appropriate because "[u]nder a lower standard, there would be a risk that the recipient would be *liable in damages* not for its own official decision but instead for its employees' independent actions." *Id.* (emphasis added).

Crucially, the deliberate-indifference standard is designed to replicate statutory notice conditions. Title IX, like Title VI, has a "contractual nature." *Gebser*, 524 U.S. at 287. When Congress attaches contractual conditions to the receipt of federal funds, courts "examine closely

21

the propriety of *private actions* holding the recipient liable *in monetary damages* for noncompliance with the condition." *Id.* (citation omitted, emphasis added). That is a sensible approach. First, awards of private damages can thwart a statute's "express means of enforcement … by administrative agencies … [who] disburse education funding to enforce their rules implementing the [statutory] nondiscrimination mandate through proceedings to suspend or terminate funding." *Id.* at 288. Second, Title IX, like Title VI, "requires actual notice to officials of the funding recipient and an opportunity for voluntary compliance before administrative enforcement proceedings can commence." *Id.* at 290. It thus "would frustrate the purposes of Title IX to permit a damages recovery … based on principles of *respondeat superior* or constructive notice." *Id.* at 285 (quotation marks omitted). If the United States must provide actual notice before seeking monetary relief, a private plaintiff should face the same burden. In private actions "rest[ing] on principles of constructive notice or *respondeat* superior," monetary damages would be improper because "the recipient of the funds was unaware of the discrimination" until the lawsuit is filed. *Gebser*, 524 U.S. at 287.

There is no good reason to apply the deliberate-inference standard to cases where the United States seeks equitable relief. Application of this standard, a substitute for the Title VI notice requirement, is superfluous when the United States may use "any other means authorized by law" to enforce Title VI and provides notice of enforcement pursuant to 42 U.S.C. § 2000d-1. *See also* 42 U.S.C. § 2000h-3 ("[n]othing in this Act shall be construed to deny, impair, or otherwise affect any right or authority of the … United States … under existing law to institute or intervene in any action or proceeding."); 28 C.F.R. § 50.3(c)(I)(B)(1)-(3) ("[c]ompliance with the nondiscrimination mandate of title VI may often be obtained more promptly by appropriate court action than by hearings and termination of assistance … include[ing] (1) a suit to obtain

22

specific enforcement of assurances…, and (3) initiation of … a suit for other relief designed to secure compliance.").

The correct inquiry here is whether a recipient of federal funding has allowed a hostile educational environment to exist. This inquiry aligns with the text of Title VI, which prohibits all "discrimination," not only discrimination to which a recipient is deliberately indifferent. 42 U.S.C. § 2000d. Thus, where a recipient knew or should have known that it was "fostering and incubat[ing] … a hostile campus environment," as the United States alleges in Count I, the United States may obtain equitable relief. AC ¶ 181. The well-pleaded "fostering" of a hostile environment suffices to state a Title VI claim, and allegations establishing deliberate indifference are not needed. Indeed, the United States alleges Harvard's decisions—such as selective enforcement and non-enforcement of its rules, participation in, and rewarding of, conduct that violates its rules, and mishandling the complaints of its Jewish and Israeli students—amount to a "policy of tolerance" toward the metastasizing antisemitic environment on its campus. *EEOC v. Mitsubishi Motor Mfg. of Am.*, 990 F. Supp. 1059, 1073-75 (C.D. Ill. 1998).

Harvard disputes that negligence alone can violate Title VI. (Count I alleges far more than mere negligence; the United States asserts that Harvard was "cuplabl[e] in the creation of a hostile educational environment. AC ¶ 181.) It relies on *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001), where the Supreme Court stated that Title VI "prohibits only intentional discrimination." Harvard takes *Sandoval* out of context. *Sandoval* was a case brought by private plaintiffs that addressed whether there is a private right of action to enforce Title VI's disparate-impact regulations, and the Supreme Court explained that Title VI itself (as distinct from the regulations) does not authorize disparate-impact liability. *Id.* at 280-281. *Sandoval* therefore does not purport to decide what *Gebser* and *Davis* left unsaid: whether the deliberate-indifference standard applies

23

when the United States seeks equitable relief and whether a recipient's series of decisions to respond (or not respond) to a hostile environment constitutes a discriminatory "policy of tolerance" that violates Title VI.

### d. Alternatively, the United States has alleged that Harvard was deliberately indifferent to discrimination against and harassment of Jewish and Israeli students.

