# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETS

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:26-cv-11352-RGS |
| | ) | |
| President and Fellows of Harvard College, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## BRIEF OF *AMICUS CURIAE*
## THE LOUIS D. BRANDEIS CENTER FOR HUMAN RIGHTS UNDER LAW
## IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

**The Louis D. Brandeis Center for Human Rights Under Law**
Richard A. Rosen*
Paul M. Eckles*
Rafaela Fischman*
1675 Broadway, 13th floor
New York, NY 10019
Telephone:  (202) 559-9296
rrosen@brandeiscenter.com
peckles@brandeiscenter.com
sgoldstein@brandeiscenter.com

**Brown Counsel, LLC**
Philip Y. Brown (BBO #552366)
Amelia R. Gray (BBO #675632)
One Marina Park Drive, 1410
Boston, MA 02210
Telephone:  (617) 683-1500
pbrown@browncounsel.com
agray@browncounsel.com

* *Pro hac vice application pending*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

IDENTITY AND INTERESTS OF AMICUS CURIAE .................................................. 1

SUMMARY OF ARGUMENT........................................................................................ 2

ARGUMENT.................................................................................................................... 5

    I.     THE GOVERNMENT'S ENFORCEMENT AUTHORITY IS DEFINED BY
          STATUTE ....................................................................................................... 5

    II.    THE DELIBERATE INDIFFERENCE STANDARD WAS CREATED TO LIMIT
          MONETARY DAMAGES IN IMPLIED PRIVATE ACTIONS ..................................... 6

    III.   DELIBERATE INDIFFERENCE IS NOT NECESSARY TO PROVE INTENTIONAL
          DISCRIMINATION.......................................................................................... 9

## TABLE OF AUTHORITIES

**Cases**

*A. J. T. by & through A. T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279,*
605 U.S. 335 (2025)........................................................................................ .9, 10

*Alexander v. Sandoval,*
532 U.S. 275 (2001)............................................................................................. 9

*Ames v. Ohio Dep't. Of Youth Servs.,*
605 U.S. 303 (2025)........................................................................................... 10

*Barnes v Gorman,*
536 U.S. 181 (2002)............................................................................................. 8

*C. W. by & through Doe v. Smith,*
178 F.4th 1278 (11th Cir. 2026). ...................................................................... 12

*Cannon v. University of Chicago,*
441 U.S. 677 (1979)............................................................................................. 6

*Cummings v. Premier Rehab Keller,* P.L.L.C.,
596 U.S. 212 (2022)............................................................................................. 8

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.,*
526 U.S. 629 (1999)........................................................................... 8, 9, 10, 13

*Doe v. Columbia Univ.,*
81 F.3d 46 (2d Cir. 2016). ................................................................................ 12

*Franklin v. Gwinnett County Public Schools,*
503 U.S. 60 (1992)............................................................................................... 6

*Gebser v. Lago Vista Independent School Dist.,*
524 U.S. 274 (1998)............................................................... 3, 5, 6, 7, 8, 9, 10, 13

*Jackson v. Birmingham Board of Education,*
544 U.S. 167 (2005)........................................................................................... 11

*Louis D. Brandeis Ctr. for Hum. Rts. Under L. v. President & Fellows of Harvard Coll.,* No. 24-
cv-11354-RGS, 2024 WL 4681802 (D. Mass. Nov. 5, 2024).............................. 1

*Muldrow v. City of St. Louis,*
601 U.S. 346 (2024)..................................................................................... 4, 9, 11

*Murray v. UBS Sec., LLC,*
601 U.S. 23 (2024)............................................................................................. 12

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
600 U.S. 181 (2023)...................................................................................... 11, 12

*Yakoby v. Trs. of Univ. of Pennsylvania,* No. CV 23-4789,
2025 WL 1558522 (E.D. Pa. June 2, 2025). ...................................................... 9

ii

**Statutes**

42 U.S.C. § 2000......................................................................................................... 1, 3, 5

**Other Authorities**

Brief for the United States as Amicus Curiae, at 11, No. 25-183, *Crowther v. Board of Regents of the Univ. Sys. of Ga.,* (U.S. filed April 9, 2026). ................................................................ 10

**Regulations**

28 C.F.R. § 42 ................................................................................................................ 7

28 C.F.R. § 50 ................................................................................................................ 3

