**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>v.<br><br>PRESIDENT AND FELLOWS OF HARVARD<br>COLLEGE,<br><br>       Defendant. | Case No. 1:26-cv-11352-RGS<br><br><br>**Leave to file granted on July 24, 2026** |

**<u>REPLY MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

TABLES OF AUTHORITIES ................................................................................................ ii

I.    The Government Fails to State a Claim Under Title VI .......................................................1

      A.    The Government Alleges No Ongoing Violation of Title VI ...................................1

      B.    The Government Does Not Plausibly Allege a Hostile Environment .....................3

      C.    The Government Fails to Plead Intentional Discrimination ..................................5

            1.    The Government's Negligence Theory Is Not Actionable ...............................5

            2.    The Government Fails to Plead Deliberate Indifference ..................................6

            3.    *HHS* Forecloses the Deliberate-Indifference Claim ..........................................8

            4.    The Government Does Not Plausibly Allege Direct Discrimination..................9

      D.    The Government Failed to Satisfy Title VI's Procedural Requirements...............10

II.   The Government's Breach of Contract Claim Fails as a Matter of Law ..........................10

      A.    The Government Cannot Use Contract Law to Evade Title VI's Remedial Limits ..........11

      B.    The Government Fails to Plead a Breach of Contract ..........................................13

III.  This Action Is Retaliatory and Should Be Dismissed on That Basis...............................14

CONCLUSION..............................................................................................................15

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*ActBlue, LLC v. Paxton*,
   2026 WL 1694290 (D. Mass. June 11, 2026) ............................................................................14

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) ......................................................................................................................5

*American Association of University Professors v. Rubio*,
   802 F. Supp. 3d 120 (D. Mass. 2025) ...........................................................................................4

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................................................2, 10

*Barnes v. Gorman*,
   536 U.S. 181 (2002) ....................................................................................................................12

*Bell v. New Jersey*,
   461 U.S. 773 (1983) ....................................................................................................................11

*City of Milwaukee v. Illinois*,
   451 U.S. 304 (1981) ....................................................................................................................13

*Clark v. Martinez*,
   543 U.S. 371 (2005) ......................................................................................................................5

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
   596 U.S. 212 (2022) ....................................................................................................................12

*Davis v. Monroe County Board of Education*,
   526 U.S. 629 (1999) ...............................................................................................................3, 5, 6

*Edlow v. RBW, LLC*,
   2010 WL 2034772 (D. Mass. May 21, 2010) .............................................................................13

*Frederick v. Simpson College*,
   160 F. Supp. 2d 1033 (S.D. Iowa 2001) ......................................................................................5

*Gartenberg v. Cooper Union*,
   765 F. Supp. 3d 245 (S.D.N.Y. 2025) ..........................................................................................8

*Gebser v. Lago Vista Independent School District*,
   524 U.S. 274 (1998) ...................................................................................................................5, 6

*Grace v. Board of Trustees, Brooke East Boston*,
    85 F.4th 1 (1st Cir. 2023)..................................................................................................7

*Kestenbaum v. President and Fellows of Harvard College*,
    743 F. Supp. 3d 297 (D. Mass. 2024) ...............................................................1, 4, 9

*Kocsis v. Florida State University Board of Trustees*,
    788 F. App'x 680 (11th Cir. 2019) ..................................................................................5

*Louis D. Brandeis Center for Human Rights Under Law v. President and Fellows
    of Harvard College*,
    2024 WL 4681802 (D. Mass. Nov. 5, 2024) .......................................................1, 4

*M.L. ex rel. D.L. v. Concord School District*,
    86 F.4th 501 (1st Cir. 2023).............................................................................................7

*Mach Mining v. U.S. Equal Employment Opportunity Commission*,
    575 U.S. 480 (2015).........................................................................................................10

*National Association of Government Employees, Inc. v. Yellen*,
    120 F.4th 904 (1st Cir. 2024)..........................................................................................3

*Northwest Airlines, Inc. v. Transport Workers Union of America*,
    451 U.S. 77 (1981)............................................................................................................3

*O'Melveny & Myers v. Federal Deposit Insurance Corporation*,
    512 U.S. 79 (1994)..........................................................................................................13

*President and Fellows of Harvard College v. U.S. Department of Health &
    Human Services*,
    798 F. Supp. 3d 77 (D. Mass. 2025) ................................................1, 8, 9, 14, 15

*Rodríguez-Garcia v. Miranda-Marin*,
    610 F.3d 756 (1st Cir. 2010)...........................................................................................9