**1.** Deliberate indifference means "affirmatively choosing to do the wrong thing, or doing nothing, despite knowing what the law requires." *Kestenbaum*, 743 F. Supp. 3d 297, 308 (D. Mass. 2024) (citations omitted). A recipient of federal funding is deliberately indifferent when "its response to known harassment is so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances." *StandWithUs*, 158 F.4th at 22 (quotation marks omitted). In other words, deliberate indifference is sufficiently alleged when a "remedial action only follows after a lengthy and unjustified delay," *Gartenberg*, 765 F. Supp. 3d at 274 (citations omitted), or "[w]here a [recipient] has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail." *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F. 3d 253, 261 (6th Cir. 2000).

The United States has alleged deliberate indifference. The Complaint details numerous instances where Harvard did nothing in response to Jewish and Israeli students' complaints of both student-on-student and faculty-on-student antisemitic harassment. For example, Harvard ignored Jewish students who complained that demonstrators destroyed and defaced posters of Israeli hostages. AC ¶¶ 39, 48. And Harvard ignored or declined to follow up on complaints lodged by Jewish students. AC ¶¶ 51, 52, 98, 140.

This Court has _twice_ held that these actions and similar actions amounted to deliberate indifference. In *Kestenbaum*, 743 F.3d at 309–10, this Court explained that a Jewish student "plausibly alleged deliberate indifference" by pleading that "Harvard's reaction was, at best,

24

indecisive, vacillating, and at times internally contradictory." *Kestenbaum* is not an outlier. Other courts in this District have held that allegations of Harvard's ignoring harassment complaints establish deliberate indifference at the pleading stage. In *Czerwienski v. Harvard Univ.*, 666 F. Supp. 3d 48, 90 (D. Mass. 2023), the court found a plausible allegation of deliberate indifference where "Harvard allegedly failed to address any [harassment] complaints" until after negative publicity. Likewise, in *Brandeis Center*, 2024 WL 4681802, at *5, this Court held that Jewish plaintiffs alleged deliberate indifference where Harvard failed to meaningfully investigate complaints of antisemitism.

Harvard unsurprisingly does not attempt to factually distinguish *Kestenbaum* and *Brandeis Center*. Instead, it reasserts the false premise that the United States must allege that "Harvard *continues* to be deliberately indifferent." Mot. 18. As discussed above, that is incorrect, and in any event, the United States plausibly has alleged that Harvard's deliberate indifference continues. *Infra* pp. 27-28. That Harvard has settled *Kestenbaum* and *Brandeis Center* does not absolve it of liability here. *Contra* Mot. 20. It would be absurd if voluntary settlement of one Title VI case could preclude a finding of deliberate indifference in another case involving different parties, particularly when the United States is the plaintiff acting pursuant to its statutory authority to protect the public interest. *See United States v. Borden Co.,* 347 U.S. 514, 518-19 (1954); *Global NAPs, Inc. v. Verizon New Eng, Inc.*, 603 F.3d 71, 95 (1st Cir. 2010) (explaining that issue preclusion requires a final judgment on the merits).

Harvard further argues that the numerous instances of inaction alleged in the Complaint are "conclusory" and do not amount to deliberate indifference, but Harvard's inaction mirrors that in *Gartenberg*, where the court held that plaintiffs alleged "numerous examples of deliberate indifference." *Gartenberg*, 765 F. Supp. 3d at 275. Specifically, Cooper Union "did nothing to

25

prevent a group of … protestors from trespassing into and occupying the [library], where they disrupted school activities and intimidated Jewish students." *Id.* at 275–76; *see* AC ¶ 45 ("Harvard refused to intervene" to prevent a library occupation while "also advising students to hide or conceal their Jewish or Israeli identities"). Cooper Union did not "check the student IDs of [protestors]." *Id.*; *see* AC ¶ 35 ("[P]eople from outside the Harvard community … bypassed card scanners to trespass in the buildings."). Cooper Union told police and its security to "stand down." *Id.* at 255, 276; *see* AC ¶ 45 ("Harvard refused to intervene, or let the police intervene, even though Harvard could lawfully stop blockades and punish disruptors."). And Cooper Union "took no action to disperse the protestors" even though they were "violating Cooper Union's generally applicable policies against engaging in 'disorderly, disruptive, or aggressive behavior.'" *Id.*; *see* AC ¶ 122-144 (alleging Harvard failed to enforce its own rules). If anything, Harvard's deliberate indifference was far worse than Cooper Union's. Whereas Cooper Union's deliberate indifference largely stemmed from its nonresponse to a single violent building occupation, *id.*, Harvard's deliberate indifference has lasted far longer, despite repeated protests, building occupations, and pleas for help from its Jewish and Israeli students, *e.g.*, AC ¶ 105-121. Even assuming Harvard can be forgiven for its tepid response (or lack thereof) to antisemitic conduct in the immediate aftermath of October 7, Harvard nevertheless was deliberately indifferent because it "failed to take additional reasonable measures after it learned that its initial remedies were ineffective." *Porto v. Town of Tewksbury*, 488 F.3d 67, 74 (1st Cir. 2007).