## IDENTITY AND INTERESTS OF AMICUS CURIAE

The Louis D. Brandeis Center for Human Rights Under Law (the "Brandeis Center") is a nonprofit, non-partisan organization for public interest advocacy, research, and education that seeks to advance the civil and human rights of the Jewish people and to promote justice for all. The Brandeis Center's advocacy focuses specifically, though not exclusively, on the spread of anti-Semitism on college and university campuses. Brandeis Center attorneys advise and represent college and university students and employees who have been victims of anti-Semitic conduct that violates Title VI of the Civil Rights Act of 1964 (codified as amended at 42 U.S.C. §§ 2000d to 2000d-4a) ("Title VI") and other anti-discrimination laws.[1]

The Brandeis Center previously litigated a Title VI case against Harvard before this Court involving allegations that Harvard allowed Jewish and Israeli students to be subject to harassment and discrimination. *Louis D. Brandeis Ctr. for Hum. Rts. Under L. v. President & Fellows of Harvard Coll.*, No. 24-cv-11354-RGS, 2024 WL 4681802 (D. Mass. Nov. 5, 2024).

The Brandeis Center is currently litigating a case against the Massachusetts Institute of Technology ("MIT") before this Court pursuant to Titles VI and VII involving allegations that MIT has allowed Jewish and Israeli students and employees to be subject to harassment and discrimination. *Sussman v. Massachusetts Institute of Technology*, No. 25-cv-11826-RGS.

The Brandeis Center submits this brief to address discrete issues of law relating to the interpretation and application of Title VI in connection with the Government's enforcement action. Specifically, the Brandeis Center submits this brief to address the history, purpose, and function of the deliberate indifference standard, and why it is neither an element of a Title VI claim in a

---

[1] No party or party's counsel authored this brief in whole or in part or contributed money intended to fund its preparation or submission, and no person other than amicus curiae and its counsel contributed money that was intended to fund preparing or submitting this brief.

1

government enforcement action, nor necessary to the proof of intentional discrimination.

## SUMMARY OF ARGUMENT

The Government's Amended Complaint includes a claim based on Harvard's failure to comply with its obligations under Title VI. (First Amend. Compl. at Count 1, June 8, 2026, ECF 38. ("Amend. Compl.").) In support of Count 1, which seeks a non-monetary judicial remedy, the Government alleges that the claim is <u>not</u> dependent on satisfying the judicially-created deliberate indifference standard. The Government instead alleges intentional discrimination through allegations relating to Harvard's conduct, including how it fostered a hostile environment, enforced its rules in a discriminatory manner, and responded to the hostile environment in an inadequate and discriminatory manner. Amend. Compl. ¶¶ 172-84.

Harvard argues two points in its opposition: (i) that the deliberate indifference standard applies to all Title VI claims, including government enforcement actions for a "non-monetary judicial remedy," and (ii) that in the absence of allegations (and ultimately, evidence) that Harvard acted with deliberate indifference, the Government must improperly be relying on a negligence theory when Title VI applies only to intentional conduct. (Memorandum of Law in Support of Defendant's Motion to Dismiss Amended Complaint, June 30, 2026, ECF 47 at 25-27 ("Def. Mot.")). Amici Eidelson and Hellman submitted a brief supporting Harvard's motion. (Brief of Professors Benjamin Eidelson And Deborah Hellman as Amici Curiae In Support Of Defendant's Motion to Dismiss Amended Complaint, July 10, 2026, ECF 31 at 13-17.) Harvard and Amici's arguments are misguided and wrong for several reasons. Most significantly, their arguments improperly seek to transform a heightened limitation on monetary damages developed for implied private actions into an element of a government enforcement action.

*First*, the Supreme Court adopted the deliberate-indifference standard as a prerequisite to the recovery of *monetary damages* by private plaintiffs proceeding under an implied right of

2

action. The standard was fashioned for that context in light of Title VI's and Title IX's Spending Clause framework and the statutory procedures governing the Government's authority to suspend or terminate federal funding. The Court reasoned that a private plaintiff seeking damages should not be permitted to impose financial liability without conditions comparable to the notice and opportunity for voluntary compliance required before the Government may terminate funding.

That rationale provides no basis for imposing deliberate indifference as an additional element of the Government's own enforcement action. The deliberate indifference standard was intended to replicate the procedure the federal government must follow before revoking an institution's funding under Title VI/Title IX (*i.e.,* notice and an opportunity to voluntarily come into compliance). *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 290 (1998), explained that plaintiffs in an implied right of action should not face a lower burden than the express statutory procedure the federal government must follow to impose financial consequences. Thus, the purpose of the standard is already incorporated into the statutory prerequisites, and where the Government seeks consequences tied to termination of funding the relevant inquiry is whether it has satisfied the statutory prerequisites Congress prescribed—not whether it can additionally prove deliberate indifference.