*Securities & Exchange Commission v. Koracorp Industries, Inc.*,
    575 F.2d 692 (9th Cir. 1978) ..........................................................................................2

*Segev v. President and Fellows of Harvard College*,
    No. 1:25-cv-12020, Dkt. 35 (D. Mass. Dec. 4, 2025).................................................4

*StandWithUs Center for Legal Justice v. Massachusetts Institute of Technology*,
    158 F.4th 1 (1st Cir. 2026)....................................................................................3, 4, 7

*Staub v. Proctor Hospital*,
    562 U.S. 411 (2011).........................................................................................................15

*Suppan v. Dadonna*,
    203 F.3d 228 (3d Cir. 2000)................................................................................................15

*Texas Industries, Inc. v. Radcliff Materials, Inc.*,
    451 U.S. 630 (1981)...........................................................................................................12

*Trump v. Internal Revenue Service*,
    __ F. Supp. 3d __, 2026 WL 2015525 (S.D. Fla. July 13, 2026) ...........................................15

*United States v. Florida*,
    938 F.3d 1221 (11th Cir. 2019) ..........................................................................................11

*United States v. Marion County School District*,
    625 F.2d 607 (5th Cir. 1980) .............................................................................................11

*United States v. Seckinger*,
    397 U.S. 203 (1970)..........................................................................................................14

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977)..........................................................................................................15

## STATUTES, RULES, AND REGULATIONS

42 U.S.C. § 2000d-1 ..........................................................................................1, 3, 11, 12, 13

2 C.F.R.
    § 200.208.........................................................................................................................11
    § 200.339.........................................................................................................................11

28 C.F.R. § 50.3 .........................................................................................................1, 2, 3

*Rescinding Portions of HHS Title VI Regulations*, 91 Fed. Reg. 46746 (July 24, 2026) ................5

## OTHER AUTHORITIES

Restatement (Second) of Contracts
    § 241..............................................................................................................................12
    § 371..............................................................................................................................12

*Harmeet Dhillon Holds Harvard Accountable*, 77 WABC, at 03:29-05:02 (Mar. 24, 2026),
    https://perma.cc/9T5A-KLN3 ...........................................................................................14

The Government's Opposition exposes the fundamental flaws in its case. First, the Government concedes that its Amended Complaint includes *no* allegations of antisemitic conduct after March 2025. Rather than alleging an ongoing Title VI violation, the Government asks the Court to infer one solely based on allegations of past incidents from more than a year before the Amended Complaint. This fails as a matter of law. Second, the Government relies heavily on *Kestenbaum v. President and Fellows of Harvard College*, 743 F. Supp. 3d 297 (D. Mass. 2024), and *Louis D. Brandeis Center for Human Rights Under Law v. President and Fellows of Harvard College*, 2024 WL 4681802 (D. Mass. Nov. 5, 2024), but fails to acknowledge material changes in both the facts and the law since those decisions. Third, the Amended Complaint does not plausibly allege that Harvard has intentionally discriminated against Jewish and/or Israeli students, especially in light of *President and Fellows of Harvard College v. HHS*, 798 F. Supp. 3d 77 (D. Mass. 2025), and the Government's attempt to avoid the deliberate indifference standard is unsupported by the statutory scheme and legal precedent, and it is contradicted by its own pronouncements. Fourth, the breach of contract claim fails basic pleading requirements and ignores the Title VI remedial structure Congress enacted. Finally, the Government's barebones assertion that it would have brought the case absent retaliatory intent—which it does not deny—is belied by its own statements.

## I.    THE GOVERNMENT FAILS TO STATE A CLAIM UNDER TITLE VI

### A.    The Government Alleges No Ongoing Violation of Title VI

Title VI and its implementing regulations are focused on achieving current compliance. They authorize the Government to take steps to "effect[]" "[c]ompliance" only after determining that compliance "cannot be secured by voluntary means." 42 U.S.C. § 2000d-1; *see* 28 C.F.R. § 50.3(a) ("the objective should be to secure prompt and full compliance"); *id.* § 50.3(b)

1

(department and agencies should "select, from among the available sanctions, the methods best designed to secure compliance in individual cases"); *id.* § 50.3(c) (describing court action to "obtain[]" "[c]ompliance with … [T]itle VI"). Both the language and structure of the statute thus confirm that remedying current noncompliance is its only goal. Yet the Government admits that "a full calendar year and academic year have now passed since any alleged harassment." Opp. 31. That concession alone warrants dismissal.