Harvard tries to escape liability by arguing that the United States merely faults it for "not tak[ing] the Government's favored approach on its preferred timeline." Mot. 17. This misses the mark. Harvard was deliberately indifferent not because it "declin[ed] to turn the police on student protestors," *id.*, but because time and again, its response to antisemitic harassment was "so lax …

26

as to be clearly unreasonable." *StandWithUs*, 158 F.4th at 22. At this motion-to-dismiss stage, it is at least plausible that systemically ignoring complaints (AC ¶¶ 51, 52, 98, 140), buying burritos for illicit building occupiers (AC ¶ 42), rewarding students who beat up a Jewish peer (AC ¶ 32-33), and reversing suspensions for students who unlawfully refused to leave the encampment (AC ¶ 66) is "clearly unreasonable." *See Kestenbaum*, 743 F.3d at 309; *Brandeis Ctr.*, 2024 WL 4681802, at *5. *Cf. Bryant*, 334 F.3d at 933 ("It is impossible to discern at the summary judgment stage whether the [recipient] intentionally allowed and nurtured the racially hostile environment to the boiling point.").

Harvard also argues that it has not been deliberately indifferent because it has taken "many actions … since the end of the 2023-2024 academic year." Mot. 5; 19-20. Actions taken since 2025 do not demonstrate a lack of deliberate indifference prior to that time. By the time Harvard finally took these "many actions," this Court already denied the motion to dismiss in *Kestenbaum*. *See Czerwienski*, 666 F. Supp. 3d at 61-69, 89-91. Harvard applauds itself because it "issued admonishments, threatened discipline," and otherwise "successful[ly] … end[ed] the encampment." Mot. 18-19. Harvard's definition of "success" is an odd one. Its reiteration of existing rules was ineffective. ¶ 46. Its threats were empty. AC ¶ 62. Its police chief sided with the demonstrators. AC ¶ 63. Its discipline was reversed. ¶ 66. Perhaps Harvard believes its response was "successful" because it did not require the use of riot police and tear gas to disperse armed and militarized demonstrators. *See generally United States v. Regents of the Univ. of Cal.*, No. 2:26-cv-05589 (C.D. Cal. 2026), Doc. 1. But Title VI does not set such a low bar for deliberate indifference. Even after three Title VI lawsuits, Harvard still has not learned its lesson. It continues to make "virtuous public declarations" while neglecting that its words "proved hollow when it came to taking disciplinary measures against offending students and faculty."

27

*Kestenbaum*, 743 F. Supp. 3d at 310. Indeed, although Harvard touts its settlement agreements with third-party Title VI litigants, it admits that it has yet to produce its promised annual Title VI report in the eighteen months since making that commitment. Mot. 28 p. 21; AC ¶ 42; Mot. 20, n. 22.

**2.** *President and Fellows of Harvard Coll. v. Department of Health and Human Services*, 798 F. Supp. 3d 77, (D. Mass. 2025) ("*HHS*") does not preclude a deliberate-indifference claim. Issue preclusion applies only where "(1) both proceedings involved the same issue of law or fact, (2) the parties actually litigated that issue, (3) the prior court decided that issue in a final judgment, and (4) resolution of that issue was essential to judgment on the merits." *Global NAPs, Inc.* 603 F. 3d at 95. Further, issue preclusion "must be confined to situations where the matter raised in the second suit is *identical in all respects* with that decided in the first proceeding." *Faigin v. Kelly*, 184 F.3d 67, 78 (1st Cir. 1999) (emphasis added, quotation marks omitted).

Issue preclusion does not apply here for the straightforward reason that Harvard's compliance with Title VI was not at issue in *HHS*. Rather, the case concerned whether the United States complied with the statute's procedural requirements. After the United States terminated grants to Harvard, invoking its failure to address antisemitism, Harvard filed suit and alleged in relevant part that the termination violated Title VI's procedural requirements. *HHS*, 798 F. Supp. 3d at 94. Judge Burroughs agreed that the United States "did not comply with these requirements." *Id.* at 126.[5]

Because Harvard was the plaintiff in *HHS*, not the defendant, the parties did not "actually litigate[]" whether Harvard was deliberately indifferent to antisemitism, *HHS*, Docs. 70, 185-1

---

[5] The United States respectfully disagrees with this decision, and its appeal is pending before the First Circuit (No. 25-2230).