*Second*, Title VI expressly authorizes compliance to be effectuated "by any other means authorized by law." 42 U.S.C. § 2000d-1. Neither Title VI nor its implementing regulations requires proof of deliberate indifference before the Government may seek prospective judicial relief compelling compliance. To the contrary, Department of Justice regulations expressly contemplate judicial enforcement, including "appropriate court action," to enforce statutory or constitutional nondiscrimination requirements, and participation in actions seeking "other relief designed to secure compliance." 28 C.F.R. § 50.3.

3

That is exactly what the Government is seeking in Count 1: "No provision within Title VI or its implementing regulations requires that the United States satisfy a 'deliberate indifference' standard in order to obtain a non-monetary judicial remedy for a Title VI violation manifested by a federally-funded institution's enabling of a hostile environment against a protected group, like Jewish and Israeli students, on its campus." Amend. Compl. at ¶ 177.

Requiring the Government to prove deliberate indifference before obtaining an injunction against an ongoing violation would add a condition found nowhere in the statute or regulations. Such a requirement cannot be reconciled with Title VI's text, its enforcement structure, or the Government's express authority to seek judicial means of securing compliance.

*Third*, the "high" or "stringent" character of the deliberate indifference standard was specifically developed to restrict the availability of monetary damages in implied private actions. The Supreme Court has never extended that heightened requirement to private claims seeking prospective relief, much less to enforcement actions brought by the United States. Nor should such an extension be inferred. The Court has repeatedly rejected efforts to extend judicially-created heightened standards beyond the contexts that produced them when neither statutory text nor the original rationale supports the extension. *See, e.g., Muldrow v. City of St. Louis*, 601 U.S. 346, 353 (2024).

*Fourth*, deliberate indifference is not the only means of proving intentional discrimination. Deliberate indifference is a heightened method of proving intentional discrimination that was adopted for a specific context for a specific purpose. But the Supreme Court has recognized that "discrimination" under Title VI is a broad concept encompassing multiple forms of intentional unequal treatment. Intentional discrimination may be proven by a number of different methods; all that is required is proof that persons were treated worse because of their protected category.

4

The Government is therefore not confined to a deliberate indifference theory, and it is certainly not confined to the "heightened" version of such a theory created for the damages remedy in an implied private right of action. The Government alleges that Harvard intentionally discriminated against Jewish and Israeli students in multiple ways. Those allegations must be assessed under the ordinary principles governing intentional discrimination under Title VI, not under a heightened damages standard created for a different plaintiff, a different remedy, and a different procedural context.

## ARGUMENT

### I.    THE GOVERNMENT'S ENFORCEMENT AUTHORITY IS DEFINED BY STATUTE

Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.[2] Congress also established the mechanism by which the United States enforces that prohibition. Federal agencies are authorized to effectuate Title VI through regulations and, upon satisfaction of the statutory prerequisites, to enforce compliance "by any other means authorized by law," including the termination of federal financial assistance. 42 U.S.C. § 2000d-1.

As the Supreme Court has explained, "[t]he express statutory means of enforcement is administrative." *Gebser*, 524 U.S. at 280–81. The statute directs federal agencies distributing federal funds to establish requirements implementing Title VI's nondiscrimination mandate and authorizes enforcement through "any ... means authorized by law," including, ultimately, the

---

[2] Title IX is modeled on Title VI except it prohibits discrimination on the basis of sex. Courts have treated case law governing the legal standards under Title VI and IX interchangeably.

5

termination of federal funding. *Id.* Likewise, "[b]oth statutes [Title VI and Title IX] provide the same administrative mechanism for terminating federal financial support for institutions engaged in prohibited discrimination." *Cannon v. University of Chicago*, 441 U.S. 677, 695–96 (1979).

Accordingly, the Government's authority to enforce Title VI, including the conditions governing that enforcement, derive from the statutory scheme Congress enacted. The relevant question is therefore whether the Government has satisfied the procedural prerequisites Congress prescribed for exercising its enforcement authority. Amend. Compl. ¶¶ 153-71, 178-80. Nothing in Title VI's text, its implementing regulations, or the Supreme Court's description of the statutory enforcement scheme imposes an additional requirement that the Government prove deliberate indifference in order to seek judicial relief to secure compliance.