The Government's invitation to infer current noncompliance based on allegations from nearly 18 months ago, Opp. 31, has no basis in law.[1] And the conclusory allegation of ongoing noncompliance, AC ¶ 13, is the type of impermissible "bare assertion[]," *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009), that is insufficient, particularly where *every* alleged incident predates the Amended Complaint by over a year. The Government drafted and amended its complaint but continues to make no allegations from which the Court can infer *present* noncompliance with Title VI.

The Government's failure to allege an ongoing violation also means it lacks standing for prospective relief, the only remedy it can seek under Title VI. The Government argues that past violations can make future violations more likely, Opp. 33, but it offers no basis for this Court to infer—after more than a year since the last alleged incident and in light of Harvard's significant efforts in this area in the intervening period, *see infra* pp.6-8[2]—that future violations are likely even if alleged past violations could state a claim. Without an "'ongoing injury or a sufficient

---

[1]    The Ninth Circuit decision from nearly 50 years ago cited by the Government, Opp. at 31, is inapposite because under the securities laws, "the fact that illegal conduct has ceased does not foreclose injunctive relief." *S.E.C. v. Koracorp Indus., Inc.*, 575 F.2d 692, 698 (9th Cir. 1978). The opposite is true under Title VI, where an ongoing violation is required.

[2]    A number of Harvard's efforts are described at length in the Task Force Report, *see* Mot. 3-6, which the Government now concedes can be considered at this stage, *see* Opp. 10-11.

threat that the injury will recur,'" the Government lacks standing to "'seek forward-looking declaratory or injunctive relief.'" *Nat'l Ass'n of Gov't Emps., Inc. v. Yellen*, 120 F.4th 904, 910 (1st Cir. 2024). The Government also claims that it has "standing to obtain a monetary remedy," Opp. 32, but points to no authority allowing it to recover money damages under Title VI. Unlike private plaintiffs who have an implied right of action for damages for past Title VI violations, *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 639 (1999), the Government may obtain relief only to "effect[]" "[c]ompliance" with Title VI. 42 U.S.C. § 2000d-1. Monetary damages and recoupment are not available forms of relief for the Government under Title VI. *Infra* pp.11-13; *see Northwest Airlines, Inc. v. Transp. Workers Union of Am.*, 451 U.S. 77, 95-97 (1981) (courts cannot "fashion new remedies that might upset carefully considered legislative programs").

The Government demonstrates a fundamental misunderstanding of Title VI in arguing that it must be able to sue for past noncompliance because otherwise funding recipients could avoid government Title VI suits by coming into compliance. Opp. 31-32 & n.6. The statute and related regulations make clear that Title VI is designed specifically to encourage "compliance … by voluntary means," 42 U.S.C. § 2000d-1, and to avoid the draconian remedy of grant termination where possible, *see* 28 C.F.R. § 50.3(a) ("[T]he objective should be to secure prompt and full compliance so that needed Federal assistance may commence or continue."). Indeed, this is exemplified by the requirement that the Government cannot sue under Title VI once a recipient "cease[s]" violating the statute and makes "effort[s] to prevent future discrimination," Opp. 31-32 & n.6, which is a feature of Congress's design, not a bug.

### B.    The Government Does Not Plausibly Allege a Hostile Environment

The Government fails to engage meaningfully with the First Circuit's decision in *StandWithUs Center for Legal Justice v. MIT*, which held that allegations of divisive protest

3

activity, even coupled with allegations of isolated instances of antisemitic conduct, do not plead a hostile environment.  158 F.4th 1, 11-22 (1st Cir. 2026).  The decision in *StandWithUs* addressed the question left open in *Kestenbaum*, 743 F. Supp. 3d at 309 & n.11, holding that the same types of third-party expression the Government alleges here are not actionable absent a plausible allegation that "in these specific circumstances" they "were driven by antisemitism." *StandWithUs*, 158 F.4th at 18.  *Compare id.* at 19, *with* Opp. 15, 20; *see also Segev v. President & Fellows of Harvard Coll.*, No. 1:25-cv-12020, Dkt. 35 (D. Mass. Dec. 4, 2025).[3]

The Government does not differentiate between hostility to students *because* they are Jewish and/or Israeli, which implicates Title VI, and criticism of Israel, which does not.  *See StandWithUs*, 158 F.4th at 13, 18-19; *AAUP v. Rubio*, 802 F. Supp. 3d 120, 143 n.18 (D. Mass. 2025).  The Government's reliance on self-reported data showing some Jewish students reported experiencing "some form of discrimination, stereotyping, or negative bias on campus *due to their views on current events*," Opp. 7, 16 (quoting AC ¶ 85) (emphasis added), describes experiences based on viewpoint, not ancestry.  *StandWithUs*, 158 F.4th at 20-21; *see also* Dkt. 50 (B. Eidelson & D. Hellman Amicus Br.) at 3-4.  The Government recognizes it cannot require universities to silence political speech based on its impact.  Opp. 19-20.[4]  But, as in *StandWithUs*, the Government has not alleged "facts that, if true, would otherwise permit the inference that in these specific circumstances [] protestors' strident criticisms of Israel were driven by antisemitism."  158 F.4th at 18.