(motions for summary judgment), and Judge Burroughs did not "decide that issue in a final judgment." Harvard emphasizes a finding that Harvard made "policy and other changes aimed at ensuring that its campus is safe and welcoming for Jewish and Israeli students" (*id.* at 93)—dictum that is by no means "essential to the judgment" that the United States made procedural missteps—she did not decide whether Harvard had violated Title VI. The phrase "deliberate indifference" does not appear anywhere in her lengthy opinion. Thus, no court has decided whether Harvard violated Title VI, so the United States cannot be "barred from relitigating that issue." Mot. 23. In any case, issue preclusion does not apply simply because two cases involve substantially overlapping facts involving interactions between similar parties. *See*, *e.g.*, *Enica v. Principi*, 544 F.3d 328, 334-37 (1st Cir. 2008); *see also De Prins v. Michaeles*, 942 F.3d 521, 525 (1st Cir. 2019) (emphasis in original) "[W]e generally err on the side of <u>not</u> finding an issue precluded when it is not clear that it was fully litigated.").

### e.   The United States has alleged intentional discrimination.

The Complaint adequately alleges Harvard ignored complaints of antisemitism while taking other forms of discrimination more seriously. AC ¶ 145-152. Most notably, Harvard's Task Force noted "widespread perceptions that anti-Israeli and anti-Jewish expression are tolerated in a way that hostile rhetoric towards other groups would not be; that some of Harvard's offices for Equity, Diversity, Inclusion, and Belonging have not taken antisemitism seriously; and that discipline against students who engaged in bullying, harassment, and intimidation has been lax." Task Force Report at 27. The Task Force also observed that a "widespread sentiment emerged that anti-Israeli and anti-Jewish expression was tolerated to a greater degree than similar hostility toward other minority groups, such as Black or LGBTQ+ students." *Id.* at 122; *see also* AC ¶ 147. (same). The findings of Harvard's own Task Force—which Harvard does not dispute—raise at least a plausible inference that Harvard treated Jews and Israelis as second-class citizens.

29

Harvard's diversity bureaucracy "prioritized work around race, disability, and sexual and gender identity, to the exclusion of Jewish and Israeli community members." AC ¶ 148 (cleaned up). Two plausible explanations for this are animus towards Jews and preferences for other minority groups.

Citing *Brandeis Center*, Harvard argues that the United States must show "[d]iscriminatory animus." Mot. 24. However, animus is not the exclusive means of establishing intentional discrimination under Title VI. Intentional discrimination on the ground of race or national origin, "however well intentioned," violates Title VI. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 213 (2023) ("*SFFA*"); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-69 (1977). The "widespread sentiment" that Harvard preference black and other minority students over Jewish students is powerful evidence of a Title VI violation, even if unmotivated by antisemitic animus, "[s]moking gun" evidence of which is "rarely available … at the pleading stage." *See Rodriquez-Reyes v. Molina-Rodriguez*, 711 F. 3d 46, 56 (1st Cir. 2013) (citations omitted).

The United States also has provided evidence of comparator incidents showing that Harvard cracked down on supposedly racially offensive conduct and speech while ignoring and rewarding acts of antisemitism. AC ¶¶ 14-16, 149. For example, Harvard failed to discipline, and later rewarded, a professor who discriminated against Israelis *in class*, but another Harvard professor was demoted and ultimately terminated for authoring purportedly racist posts about black people *outside of class*. *Id.*; *see also* AC ¶ 149(f) (alleging that Harvard responded to anti-Chinese speech but not antisemitic speech).

### f.   The United States has alleged ongoing noncompliance with Title VI

Harvard argues that the Title VI claim should be dismissed because (1) the United States has not alleged "ongoing or threatened noncompliance with Title VI," and (2) the United States

lacks standing to seek prospective relief. Mot. 12-13. Both arguments fail.

The United States plausibly has alleged "ongoing or threatened noncompliance" with Title VI even though "a full calendar year and academic year have now passed since *any* alleged harassment identified by the Government." Mot. 12. As an initial matter, the Complaint alleges over eighteen months of systemic and widespread discrimination against Jewish and Israeli students. This lengthy period of discrimination gives rise to a plausible inference that such discrimination remains ongoing. *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692, 698 (9th Cir. 1978) ("An inference arises from illegal past conduct that future violations may occur."). Citing the Task Force Report's findings that Harvard has taken some remedial efforts, Harvard argues that it has resolved the antisemitism crisis. These supposed efforts did not defeat the *Kestenbaum* or *Brandeis Center* claims, and the Court should not defer to Harvard's "trust us" argument. *SFFA*, 600 U.S. at 217; *see* Mot. 19–20. At the motion-to-dismiss stage, courts must credit the plaintiff's allegations, not the defendant's.