## II.    THE DELIBERATE INDIFFERENCE STANDARD WAS CREATED TO LIMIT MONETARY DAMAGES IN IMPLIED PRIVATE ACTIONS

The Supreme Court first recognized an implied private right of action in *Cannon v. University of Chicago*, 441 U.S. 677 (1979). It did not recognize monetary damages as an available remedy in an implied action until *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992). Having recognized an implied damages remedy, the Court next confronted the question whether every violation of Title IX automatically subjected a funding recipient to monetary liability.

In answering that question, the Court adopted the deliberate indifference standard to establish a prerequisite for *monetary damages* as a remedy against a funding recipient in a private right of action. *Gebser*, 524 U.S. at 290. Because Title IX is a Spending Clause statute, recipients accept federal funds pursuant to what the Court has repeatedly described as a contractual arrangement. The Court therefore concluded that an implied damages remedy should not expose recipients to monetary liability under conditions less protective than those Congress required before the Government itself could impose financial consequences. *Gebser*, 524 U.S. at 290

6

("[w]here a statute's *express* enforcement scheme hinges its most severe sanction on notice and unsuccessful efforts to obtain compliance, we cannot attribute to Congress the intention to have implied an enforcement scheme that allows imposition of greater liability without comparable conditions."). Thus, the Court held that the implied remedy must "roughly parallel" the statutory enforcement scheme.  Before initiating proceedings to terminate funding, the Government must notify the recipient of its noncompliance and determine that voluntary compliance cannot be secured. *Id.* at 288; *see also* 28 C.F.R. § 42.108. The Court explained "[t]hat framework finds a rough parallel in the standard of deliberate indifference." *Gebser*, 524 U.S. at 290–91.

The Court's holding in *Gebser* confirms the limited scope of its decision. It did not hold that a Title IX violation requires deliberate indifference. Rather, it focused on the remedy: "we hold that a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Id.* at 290.

Nothing in *Gebser* suggests that the Court intended to alter the statutory enforcement scheme Congress expressly enacted. Nor did the Court suggest that it was redefining what constitutes intentional discrimination under Title VI or Title IX. To the contrary, the Court adopted deliberate indifference precisely because the Government's enforcement procedures already supplied the model against which the Court measured the implied damages remedy. The Court specifically distinguished an enforcement action to bring a funding recipient into compliance. *Id.* at 288 ("In the event of a violation, a funding recipient may be required to take 'such remedial action as [is] deem[ed] necessary to overcome the effects of [the] discrimination.") (citations omitted).

7

The Court extended the deliberate indifference standard in *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, (1999), to private actions seeking *damages* for student-on-student harassment. *Davis* repeatedly described the question presented as whether private plaintiffs could recover money damages: "we are asked to do more than define the scope of the behavior that Title IX proscribes. We must determine whether a district's failure to respond to student-on-student harassment in its schools can support a private suit for money damages." *Davis*, 526 U.S. at 639. The Court reiterated that "the '*high standard*' imposed in *Gebser* sought to eliminate any 'risk that the [funding] recipient would be liable in *damages* not for its own official decision but instead for its employees' independent actions.'" *Id.* at 643 (quoting *Gebser*) (emphasis added).[3]

At no point did either *Gebser* or *Davis* purport to redefine the substantive prohibition against discrimination contained in Title VI or Title IX. Those decisions answered a different question: when an implied private plaintiff may recover monetary damages. Because the Government proceeds under Congress's express statutory enforcement authority rather than an implied damages remedy, the judicially-created deliberate indifference prerequisite adopted in *Gebser* and *Davis* does not apply.

---

[3] At the time *Gebser* and *Davis* were decided; the Supreme Court was concerned about the potential for unlimited punitive and emotional distress damages that would "exceed a recipient's level of federal funding." *Gebser*, 524 U.S. at 290. After *Cummings v. Premier Rehab Keller*, P.L.L.C., 596 U.S. 212 (2022) and *Barnes v Gorman*, 536 U.S. 181 (2002), that is no longer a concern.

8

### III.   DELIBERATE INDIFFERENCE IS NOT NECESSARY TO PROVE INTENTIONAL DISCRIMINATION

In *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001), the Supreme Court held that Title VI prohibits only intentional discrimination. It did not hold that deliberate indifference, which was not even an issue in the case, is the exclusive means of proving intentional discrimination. As demonstrated below, Harvard and Amici erroneously conflate the issues of deliberate indifference and intentional discrimination. Intentional discrimination under Title VI has its ordinary (and broad) meaning and may be established in a variety of ways.