---

[3]    The Government's heavy reliance on *Kestenbaum* and *Brandeis Center*, is misplaced for the additional reason that the Complaints in those cases alleged facts that were unfolding in real time, before Harvard had taken many of the comprehensive and significant steps to address antisemitism on campus or even issued its Task Force Report.

[4]    Harvard recognizes the importance of free expression and healthy debate on campus and has taken actions to further foster respectful discourse.  *See, e.g.*, Report at 195-197.

4

### C.    The Government Fails to Plead Intentional Discrimination

#### 1.    The Government's Negligence Theory Is Not Actionable

It is "beyond dispute" that, to state a Title VI claim, the Government must plead "intentional discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001); *see also* Dkt. 59 (Brandeis Center Amicus Br.) at 9 ("Title VI prohibits only intentional discrimination."). The Government recently recognized this requirement, *see Rescinding Portions of HHS Title VI Regulations*, 91 Fed. Reg. 46746, 46748 (July 24, 2026) (Title VI has "a single, best meaning" that "prohibits only intentional discrimination."), yet somehow rejects that position here, arguing it need only satisfy a negligence standard, *see* Opp. 21-24. But a statute is not a "chameleon" that changes its meaning in different contexts, *Clark v. Martinez*, 543 U.S. 371, 382 (2005), and Title VI requires intentional discrimination—nothing less.

The Government argues that Harvard can be liable for "negligent conduct," AC ¶ 202; Opp. 23-24, and that a funding recipient violates Title VI by "allow[ing] a hostile educational environment to exist," meaning the recipient "knew *or should have known* that it was 'fostering and incubat[ing] … a hostile campus environment.'" Opp. 23 (emphasis added). But the Supreme Court has spoken clearly on this point: funding recipients cannot be held liable under "a negligence standard" for "failure to react to … harassment of which it knew or *should have* known." *Davis*, 526 U.S. at 642; *see Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 283 (1998) (rejecting "agency principles" of *respondeat superior* and constructive notice). The cases the Government cites are not to the contrary. *See* Opp. 21 (citing *Kocsis v. Fla. State Univ. Bd. of Trs.*, 788 F. App'x 680, 684 n.2 (11th Cir. 2019) (declining to decide what standard applies); *Frederick v. Simpson Coll.*, 160 F. Supp. 2d 1033, 1036-1037 (S.D. Iowa 2001) (even if deliberate indifference

were not required, equitable relief was inappropriate where school engaged in "the type of voluntary compliance Title IX is intended to achieve")).

The Government offers no intelligible theory of how a funding recipient's allegedly negligent response to peer-on-peer harassment constitutes *intentional* discrimination. The deliberate indifference standard ensures that the intentional discrimination requirement is met by showing the funding recipient "itself intentionally acted in clear violation" of Title VI. *Davis*, 526 U.S. at 642. And it applies to private damages actions precisely because it is "rough[ly] parallel" to the framework the Government must follow when enforcing the statute. *See Gebser*, 524 U.S. at 290. Both deliberate indifference and the Government's enforcement power are "premise[d]" on "an official decision by the recipient not to remedy the [Title VI] violation." *Id.* Deliberate indifference is thus not just about meeting a pre-suit "notice requirement," *contra* Opp. 21-22; rather, it ensures Title VI applies only to intentional discrimination by the funding recipient itself, *see Gebser*, 524 U.S. at 289-291 ("Under a lower standard, there would be a risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions.").

### 2.    The Government Fails to Plead Deliberate Indifference

Harvard has taken extensive action to make its campus a safe and welcoming environment for Jewish and Israeli students. Many of those actions are evident from the face of the Amended Complaint: new guidelines on campus protests and dissent, the painstaking work of the Harvard Task Force, and the use of progressive sanctions for rule violations to avoid escalation and minimize further disruptions. *See* AC ¶¶ 60-64, 66, 116-117, 123. The Task Force Report—which the Government agrees the Court may consider, Opp. 10-11, 29—details (at 193-200) many other actions Harvard has taken, including educating the community on antisemitism, changing how the

6

school handles reports of antisemitic harassment, and engaging directly with Jewish and Israeli students over safety issues. Indeed, the existence of the Task Force is strong evidence of the University's attention to these important issues and renders implausible the notion that Harvard is deliberately indifferent.