Harvard essentially attempts to impose an extra-textual statute-of-limitations requirement on the United States and cites no authority for its assertion that the one-year period between the alleged discrimination and this lawsuit bars the United States' claim. *Contra Ricketts v. Wake Cty. Pub. Sch. Sys.* 125 F.4th 507 (4th Cir. 2025) (reversing dismissal of Title VI claim brought more than four years after the discrimination ceased). Harvard provides no such authority—and for good reason. Under Harvard's theory, the United States would have to rush to file a complaint or risk having the case dismissed because the discrimination has ceased.[6] Of course, rushing to the courthouse as soon as a violation occurs is impermissible under Title VI, which requires the

---

[6] Under Harvard's theory, it would be virtually impossible for the United States to win a Title VI suit because a reasonable defendant would cease its indifference as soon as the United States threatens to withhold funding.

United States to "advise[]" Harvard of its noncompliance and to "determine[] that compliance cannot be secured by voluntary means." 42 U.S.C. 2000d-1.[7]

Harvard's argument is particularly implausible considering its contention (addressed *supra* 21-24) that Title VI prohibits only "clearly unreasonable" responses to harassment. Mot 16-17. In Harvard's view, it can ignore the most heinous forms of discrimination for years and then escape liability by making a minimal post hoc effort to prevent future discrimination. *See* Mot. 5. If Harvard's position were correct, the enforcement mechanism of Title VI would be a dead letter—the United States must give a recipient of funds an opportunity to self-correct, and once the recipient does so, however inadequately, the United States cannot bring an enforcement action. Such an interpretation of Title VI "would serve to render this section of the statute totally ineffective," so the Court should "decline[d] to attribute any such intent to Congress." *United States v. Shelton*, 465 F.2d 361, 363 (4th Cir. 1972) (citation omitted).

Even if the United States has failed to allege ongoing compliance, it is still entitled to monetary relief in the form of grant repayments. The United States may "recover funds misused" by grant recipients, even years after the misuse has ceased. *Bell v. New Jersey*, 461 U.S. 773, 791 (1983). If Harvard accepted federal funding while in noncompliance with Title VI, the United States may recoup those funds. *Infra* 33-36.

Harvard's standing argument fares no better. Harvard does not contest that, even if there is no ongoing discrimination, the United States would have standing to obtain a monetary remedy for past discrimination. *See Kestenbaum* 743 F. Supp. 3d at 306-07 (Even after graduation, "Kestenbaum has standing to seek damages to redress the harms he alleges that he suffered while

---

[7]At the time the United States filed the original complaint, less than eight months had passed since HHS "met and conferred with Harvard to attempt [to secure] voluntary compliance." AC ¶ 164.

a student at Harvard Divinity."); *Granger v. Klein*, 197 F. Supp. 2d 851, 878 (E.D. Mich. 2002) ("That Plaintiff had already graduated from the High School when he commenced this lawsuit does not deprive him of standing to bring a Title IX claim.").

Harvard argues only that the United States lacks standing "for prospective relief." Mot. 13. But "a district court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may be fairly anticipated from the defendant's conduct in the past.'" *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 564 (9th Cir. 1990) (quotation marks omitted) Moreover, "[a]n inference arises from illegal past conduct that future violations may occur. The fact that illegal conduct has ceased does not foreclose injunctive relief." *Koracorp*, 575 F.2d at 698 (citation omitted).

## II.    The United States has stated a claim for breach of contract.

### a.  The Complaint pleads each element of breach of contract.

To state a claim for breach of contract, the United States must allege a valid agreement, a duty, breach, and damages. *United Launch Servs., LLC v. United States*, 139 Fed. Cl. 664, 681 (Fed. Cl. 2018). Three of these elements are straightforward. First, the grants Harvard receives from the United States undisputedly are "legally binding contracts." ¶ AC 154. Second, these contracts require Harvard to comply with Title VI, including "practices relating to the treatment of students." AC ¶ 162 (quoting 45 C.F.R. § 80.4(d)(1)). Third, the contracting parties agreed that Harvard had a duty to comply with Title VI "for the entire period during which such assistance is provided." AC ¶ 155–156. As to the fourth element, the United States has alleged damages. Specifically, Harvard's continuing drawdowns and unsupported certifications of compliance with Title VI caused the United States to disburse billions of dollars of funds during periods of noncompliance, that it would not have otherwise disbursed. AC ¶¶ 157–161, 196201. The United

States seeks contract-based relief for those periods of breach.

Regarding the third element, the United States has alleged Harvard breached its contracts by violating Title VI. The Complaint details failure to enforce content-neutral protest rules, toleration of occupations and disruptions of academic spaces, assaults and intimidation, and the targeted exclusion of Jewish and Israeli students from equal access to educational benefits—during periods in which Harvard continued accept billions of dollars from the United States and certify institutional compliance as a condition of payment. AC ¶¶ 32–41, 45–46, 56–66, 67–76, 82–91, 122–131, 157–161. Such conduct is inconsistent with Harvard's assurances and with its payment-stage certifications.