As noted by the dissent in *Gebser*, deliberate indifference goes well beyond what is necessary to prove intentional conduct. *Gebser,* 524 U.S. at 304 (Stevens, J., dissenting) ("Presumably, few Title IX plaintiffs who have been victims of intentional discrimination will be able to recover damages under this exceedingly high standard"). *Davis* then adopted the "high standard" characterization. 526 U.S. at 643. Indeed, courts regularly cite the "high standard" language in dismissing Title VI claims. *See, e.g., Yakoby v. Trs. of Univ. of Pennsylvania*, No. CV 23-4789, 2025 WL 1558522, at *8 (E.D. Pa. June 2, 2025) ("Deliberate indifference is a very high bar").

But the Supreme Court has repeatedly rejected the extension of judicially-created heightened standards that are not supported by statutory text beyond the circumstances that produced them. *See, e.g., Muldrow,* 601 U.S. at 353 (holding courts erred in extending "material adversity" requirement that the Court had adopted for Title VII retaliation claims to Title VII discrimination claims when neither the Court's rationale nor the text of Title VII supported the extension); *A. J. T. by & through A. T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279,* 605 U.S. 335, 345 (2025) (holding courts erred in applying heightened standard to ADA and Rehabilitation Act claims based on educational services and that "[n]othing in the text of Title II of the ADA or

Section 504 of the Rehabilitation Act suggests that such claims should be subject to a distinct, more demanding analysis"); *Ames v. Ohio Dep't. Of Youth Servs.,* 605 U.S. 303, 320-26 (2025) (Thomas, J., concurring) (criticizing extension of judicially-created doctrines in civil rights cases that are not supported by statutory text, have created confusion in lower courts, and are incompatible with the Federal Rules of Civil Procedure).

To be sure, the Supreme Court has recognized deliberate indifference as one means by which a plaintiff may establish an intentional violation. But that is different than the meaning of discrimination under Title VI. Indeed, the U.S. Solicitor General recently argued that "there remains a 'critical' difference between the threshold showing required 'to establish a Title IX violation' and the additional, heightened showing required for private parties 'to recover damages' or other 'relief' for that violation." Brief for the United States as Amicus Curiae, at 11, No. 25-183, *Crowther v. Board of Regents of the Univ. Sys. of Ga.,* (U.S. filed April 9, 2026) (https://www.justice.gov/d9/2026-04/25-183_crowther_cvsg.pdf).

Harvard and Amici offer no explanation as to why the distinct, more demanding analysis set forth in *Gebser* and *Davis* – *"clearly unreasonable," "high standard," "systemic," "very real limitations on a funding recipient's liability"* – should be regarded as having been imported into the definition of intentional discrimination. The Supreme Court has never used those terms to define intentional discrimination in connection with Title VI or any other civil rights statute. While the Rehabilitation Act is also a Spending Clause statute modeled on Title VI, courts have distinguished between the elements of a claim and the damages remedy and required plaintiffs to prove deliberate indifference only to obtain monetary damages. *A. J. T. by & through A. T.,* 605 U.S. at 344-45 (noting treatment by lower courts).

On the meaning of intentional discrimination, the Supreme Court has focused on the plain

10

language of Title VI. As Justice Gorsuch recently explained, intentional discrimination under Title VI occurs when someone is treated worse by a funding recipient because of their protected category: "Title VI forbids a recipient of federal funds from intentionally treating one person worse than another similarly situated person on the ground of race, color, or national origin." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 288 (2023) (Gorsuch, J., concurring). He elaborated that "on the ground of" means "because of," which means that Title VI incorporates the ordinary but-for causation standard, which is "sweeping." *Id.*

The Court has also interpreted similar statutory language the same way in other civil-rights statutes. In the Title VII context, the Court explained that "discriminate against" simply means "treat[ing] a person worse" because of their protected trait. *Muldrow*, 601 U.S. at 354.

The Supreme Court has repeatedly recognized that plaintiffs may establish intentional discrimination in a variety of ways other than by proving deliberate indifference. In a Title IX case, the Court explained that "'[d]iscrimination' is a term that covers a wide range of intentional unequal treatment; by using such a broad term, Congress gave the statute a broad reach." *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 175 (2005). The Court held that "[r]etaliation is, by definition," intentional discrimination and hence another method of establishing intent. *Id.* at 168.