The Government's conclusory allegation that "Harvard's deliberate indifference continues," without more, falls far short of the pleading requirements. Indeed, because the Government cannot allege current conduct, it instead chooses to focus on alleged deliberate indifference from prior to 2025. Opp. 27 ("Actions taken [by Harvard to address antisemitism] *since 2025* do not demonstrate a lack of deliberate indifference *prior to* that time." (emphasis added)). This attempt to rely on alleged past deliberate indifference fails: the Government cannot state a Title VI claim without showing ongoing noncompliance. *Supra* pp.1-3.

In any event, the Government's allegations, if proven, would not establish past deliberate indifference. The Amended Complaint demonstrates that Harvard began taking effective action during the 2023-24 school year, including by instituting new time, place, and manner guidelines; creating the Harvard Task Force; and bringing a peaceful end to the encampment. AC ¶¶ 60-64, 66, 116-117, 123. And even if Harvard's actions fell short at times, that is not the end of the story, as reflected in the Harvard Task Force Report. The point is not that later actions "absolve" Harvard of past alleged shortcomings, Opp. 25, but that they show "'additional reasonable measures,'" *Grace v. Bd. of Trs., Brooke E. Bos.*, 85 F.4th 1, 11 (1st Cir. 2023). A school's "response to known harassment" is not "so lax, so misdirected, or so poorly executed as to be clearly unreasonable," *StandWithUs*, 158 F.4th at 22 (quoting *M.L. ex rel. D.L. v. Concord Sch. Dist.*, 86 F.4th 501, 511 (1st Cir. 2023)), when the school takes meaningful action—for example, improving complaint-handling procedures and ensuring enforcement of its policies on campus demonstrations, *id.* at 22-

23; *see also* HHS Notice of Violation at 15 (describing protest against enforcement of policy).

The Government's superficial parallels to *Gartenberg v. Cooper Union*, 765 F. Supp. 3d 245 (S.D.N.Y. 2025), are also unavailing. *Gartenberg* held that a plaintiff plausibly alleged in April 2024 that a school's response to the violent occupation of a campus building in October 2023 was deliberately indifferent, concluding that it was not possible to determine, from the complaint or "the documents it incorporate[d]," that the school "did in fact" take "appropriate action" based on the school's actions "and their effects." *See id.* at 277 & n.10. There, the school relied only on "precatory language" in public statements that "cannot, without more, justify dismissal." *Id.* at 277. Here, by contrast, the Amended Complaint and the Task Force Report it incorporates leave no doubt that Harvard responded through sustained, evolving, and comprehensive actions both during and after the 2023-24 academic year. *See* AC ¶¶ 60-64, 66, 116-117, 123; Report at 193-200.

### 3.    *HHS* Forecloses the Deliberate-Indifference Claim

To try to escape the preclusive effects of *HHS*, the Government argues that (1) *HHS* addressed the Government's "compli[ance] with the statute's procedural requirements," not "Harvard's compliance with Title VI," and (2) the court's findings regarding Harvard's response to antisemitism were not essential to the judgment. Opp. 28-29. It is wrong on both fronts.

First, *HHS* is preclusive because the court's finding that "Harvard was, in fact, working to respond to and ameliorate antisemitism" directly forecloses the Government's factual allegations here. *HHS*, 798 F. Supp. 3d at 130. It was the Government that put at issue Harvard's alleged failure to adequately address antisemitism, which the court then analyzed. *See, e.g.*, *id*. at 94-100, 102, 121, 127-128, 130-133, 136-137. It does not matter that the *HHS* court did not use the words "deliberate indifference," *see* Opp. 29, because "collateral estoppel extends to 'necessary

intermediate findings,' not merely 'ultimate issues,'" *Rodríguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 771 (1st Cir. 2010). Nor does it matter that the preclusive aspects of the *HHS* opinion come in its discussion of Harvard's First Amendment and APA claims rather than in the section under the heading "Title VI." What matters is the substance, not the label.