Harvard insists that the United States has failed to identify a "breach of an enforceable obligation" because the contractual provisions quoted in the Complaint (AC ¶ 155) are "standard-form" and insufficiently "award-specific." Mot. 34. These arguments are legally irrelevant to a breach of contract claim. Harvard admits that the certification provisions are "required of *every* federal grantee," Mot. 34 (emphasis added) and apply to *every* contract. It is therefore entirely unnecessary for the United States to "connect [the] asserted Title VI noncompliance to any award term governing the expenditure or retention of funds." Mot. 34. A violation of Title VI requirements breaches every contract that requires compliance with Title VI.

Nor is it relevant that the certification is part of a "boilerplate" language. So-called "boilerplate" is legally enforceable to the same extent as any other contractual terms between sophisticated parties. *See Reynolds Industries, Inc. v. Mobil Oil Corp.*, 618 F. Supp. 419, 422-423 (D. Mass. 1985). As Harvard admits, this "boilerplate" is standard-form "required of every federal grantee." Mot. 34. Because these terms are undisputedly present in every single grant to Harvard, the United States need not mechanistically identify each grant by name and quote each (identical)

34

term in the Complaint. *Contra* Mot. 32; *see* Fed. R. Civ. P. 8(a)(2) (requiring a *short and plain* statement of the claim showing that the pleader is entitled to relief") (emphasis added).

Harvard also argues that the United States makes only "[c]onclusory allegations of 'material' breach." Mot. 35. The Complaint quotes contractual language providing that "compliance with this [Title VI] assurance constitutes a material condition." AC ¶ 155. Having agreed that compliance with Title VI is a material condition, Harvard cannot now claim that the very language it agreed to does not establish that the condition is material.

Harvard's materiality argument also is premature. Whether or to what extent the grant assurances are material terms (or are award-specific) are factual questions unsuited for resolution at this stage. *See, e.g.*, *Miller v. Mills Constr.*, 352 F.3d 1166, 1172 (8th Cir. 2003) ("Whether a party's conduct amounts to a material breach is a question of fact."). Harvard's reliance on the October 2025 HHS Grants Policy Statement, in which the United States supposedly changed its "position regarding the materiality of [Title VI] requirements" underscores this point. Mot. 35. According to Harvard, this Policy Statement means that the United States previously viewed Title VI compliance as immaterial. But the Complaint, which must be taken as true at this stage, plausibly alleges otherwise. AC ¶ 155.

### b. A breach-of-contract claim can proceed even if Harvard has cured the breach.

Harvard seeks dismissal of the United States' Title VI claim because there are no *ongoing* Title VI violations. Mot. 12-13. Even if this argument is correct, it would not defeat a breach-of-contract claim (or a Title VI claim, *supra* 30-33). A cause of action for a breach of contract arises at the moment of the breach. *See Arellano v. McDonough*, 1 F.4th 1059, 1073 (Fed. Cir. 2021), *aff'd*, 598 U.S. 1 (2023) (Chen, J. concurring) ("The earliest opportunity for a complete and present cause of action is that moment when the plaintiff has suffered a legally recognizable harm

35

at the hands of the defendant, such as the time of contract breach or the commission of a tortious wrong.") (quoting 1 Calvin W. Corman, Limitation of Actions, § 6.1, at 370 (1991)). Thus, unlike a Title VI enforcement action, which may not be brought until the violator is notified and attempts to secure voluntary compliance fail, *see* 42 U.S.C. § 2000d-1, an action for a breach of contract can be brought as soon as the breach occurs. Indeed, "[n]othing in [the Civil Rights Act of 1964] shall be construed to deny, impair, or otherwise affect any right or authority of the … United States … under existing law to institute or intervene in any action or proceeding." 42 U.S.C. § 2000h-3.

Harvard's claim that it has resolved any Title VI violation, *i.e.*, cured the breach of contract, does not defeat the United States' claim. At common law, curing a breach does not prevent an action for damages that arose out of that breach. A "party who has cured a material breach has still committed a breach, by his delay, for which he is liable in damages." Restatement (Second) of Contracts § 242 cmt. A.

  **c. Title VI and the Spending Clause do not preclude a breach-of-contract claim.**

Harvard wrongly argues that Title VI and the Spending Clause bar the United States' claim. As the Supreme Court has explained, Title VI "and other Spending Clause legislation [is] much in the nature of a *contract*: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (quotation marks omitted). And "[a] funding recipient is generally on notice that it is subject not only to those remedies explicitly provided in the relevant legislation, but also to those remedies traditionally available in suits for breach of contract." *Id.* at 187. When the United States sues as a party to the agreement, its rights and remedies for breach are the same as those of any private counterparty unless Congress clearly says otherwise. *United States v. Winstar Corp.*, 518 U.S. 839, 880 (1996).