A related point is that "intent" is a distinct concept from "motivation" or "animus." Plaintiffs in Title VI cases do not need to prove the funding recipient was itself motivated by discriminatory animus (e.g., anti-Semitism); nor is a funding recipient relieved of liability because it acted in pursuit of some assertedly benign objective. "It does not matter if the recipient discriminates in order to advance some further benign 'intention' or 'motivation.' . . . Title VI prohibits a recipient of federal funds from intentionally treating any individual worse even in part

11

because of his race, color, or national origin and without regard to any other reason or motive the recipient might assert." *Students for Fair Admissions, Inc.,* 600 U.S. at 288-290 (Gorsuch, J., concurring).

The Second Circuit explained this distinction in the Title IX context. "A defendant is not excused from liability for discrimination because the discriminatory motivation does not result from a discriminatory heart . . . A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other . . . has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex." *Doe v. Columbia Univ.,* 81 F.3d 46, 58 n.11 (2d Cir. 2016).[4]

Thus, even within the deliberate indifference framework, in the context of a harassment or hostile environment claim, but-for causation "require[s] only that a school official be deliberately indifferent *to* sexual harassment, not that the deliberate indifference be sex-based." *C. W. by & through Doe v. Smith,* 178 F.4th 1278, 1291 (11th Cir. 2026).

In sum, Title VI prohibits intentionally treating a person worse because of race, color, or national origin, regardless of the motivation. In harassment or hostile environment cases, as in other Title VI actions, intentional discrimination may be established through the totality of the evidence, including evidence concerning a recipient's response to known harassment. District courts routinely determine at the pleading stage whether a plaintiff has plausibly alleged intentional discrimination. Nothing in Title VI requires a distinct, judge-made definition of intentional discrimination or a distinct, more demanding, judge-made test for proving intentional discrimination.

---

[4]  *See generally Murray v. UBS Sec., LLC,* 601 U.S. 23, 34 (2024) ("An animus-like 'retaliatory intent' requirement is simply absent from the definition of the word 'discriminate.'").

Here, the Amended Complaint is replete with allegations that students were treated worse because they are Jews or Israelis. The Government alleges that Harvard "fostered a hostile environment for Jewish and Israeli students," "remained deliberately indifferent" to hostility, "intentionally refused to enforce its campus rules" when the victims were Jews or Israelis, and "deliberately chose the wrong response to the victimization of its Jewish and Israeli students." Amend. Compl. pp. 2-3, 6, 52-53. The Brandeis Center submits this brief solely to address the appropriate legal standard, rather than opine on the Government's factual allegations. But if supported by well-pled factual allegations, these types of allegations state a claim for intentional discrimination under Title VI without regard to whether Harvard's conduct also satisfies the heightened elements and admonitions set forth in *Gebser* and *Davis*.[5]

---

[5] To be clear, the Brandeis Center does not believe deliberate indifference is an element of *any* Title VI claim or that the deliberate indifference standard provides a basis for dismissing claims seeking prospective injunctive relief. The Brandeis Center also believes that the highly deferential application of the deliberate indifference standard currently utilized by many courts is inconsistent with the text of Title VI and the Federal Rules of Civil Procedure.

13

Dated: July 22, 2026

Respectfully submitted,

**THE LOUIS D. BRANDEIS CENTER FOR HUMAN RIGHTS UNDER LAW**

By: */s/ Philip Y. Brown*
**THE LOUIS D. BRANDEIS CENTER FOR HUMAN RIGHTS UNDER LAW**
Richard A. Rosen*
Paul M. Eckles*
Rafaela Fischman*
1675 Broadway, 13th floor
New York, NY 10019
Telephone:  (202) 559-9296
rrosen@brandeiscenter.com
peckles@brandeiscenter.com
sgoldstein@brandeiscenter.com

**BROWN COUNSEL, LLC**
Philip Y. Brown (BBO #552366)
Amelia R. Gray (BBO #675632)
One Marina Park Drive, 1410
Boston, MA 02210
Telephone:  (617) 683-1500
pbrown@browncounsel.com
agray@browncounsel.com

*Attorneys for Amicus Curiae*
The Louis D Brandeis Center for Human Rights Under Law

 * *Pro hac vice application pending*

14

15

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the Court's CM/ECF system on July 22, 2026 and will be sent electronically to registered participants on the Notice of Electronic Filing.

**BROWN COUNSEL, LLC**

*/s/ Philip Y. Brown*
Philip Y. Brown (BBO #552366)
One Marina Park Drive, Suite 1410
Boston, MA 02210
Telephone: (617) 683-1500
pbrown@browncounsel.com