Second, the *HHS* court's finding that Harvard had already taken substantial steps to address antisemitism, 798 F. Supp. 3d at 93, 98, 130-131, 137, was essential to its holding that the Government's actions were pretextual and unlawful, *id.* at 121-122, 130-133. The Government argued based on the same allegations it relies on here that its funding decisions were based on its "'determination that Harvard had not taken sufficient steps to address antisemitism,'" *id.* at 129, and the court rejected this as an unreasonable post-hoc explanation, *id.*

### 4. The Government Does Not Plausibly Allege Direct Discrimination

The Government does not even try to meet the standard for a direct discrimination claim or explain why the Court should accept the same comparators it rejected in *Kestenbaum*. *See* 743 F. Supp. 3d at 310-311. The Government had to plausibly allege that Harvard responded differently to incidents where "the nature of the infraction and knowledge of the evidence by college officials [was] sufficiently similar," *and* that this disparate treatment was "racially motivated." *Id.* (citations and quotation marks omitted). The Government fails to do so. Instead, the Government argues that a general "sentiment" that anti-Israeli or anti-Jewish expression was more tolerated than anti-Black or anti-LGBTQ expression and a "perception" that Harvard's diversity efforts put insufficient focus on Jewish and Israeli students can state a claim. Opp. 29. But allegations about "sentiment" and "perception" do not plausibly identify similarly situated individuals who were treated differently, let alone treated differently because of their race. *See Kestenbaum*, 743 F. Supp. 3d at 310.

9

### D.     The Government Failed to Satisfy Title VI's Procedural Requirements

The Amended Complaint fails to plausibly allege that Title VI's procedural requirements were satisfied.  The Government concedes, Opp. 11, 13, that there are no allegations about any agency other than HHS.  And as to HHS, there is only a conclusory assertion that it advised Harvard of its purported noncompliance and determined that voluntary compliance could not be secured.  AC ¶¶ 164-165.  The claim that it had no obligation to seek compliance is simply incorrect as a matter of law.  *See supra* pp.1-3.

The Government also argues that Title VI's prerequisites are Rule 9(c) "conditions precedent" that it can aver "generally" free of Rule 8's plausibility requirement.  Opp. 11-13.  But Title VI's prerequisites are substantive elements of the Government's claim, not conditions precedent.  Moreover, even if Rule 9(c) applied, it "does not give [a party] license to evade the less rigid—though still operative—strictures of Rule 8."  *Iqbal*, 556 U.S. at 686-687. *Iqbal* addressed this exact point under Rule 9(b), explaining that the word "generally" in context must be compared to "the particularity" requirement elsewhere in the subsection, "excus[ing] a party from pleading … under an elevated pleading standard," not lowering the floor.  *Id.*  The Amended Complaint's bare assertion that "compliance could not be secured by voluntary means," AC ¶ 164, is precisely the kind of conclusory allegation Rule 8 does not credit.[5]

## II.     THE GOVERNMENT'S BREACH OF CONTRACT CLAIM FAILS AS A MATTER OF LAW

Because the Government's contract claim rests on an alleged Title VI violation, AC ¶ 198, it fails for the same reasons as the Title VI claim.  *Supra* Part I.  It also independently fails.

---

[5]     Indeed, even Title VII's precondition cannot rest on the agency's "say-so"; a court must confirm that the agency "actually, and not just purportedly, tried" to comply.  *Mach Mining v. EEOC*, 575 U.S. 480, 490 (2015).

### A.    The Government Cannot Use Contract Law to Evade Title VI's Remedial Limits

The federal grant framework authorizes only prospective relief.  The Government does not dispute that the "Uniform Guidance" applicable to federal grants permits only prospective remedies except in narrow circumstances not alleged here.  *See* Mot. 31; 2 C.F.R. §§ 200.208, 200.339.  Similarly, the HHS Grants Policy Statement ("HHS GPS")—"incorporated by reference in the official Notice of Award as a standard term and condition"—authorizes prospective, program-specific responses to noncompliance: for example, withholding future payments or suspending an award going forward.  Mot. 32.  It does not authorize the Government to recast an alleged Title VI violation as a breach of contract justifying institution-wide rescission, restitution, or damages.  The Government does not dispute that the awards incorporate these terms, which authorize only prospective, program-specific remedial actions.

That conclusion is reinforced by the text of Title VI, which directs the Government to "effectuate" its provisions through "rules, regulations, or orders of general applicability… consistent with achievement of the objectives of the statute authorizing financial assistance."  42 U.S.C. § 2000d-1.  The Government may then "effect" "[c]ompliance" by terminating funding or "any other means authorized by law"—in each case subject to strict procedural and program-specific constraints.  *Id*.  Indeed, as the Government's own cited case notes, the termination of funding is the "'ultimate sanction'" Title VI authorizes, and Congress sharply confined that remedy to only the offending program or entity.  *United States v. Florida*, 938 F.3d 1221, 1230-1231 (11th Cir. 2019).[6]  The wholesale clawback of performed grants across every federal program

---

[6]    Likewise, in *Marion County*, the United States sought only "a court order compelling specific performance of the assurances."  *United States v. Marion Cnty. Sch. Dist.*, 625 F.2d 607, 609 (5th Cir. 1980).  And *Bell v. New Jersey* permitted recovery of misused Title I funds precisely because Congress had expressly authorized it by statute.  461 U.S. 773, 782-787 (1983).

that the Government seeks here would be an even greater penalty, yet no statute, regulation, or award authorizes it.