"[I]t is well established" that the United States has a "federal common law" right "to sue

36

to enforce its contracts." *United States v. Marion Cty. Sch. Dist.*, 625 F.2d 607, 611 (5th Cir. 1980). "Congress may, by statute, remove that right, but only if it offers extremely, even unmistakably clear evidence of such intent." *United States v. Florida*, 938 F.3d 1221, 1231 (11th Cir. 2019) (quotation marks omitted). Such evidence is absent from Title VI. Indeed, the Fifth Circuit has rejected the proposition that "Congress nullified the United States's existing right to sue to enforce contracts." *Id.* (citing *Marion Cty.*, 625 F.2d at 609-612). Congress "stated [its] intent to preserve other means of action which were not expressly set out in [Title VI]." *Marion Cty.*, 625 F.2d at 612. Harvard offers no suggestion as to which provision of Title VI shows Congress intended to abrogate traditional common-law remedies for breach of contract in the Title VI context.

### d.  Harvard's remedy-based arguments do not warrant dismissal.

Harvard's final set of arguments focuses on remedies. It contends that institution-wide rescission, restitution, and tailored funding relief are unavailable as a matter of contract and Spending-Clause law. Mot. 32, 36-38. But these are not the only forms of relief available or asked for by the United States. Contract remedies may include, *inter alia*, damages short of complete repayment, restitution, rescission, injunctive relief, and specific performance. *See, e.g.*, *Barnes*, 536 U.S. at 186-88; *Foley v. Wells Fargo Bank*, N.A., 772 F. 3d 63, 77-78 (1st Cir. 2014). The Court may impose the non-monetary remedies sought by the United States, enter declaratory judgment, or order "such other additional relief as justice may require," AC ¶ 204-210. That the Court ultimately might hold that some of the relief is unavailable or disproportionate to the harm suffered by the United States is not grounds for dismissing the entire breach-of-contract claim. These issues are inappropriate for a resolution on a Rule 12(b)(6) motion. The question at this stage is whether the United States has stated a claim, not whether particular remedies are available. *See, e.g.*, *Doe v. U.S. Dep't of Just.*, 753 F.2d 1092, 1104 (D.C. Cir. 1985) ("[A]

37

complaint should not be dismissed for legal insufficiency except where there is failure to state a claim on which *some* relief, not limited by the request in the complaint, can be granted."

### III.    This lawsuit is neither retaliatory nor pretextual.

Harvard seeks dismissal on First Amendment grounds, arguing that this Title VI lawsuit "is a continuation of the Government's ongoing unlawful campaign of retaliation against Harvard for refusing to "capitulate to government demands that it audit, censor, or dictate viewpoints of staff and students." Mot. 38. This retaliation argument is an affirmative defense, and Harvard cannot meet its heavy burden of proof.

The United States recognizes that the First Amendment prohibits governmental efforts to suppress disfavored speech and that the First Amendment protects academic freedom. *See* Mot. 38-39. As such, the First Amendment can "operate[] as an affirmative defense to an otherwise cognizable claim." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 195 n.4 (2012); *see also MJ's Mkt., Inc. v. Jushi Holdings, Inc.*, 766 F. Supp. 3d 197, 213 (D. Mass. 2025) ("The *Noerr-Pennington* doctrine functions as an affirmative defense."). "[F]or dismissal to be allowed on the basis of an affirmative defense … review of the complaint, together with any other documents appropriately considered under Fed. R. Civ. P. 12(b)(6), must leave no doubt that the plaintiff's action is barred by the asserted defense." *Blackstone Realty LLC v. FDIC*, 244 F.3d 193, 197 (1st Cir. 2001) (quotation marks omitted). To succeed on its retaliation defense at this stage, Harvard must show that there is *no doubt* that its "protected conduct played a substantial or motivating part" in the United States' decision to investigate Harvard and bring this lawsuit. *HHS*, 798 F. Supp. 3d at 118 (quotation marks omitted).

Harvard does not have the evidence necessary to satisfy this stringent standard. It cites a statement from the Assistant Attorney General for Civil Rights, who explained that the United States filed this lawsuit because "Harvard sued us" and "is defiant." Mot. 39. That is an accurate

description of the chronology of this case and *HHS*. Harvard had the opportunity to settle the United States' Title VI allegations, both before *HHS* was filed and before this suit was filed, but it instead sued the United States. *See* Michael S. Schmidt and Michael C. Bender, *Trump Officials Blame Mistake for Setting Off Confrontation With Harvard*, The New York Times (Apr. 18, 2025). Harvard also cites an October 2024 statement from a Senior Counsel to the Assistant Attorney General predicting that "Harvard will lose much more effective January 2025." Mot. 6. This statement predates the 2024 election, and the Senior Counsel was a private citizen at the time the statement was made.