Unable to locate its remedy in the federal grant framework, the Government turns to contract principles to argue that Harvard is "on notice … [of] those remedies traditionally available in suits for breach of contract." Opp. 36 (quoting *Barnes v. Gorman*, 536 U.S. 181, 186-187 (2002)). *Barnes* rested on the premise that Title VI "mention[ed] no remedies" for private plaintiffs. 536 U.S. at 187. That is not true for the Government. *See* 42 U.S.C. § 2000d-1. But even if the Government could seek other remedies, rescission and restitution are available only to remedy contractual nonperformance, and the Amended Complaint alleges none. It does not allege that Harvard retained funds for work it did not perform, that any agency paid for research not conducted, or that any disbursement exceeded Harvard's entitlement under a specific award. *See* Restatement (Second) of Contracts §§ 241, 371 (requiring a material failure of performance and a measurable unjust benefit). The Government's damages theory fails for the same reason. Its allegation that it disbursed funds "during periods of noncompliance" that it "would not have otherwise disbursed," Opp. 33, seeks the return of grant money for completed research—restitution by another name. Because the Government received the performance for which it paid, it suffered no recoverable damages. No recipient could have notice of the "*unusual*, even 'rare'" clawback remedy the Government now demands. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 221-223 (2022).

The Government's response—that Title VI does not abrogate its common-law right to sue on its contracts, Opp. 36-37—attacks a strawman. That the Government has the *ability* to sue does not mean it can seek *remedies* that Title VI excludes. A federal common law claim cannot "alter or supplement the remedies enacted" by Congress. *Tex. Indus., Inc. v. Radcliff Materials, Inc.*,

12

451 U.S. 630, 645-647 (1981).  To use a breach-of-contract claim to obtain retrospective relief barred by Title VI's "comprehensive and detailed" scheme would not merely "'supplement' this scheme" but impermissibly "alter it."  *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85, 87 (1994); *see also City of Milwaukee v. Illinois*, 451 U.S. 304, 314, 317 (1981) ("federal common law is 'subject to the paramount authority of Congress'" and is displaced when Congress "has occupied the field through the establishment of a comprehensive regulatory program").

Finally, there is no basis to defer consideration of the Government's entitlement to relief.  Opp. 37-38.  Where the governing contracts, Spending Clause principles, and federal law bar the relief sought, the problem is not premature; it is fatal.  The Government has failed to state a claim "upon which *relief* can be granted."  Fed. R. Civ. P. 12(b)(6) (emphasis added).

## B.    The Government Fails to Plead a Breach of Contract

The Government does not dispute that it has failed to identify any specific contract that Harvard has allegedly breached.  Opp. 34-35; *cf.* Mot. 33-35.  Instead, the Government insists that it "need not" identify any agreement because "every single grant to Harvard" "undisputably" includes generalized assurances of Title VI compliance.  Opp. 34.  Absent identification of the terms allegedly breached in specific agreements, however, the Court cannot assess the Government's theory.  Whether the contract claim can proceed turns on the grants at issue, what statutes authorized them, what conditions governed them, what promises Harvard made, and how the alleged noncompliance related to Harvard's performance.  Those questions cannot be answered in the abstract.[7]  *See* 42 U.S.C. § 2000d-1 (requiring agency action to be "consistent with

---

7    Similarly, the Court cannot assess whether the assurances were an "'essential and inducing feature' of the contract[s]" without knowing what obligations the contracts imposed, what

13

achievement of the objectives of the statute authorizing the financial assistance").

The Government effectively concedes that it cannot allege these assurances were material terms of the agreements as a matter of law because the HHS GPS (as incorporated) did not designate civil-rights assurances as "material" until October 2025, and it expressly stated that this revision "reflects a change in the government's position" regarding "materiality." Mot. 35. Where a contract's own terms contradict one another, ambiguity is construed against the drafter—here, the Government. *United States v. Seckinger*, 397 U.S. 203, 210 (1970).