*HHS* does not require dismissal of this case on First Amendment grounds. In *HHS*, Judge Burroughs held that the United States violated the First Amendment by terminating grants in retaliation for Harvard's viewpoints on "governance, hiring, and academic programs." 798 F. Supp. 3d at 119. But *HHS* is not a get-out-of-jail free card that allows Harvard to violate federal law with impunity by asserting retaliation. Judge Burroughs did not enjoin the United States from filing Title VI suits against Harvard. On the contrary, she correctly observed—and Harvard did not dispute—that the United States has the "constitutional, statutory, [and] regulatory authority" to bring Title VI claims against Harvard as long as the United States follows the procedural "requirements of Title VI." *HHS*, 798 F. Supp. 3d at 136. The United States did so here. *Supra* 11-13.

Even if Harvard had sufficient evidence of retaliation, the United States could overcome Harvard's defense "by showing that '[it] would have reached the same decision . . . even in the absence of the protected conduct.'" *HHS*, 798 F. Supp. 3d at 118 (quoting *D.B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012)). The Complaint hardly "leaves no doubt" that notwithstanding the President's comments about Harvard and statements of other officials, the United States would

39

not have sued Harvard but for its allegedly retaliatory motives. The United States has prioritized combatting antisemitism on college campuses. Shortly after taking office, President Trump signed Executive Order 14188, entitled *Additional Measures to Combat Anti-Semitism* (Jan. 29, 2025); AC ¶ 1 n. 4. The Executive Order found that Hamas's "attacks unleashed an unprecedented wave of vile anti-Semitic discrimination, vandalism, and violence … especially in our schools and on our campuses" and that "Jewish students have faced an unrelenting barrage of discrimination; denial of access to campus common areas and facilities, including libraries and classrooms; and intimidation, harassment, and physical threats and assault." *Id.* § 1. The Executive Order further declared that "[i]t shall be the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools." *Id.* § 2.

Pursuant to the Executive Order, the United States began investigating discrimination against Jews and Israelis at universities across the country. Several of the worst offenders— including but not limited to Columbia University and Northwestern University—entered into settlements with the United States. AC ¶ 1 n.5. Additionally, the United States filed a Title VI lawsuit against the University of California, Los Angeles, which alleges similar deliberate indifference to widespread discrimination against and harassment of Jewish and Israeli students. *Regents of the Univ. of California*, No. 2:26-cv-05589 (C.D. Cal. 2026). This lawsuit against Harvard is just one component of the United States' aggressive nationwide strategy to protect Jewish and Israeli university students and to hold accountable the universities that failed to do so. Harvard therefore cannot establish retaliation at this stage. Mot. 10.

## CONCLUSION

For the foregoing reasons, Harvard's motion to dismiss should be denied.

Dated: July 22, 2026

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

JESUS A. OSETE
Principal Deputy Assistant Attorney General

JEFFREY MORRISON (MO No. 44401)
Deputy Assistant Attorney General


*/s/ Jeffrey Morrison*
JOHN P. MERTENS (UT No. 14522)
Acting Chief, Educational Opportunities Section
DANIEL S. FLICKINGER (AL No. 9539N77F)
Senior Counsel
ADAM F. GRIFFIN (NC No. 55075)
Trial Attorney
JOSHUA R. ZUCKERMAN (DC No. 1724555)
Trial Attorney
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 532-3893
Email: Jeffrey.Morrison@usdoj.gov

ATTORNEYS FOR PLAINTIFF
UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF

system, which will distribute copies of the foregoing to the following counsel of record for

Defendant on this, the 22nd day of July, 2026.

Felicia H. Ellsworth
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
T: (617) 526-6000
F: (617) 526-5000
Felicia.Ellsworth@wilmerhale.com

Joshua S. Levy
ROPES & GRAY LLP
The Prudential Tower
800 Boylston Street
Boston, MA 02199
T: (617) 951-7000
F: (617) 951-7050
joshua.levy@ropesgray.com

Steven P. Lehotsky
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
T: (512) 693-8350
F: (512) 727-4755
steve@lkcfirm.com

Robert K. Hur
KING & SPALDING LLP
1700 Pennsylvania Ave. NW, Suite 900
Washington, DC 20006
T: (202) 383-8969
F: (202) 626-3737
rhur@kslaw.com

*/s/ Jeffrey Morrison*