## III.    THIS ACTION IS RETALIATORY AND SHOULD BE DISMISSED ON THAT BASIS

The Government recognizes that First Amendment retaliation can warrant dismissal, but it provides no persuasive response to Harvard's showing that this suit is retaliatory. Opp. 38-40.

First, the Government reinterprets the assertion—made only days after the Government filed this lawsuit—that the Government brought this lawsuit because "Harvard sued us" and "is defiant," Mot. 11 & n.15, 39, as merely "an accurate description of the chronology of this case and *HHS*," Opp. 38-39. But the retaliatory intent is plain—government officials have targeted Harvard, explaining that "Harvard took a different tack" than other entities by suing the Government, "[s]o… I've now sued Harvard twice."[8] The litany of statements from senior government officials confirms the retaliatory nature of Government's suit. Mot. 10-11 & nn. 12-15 (collecting examples). These "public statements in the wake of filing the case … reveal [the] true motivation." *ActBlue, LLC v. Paxton*, 2026 WL 1694290, at *4 (D. Mass. June 11, 2026); *see*

---

consideration the Government received, and how the alleged noncompliance related to the bargain reflected in the agreements. *Edlow v. RBW, LLC*, 2010 WL 2034772, at *3 (D. Mass. May 21, 2010) (materiality may be determined as a matter of law where pleadings do not support it).

[8]    *Harmeet Dhillon Holds Harvard Accountable*, 77 WABC, at 03:29-05:02 (Mar. 24, 2026), https://perma.cc/9T5A-KLN3.

*also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) ("contemporary statements" are evidence of purpose); *HHS*, 798 F. Supp. 3d at 121-122 (public statements corroborate retaliation).[9]

Second, the events leading to this suit confirm the Government's retaliatory purpose. *See Arlington Heights*, 429 U.S. at 267 ("specific sequence of events leading" to a decision is evidence of purpose). In *HHS*, the Court determined that the Government's actions in response to Harvard's April 14 rejection letter were a clear instance of First Amendment retaliation, 798 F. Supp. 3d at 118-123, and further explained that there was "no evidence in the record that Defendants ever considered [Harvard's] reforms or Harvard's attention to the problem of antisemitism," *id*. at 131. Nothing has changed. The only allegations here that post-date the allegations in *HHS* are (1) the Notice of Violation and (2) the Government's purported attempts to bring Harvard into compliance. AC ¶¶ 9-10, 178-180. That the Government took perfunctory steps to purport to comply with Title VI's procedural requirements after Judge Burroughs found it had violated them, *HHS*, 798 F. Supp. 3d at 125-128, "cannot expunge the taint" of the earlier retaliation nor "break the causal connection" between the protected conduct and the challenged action, *Suppan v. Dadonna*, 203 F.3d 228, 237-238 (3d Cir. 2000); *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 419-420 (2011) (later exercise of judgment does not insulate prior discriminatory animus).

## CONCLUSION

The Court should dismiss the Government's Amended Complaint with prejudice.

---

[9]    The Government does not contest that the Court can consider these statements in deciding Harvard's motion to dismiss. Mot. 4 n.3; *see* Opp. 10-11, 38-39; *see also Trump v. IRS*, __ F. Supp. 3d __, 2026 WL 2015525, at *1 n.3 (S.D. Fla. July 13, 2026).

DATED:  August 3, 2026                              Respectfully Submitted,


                                                    */s/ Felicia H. Ellsworth*

Robert K. Hur (*pro hac vice*)                      Felicia H. Ellsworth, BBO # 665232
KING & SPALDING LLP                                 WILMER CUTLER PICKERING
1700 Pennsylvania Ave. NW, Suite 900                  HALE AND DORR LLP
Washington, DC 20006                                60 State Street
T: (202) 383-8969                                   Boston, MA 02109
F: (202) 626-3737                                   T: (617) 526-6000
rhur@kslaw.com                                      F: (617) 526-5000
                                                    Felicia.Ellsworth@wilmerhale.com


Joshua S. Levy, BBO # 563017                        Steven P. Lehotsky, BBO # 655908
ROPES & GRAY LLP                                    LEHOTSKY COHN LLP
The Prudential Tower                                200 Massachusetts Ave. NW, Suite 700
800 Boylston Street                                 Washington, DC 20001
Boston, MA 02199                                    T: (512) 693-8350
T: (617) 951-7000                                   F: (512) 727-4755
F: (617) 951-7050                                   steve@lehotskycohn.com
joshua.levy@ropesgray.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 3, 2026, I caused this document to be filed through the CM/ECF system, where it will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Felicia H. Ellsworth*

Felicia H. Ellsworth